# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 03 CR 0978 |
| | ) |
| MOUSA MOHAMMED ABU MARZOOK, | ) |
| MUHAMMAD HAMID KHALIL | ) |
| SALAH, and ABDELHALEEM | ) |
| HASAN ABDELRAZIQ ASHQAR, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On August 19, 2004, a Grand Jury returned a multiple-count, second superseding indictment (the "Indictment") against Defendant Muhammad Hamid Khalil Salah ("Defendant" or "Salah") and his co-defendants. Currently before the Court is Salah's motion to dismiss Count II of the Indictment. For the reasons stated below, the Court denies the motion.

### BACKGROUND

**I. Facts**

The Indictment alleges the following facts. Some time around November 1997, Salah recruited Individual A to join Hamas and make trips to the Middle East in order to conduct Hamas activities. (R. 59-1, Second Superseding Indictment at ¶ OO.) In October 1999, at Salah's direction, Individual A traveled to Israel and the West Bank and, at Salah's direction, Individual A: (1) delivered money to the family of an imprisoned co-conspirator; (2) attempted

-1-

to meet with a co-conspirator in prison; and (3) scouted specific locations in and around Jerusalem for suitability as targets for Hamas terrorist attacks. (*Id.* at ¶¶ PP, QQ, RR, SS, TT.) In addition, after arriving in Israel, at Salah's direction, Individual A met with various Hamas leaders and attempted to enter the Gaza Strip to visit with Hamas leader Sheik Ahmed Yassin. (*Id.* at ¶¶ UU, VV.) During Individual A's trip, Salah and Individual A periodically discussed Individual A's activities. (*Id.* at ¶ WW.) Salah also discussed Individual A's activities with certain Hamas members in the West Bank. (*Id.* at ¶ XX.) Upon Individual A's return to the United States, Salah "debriefed" Individual A and told Individual A that he was "pleased with the success" of Individual A's trip. (*Id.* at ¶ YY.) Salah further informed Individual A that Individual A would be asked to take additional trips in furtherance of Hamas activities. (*Id.* at ¶ ZZ.) These alleged facts form the basis for Count II of the indictment, which charges that Salah violated 18 U.S.C. § 2339B(a)(1), a criminal statute that Congress enacted as part of the Anti-Terrorism and Effective Death Penalty Act, Pub.L. No. 104-132 § 1, *et seq.*, 110 Stat. 1214 (1996), 28 U.S.C. § 2241 *et seq.* (the "AEDPA"). (*Id.* at 34, ¶ 2.)

## II.    The AEDPA

Two sections of the AEDPA – 8 U.S.C. § 1189 ("Section 1189") and 18 U.S.C. § 2339B ("Section 2339B") – are at issue in Defendant's motion. Section 1189 empowers the Secretary of State to designate an entity as a "foreign terrorist organization" ("FTO"). The Secretary may so designate an organization if the Secretary finds: (1) that the organization is a foreign organization; (2) that the organization engages in terrorist activity; and (3) that the terrorist activity or terrorism of the organization threatens the security of United States nationals or the

national security of the United States.[1] 8 U.S.C. § 1189(a)(1)(A)-(C). The Secretary must base his or her findings on an "administrative record" that the Secretary independently complies. 8 U.S.C. § 1189(a)(3)(A)-(B). But the Secretary also may consider "classified information" that is not subject to public disclosure or even review by the designated organization. *Id.*; *PMOI*, 327 F.3d at 1239-41; *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 209 (D.C. Cir. 2001) ("*NCRI*"). The Secretary is not required to notify an organization that it is being considered for designation as a foreign terrorist organization. *See Humanitarian Law Project v. United States Dept. of Justice*, 352 F.3d 382, 386 (9th Cir. 2003) ("*HLP*").

Seven days before the Secretary intends to designate an organization as an FTO the Secretary must submit to certain Congressional leaders a "classified communication" detailing the Secretary's findings. 8 U.S.C. § 1189(a)(1)(A)(i). Then, the Secretary must publish the designation in the Federal Register. 8 U.S.C. § 1189(a)(1)(A)(ii). Again, the Secretary is not required to provide direct notice of the publication to the designated organization. *See HLP*, 352 F.3d at 386. The FTO designation lasts for two years, and the Secretary of State may re-designate the organization as an FTO for additional two-year periods. 8 U.S.C. § 1189(a)(4)(B).

An organization designated as an FTO must seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit no later than 30 days after

---

[1]    As to the third finding, the D.C. Circuit (which, as indicated below, has exclusive jurisdiction over the review of FTO designations) has concluded that "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States" presents a nonjusticiable question. *People's Mojahedin Org. of Iran v. Department of State*, 327 F.3d 1238, 1240-41 (D.C. Cir. 2003) ("*PMOI*") (internal citation and quotation omitted). "Such questions concerning the foreign policy decisions of the Executive Branch present political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibilities and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.*

the Secretary of State publishes the designation in the Federal Register. 8 U.S.C. § 1189(c)(1).

