| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 0978 |
| | ) | |
| MOUSA MOHAMMED ABU MARZOOK, | ) | |
| MUHAMMAD HAMID KHALIL | ) | |
| SALAH, and ABDELHALEEM | ) | |
| HASAN ABDELRAZIQ ASHQAR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On August 19, 2004, a Grand Jury returned a multiple-count, Second Superseding

Indictment (the "Indictment") against Defendant Abdelhaleem Hasan Abdelraziq Ashqar

("Ashqar" or "Defendant") and his co-defendants, Mousa Mohammed Abu Marzook

("Marzook") and Muhammad Hamid Khalil Salah ("Salah"). Currently before the Court is

Ashqar's Motion to Suppress (the "Motion") wherein Ashqar urges the Court to suppress certain

materials and documents that the government obtained during a physical search – conducted

pursuant to the Attorney General's finding that the search was aimed at obtaining foreign

intelligence – of his home in December 1993. For the reasons stated below, the Court denies

Ashqar's motion because the current facts do not warrant application of the exclusionary rule. In

light of the current FISA statutory scheme, which now specifically outlines the procedures for

conducting physical searches against agents of a foreign power, no deterrent value would be

gained by excluding the materials at issue here. Even assuming that the exclusionary rule applies

on the present facts, the Court concludes that the search at issue nonetheless satisfies the Fourth Amendment's reasonableness requirement and falls within the "foreign intelligence" exception to the Fourth Amendment's general warrant requirement.[1]

## BACKGROUND

The following facts are not contested by the parties[2] and are relevant to the Court's ruling on the Motion.[3] In August 2004, at his detention hearing following his arrest on the Second Superseding Indictment, Ashqar learned for the first time that, in December 1993, the Federal Bureau of Investigation ("FBI") had physically searched his personal residence at 7 Rubin Drive, Oxford, Mississippi. (R. 196-1, Def.'s Motion at ¶1.) The government did not obtain a warrant before searching Ashqar's residence and neither Defendant nor any one else consented to the search. (*Id.* at ¶3.) Prior to this search, in September 1993, the FBI submitted a classified *in camera ex parte* application to the Foreign Intelligence Surveillance Act ("FISA") court, which thereafter authorized the FBI to conduct electronic surveillance on the telephone and facsimile

---

[1]     In addition to considering the parties' submissions, the Court also has analyzed the arguments presented by the American Civil Liberties Union and the Center for National Security Studies in the *amicus curiae* brief they submitted in support of Defendant's motion. (R. 375-1, Amicus Br.)

[2]     Because the facts are not in dispute a hearing on Defendant's suppression motion, as Defendant himself concedes (R. 382-1, Def.'s Reply at 38 n.16), is not necessary notwithstanding the *amici*'s claim that "there is much to be tried." (R. 375-1, Amicus Br. at 4 (further noting that "[a]mici will not be a participant in such a hearing other than to express their opinions as amici curiae").)

[3]     This Opinion assumes familiarity with the Court's previous Opinion on Ashqar's Motion to Dismiss Count I of the Indictment and incorporates the summary of those allegations here. *United States v. Marzook*, No. 03 CR 978, 2005 WL 3095543, *1 (N.D. Ill. Nov. 17, 2005).

lines in Ashqar's residence pursuant to FISA, codified at 50 U.S.C. §§ 1801, et seq. (R. 277-1, Gov't's Resp. at 1, 5.) Specifically, the FISA court found: (1) probable cause to believe that Ashqar, who was not a United States person, was an agent of a foreign power, Hamas; (2) that the targeted telephone and facsimile lines at his home were being, or about to be used, by an agent of a foreign power; and (3) that the Attorney General had certified that the purpose of the requested electronic surveillance was to obtain foreign intelligence pertaining to Ashqar and Hamas. (*Id.* at 5.) In late November 1993, the FISA court, pursuant to a second FISA application, extended the electronic surveillance on the telephone and facsimile lines in Ashqar's residence. (*Id.*) Defendant appealed the FISA court's findings, and the Seventh Circuit, after "conduct[ing] a careful *in camera* and *ex parte* review of the entire record in this matter," "conclude[d] that the FISA court properly granted the applications." *In re Grand Jury Proceedings of Special April 2002 Grand Jury*, 347 F.3d 197, 205 (7th Cir. 2003) ("All of the requisite certifications are in order. The Appellant's remaining objections to the legality of the FISA surveillance (specifically, his claims of wrong-doing or illegal intent by the Attorney General) are wholly without basis in the record . . . . [T]he FISA surveillance was not illegal . . ." (parentheses in original)).

Shortly after receiving approval of the second FISA application, the Attorney General, pursuant to Section 2.5 of Executive Order 12,333, approved a request from the FBI to execute a physical search of Ashqar's residence. (R. 277-1; Gov't's Resp. at 6.) At that time, FISA did not provide for a method to obtain authorization to conduct physical searches, only electronic surveillance. On December 26, 1993, pursuant to the Attorney General's approval, the FBI executed that search when Ashqar's residence was unoccupied and photographed approximately

1600 pages of documents and copied computer files. (*Id.*) In 2002, as part of a grand jury investigation, government prosecutors were permitted to review the materials obtained during the physical search and thereafter received permission to use these materials as part of the investigation and prosecution of this case. (*Id.*) In the course of discovery in this case, the government has tendered this material to Ashqar, and the government intends to introduce some or all of these documents into evidence at trial. (R. 196-1, Def.'s Motion at ¶2.) Ashqar moves to suppress the items obtained from the 1993 physical search of his residence, arguing that the FBI's warrantless search violated his rights under the Fourth Amendment. (*Id.* at ¶5.)