In weighing the merits, the D.C. Circuit reviews only the administrative record compiled by the

Secretary plus any classified information the government chooses to submit *ex parte* for *in

camera* review. 8 U.S.C. § 1189(c)(2); *Sattar*, 272 F. Supp. 2d at 363. The D.C. Circuit will set

aside an FTO designation only if that court finds it to be (1) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right,

power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitation, or

short of statutory right; (4) lacking substantial support in the administrative record taken as a

whole or in classified information submitted to the court; or (5) not in accord with the procedures

required by law. 8 U.S.C. § 1189(c)(3)(A)-(E).[2]

An FTO designation yields "severe" consequences that take effect as soon as the Secretary

publishes the designation in the Federal Register. *See HLP*, 352 F.3d at 387; *NCRI*, 251 F.3d at

196. For instance, the designation freezes any funds which the organization has on deposit with

any financial institution in the United States, 18 U.S.C. § 2339B(a)(2), and representatives and

certain members of the organization are barred from entering the United States. 8 U.S.C. §

1182(a)(3)(B)(i)(IV & V).

Most importantly for purposes of Defendant's motion, Section 2339B imposes criminal

liability (up to life in prison, or possibly even the death penalty) upon "[w]hoever knowingly

provides material support or resources to a foreign terrorist organization . . ." 18 U.S.C. §

---

[2]     Certain organizations have used this procedure to challenge the FTO designation.
*See, e.g., PMOI*, 327 F.3d at 1239; *NCRI*, 251 F.3d at 195-96.

2339B(a)(1) (2000).[3] "Material support or resources" means:

> any currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C.A. § 2339A (2000).[4] Here, Defendant is charged under Section 2239B with providing

---

[3]     In December 2004, Congress amended Section 2339B to include the following language:

> To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C.A. § 2339B (2004).

[4]     As amended in December 2004, the phrase "material support or resources" now means:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C.A. § 2339B (2004). In addition, Congress further limited the extent to which Section 2339B criminalized the "provision of personnel" :

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C.A. § 2339B(h) (2004).

material support in the form of "currency and personnel" to Hamas, a designated FTO. (R. 59-1, Second Superseding Indictment at 34, at ¶ 2.) As "a defendant in a criminal action," Salah is "not [ ] permitted to raise any question concerning the validity of the issuance of [an FTO] designation or redesignation as a defense or an objection at any trial or hearing." 8 U.S.C. § 1189(a)(8).

**ANALYSIS**

Defendant's motion raises a number of constitutional challenges. Specifically, Defendant contends that: (1) Section 2339B is vague and overbroad in violation of the First Amendment; (2) Section 2339B violates the Due Process Clause of the Fifth Amendment by allowing for conviction in the absence of personal guilt; (3) Section 2339B as written does not comply with Due Process or, alternatively, the Court must construe Section 2339B as requiring a "specific intent" as to all elements of the offense; and (4) Section 2339B violates Defendant's constitutional rights to Due Process by precluding a collateral challenge to the Secretary of State's FTO designation. For the reasons discussed below, Defendant's arguments do not warrant dismissal.

## I.    The First Amendment

### A.    Overbreadth

Defendant asserts that Section 2339B is overbroad in violation the First Amendment because it sweeps within its scope a "broad array of protected First Amendment rights of association." In particular, Defendant asserts that Section 2339B impermissibly criminalizes the act of contributing money to an organization "even in the absence of knowledge by the donor that the recipient organization has been designated as an FTO or has engaged in the past in terrorist

conduct." (R. 201-1, Def.'s Mot. to Dismiss at 4.) Defendant reasons further that the unconstitutional infirmity is even greater here because Hamas is a "multi-dimensional" organization that, in addition to its unlawful aims, provides humanitarian and social services to Palestinians in the Gaza Strip and West Bank. Defendant's argument does not persuade the Court.

The overbreadth doctrine operates to invalidate statutes that "sweep[] within [their] prohibitions" that which may not be punished under the First Amendment. *Berg v. Health and Hosp. Corp. of Marion County, Ind.*, 865 F.2d 797, 804-05 (7th Cir. 1989) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S. Ct. 2294, 2302, 33 L. Ed. 2d 222, 230 (1972)). "The doctrine is predicated on the sensitive nature of protected expression: persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." *New York v. Ferber*, 458 U.S. 747, 768, 102 S. Ct. 3348, 3361, 73 L. Ed. 2d 1113, 1130 (1982) (internal citation and quotation omitted). "It is for this reason that [the Supreme Court has] allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *Id.* at 458 U.S. at 769, 102 S. Ct. at 3361, 73 L. Ed. 2d at 1130 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 491-92, 85 S. Ct. 1116, 1123-24, 14 L. Ed. 2d 22, 28 (1965) among other authorities); *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 2916, 37 L. Ed. 2d 830, 840 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or

-7-

expression.").

The overbreadth doctrine, however, "attenuates as the otherwise unprotected behavior that [a statute] forbids . . . moves from 'pure speech' toward conduct." *Virginia v. Hicks*, 539 U.S. 113, 124, 123 S. Ct. 2191, 2199, 156 L. Ed. 2d 148, 160 (2003) (quoting *Broadrick*, 413 U.S. at 615, 93 S. Ct. at 2917, 37 L. Ed. 2d at 841). Thus, under the First Amendment a "less rigorous standard of review is applied to monetary contributions than to pure speech." *United States v. Afshari*, 412 F.3d 1071, 1079 (9th Cir. 2005). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124, 123 S. Ct. at 2199, 156 L. Ed 2d at 160 (parentheses in original).