## LEGAL STANDARD

### I. Motions To Suppress

Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides," Fed. R. Crim. Pro. 41(h), and Rule 12, in turn, provides that suppression motions must be made before trial. *See* Fed. R. Crim. P. 12(b)(3)(C). When a defendant's motion to suppress raises a Fourth Amendment challenge to a warrantless search, the government bears the burden of establishing legality. *See United States v. Rosselli*, 506 F.2d 627, 629 (7th Cir. 1974) ("The burden of justifying a warrantless, forcible entry into a private home is, of course, upon the government."); *see also United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) ("[t]hose seeking to invoke an exception to the warrant requirement bear the burden of establishing that the circumstances required dispensing with that requirement").

## II. The Fourth Amendment

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. "The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S. Ct. 733, 740, 83 L. Ed.2d 720 (1985) ("[a]lthough the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place"). Indeed, "[t]he fourth amendment does not of its own force require a warrant for any search. Its text is a *limitation* on warrants." *United States v. Limares*, 269 F.3d 794, 799 (7th Cir. 2001) ("warrants are not the *only* way to justify entries as reasonable") (emphasis original). Put differently, "[t]he Fourth Amendment does not require that a search be based on probable cause to believe that the search will yield contraband or evidence of crime. The amendment requires that *warrants* be based on probable cause, but forbids only unreasonable searches." *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006) (emphasis original); *see also United States v. Sutton*, 336 F.3d 550, 553 (7th Cir. 2003) ("[T]he reasonableness of any given search will depend on a multiplicity of factors, precluding any generalizations as to whether a certain type or class of search would pass muster under the Fourth Amendment.").

Although law enforcement may generally undertake a physical search of a home only

pursuant to a warrant, the Supreme Court has recognized certain exceptions to that rule. *See Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 3168, 97 L. Ed. 2d 709 (1987) (citing authorities); *see also Illinois v. Rodriguez*, 497 U.S. 177, 183, 110 S. Ct. 2793, 2799, 111 L. Ed. 2d 148 (1990) ("[w]hat [a person] is assured by the Fourth Amendment . . . is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.'"); *cf. Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980) ("[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable" (internal quotation omitted)). For example, "several cases have permitted home entries, without warrants, where a special need of the government is shown." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 274-76 (S.D.N.Y. 2000) (holding that the foreign intelligence exception allows warrantless physical searches conducted abroad in part because "there is presently no statutory basis for the issuance of a warrant to conduct searches abroad"). In addition, several cases have held that FISA's statutory procedures (discussed more fully below) satisfy the Fourth Amendment's reasonableness requirement, *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987) ("FISA's numerous safeguards provide sufficient protection for the rights guaranteed by the Fourth Amendment within the context of foreign intelligence activities."); *United States v. Cavanagh*, 807 F.2d 787, 790 (9th Cir. 1987) ("FISA satisfies the constraints the Fourth Amendment places on foreign intelligence surveillance conducted by the government."); *United States v. Nicholson*, 955 F. Supp. 588, 591 (E.D. Va. 1997), even if an order issued by a FISA court does not constitute a "warrant" for Fourth Amendment purposes. *In re Sealed Case*, 310 F.3d 717, 746 (FISA Ct. App. 2002) ("we think the procedures and government showings

required under FISA, if they do not meet the minimum Fourth Amendment warrant standards, certainly come close. We, therefore, believe firmly. . . that FISA as amended is constitutional because the surveillances it authorizes are reasonable"); *cf. United States v. Spanjol*, 720 F. Supp. 55, 58 (E.D. Pa. 1989) ("FISA's procedure for obtaining judicial authorization of the Government's electronic surveillance for foreign intelligence purposes interposes a neutral and detached judicial officer between the Government and the target of the surveillance. As such, it satisfies the warrant requirements of the Fourth Amendment."). Such is the case, courts have reasoned, because "the procedures fashioned in FISA [are] a constitutionally adequate balancing of the individual's Fourth Amendment rights against the nation's need to obtain foreign intelligence information." *Duggan*, 743 F.2d at 73; *Cavanagh*, 807 F.2d at 790 (FISA's probable cause standard satisfies Fourth Amendment's reasonableness requirement); *United States v. Falvey*, 540 F. Supp. 1306, 1313 (E.D.N.Y. 1982) (finding "that the FISA probable cause standard fully satisfies the Fourth Amendment requirements:" "[i]t provides an effective external control on arbitrary executive action and is a fundamental safeguard for the civil liberties of the individual because it requires that a federal district court judge – not the Executive branch – make a finding of probable cause to believe that the target of surveillance is an agent of a foreign power" (internal quotation omitted)).

## ANALYSIS

The government contends that it meets its burden of establishing the legality of the FBI search in a number of ways. Foremost, the government contends that the Warrants Clause of the Fourth Amendment does not require the Executive Branch to obtain a warrant prior to directing foreign intelligence collection against agents of foreign powers. This exception rests, the

government contends, on the President's broad authority in the field of foreign affairs. In the alternative, the government argues that, even if the search was unconstitutional, the exclusionary rule does not apply because suppression would not yield any deterrent value and because the FBI conducted the search in "good faith."