Indeed, "like most exceptions to established principles," the scope of the First Amendment overbreadth doctrine "must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted." *Ferber*, 458 U.S. at 769, 102 S. Ct. at 3361, 73 L. Ed. 2d at 1130. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, [the Supreme Court has] recognized that the overbreadth doctrine is 'strong medicine' and [has] employed it with hesitation, and then 'only as a last resort.'" *Id.* (citing *Broadrick*, 413 U.S. at 613, 93 S. Ct. at 2916, 37 L. Ed. 2d at 840-41).[5]

---

[5] "When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *Ferber*, 458 U.S. at 769 n.24, 102 S. Ct. at 3361 n.24, 73 L. Ed. 2d at 1130 n.24. "Furthermore, if the federal statute is not subject to a narrowing construction and is impermissibly overbroad, it nevertheless should not be stricken down on its face; if it is severable, only the unconstitutional portion is to be invalidated." *Id.*; *see also Broadrick*, 413 U.S. at 612, 93 S. Ct. at 2916, 37 L. Ed. 2d at 840 ("The consequence of [the] departure from

Accordingly, "the overbreadth involved [must] be 'substantial' before the statute involved will be invalidated on its face." *Id.*; *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S. Ct. 1186, 1191, 71 L. Ed. 2d 362, 369 (1982) ("In a facial challenge to the overbreadth . . . of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail."). Whether a statute's overbreadth is "substantial" is judged against the statute's legitimate sweep. *Berg*, 865 F.2d at 804-05 (internal citation omitted). "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Flipside*, 455 U.S. at 494-95 n.6, 102 S. Ct. at 1191 n.6, 71 L. Ed. 2d at 369 n.6. Put another way, a statute "is not violative of the overbreadth doctrine unless the law, '*taken as a whole*, is substantially overbroad judged in relation to its plainly legitimate sweep.'" *Sattar*, 272 F. Supp. 2d at 362 (considering an overbreadth challenge to Section 2339B) (quoting *Hicks*, 539 U.S. at 122, 123 S. Ct. at 2198, 156 L. Ed. 2d at 159) (emphasis original). Furthermore, even assuming that substantial overbreadth exists, "a significant interference with protected rights of political association [nonetheless] may be sustained if the State demonstrates [1] a sufficiently important interest and [2] employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief And Dev.*, 291 F.3d 1000, 1026-27 (7th Cir. 2002) (internal quotation and punctuation omitted).

---

traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.").

Under these principles, Section 2339B is not unconstitutionally overbroad. Regarding Section 2339B's limit on contributing money, "it may be true that the material support prohibition of § 2339B encompasses some forms of expression that are entitled to First Amendment protection." *United States v. Hammoud*, 381 F.3d 316, 330 (4th Cir. 2004). But, even so, the Seventh Circuit has held that "[c]onduct giving rise to liability under section 2339B, of course, does not implicate [the First Amendment's more highly protected] associational or speech rights." *Boim*, 291 F.3d at1026; *Hammoud*, 381 F.3d at 329 (Section 2339B does not target advocacy and is unrelated to the suppression of free expression); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136-37 (9th Cir. 2000) (the "AEDPA does not regulate speech or association *per se*. Rather, the restriction is on the act of giving material support to designated foreign organizations.") ("*Reno*"). That is to say, "[u]nder section 2339B . . . [defendants] may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas," but "[t]here is no constitutional right to provide weapons and explosives to terrorists, nor is there any right to provide the resources with which the terrorists can purchase weapons and explosives." *Boim*, 291 F.3d at 1026. The overbreadth doctrine thus attenuates here because while money contributions may fall under Section 2339B's purview, pure speech and association do not. *See Afshari*, 412 F.3d at 1079 (applying a "less rigorous standard" of overbreadth review to Section 2339B and further noting that "[e]ven giving money to perfectly legitimate political expression within the United States can be, and is, restricted by Congress, and such restrictions are consistent with the Constitution").

In any event, Defendant fails to demonstrate that Section 2339B's overbreadth is *substantial* in relation to its legitimate reach. Section 2339B prohibits the provision of material

support or resources to an FTO "in many forms, including currency, safehouses, false documentation or identification, weapons, lethal substances, explosives and other physical assets." *Sattar,* 272 F. Supp. 2d at 362 (citing these factors when determining whether Section 2339B is overbroad). Thus, when compared to the law's plainly legitimate applications, Defendant has failed to establish that substantial overbreadth exists. *See id.* (finding that "the possible application of the potentially broad definition of the provision of 'personnel' and 'communications equipment'" "[has] not been shown to be a substantial part of the plainly legitimate scope of the statute").

Moreover, even assuming that substantial overbreadth exists, Section 2339B pertains to a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms. *Boim,* 291 F.3d at 1026-27. As to the first requirement, "the government's interest in preventing terrorism is not only important but paramount . . ." *Id.* at 1027; *Hammoud,* 381 F.3d at 328-29 ("there can be no question that the government has a substantial interest in curbing the spread of international terrorism."). Thus, the only remaining issue is whether Section 2339B is closely drawn, or avoids unnecessary abridgement of associational freedoms, in addressing that paramount interest. *Boim,* 291 F.3d at 1027.