## I. The Authority for Foreign Intelligence Searches

### A. FISA

In 1978, Congress enacted FISA, "[a]n Act to authorize electronic surveillance to obtain foreign intelligence information." P.L. 95-511 (1978); 50 U.S.C. § 1802(b); *United States v. Duggan*, 743 F.2d 59, 77 (2$^d$ Cir. 1984) ("FISA permits federal officials to obtain orders authorizing electronics surveillance for the purpose of obtaining foreign intelligence information" (internal quotation omitted)). The initial version of that statute (which Congress subsequently has amended several times) designated seven district court judges from seven circuits to "constitute a court which shall have jurisdiction to hear applications for and grant orders approving electronic surveillance anywhere within the United States under the procedures set forth [in FISA]." Pub. L. 95-511 (1978); *cf.* 50 U.S.C. §1803(a) (2006). To obtain authorization for electronic surveillance under FISA, a federal officer must submit an application to the FISA court certifying that the Attorney General approves the application and has found that it satisfies FISA's "criteria and requirements," including, among other things: (1) "the identity, if known, or a description of the specific target of the electronic surveillance, 50 U.S.C. §1804(a)(3); (2) "a statement of the facts and circumstances relied upon by the applicant to justify his belief that (a) the target of the electronic surveillance is a foreign power or an agent of a foreign power; and (b) each of the facilities or places at which the electronic surveillance is

directed is being used, or is about to be used, by a foreign power or an agent of a foreign power,"

50 U.S.C. §1804(a)(3)(A), (B); (3) "a detailed description of the nature of the information sought

and the type of communications or activities to be subjected to the surveillance," 50 U.S.C.

§1804(a)(6); and (4) "that the certifying official deems the information sought to be foreign

intelligence information." 50 U.S.C. §1804(a)(7)(A); *Duggan*, 742 F.2d at 77.

Upon review of the application, the FISA court "shall enter an ex parte order as

requested . . . approving the electronic surveillance" if the court finds that:

(1) the President has authorized the Attorney General to approve applications for electronic surveillance for foreign intelligence information;[4]

(2) the application has been made by a Federal officer and approved by the Attorney General;

(3) on the basis of the facts submitted by the applicant there is probable cause to believe that –

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power[5]: Provided, [t]hat no United States person may be considered a

---

[4]     FISA defines "foreign intelligence information" to mean: "(1) information that relates to . . . the ability of the United States to protect against, (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or (C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or (2) information with respect to a foreign power or foreign territory that relates to . . . (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States." Pub. L. 95-511 (1978); 50 U.S.C. § 1801(e).

[5]     FISA defines "foreign power" to mean:

(1) a foreign government or any component thereof, whether or not recognized by the United States; (2) a faction of a foreign nation or nations, not substantially composed of United States persons; (3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments; (4) a group engaged in international terrorism or activities in preparation therefor; (5) a foreign-based political organization, not substantially composed of United

foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(4) the proposed minimization procedures meet the definition of minimization procedures under section 1801(h) of this title; and

(5) the application which has been filed contains all statements and certifications required by section 1804 of this title and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 1804(a)(7)(E) of this title and any other information furnished under section 1804(d) of

States persons; or (6) an entity that is directed and controlled by a foreign government or governments.

Pub. L. 95-511 (1978); 50 U.S.C. §1805(a). In addition, FISA defines "agent of a foreign power" to mean:

(1) any person other than a United States person, who (A) acts in the United States as an officer or employee of a foreign power, or as a member of a foreign power as defined in subsection (a)(4); (B) acts for or on behalf of a foreign power which engages in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person may engage in such activities in the United States, or when such person knowingly aids or abets any person in the conduct of such activities or knowingly conspires with any person to engage in such activities; or

(2) any person who (A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statues of the United States; (B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States; (C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power; or (D) knowingly aids or abets any person in the conduct of activities described in subparagraph (A), (B), or (C) or knowingly conspires with any person to engage in activities described in subparagraph (A), (B), or (C).

Pub. L. 95-511 (1978); 50 U.S.C. §1801(b).

this title.

50 U.S.C. § 1805(a); *see also In re Grand Jury Proceedings*, 347 F.3d at 205. "By enacting FISA, Congress sought to resolve doubts about the constitutionality of warrantless, foreign security surveillance and yet protect the interests of the United States in obtaining vital intelligence about foreign powers." *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 461 (D.C. Cir. 1991). "FISA thus created a 'secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights.'" *Barr*, 952 F.2d at 460-61 (quoting S. Rep. 95-604 (1977)); *United States v. Squillacote*, 221 F.3d 542, 552 (4th Cir. 2000) (same).