The Seventh Circuit already has concluded that Section 2339B is so drawn. In *Boim,* the Seventh Circuit reasoned that, by prohibiting the provision of "material support or resources" to an FTO, "Congress determined that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Id.* (quoting Pub. L. 104-132, § 301). "Terrorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress thus was compelled to attach

-11-

liability to all donations to foreign terrorist organizations." *Id.*; *see also Reno*, 205 F.3d at 1134

("[m]aterial support given to a terrorist organization can be used to promote the organization's

unlawful activities, regardless of donor intent. Once the support is given, the donor has no

control over how it is used."). "Given the stringent requirements that must be met before a group

is designated a foreign terrorist organization, Congress carefully limited its prohibition on

funding as narrowly as possible in order to achieve the government's interest in preventing

terrorism." *Boim*, 291 F.3d at 1026. Thus, even if it reached a substantial amount of

constitutionally protected conduct, Section 2339B nonetheless is sufficiently tailored to achieve

an important government interest and does not run afoul of the First Amendment in this regard.

*Id.*

## B. Vagueness

Defendant also argues that Section 2339B is unconstitutionally vague because, by

criminalizing the provision of "personnel" to an FTO, it fails to provide sufficient notice to as to

what conduct falls within the statute's scope. The Court disagrees.

"The void for vagueness doctrine rests on the basic principle of due process that a law is

unconstitutional 'if its prohibitions are not clearly defined.'" *Karlin v. Foust*, 188 F.3d 446, 458

(7th Cir. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L.

Ed. 2d 222 (1972)).[6] By failing to clearly define prohibited conduct:

---

[6]     Although often the concepts of vagueness and overbreadth overlap, the two are
analytically distinct. As described above, the overbreadth doctrine controls when a party
contends that a statute intrudes into territory where it does not belong. The vagueness doctrine,
on the other hand, governs when a party contends he or she cannot determine whether the
regulation intrudes upon otherwise innocent terrain. *Flipside*, 455 U.S. at 497 n.9, 102 S. Ct. at
1192 n.9, 71 L. Ed. 2d at 370 n.9.

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*Grayned*, 408 U.S. at 108-09, 92 S. Ct. at 2298-99, 33 L. Ed. 2d at 227-28 (internal quotation and punctuation omitted). "Although the [vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Supreme Court has] recognized recently that the more important aspect . . . 'is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 357-58, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903, 909 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974)). In addition, "'the degree of vagueness that the Constitution tolerates–as well as the relative importance of fair notice and fair enforcement–depends in part on the nature of the enactment.'" *Karlin*, 188 F.3d at 458 (quoting *Flipside*, 455 U.S. at 497, 102 S. Ct. at 1193, 71 L. Ed. 2d at 371). "The Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties because the consequences of imprecision are more severe." *Id.* (internal quotation omitted).[7]

---

[7] Another "important aspect in evaluating [vagueness] is whether a challenged statute contains a scienter requirement." *United States v. Cherry*, 938 F.2d 748, 754 (7th Cir. 1991). "When the government must prove intent and knowledge, 'these requirements do much to destroy any force in the argument that application of the statute would be so unfair that it must be held invalid.'" *Id.* As discussed in Section III below, Section 2339B contains a scienter requirement.

A party may raise a vagueness challenge by arguing either that a statute is vague as applied to the facts at hand, or that a statute is void on its face. As to the first type of challenge, "[i]f the actor is given sufficient notice that his conduct is within the proscription of the statute, his conviction is not vulnerable on vagueness grounds, even if as applied to other conduct, the law would be unconstitutionally vague." *Kolender*, 461 U.S. at 370, 103 S. Ct. at 1864-65, 75 L. Ed. 2d at 917 (White, J., dissenting). Thus, where a party "receive[s] fair warning of the criminality of his own conduct from the statute in question" he may not attack the statute on grounds that "the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit." *Parker v. Levy*, 417 U.S. 733, 756, 94 S. Ct. 2547, 2561-62, 41 L. Ed. 2d 439, 457-58 (1974). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Id.*

As to facial vagueness challenges, a court, generally speaking, "must uphold a facial challenge 'only if the enactment is impermissibly vague in all of its applications.'" *Fuller v. Decatur Public School Bd. of Educ. School Dist. 61*, 251 F.3d 662, 667 (7th Cir. 2001) (quoting *Flipside*, 455 U.S. at 494-95, 102 S. Ct. at 1191, 71 L. Ed. 2d at 369). Yet "[w]hen a law threatens to inhibit the exercise of constitutionally protected rights [such as those protected under the First Amendment] . . . the Constitution demands that courts apply a more stringent vagueness test." *Karlin*, 188 F.3d at 458 ("The most important factor affecting the degree of clarity necessary to satisfy the Constitution is whether constitutional rights are at stake."). Accordingly, "[i]n vagueness challenges alleging infringement of constitutionally protected rights, courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its applications." *Id.* at 458 n.7 (internal citation omitted); *see also Kolender*, 461 U.S.

at 358 n.8, 103 S. Ct. at 1859 n.8, 75 L. Ed. 2d at 910 n.8 (rejecting the notion that "whether or not a statute purports to regulate constitutionally protected conduct, it should not be held unconstitutionally vague unless it is vague in all of its possible applications"). At the same time, however, "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." *Levy*, 417 U.S. at 760, 94 S. Ct. at 2564, 41 L. Ed. 2d at 460 (citing *CSC v. Letter Carriers*, 413 U.S. 548, 580-581, 93 S. Ct. 2880, 2898, 37 L. Ed. 2d 796, 817 (1973)) (internal quotation and punctuation omitted). Rather, to avoid the generally applicable burden of demonstrating vagueness in all applications, a statute must reach a "'substantial amount of constitutionally protected conduct.'" *Fuller*, 251 F.3d at 667 (quoting *Flipside*, 455 U.S. at 497, 102 S. Ct. at 1191, 71 L. Ed. 2d at 369); *see also United States v. Rodgers*, 755 F.2d 533, 544 (7th Cir. 1985) ("As with overbreadth, a party seeking to overturn a statute for vagueness on its face must in essence establish that it is unconstitutionally vague in at least a substantial number of the cases to which it could apply.").