As originally drafted, FISA did not provide a protocol for obtaining permission to conduct physical searches to obtain foreign intelligence. In 1994, however, Congress amended FISA to encompass physical searches conducted for foreign intelligence purposes. Pub. L. 103-359 §§301-09 (1994). In essence, the government bears the same burden as that for obtaining electronic surveillance. A federal officer seeking approval of a physical search under FISA must submit an application to a FISA court. Like the certification needed for electronic surveillance, the Attorney General must certify that such an application contains certain information, including: (1) "the identity, if known, or a description of the target of the search, and a detailed description of the premises or property to be searched," 50 U.S.C. §1823(a)(3); (2) the basis for the government's belief that the target of the physical search is a "foreign power" or an "agent of a foreign power," 50 U.S.C. §1823(a)(4)(A); (3) the information sought is foreign intelligence information, 50 U.S.C. §1823(a)(7)(A); (4) the property to be searched contains foreign intelligence, 50 U.S.C. §1823(a)(4)(B); and (5) that the target controls the property to be

-11-

searched. 50 U.S.C. §§ 1823(a)(4)(C). Upon reviewing the application, the FISA court "shall

enter an ex parte order as requested or as modified approving the physical search if the judge

finds that:"

> (1) the President has authorized the Attorney General to approve applications for physical searches for foreign intelligence purposes;
>
> (2) the application has been made by a Federal officer and approved by the Attorney General;
>
> (3) on the basis of the facts submitted by the applicant there is probable cause to believe that
>
>> (A) the target of the physical search is a foreign power or an agent of a foreign power, except that no United States person may be considered an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and
>>
>> (B) the premises or property to be searched is owned, used, possessed by, or is in transit to or from an agent of a foreign power or a foreign power;
>
> (4) the proposed minimization procedures meet the definition of minimization contained in this subchapter; and
>
> (5) the application which has been filed contains all statements and certifications required by section 1823 of this title, and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 1823(a)(7)(E) of this title and any other information furnished under section 1823(c) of this title.

50 U.S.C. §1824(a).[6] As the text of this section (and its electronic surveillance counterpart)

makes clear, "[t]he FISA court, in reviewing the application, is not to second-guess the executive

branch official's certifications." *In re Grand Jury Proceedings*, 347 F.3d at 205 (citing *Duggan,*

---

[6]     As is the case with electronic surveillance, the Attorney General, in certain circumstances, can authorize a warrantless physical search, including in "an emergency situation." 50 U.S.C. §§1805(f), 1824(e) (further requiring the Attorney General to inform the FISA court of the emergency order immediately and to submit promptly an application to the FISA court for an order validating the emergency investigation).

743 F.2d at 77). Indeed, once the proper executive branch officials make the requisite certifications under FISA, the FISA applications are "subjected to only minimal scrutiny by the courts." *Duggan*, 743 F.2d at 77. "Congress deemed it a sufficient check in this regard to require the FISA Judge (1) to find probable cause to believe that the target of the requested surveillance is an agent of a foreign power; (2) to find that the application is complete and in proper form; and (3) when the target is a United States person, to find that the certifications are not 'clearly erroneous.'" *Id.* (further noting that "Congress intended that, when a person affected by a FISA surveillance challenges the FISA Court's order, a reviewing court is to have no greater authority to second-guess the executive branch's certifications than has the FISA Judge"), *cited with approval in In re Grand Jury Proceedings*, 347 F.3d at 205.

Courts uniformly have held that FISA procedures satisfy the Fourth Amendment's reasonableness requirement. *United States v. Johnson*, 952 F.2d 565, 573 (1st Cir. 1991) (FISA satisfies Fourth Amendment's reasonableness requirement); *Cavanagh*, 807 F.2d at 790 ("FISA satisfies the constraints the Fourth Amendment places on foreign intelligence surveillance conducted by the government."); *Duggan*, 743 F.2d at 73 ("We regard the procedures fashioned in FISA as a constitutionally adequate balancing of the individual's Fourth Amendment rights against the nation's need to obtain foreign intelligence information."); *United States v. Sattar*, No. 02 CR. 395 JGK, 2003 WL 22137012, *14 (S.D.N.Y. Sept. 15, 2003) ("This Court's *ex parte, in camera* review of the FISA applications and orders has made clear that the surveillances at issue were lawfully authorized and executed. Therefore, those surveillances were performed in accordance with the statutorily established court authorized procedure that satisfies the Fourth Amendment."); *see also In re Grand Jury Proceedings*, 347 F.3d at 206 ("All courts to consider

-13-

the issue before FISA was amended by the USA Patriot Act of 2001 have found FISA constitutional"); *Nicholson*, 955 F. Supp. at 591 ("In the twenty years since it was enacted, FISA has been upheld as constitutional by every court to address the issue."). Likewise, courts have held that FISA's physical search provisions, like their electronic surveillance counterparts, satisfy the Fourth Amendment's reasonableness requirement. *Nicholson*, 955 F. Supp. at 590; *United States v. Benkahla*, No. 1:06CR9 (JCC), 2006 WL 1390573, *11 (E.D. Va. May 17, 2006); *Global Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 807 (N.D. Ill. 2002) (rejecting the argument that the FBI's FISA search of plaintiff's offices and seizure of property violated the Fourth Amendment because the court "agree[d] with the many courts which have held that searches conducted pursuant to FISA do not violate the protections afforded by the Fourth Amendment").

As noted above, immediately before conducting a physical search of Ashqar's residence, the FBI twice utilized FISA procedures to obtain authorization to conduct electronic surveillance on the telephone and facsimile lines in Ashqar's residence. The 1994 amendments pertaining to physical searches, of course, were not available to the FBI in 1993.