As to Section 2339B specifically, Defendant correctly notes that some courts have found the term "personnel" unconstitutionally vague. For instance, in *Reno*, the Ninth Circuit concluded that the term "personnel" does not provide sufficient warning as to what conduct falls under Section 2339B:

> It is easy to see how someone could be unsure about what AEDPA prohibits with the use of the term 'personnel,' as it blurs the line between protected expression and unprotected conduct. Someone who advocates the cause of the [FTO] could be seen as supplying them with personnel . . . But advocacy is pure speech protected by the First Amendment.

205 F.3d at 1137; *Sattar*, 272 F. Supp. 2d at 359 ("It is not clear from [Section] 2339B what

-15-

behavior constitutes an impermissible provision of personnel to an FTO."). Other courts, however, have reached the opposite conclusion. In construing the same term, the Eastern District of Virginia rejected the Ninth's Circuit's reading, finding instead that the plain meaning of "personnel" clearly delineated the scope of unlawful conduct:

> [T]he plain meaning of 'personnel' is such that it requires, in the context of Section 2339B, an employment or employment-like relationship between the persons in question and the terrorist organization . . . . The term is aimed at denying the provision of human resources to proscribed terrorist organizations, and not at the mere independent advocacy of an organization's interests or agenda. Thus, the term "personnel" in Section 2339B gives fair notice to the public of what is prohibited and the provision is therefore not unconstitutionally vague.

> \* \* \*

> Thus, to provide personnel is to provide people who become affiliated with the organization and work under its direction: the individual or individuals provided could be the provider himself, or others, or both.

*United States v. Lindh*, 212 F. Supp. 2d 541, 574-77 (E.D. Va. 2002); *see also United States v. Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002) (agreeing with *Lindh* and rejecting defendant's challenge that the term "personnel" as used in Section 2339B is unconstitutionally vague).

On these facts, the Court concludes that Section 2339B is not unconstitutionally vague. First, Defendant does not argue that Section 2339B is vague as applied to the conduct charged against him. Nor could he. The grand jury specifically charged that Defendant recruited Individual A to join Hamas and make trips to the Middle East in order to conduct Hamas activities. (R. 59-1, Second Superseding Indictment at ¶ OO.) Furthermore, at Salah's direction, Individual A traveled to Israel and the West Bank and, at Salah's direction, Individual A: (1) delivered money to the family of an imprisoned co-conspirator; (2) attempted to meet with a co-

conspirator in prison; and (3) scouted specific locations in and around Jerusalem for suitability as targets for Hamas terrorist attacks. (*Id.* at ¶¶ PP, QQ, RR, SS, TT.) The facts charged against Defendant quite plainly constitute conduct one would expect to be criminalized under a statute that proscribes the provision of "personnel" to an FTO. Section 2339B is not vague as applied to Defendant.

The Court further concludes that Section 2339B is not facially vague either. By offering no argument on point, Defendant has failed to demonstrated that Section 2339B is "unconstitutionally vague in at least a substantial number of the cases to which it could apply." *Rodgers*, 755 F.2d at 544. Regardless, there likely are many instances, like those described in the grand jury charge here, that involve "easily identifiable and constitutionally proscribable conduct." *Levy*, 417 U.S. at 760, 94 S. Ct. at 2564, 41 L. Ed. 2d at 460; *see also, e.g., Goba*, 220 F. Supp. 2d at 190, 197-223 (describing conduct that can be easily identified as providing "personnel" to an FTO, namely that defendants " training by al-Qaida members and other persons affiliated with the al-Qaida terrorist network"); *Lindh*, 212 F. Supp. 2d at 574-77 (same).[8] Thus, facial invalidation is inappropriate.[9]

---

[8] It appears that both *Reno* and *Sattar*, in effect, determined that the term "personnel" was improperly vague "as applied" to the facts of the case. *See Reno*, 205 F.3d at 1137; *Sattar*, 272 F. Supp. 2d at 357.

[9] The Court's determination is further supported by the fact that the Department of Justice's internal policies limit the risk of arbitrary enforcement (the more important concern in weighing vagueness challenges) under Section 2339B:

It is the policy of the Department that a person may be prosecuted under § 2339B for providing "personnel" to a designated foreign terrorist organization if and only if that person has knowingly provided the organization with one or more individuals to work under the foreign entity's direction or control. Individuals who act independently of the designated foreign terrorist organization to advance its goals and objectives are not

## II.    The Absence of "Personal Guilt"

Salah next argues that Section 2339B also violates Due Process by allowing for a conviction in the absence of personal guilt by criminalizing the mere association with Hamas, a purportedly "bifarious" organization that pursues both legal and illegal purposes and conduct. Defendant further maintains that Section 2339B violates the First Amendment because it does not require a showing of a specific intent to further the illegal goals of FTOs such as Hamas.