## B. Executive Order 12,333

The government contends that the FBI's warrantless physical search of Ashqar's residence was proper because the FBI followed the procedures set forth in Executive Order 12,333. That order authorizes physical searches for intelligence gathering and provides in pertinent part:

> Timely and accurate information about the activities, capabilities, plans, and intentions of foreign powers, organizations, and persons and their agents, is essential to the national security of the United States . . .

-14-

\*   \*   \*

2.4 Collection Techniques. Agencies within the Intelligence Community shall use the least intrusive collection techniques feasible within the United States or directed against United States persons abroad. Agencies are not authorized to use such techniques as electronic surveillance, unconsented physical search, mail surveillance, physical surveillance, or monitoring devices unless they are in accordance with procedures established by the head of the agency concerned and approved by the Attorney General. Such procedures shall protect constitutional and other legal rights and limit use of such information to lawful governmental purposes.

\*   \*   \*

2.5 Attorney General Approval. The Attorney General hereby is delegated the power to approve the use for intelligence purposes, within the United States or against a United States person abroad, of any technique for which a warrant would be required if undertaken for law enforcement purposes, provided that such techniques shall not be undertaken unless the Attorney General has determined in each case that there is probable cause to believe that the technique is directed against a foreign power or an agent of a foreign power. Electronic surveillance, as defined in the Foreign Intelligence Surveillance Act of 1978, shall be conducted in accordance with that Act, as well as this Order.

Exec. Order 12,333, §§ 2.4, 2.5, 46 FR 59941 (1981). Before President Reagan issued this

Executive Order in 1981, other Presidents had issued executive orders to similar effect. *See*

Exec. Order 12,036, 43 FR 3674 (1978) (issued by President Carter and subsequently revoked by

President Reagan's order, prohibiting warrantless physical searches either conducted in the

United States or directed against United States persons abroad "unless the President has

authorized the type of activity involved and the Attorney General has both approved the

particular activity and determined that there is probable cause to believe that the United States

person is an agent of a foreign power"); Exec. Order 11,905, 41 FR 7703 (1976) (issued by

President Ford and subsequently revoked by President Carter's order, prohibiting intelligence

agencies from conducting "unconsented physical searches within the United States; or

unconsented physical searches directed against United States persons abroad, except lawful searches under procedures approved by the Attorney General"); *see also United States v. United States Dist. Court for Eastern Dist. of Mich., Southern Division (Keith)*, 407 U.S. 297, 310, 92 S. Ct. 2125, 2133, 32 L. Ed. 2d 752 (1972) ("In the discharge of [the] duty [to preserve, protect, and defend the Constitution], the President – through the Attorney General – may find it necessary to employ electronic surveillance to obtain intelligence information on the plans of those who plot unlawful acts against the Government. The use of such surveillance in internal security cases has been sanctioned more or less continuously by various Presidents and Attorneys General since July 1946."). The Court has reviewed the FBI's application under Executive Order 12,333, and the Attorney General in fact certified that there was probable cause to believe that the physical search of Ashqar's residence was directed against an agent of a foreign power.

## II. The Exclusionary Rule

Defendant Ashqar seeks to suppress the evidence seized from his residence in 1993 pursuant to the exclusionary rule. Contrary to Defendant's contention, however, even if the physical search at his residence does not fall within an exception to the Warrants Clause of the Fourth Amendment, the exclusionary rule does not apply. *See also United States v. Espinoza*, 256 F.3d 718, 724 (7th Cir. 2001) ("whether the exclusionary rule is appropriately imposed in a particular case is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police misconduct" (internal quotation omitted)); *Sutton*, 336 F.3d at 553 ("[W]hile a reasonableness determination necessarily depends on a number of factors, fashioning and applying an appropriate remedy once a search is deemed unreasonable presents a different issue.").

"The exclusionary rule prevent[s] the use of evidence obtained in violation of [the Fourth] [A]mendment [and] protects [the Fourth Amendment's] guarantees by deterring lawless conduct by federal officers, and by closing the doors of the federal courts to any use of evidence unconstitutionally obtained." *United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004) (internal quotation omitted). But because "the Fourth Amendment does not expressly preclude the use of evidence obtained through its violation . . . the exclusionary rule 'operates as a judicially created remedy . . . rather than a personal constitutional right of the party aggrieved.'" *United States v. Real Property Located at 15324 County Highway E.*, 332 F.3d 1070, 1076 n.7 (7th Cir. 2003) (quoting *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 3412, 82 L. Ed. 2d 677 (1984)). Accordingly, "[e]xclusion is not automatic but discretionary, turning on 'a congeries of factors, including such elements as the deterrent purpose of the exclusionary rule, the importance of judicial integrity, and the likelihood that admission of evidence would encourage violations of the Fourth Amendment." *United States v. Mansoori*, 304 F.3d 635, 660-61 (7th Cir. 2002) (quoting *United States v. Gaines*, 555 F.2d 618, 623-24 (7th Cir. 1977)). "Suppression of evidence [under the exclusionary rule], however, has always been [a] last resort, not [a] first impulse." *Hudson v. Michigan*, ___ S. Ct. ___, 2006 WL 1640577, *4 (June 15, 2006).