Defendant premises his argument on the well-established principle that the First Amendment prohibits criminal liability based on an individual's mere association with a group. *See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-19, 102 S. Ct. 3409, 3429, 73 L. Ed. 2d 1215, 1240 (1982); *Scales v. United States*, 367 U.S. 203, 224-25, 81 S. Ct. 1469, 1484, 6 L. Ed. 2d 782, 799 (1961) (finding unconstitutional a statute making it unlawful to be a knowing member in any organization that advocated the violent overthrow of the United States because "[i]n our jurisprudence guilt is personal" and "[m]embership without more, in an organization engaged in illegal advocacy" is insufficient to satisfy personal guilt"). Under this principle, an individual cannot be punished for mere membership in an organization, even if that organization has legal and illegal goals. *See Scales*, 367 U.S. at 229, 81 S. Ct. at 1486, 6 L. Ed. 2d at 802 (a

---

working under its direction or control and may not be prosecuted for providing "personnel" to a designated foreign terrorist organization. Only individuals who have subordinated themselves to the foreign terrorist organization, *i.e.*, those acting as full-time or part-time employees or otherwise taking orders from the entity, are under its direction or control.

*United States Attorney Manual* § 9-91.100 (available at http://www.usdoj.gov/usao/eousa/ foia_reading_room/usam/title9/91mcrm.htm). In addition, apart from the Court's reasoning here, the recent amendment to Section 2339B likewise speaks to Defendant's vagueness challenge by further defining the scope of proscribed conduct under the term "personnel." *See* 18 U.S.C.A. § 2339B(h) (2004).

"blanket prohibition of association with a group having both legal and illegal aims . . . [would pose] a real danger that legitimate political expression or association would be impaired"). Thus, any statute prohibiting *mere association* with such an organization must require a showing that the defendant specifically intended to further the organization's unlawful goals. *See, e.g., Hammoud,* 381 F.3d at 328-29 ("it is a violation of the First Amendment to punish an individual *for mere membership* in an organization that has legal and illegal goals" (emphasis added)).

In line with unanimous precedent on point, the Court finds Defendant's argument unpersuasive. A "close reading of *Scales* reveals that at heart, is was concerned with criminalizing associational membership in violation of the First Amendment." *Humanitarian Law Project v. Gonzales,* __ F. Supp. 2d __, 2005 WL 1862110, *8 (C.D. Cal. July 25, 2005). Accordingly, *Scales* applies only "to situations where the government seeks to impose liability on the basis of association alone, *i.e.,* on the basis of membership alone or because a person espouses the views of an organization that engages in illegal activities." *Boim,* 291 F.3d at 1026. That is not the case here.

The "AEDPA does not criminalize mere membership or association, or expressions of sympathy with foreign terrorist organizations." *Gonzales,* 2005 WL 1862110 at *8. Nor is it "aimed at interfering with the expressive component of [an organization's] conduct . . ." *Reno,* 205 F.3d at 1135; *PMOI,* 327 F.3d at 1244-1245 (same). Rather Section 2339B is aimed at "stopping aid to terrorist groups," *Reno,* 205 F.3d at 1135, by "prohibit[ing] the conduct of providing material support or resources to an organization that one knows is a designated terrorist organization or is engaged in terrorist activities." *Gonzales,* 2005 WL 1862110 at *8. Simply put, "[i]t is conduct and not communication that the statute controls." *PMOI,* 327 F.3d at

1244-1245.

Thus, in prohibiting the act of providing material support to FTOs, Section 2339B does not run afoul of the First Amendment. *See, e.g., Reno,* 205 F.3d at 1134 ("We therefore do not agree . . . that the First Amendment requires the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds."); *Afshari,* 392 F.3d at 1078-80 (Section 2339B does not impermissibly restrict the First Amendment right of association). Indeed, "there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions." *Reno,* 205 F.3d at 1133; *PMOI,* 327 F.3d at 1244-1245 (same). "Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives." *Id.*

Moreover, that Hamas may engage in humanitarian or lawful activity does not affect the Court's analysis. "In enacting [Section] 2339B . . . Congress explicitly found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Hammoud,* 381 F.3d at 329 (quoting P.L. 104-132, § 301(a)(7)); *Boim.* As the Ninth Circuit reasoned:

> [A]ll material support given to [foreign terrorist] organizations aids their unlawful goals. Indeed, . . . terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used. Further, . . . even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive. More fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.

*Reno,* 205 F.3d at 1136. Contrary to Defendant's contention, Section 2339B does not contravene the First Amendment right to freedom of association.

## III. Scienter under Section 2339B

Defendant next contends that, to avoid impermissibly criminalizing otherwise innocent conduct, the Court must construe Section 2339B as requiring proof that Defendant knew that he was providing material support to a designated FTO or an organization engaged in terrorist acts, and further that defendant specifically intended that material support to aid the organization in terrorist activities. In response, the Government does not counter Defendant head on, but rather maintains (without citing any authority) that the Court need not determine Section 2339B's requisite *mens rea* until the parties submit their proposed jury instructions. Finding no compelling reason to postpone its determination, the Court has analyzed the issue and agrees with Defendant, in part.

"The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424-25, 105 S. Ct. 2084, 2087, 85 L. Ed. 2d 434, 439 (1985). Accordingly, "[t]he language of the statute [is] the starting place [of the] inquiry." *Staples v. United States*, 511 U.S. 600, 604-05, 114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608, 615 (1994). In addition, "the requirement of some *mens rea* for a crime is firmly embedded . . . [and its] existence . . . is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Id.* (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 436-37, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978)). Indeed, "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."