## A. Deterrence

Because "[t]he purpose of suppression of evidence obtained in an unreasonable search is to deter violations by officers of the Fourth Amendment . . . . the exclusionary rule should not be applied when its application will not result in appreciable deterrence." *United States v. Grap*, 403 F.3d 439, 444-45 (7th Cir. 2005) (internal quotation omitted); *United States v. Salgado*, 807 F.2d 603, 607 (7th Cir. 1986) ("the exclusionary rule is a sanction, and sanctions are supposed to

be proportioned to the wrong-doing that they punish"). In this regard, the Seventh Circuit recognizes that application of the exclusionary rule involves "competing interests." *Espinoza*, 256 F.3d at 724-25. "[T]he underlying purpose of the exclusionary rule [is] to deter illegal police conduct by punishing the behavior and removing the incentive for its repetition," but "[o]n the other side of the ledger, . . . [t]he exclusionary rule by definition deprives courts and juries of probative evidence of a crime, and thereby offends the important societal interest in prosecuting, punishing, and deterring criminal conduct." *Id.* (internal quotation and citation omitted); *see also United States v. Payner*, 447 U.S. 727, 734, 100 S. Ct. 2439, 2445, 65 L. Ed. 2d 468 (1980) ("Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury."). Accordingly, application of the exclusionary rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served" because "it is well-recognized that indiscriminate application of the exclusionary rule may well generate disrespect for the law and administration of justice." *Espinoza*, 256 F.3d at 724-25 (internal quotation and punctuation omitted).

Because FISA now prescribes the methods through which the government may seek physical searches pursued for foreign intelligence purposes, exclusion would not further the deterrence rationale of the exclusionary rule. The Court finds persuasive the reasoning of the Second Circuit, which has addressed this issue. In *United States v. Ajlouny*, the Second Circuit considered the constitutionality of a warrantless foreign intelligence electronic surveillance that took place prior to Congress's enactment of FISA. 629 F.2d 830, 840 (2d Cir. 1980). Without reaching the issue of constitutionality, the *Ajlouny* court held that suppression would not further

-18-

the purposes of the exclusionary rule:

> [T]he need to apply the exclusionary rule to achieve deterrence has been virtually eliminated by the significant clarification of standards that occurred with the enactment in October, 1978 of [FISA]. FISA now requires that the Government obtaining of a court order before foreign intelligence surveillance may be conducted. Though the surveillance of Ajlouny, occurring prior to the Act's effective date, was not subject to this or any other statutory warrant requirement, passage of the Act substantially reduced the importance of deciding in this case whether the Constitution independently requires the obtaining of a warrant for foreign intelligence electronic surveillance. Though the exclusionary rule remains available in the event the new statutory requirements are not observed, there is little if any need to apply the rule to a possible Fourth Amendment violation now that agents' conduct in the future will normally be guided and measured by statutory standards. Application of the exclusionary rule in this case is therefore inappropriate.

*Ajlouny*, 629 F.2d at 841-42. Similarly, the deterrent rationale of the exclusionary rule would not

be furthered here because Congress has expanded FISA to include a specific method for federal

agents to obtain authorization for conducting physical searches to obtain foreign intelligence.

Congress amended FISA shortly after the FBI executed the search at Ashqar's residence.

Accordingly, for this reason, the Court denies Ashqar's motion to suppress.

## B.    The Good Faith Exception

The good-faith exception to the exclusionary rule – an "offshoot of the deterrence

analysis," *Bin Laden*, 126 F. Supp. 2d at 283 – also provides a basis to deny Defendant's motion

to suppress. *See Leon*, 468 U.S. at 924-25, 104 S. Ct. at 3421-22. In *Leon*, the Supreme Court

held that the exclusionary rule should not operate to suppress evidence obtained by a police

officer whose reliance on a search warrant issued by a neutral magistrate was objectively

reasonable, even though the warrant ultimately was found to be defective. The *Leon* court

reasoned that "even assuming that the rule effectively deters some police misconduct and

provides incentives for the law enforcement profession as a whole to conduct itself in accord

-19-

with the Fourth Amendment, it cannot be expected, and should not be applied, to deter

objectively reasonable law enforcement activity:"

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force. . . . If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

*Leon*, 468 U.S. at 918-19, 104 S. Ct. at 3418-19 (internal quotation omitted) (further noting that

the court has "frequently questioned whether the exclusionary rule can have any deterrent effect

when the offending officers acted in the objectively reasonable belief that their conduct did not

violate the Fourth Amendment").

Since *Leon*, the Supreme Court has extended the good-faith exception to apply to a

warrantless administrative search as conducted in objectively reasonable reliance upon a statute

that later is held unconstitutional:

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.

*Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S. Ct. 1160, 1167, 94 L. Ed. 2d 364 (1987); *see also*

*Real Property*, 332 F.3d at 1074.