*Morissette v. United States*, 342 U.S. 246, 250-51, 72 S. Ct. 240, 243, 96 L. Ed. 288, 293-94

(1952) (further noting that "[c]rime, as a compound concept, generally [requires the] concurrence

of an evil-meaning mind with an evil-doing hand. . ."). In light of these principles, the Supreme

Court instructs that a "presumption in favor of a scienter requirement should apply to each of the

statutory elements that criminalize otherwise innocent conduct." *United States v. X-Citement*

*Video*, 513 U.S. 64, 72, 115 S. Ct. 464, 469, 130 L. Ed. 2d 372, 381 (1994) (holding that the

element of "age of minority" in 18 U.S.C. § 2252 presumptively requires scienter "because

nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the

First Amendment") (citing *Morissette* and *Staples* among other authorities); *see also Staples*, 511

U.S. at 616, 114 S. Ct. at 1802, 128 L. Ed. 2d at 623 ("the penalty imposed under a statute has

been a significant consideration in determining whether the statute should be construed as

dispensing with *mens rea*").

Starting with the language of the statute, Section 2339B provides that "[w]hoever

knowingly provides material support or resources to a foreign terrorist organization, or attempts

or conspires to do so, shall be fined under this title or imprisoned not more than 15 years."

"Knowingly," the key term in analyzing the level of *mens rea*, *see, e.g. United States v. Bailey*,

444 U.S. 394 (1980), could be read in either of two ways: (1) as modifying only the verb

"provides," or (2) as modifying "provides" as well as the remaining elements in the statute. *See*

*Liparota v. United States*, 471 U.S. 419, 420-21, 105 S. Ct. 2084, 2085-86, 85 L. Ed. 2d 434, 437

(1985) (recognizing that a statute reading "whoever knowingly uses, transfers, acquires, alters, or

possesses coupons or authorization cards in any manner not authorized by [the statute] or the

regulations" presents the question of "whether . . . the Government must prove that the defendant

knew that he was acting in a manner not authorized by statute or regulations."). "Congress certainly intended by use of the word 'knowingly' to require some mental state with respect to some element of the crime," but either interpretation would "accord with ordinary usage." *Id.* at 424-25, 105 S. Ct. at 2087, 85 L. Ed. at 439 (recognizing that a statute with essentially the same sentence structure as that at issue here creates an ambiguity as to whether "knowingly" modifies only the following verbs or the rest of the statute's essential elements).

Because either reading comports with the statute's language, the Court must apply the above-described canons to resolve this ambiguity. Here, as in *Liparota*, if the term "knowingly" modifies only the following verb, then the statute would criminalize otherwise "innocent conduct." For example, consider the following scenario. An individual donates money to a hospice group (intending only to aid that group's humanitarian endeavors), without knowing that the hospice group is in fact operated by a "bifarious" FTO. Although the act of donating to a hospice group is ordinarily innocent conduct, it could be criminal under Section 2339B if "knowingly" is construed as modifying only the term "provide." Under such a construction, that is, the government would need to prove only that (1) the donor "knowingly" provided (2) money (which, by definition, constitutes material support) that (3) ended up in an FTO's hands, even if by happenstance. *See Reno*, 205 F.3d at 1134 (concluding that such a reading, in effect, would create a strict liability crime as just described here). Likewise, as Defendant points out, a donor could contribute material support with impunity to any number of organizations that engage in "terrorist" activity, so long as the Secretary of State has not designated the recipient a "foreign terrorist organization." Thus, the criminalizing fact – the fact that separates innocent conduct from criminal – is that the individual provided material support *to an organization that has been*

*designated an FTO.* Accordingly, the Court concludes that Section 2339B requires proof that Defendant provided material support knowing either that the recipient was a designated FTO or had engaged in terrorist activity. *See X-Citement Video,* 513 U.S. at 72, 115 S. Ct. at 469, 130 L. Ed. 2d at 381; *Reno,* 205 F.3d at 1134 (Due Process requires that the government prove that a donor knew the recipient was either a foreign terrorist organization or engaged in terrorist activities).[10]

Although the Court agrees with Defendant's contention that Section 2339B requires knowledge that the provider of material support knew that the recipient was an FTO or was engaged in terrorist activities, the Court does not agree with Defendant's added contention that Section 2339B further requires proof that a donor specifically intended to further an FTO's terrorist activities. At least one court's reasoning supports Defendant's contention, *see United States v. Al-Arian,* 308 F. Supp. 2d 1322, 1338-39 (M.D. Fla. 2004) (holding that the government not only must prove that a donor knew the recipient was a foreign terrorist organization, but also that the donor specifically intended to further the terrorist activities of the foreign terrorist organization); *see also United States v. Al-Arian,* 329 F. Supp. 2d 1294, 1298 (M.D. Fla. 2004) (denying government's motion for reconsideration of this issue); but the Court does not find that reasoning persuasive. Foremost, the additional requirement finds no basis in the statute's language. Moreover, such a reading clashes with Congress's intent. As the Seventh Circuit has recognized, in enacting the AEDPA, "Congress determined that foreign organizations that

_____

[10]     Although reached independently, the Court's conclusion comports with Congress's recent amendment to Section 2339B, which states: "To violate [Section 2339B], a person must have knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism . . . ." 18 U.S.C. § 2339B (2004).

engage in terrorist activity are so tainted by their criminal conduct that any contribution to such

an organization facilitates that conduct. Terrorist organizations use funds for illegal activities

regardless of the intent of the donor, and Congress thus was compelled to attach liability to all

donations to foreign terrorist organizations." *Boim*, 291 F.3d at 1027 (internal quotation

omitted); *see also Reno*, 205 F.3d at 1136 ("money is fungible; giving support intended to aid an

organization's peaceful activities frees up resources that can be used for terrorist acts."). Reading

in this additional requirement, as Defendant urges, thus would contravene the fundamental

concepts of statutory construction. *See Staples*, 511 U.S. at 604-05, 114 S. Ct. at 1796-97, 128 L.