Applying the reasoning of *Leon* and *Krull* here, it was objectively reasonable for federal agents to rely on the Attorney General's approval pursuant to Executive Order 12,333 to conduct a physical search of Ashqar's residence. The current facts do not reflect any "willful" or even "negligent" conduct that, under *Leon*, should exist before the exclusionary rule is applied. Critically, immediately before conducting the physical search, the FBI had twice obtained FISA court approval to conduct electronic surveillance based on the same factual showing that the FBI presented to the Attorney General pursuant to Executive Order 12,333 – a procedure necessitated only because, at the time, FISA did not cover physical searches. Moreover, the FBI's reliance on the Attorney General's approval under Executive Order 12,333 - an order that no court has found unconstitutional – was also objectively reasonable because that order pertains to foreign intelligence gathering, an activity incidental to the "the constitutional competence of the President in the field of foreign affairs." *Bin Laden*, 126 F. Supp. 2d at 272-73; *see also Keith*, 407 U.S. at 310, 92 S. Ct. at 2133 (recognizing that the "President of the United States has the fundamental duty, under Art. II, s 1, of the Constitution, to 'preserve, protect and defend the Constitution of the United States' and [i]mplicit in that duty is the power to protect our Government against those who would subvert or overthrow it by unlawful means"); *Duggan*, 743 F.2d at 72 (before Congress enacted FISA "virtually every court that had addressed the issue had concluded that the President had the inherent power to conduct warrantless electronic surveillance to collect foreign intelligence information"); *United States v. Ehrlichman*, 546 F.2d 910, 936 (D.C. Cir. 1976) (noting in dicta that "no court has ruled that the President does not have [the prerogative to authorize warrantless foreign intelligence collection] in a case involving foreign agents or collaborators with a foreign power"); *cf. United States v. Curtiss-Wright*, 299

-21-

U.S. 304, 320, 57 S. Ct. 216, 221, 81 L. Ed. 255 (1936) (the President's power over foreign affairs, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution."). The FBI, that is, fulfilled its responsibility of obtaining approval for a foreign intelligence physical search through procedures that were not "clearly unconstitutional" and, in turn, the application of the exclusionary rule, as *Krull* instructs, would not have any significant deterrent effect. Thus, the "good-faith" exception to the exclusionary rule applies here and suppression would be inappropriate.

## III. The FBI's Search Was Reasonable

### A. Prior To The Search of Ashqar's Residence, The FISA Court Essentially Had Made The Findings Necessary To Establish Reasonableness

The FBI's physical search satisfies the Fourth Amendment's reasonableness requirement. As an initial matter, much of Defendant's cited authority is rendered inapposite because this case is not a typical "warrantless" search case. Prior to conducting the physical search of Ashqar's residence, the FBI twice received FISA court approval for foreign intelligence electronic surveillance, and the Seventh Circuit already has held "that the FISA court properly granted the applications." *In re Grand Jury Proceedings*, 347 F.3d at 205. The Seventh Circuit, that is, has upheld the FISA court's determination that probable cause existed to believe (1) that "the target of the electronic surveillance is a foreign power or an agent of a foreign power," and (2) "that each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." *See id.* (the FISA court must limit its review to determining whether probable cause to believe that these two factors

exist); *Duggan*, 743 F.2d at 77. These are the same determinations, in essence,[7] that the FISA court would have had to make if FISA had covered physical searches at the time of the FBI's search, *see* 50 U.S.C. §1824(a); 50 U.S.C. §1804(a), and they are determinations that, in turn, would establish the reasonableness of a FISA search for purposes of the Fourth Amendment. *Nicholson*, 955 F. Supp. at 591 (further noting that "the physical searches in question here are constitutionally indistinguishable from the FISA-authorized electronic surveillance unanimously upheld by federal courts"); *Global Relief Found.*, 207 F. Supp. 2d at 807 (same); *see also Bin Laden*, 126 F. Supp. 2d at 285 (the cases that have "consider[ed] the relative intrusiveness of residential searches and electronic surveillance, generally seem to conclude that neither automatically merits greater protection from the Fourth Amendment."). In addition, after carefully reviewing *in camera* the two FISA applications and the Executive Order 12,333 application, the Court finds that the government presented even more evidence in support of its application to the Attorney General under 12,333 than for the FISA orders that already have been upheld. The Court sees no reason why the lack of FISA procedures for physical searches would render the physical search here unreasonable when executive officers, in the time period immediately preceding the physical search, twice properly brought before a FISA judge the proof necessary to establish a reasonable search under the current statutory scheme. *Nicholson*, 955 F.

---

[7] The only difference is that for physical searches the executive official must certify that "the premises or property to be searched is owned, used, possessed by . . . an agent of a foreign power or a foreign power" 50 U.S.C. § 1824(a)(3)(B), rather than that "the facilities or places at which the electronic surveillance is directed is being used . . . by . . . an agent of a foreign power," 50 U.S.C. § 1805(a)(3)(B). This distinction is not critical here. The FISA court and the Seventh Circuit have concluded that executive officers established probable cause that Defendant is an "agent of a foreign power," and Defendant in his motion concedes that he "owned, used, or possessed" 7 Rubin Drive, Oxford, Mississippi as his personal residence. (R. 196-1, Def.'s Motion at ¶1.)

Supp. at 591. Such is especially the case because at the time the FISA court did not have jurisdiction to approve a foreign intelligence physical search.

In sum, because the FISA court made (and Seventh Circuit has upheld) the determinations necessary to establish the reasonableness the physical search at issue here, the Court concludes that the FBI did not violate the Fourth Amendment and that suppression is inappropriate.