Ed. 2d at 615 ("determining the mental state required for commission of a federal crime requires

'construction of the statute and . . . inference of the intent of Congress.'" (quoting *United States*

*v. Balint*, 258 U.S. 250, 42 S. Ct. 301, 253, 66 L. Ed. 604 (1922)).

## IV.     Collateral Attack of the FTO Designation

Defendant claims that Due Process allows him to challenge the FTO designation as a

predicate finding upon which the indictment rests. Specifically, Defendant contends that (1) the

administrative procedures do not provide a designated organization meaningful review and, thus,

violate Due Process, and (2) that Defendant has a constitutional right to challenge the FTO

designation because it is a predicate to a Section 2339B defense. Having analyzed Defendant's

cited authorities, the Court disagrees.

### A.     Review Under Section 1189

Defendant argues that Section 1189 lacks minimal Due Process safeguards because the

designated organization does not receive notice of the Secretary's determination and because the

AEDPA does not provide the designated organization with meaningful judicial review. As an

initial matter, "[l]itigants never have standing to challenge a statute solely on the ground that it failed to provide due process to third parties not before the court":

> The designation of . . . an FTO ha[s] no effect on the defendant[]. While the defendants can challenge the allegation that they violated [Section] 2339B by providing material support to an FTO or could contest that [the organization in question] was, in fact, designated as an FTO, they cannot assert the due process claims of the FTO and challenge the underlying designation. The element at issue in [a defendant's criminal] case is simply whether [that organization] was designated as an FTO, and the defendants thereafter knowingly provided, or conspired to provide, material support or assistance to it, not whether the Secretary of State correctly designated [the organization] as an FTO.

*Sattar*, 272 F. Supp. 2d at 364-65 (considering the same Due Process challenge that Defendant raises here) (internal citation and quotation omitted).

In any event, the Court agrees with the Ninth Circuit's analysis of this issue. "The AEDPA does not grant the Secretary unfettered discretion in designating the groups to which giving material support is prohibited." *Reno*, 205 F.3d at 1137. The "statute authorizes the Secretary to designate only those groups that engage in terrorist activities . . . [T]he Secretary could not [for example], designate the International Red Cross or the International Olympic Committee as terrorist organizations." *Id.* "Rather, the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts – assassinations, bombings, hostage-taking and the like – before she can place it on the list." *Id.* (citing 8 U.S.C. § 1182(a)(3)). "This standard is sufficiently precise to satisfy constitutional concerns. And, because the regulation involves the conduct of foreign affairs, [the courts] owe the executive branch even more latitude than in the domestic context." *Id.* (also finding unavailing the argument that "any decision the Secretary makes in designating an organization is essentially unreviewable" because even though the D.C. Circuit affords a "degree of deference [ ] to the Secretary's decision, that is a necessary

concomitant of the foreign affairs power"). Thus, Defendant's Due Process challenge to Section

1189, even if maintainable here, would not warrant dismissal.

## B. The FTO Designation and Due Process

Defendant further argues that Section 2339B violates his Due Process Rights because the

statute prohibits him from collaterally attacking the designation of a foreign terrorist

organization. Following the reasoning of both the Ninth and Fourth Circuits, the Court rejects

this Due Process challenge, as well:

> The defendants are right that [Section] 1189(a)(8) prevents them from contending, in
> defense of the charges against them under [Section] 2339B, that the designated terrorist
> organization is not really terrorist at all. No doubt Congress was well aware that some
> might claim that "one man's terrorist is another man's freedom fighter." Congress clearly
> chose to delegate policymaking authority to the President and Department of State with
> respect to designation of terrorist organizations, and to keep such policymaking authority
> out of the hands of United States Attorneys and juries. Under [Section] 2339B, if
> defendants provide material support for an organization that has been designated a terrorist
> organization under [Section] 1189, they commit the crime, and it does not matter whether
> the designation is correct or not.

*Afshari*, 412 F.3d at 1076; *Hammoud*, 381 F.3d at 331 (finding that defendant's inability to

challenge merits of FTO designation did not violate Due Process because "Congress has

provided that the fact of an organization's designation as an FTO is an element of § 2339B, but

the *validity* of the designation is not" (emphasis original)). The result is the same even assuming

that the underlying Section 1189 proceeding is constitutionally infirm. *See Afshari*, 412 F.3d at

1077 (holding that because the Section 2339B "defendants' rights were not directly violated in

the earlier designation proceeding . . . due process does not require another review of the

predicate by the court adjudicating the instant § 2339B criminal proceeding"). Accordingly, Due

Process does not require the Court to grant Defendant's motion.

## CONCLUSION

For the above reasons, the Court denies Defendant Salah's motion to dismiss Count II of his indictment.

Dated: August 22, 2005            ENTERED

AMY J. ST. EVE
United States District Judge