## B. The Foreign Intelligence Exception

The "foreign intelligence" exception to the Fourth Amendment's general warrant requirement further underscores the reasonableness of the FBI's search and the procedures the FBI employed to obtain authorization for that search. Before Congress enacted FISA, virtually every circuit that addressed the issue held that there is a "foreign intelligence" exception to the general warrant requirement.[8] *See United States v. Truong*, 629 F.2d 908, 913 (4th Cir. 1980); *United States v. Buck*, 548 F.2d 871, 875 (9th Cir.), *cert. denied*, 434 U.S. 890, 98 S. Ct. 263, 54 L. Ed. 2d 175 (1977); *United States v. Butenko*, 494 F.2d 593, 605 (3d Cir.) (*en banc*), *cert. denied*, 419 U.S. 881, 95 S. Ct. 147, 42 L. Ed. 2d 121 (1974); *United States v. Brown*, 484 F.2d

---

[8]     In *Keith*, – a case that Defendant and the *amici* rely heavily upon – the Supreme Court considered the constitutionality of warrantless "surveillances [that] were deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of Government." 407 U.S. at 308-09, 92 S. Ct. at 2132 (internal quotation omitted). The *Keith* court ultimately rejected the government's arguments and concluded that there was no "national security" exception to the Fourth Amendment's general warrant requirement, but emphasized "the limited nature of the question before the Court," noting that "the instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country. . ." *Id.* at 308, 92 S. Ct. at 2132; *see also Ajlouny*, 629 F.2d at 840 ("[t]he substantive issue of whether foreign intelligence surveillance can be conducted lawfully without a judicial warrant was specifically left undecided by [*Keith*]").

418, 426 (5th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S. Ct. 1490, 39 L. Ed. 2d 575 (1974); *cf. Zweibon v. Mitchell*, 516 F.2d 594, 651 (D.C. Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S. Ct. 1684, 48 L. Ed. 2d 187 (1976) (noting in *dicta* warrantless foreign intelligence surveillance is unlawful). In general, these courts concluded that this exception to the warrant requirement arises from "the President's constitutional duty to act for the United States in the field of foreign relations . . ." *Brown*, 484 F.2d at 426 ("[r]estrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere"); *Butenko*, 494 F.2d at 605 ("the efficient operation of the Executive's foreign policy-making apparatus depends on a continuous flow of information. A court should be wary of interfering with this flow."). For example, as the Fourth Circuit explained in *Truong*, the "foreign intelligence" exception that existed pre-FISA recognized that "the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would, following *Keith*, 'unduly frustrate' the President in carrying out his foreign affairs responsibilities." 629 F.2d at 913. Specifically, the *Truong* court held that "foreign intelligence" searches are distinguishable from "national security" searches at issue in *Keith* because: (1) "a warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives;" (2) "the executive possesses unparalleled expertise to make the decision whether to conduct foreign intelligence surveillance, whereas the judiciary is largely inexperienced in making the delicate and complex decisions that lie behind foreign intelligence surveillance;" and (3) the executive branch is "constitutionally designated as the pre-eminent authority in foreign affairs." *Id.* at 913-14 ("[b]ecause of the need of the executive branch for flexibility, its practical experience, and its

constitutional competence, the courts should not require the executive to secure a warrant each time it conducts foreign intelligence surveillance."). As Defendant and *amici* point out, *Truong*, and the other circuit cases cited above, considered the constitutionality of foreign intelligence electronic surveillance conducted in the pre-FISA context, not physical searches like the one at issue here. That distinction, however, does not affect the ultimate outcome in this case because the above-cited cases establish that before Congress expanded FISA to include physical searches the Executive Branch maintained the authority to conduct warrantless foreign intelligence investigation, which would include physical searches.[9] *Nicholson*, 955 F. Supp. at 591 ("the physical searches in question here are constitutionally indistinguishable from the FISA-authorized electronic surveillance unanimously upheld by federal courts"); *Bin Laden*, 126 F. Supp. 2d at 285 (finding that "the foreign intelligence exception to the warrant requirement applies with equal force to residential searches" because courts "considering the relative intrusiveness of residential searches and electronic surveillance, generally seem to conclude that neither automatically merits greater protection from the Fourth Amendment"); *Global Relief Found.*, 207 F. Supp. 2d at 807. To be sure, FISA now governs the process for obtaining authorization for foreign intelligence physical searches in circumstances similar to the ones here,

---

[9]    The *amici* contend that the Supreme Court's decision in *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960) stands for the proposition that the Fourth Amendment's "warrant standards" apply to warrantless national security physical searches. The *amici*'s reliance on *Abel* is misplaced. *Abel* does not address the "foreign intelligence" exception at all as it deals instead with a search and seizure of evidence "without a search warrant, after an alien suspected and officially accused of espionage has been taken into custody for deportation, pursuant to an administrative warrant, but has not been arrested for the commission of a crime." *Id.* at 218-19, 80 S. Ct. at 686-87.

-26-

but that was not the case when the FBI searched Ashqar's residence.[10] Accordingly, the FBI

search, which complied with the procedures that were properly in place at the time of the search,

falls within the foreign intelligence exception to the Fourth Amendment's general warrant

requirement and the search, for the reasons explained in Section II.A above, was reasonable in

light of the FISA court's findings.

---

[10]     The Court does not need to and is not addressing the distinct issue of whether or
to what extent the "foreign intelligence" exception applies to physical searches (or electronic
surveillance) since FISA's enactment.

## CONCLUSION

For these reasons, the Court finds that the government has met its burden of establishing the legality of the physical search of Defendant's Ashqar's residence on December 26, 1993. Accordingly, the Court denies Defendant Ashqar's motion to suppress.

Dated: June 22, 2006

ENTERED

AMY J. ST. EVE
United States District Court Judge