1     IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2       EASTERN DIVISION

3

UNITED STATES OF AMERICA,   ) Docket No. 03 CR 978-2
4           )
      Plaintiff,  )
5           )
   vs.       )
6           )
ABDELHALEEM HASAN ABDELRAZIQ  )
7 ASHQAR,       ) Chicago, Illinois
          ) November 21, 2007
8      Defendant.  ) 8:33 o'clock a.m.

9

     TRANSCRIPT OF SENTENCING PROCEEDINGS
10    BEFORE THE HONORABLE AMY J. ST. EVE

11 APPEARANCES:

12 For the Plaintiff:  HON. PATRICK J. FITZGERALD
         United States Attorney
13        BY:  MR. JOSEPH M. FERGUSON
          MR. REID J. SCHAR
14         MS. CARRIE E. HAMILTON
         219 S. Dearborn St., Suite 500
15        Chicago, Illinois  60604

16 For the Defendant:  MR. WILLIAM MOFFITT
         11582 Greenwich Point Road
17        Reston, Virginia 20194

18        MR. KEITH ALLAN SPIELFOGEL
         20 North Clark Street, Suite 1200
19        Chicago, Illinois  60602

20 Also Present:   S/A BRADLEY BENAVIDES, FBI
         MS. KELLY RICE, U.S. Probation Office
21
 Court Reporter:   MR. JOSEPH RICKHOFF
22        Official Court Reporter
         219 South Dearborn St., Suite 1232
23        Chicago, Illinois  60604
      * * * * * * * * * * * * * * *
24      PROCEEDINGS RECORDED BY
      MECHANICAL STENOGRAPHY
25    TRANSCRIPT PRODUCED BY COMPUTER

1      (Proceedings heard in open court:)

2           THE CLERK:  03 CR 978, USA vs. Abdelhaleem Ashqar.

3           THE COURT:  Good morning.

4           MR. SPIELFOGEL:  Good morning, Judge.

5           MR. SCHAR:  Good morning, Judge.  Reid Schar and

6   Joseph Ferguson on behalf of the United States.

7           MR. SPIELFOGEL:  Bill Moffitt and Keith Spielfogel on

8   behalf of Dr. Ashqar who is here.

9           MS. RICE:  And Kelly Rice on behalf of probation.

10  Good morning.

11          THE COURT:  Good morning.

12          We're here for continuation of sentencing.  Are you

13  ready to proceed?

14          MR. SCHAR:  Yes, Judge, we are.

15          THE COURT:  Mr. Moffitt, are you ready to proceed?

16          MR. MOFFITT:  Yes, ma'am.

17          THE COURT:  Mr. Moffitt, would you please come to the

18  podium with your client.

19          Dr. Ashqar should be up here, as well.

20          THE DEFENDANT:  Good morning.

21          THE COURT:  Good morning.

22          I have the presentence investigation report before

23  me.  Mr. Moffitt, have you reviewed the presentence

24  investigation report and reviewed it with your client?

25          MR. MOFFITT:  Yes, we have.

 1           THE COURT:  Dr. Ashqar, have you reviewed the

 2   presentence investigation report and reviewed it with

 3   Mr. Moffitt and/or Mr. Spielfogel?

 4           THE DEFENDANT:  Yes, I did.

 5           THE COURT:  Okay.  Other than the guideline

 6   objections that were submitted to the Court in your various

 7   submissions, including your August 24th submission and your

 8   reply to that lengthy submission, do you have any comments,

 9   corrections or objections to the presentence investigation

10   report?

11           MR. MOFFITT:  Not for -- not on the -- not Rule

12   32-type objections, your Honor.

13           THE COURT:  Okay.

14           So, nothing else other -- I know the guidelines are

15   all in dispute, and I will get to those calculations

16   momentarily, but nothing in terms of the factual predicate,

17   the other information that's in here.

18           MR. MOFFITT:  No, no, nothing else to the historical

19   and biological information concerning Dr. Ashqar.

20           THE COURT:  Okay.

21           Mr. Schar, on behalf of the government, do you have

22   any comments, corrections or objections other than the

23   guidelines, which we'll get to, but do you have any comments,

24   corrections or objections?

25           MR. SCHAR:  No, Judge.

1          THE COURT:  All right.  And Dr. Ashqar, other than

2   what your lawyer has submitted to the Court in the submissions

3   which address the guideline calculations which I will get to

4   in a moment, do you have any objections or corrections to the

5   presentence investigation report?

6          THE DEFENDANT:  No, your Honor.

7          THE COURT:  Let's turn to the guideline calculation.

8          The base offense level.  I have read your submissions

9   thoroughly.  Your objection, Mr. Moffitt, to the base offense

10  level is overruled.  The base offense level under 2J1.2 for

11  obstruction of justice is a level 14.

12         You have -- 2J1.11 governs contempt and the

13  defendant's convictions here were on Count Four, contempt, and

14  Count Five, obstruction.

15         2J1.1 cross-references 2X5.1, which provides the

16  Court should apply the most analogous guideline where no

17  guideline has been expressly promulgated for the offense.

18         Your objection was to applying the obstruction of

19  justice base offense level here.

20         The application notes to the guideline make clear

21  that in certain cases, the offense conduct will be

22  sufficiently analogous to obstruction of justice for that

23  guideline to apply.

24         The Seventh Circuit also made this clear in U.S. vs.

25  Alwan, 279 F.3d 431 at 440, a 2002 Seventh Circuit, where it

1   specifically noted that "2J1.1 recognizes that in some cases,

2   a defendant's conduct may justify the application of 2J1.2 for

3   obstruction of justice.  This is one of those cases."

4           It's clear from the evidence at trial, including the

5   defendant's conviction on the obstruction of justice count,

6   that Dr. Ashqar's refusal to testify before the grand jury was

7   an effort to obstruct an ongoing criminal investigation into

8   potential criminal activities by various individuals and

9   organizations.

10          I reject your argument that his failure to appear --

11  that failure to appear is more analogous here and should

12  provide the base offense level because he did appear here and

13  he refused to testify, and the jury's verdict certainly

14  supports it.

15          I am adopting the probation officer's findings with

16  respect to the base offense level, which is a 14.

17          I also want to add -- first of all, I want to

18  compliment Officer Rice on her thorough and detailed report

19  before I go any further, especially for somebody who did not

20  sit through the lengthy trial in this case.  I commend you for

21  the thorough report that you have provided --

22          MS. RICE:  Thank you.

23          THE COURT:  -- to the Court and to the parties,

24  Officer Rice.

25          MS. RICE:  Thank you, your Honor.

1          THE COURT:  Before I go further on the guidelines, I

2     want to address some general objections, Mr. Moffitt, that you

3     have made to all of the guideline applications, and then I'll

4     go back to the specific applications and specific

5     enhancements.

6          You have, in your submission to the Court, repeatedly

7     raised First Amendment issues.  I have addressed your First

8     Amendment issues at length in this case, and your submission

9     that you've submitted to the Court is essentially more of the

10    same that I've already addressed.  I am incorporating the

11    Court's prior rulings in both pretrial and post-trial on your

12    First Amendment arguments, Mr. Moffitt, including the Court's

13    November 17th, 2005, opinion which can be found at 2005

14    Westlaw 3095543, and the Court's ruling on your post-trial

15    motions for acquittal and for a new trial.  And I am rejecting

16    your First Amendment arguments for the reasons I've already

17    addressed at length.  And I am incorporating those by

18    reference.

19         Also, I do note, because your submission as a prior

20    submission to this Court ignored it, that I am incorporating

21    and referring to the Seventh Circuit's decision in 2003

22    affirming the Chicago district court's civil contempt order

23    against Dr. Ashqar.  The Seventh Circuit previously determined

24    that both the New York and the Chicago district court's

25    contempt orders were designed to coerce Dr. Ashqar into

1   complying with the Court's orders.  That is not in your

2   submission, and I'm incorporating that by reference into the

3   Court's sentencing today.

4          The Seventh Circuit's opinion is at In Re Grand Jury

5   Proceedings of the Special April 2002 Grand Jury, 347 F.3d 197

6   at 200 and 206 to 207.  That's a 2003 opinion.

7          With that, I will turn to the specific offense

8   characteristic enhancement.  You have objected to the

9   three-point specific offense characteristic enhancement set

10  forth in Section 2J1.2(b)(2).

11         I have read your submission -- all of your

12  submissions, Mr. Moffitt.  I've read the government's

13  response.  In light of Agent Bray's testimony from last week,

14  is there anything you would like to add, Mr. Moffitt, to that

15  proposed enhancement?

16         MR. MOFFITT:  Judge, forgive me, but the numbers

17  don't --

18         THE COURT:  Sure, sure.

19         The enhancement for substantial interference with the

20  administration of justice.  That's the three-point

21  enhancement.

22         MR. MOFFITT:  Yes, your Honor, there's a great deal

23  that I would like to add, but I will add it as quickly as

24  possible.

25         I think Mr. Bray's testimony sets out what I have

1    always thought about this particular case.  It was not unknown

2    to the government when they called Dr. Ashqar before the grand

3    jury that he had in a prior occasion been called before a

4    grand jury and had refused to talk to the grand jury for the

5    same reason that he had refused to talk to the FBI earlier in

6    19 -- in the years 1993 through 1996, when he was called.

7            I would suggest to you to tell us that you would base

8    an investigation entirely on Dr. Ashqar under the

9    circumstances has got to create something in your mind about

10   how silly that might be under the circumstances.  Dr. Ashqar,

11   I would suggest to you further about Mr. Bray's testimony

12   included all the references to what happened in the trial and

13   the times that the government had evidence with regard to

14   Dr. Ashqar and his concern.

15           On one page, Mr. Bray testifies that he thought that

16   Dr. Ashqar as of the time of the grand jury was in

17   communication, was using his telephone as a conduit, and yet

18   all the evidence of that ended in 1995.  All the evidence of

19   any contact with Marzook ended in 1995, all prior to the

20   designation of Hamas as a terrorist organization by the United

21   States government.

22           Virtually every piece of evidence against Dr. Ashqar

23   ended in 1995.  The Al Aqsa fund had ceased to exist prior to

24   Hamas' designation.  Any contact with any of these people that

25   the Court -- that the agent testified they were concerned

1    about had certainly ended prior to Hamas' designation.

2          The evidence in this case sat for approximately eight

3    to ten years without anybody doing anything with it.  It was

4    finally collected when this grand jury started.  When we

5    asked -- when the government introduced the list of phone

6    numbers and said that they would have liked to have known what

7    these people's relationship was with Dr. Ashqar, Dr. Ashqar

8    was not the only person that could provide that information.

9    The people on the list could provide the information.  The

10   government chose not to subpoena or even talk to or call up

11   any of these people on this list.

12         And as you know, we went through a rather detailed

13   cross-examination with regard to that.  None of these people

14   were called.  The suggestion here is for some reason, this

15   investigation was thwarted by Dr. Ashqar when a parallel

16   investigation was ongoing in Dallas, Texas, investigating many

17   of the same issues and many of the same people and, in fact,

18   in a trial of that case used much of the same evidence,

19   evidence from Dr. Ashqar's home, virtually -- other things.

20   That did not disable that grand jury from indicting all of the

21   people that they indicted in the Holy Land case, as I suggest,

22   nor did it disable that grand jury and that U.S. Attorney's

23   Office from naming over 300 unindicted co-conspirators.

24         To suggest that the only source of information here

25   with respect to what was going on with regard to Hamas was

1   Dr. Ashqar is, I believe, a bit of a stretch to give the

2   government as much benefit as I possibly can.

3            THE COURT:  Mr. Moffitt, I'm sorry to interrupt you,

4   but address somewhere in your statement the significance --

5   your argument that they're suggesting he is the only source of

6   information.  The enhancement 2J1.2(b)(2) provides that if the

7   offense resulted in substantial interference with the

8   administration of justice --

9            MR. MOFFITT:  Well, I --

10           THE COURT:  One second, please -- increase by three

11  levels, and note 1 provides further definition of substantial

12  interference with the administration of justice, but nowhere

13  in there does it say somebody has to be the only source of the

14  information.

15           MR. MOFFITT:  Well, I suggest to you, your Honor,

16  that to compare what happened here with what happened in

17  Dallas, to suggest that simply because they did not, according

18  to even Mr. Bray's testimony, follow up the leads that they

19  have, then to come in and claim the only reason that they

20  didn't follow up those leads was because Dr. Ashqar refused to

21  testify, I think stretches credulity at this particular point.

22           Other people followed up other leads would show and

23  demonstrate that this grand jury and these agents could have

24  gone further than they did, and they were not limited by what

25  I mean to relying solely on Dr. Ashqar for information.

1          If the truth of it were to be believed or if the

2     government's urging on this was once they couldn't talk to

3     Dr. Ashqar, that was the end of it, that was the end of their

4     investigation, that certainly didn't happen in a very

5     comparative parallel investigation in Dallas, Texas.  And I

6     only offer that as an illustration of how far we can go.  We

7     heard all of the things that Mr. Bray didn't do.

8          The other thing I would suggest, that this

9     information, whatever information it was, the government had

10    no information and has demonstrated no information and could

11    not demonstrate it before this jury, that Dr. Ashqar

12    maintained any contact with any of these people.  And

13    certainly if they had had that information at the trial, they

14    would have offered that information.

15         So, by the time they called Dr. Ashqar before the

16    grand jury, Dr. Ashqar's information is eight to nine years

17    old and stale, I would suggest.  It's certainly not even

18    sufficient enough at that point for you, if they came before

19    you and offered that information to search Dr. Ashqar's house

20    in an affidavit in 2003, you certainly wouldn't have given

21    that affidavit to them on the basis that whatever probable

22    cause they had to believe that Dr. Ashqar was still doing

23    whatever he was doing in 1993 was stale.  No judge would have

24    authorized a search warrant under the circumstances of how the

25    government put this evidence together.

1         When Mr. Bray testifies after all the investigation

2   of Dr. Ashqar, after everything they've done, after a trial

3   and whatnot, he can still not offer anything but an opinion

4   not supported by one piece of evidence that Dr. Ashqar was

5   still in touch or in communication with any of these people.

6         I would also point out to you, your Honor, by the

7   time that Dr. Ashqar was subpoenaed in Chicago, the United

8   States government had kicked Mousa Abu Marzook, the target of

9   the grand jury investigation, out of this country.  It

10  certainly wasn't likely he -- and as Mr. Bray testified, I

11  believe, he said he was either in Syria or Jordan by the time

12  this investigation began.

13        All right.  I suggest to you that the idea that

14  Dr. Ashqar was going to offer them something that would allow

15  them to indict Mousa Abu Marzook is belied by the fact that

16  they were able to indict Mousa Abu Marzook.

17        They talk about also whether they could indict

18  Mr. Salah with regard to this.  Mr. Salah was indicted.  He

19  was indicted based on his own set of confessions and various

20  other things.  They certainly didn't need Dr. Ashqar to indict

21  Mr. Salah.  And I point out to you that throughout all of

22  this, pretty unabashedly, the government has suggested that

23  during the course of this whole attempt to get Dr. Ashqar to

24  talk, he was still a target.  Even though he was immunized --

25  if you remember, I asked Mr. Bray about whether or not he was

1    still going to be indicted.  I suggest to you that the

2    circumstances understanding the full impact of Mr. Bray's

3    testimony in this particular case is that the government for

4    eight years sat on this information, didn't do anything with

5    it.  According it him in the first part of this, didn't even

6    translate the information.  All right?

7           The government also, I think, as I mentioned to you,

8    had the ability, and if they firmly believed that Dr. Ashqar

9    was still involved with these people, the wiretap, the bug,

10   all of the things that they did to Dr. Ashqar could have been

11   extended if there was probable cause under the FISA rules.

12          Mr. Bray did not even say that he was aware of how

13   long the wiretap was as he came in here and testified.  So, if

14   they had any real evidence that Dr. Ashqar continued this

15   behavior, they had the ability to extend the wiretap, to get

16   another wiretap, to bug his house again, to search him, to do

17   all of these things, none of which happened.

18          So, I would suggest to you that under -- on even the

19   widest expansion of this particular evidence, this evidence

20   was stale.  And whatever Dr. Ashqar could say to them based on

21   the information that Mr. Bray had is a lot of speculation

22   without any material support of any pieces of evidence that

23   would indicate at all that Dr. Ashqar was in a position to

24   give them current and up-to-date information.

25          And I suggest to you that under -- in 1993, to the

1    extent that much of what Dr. Ashqar knew was in 1993, we still

2    operate under a five-year statute of limitations in this

3    country.  And he was called before this grand jury after that

4    five years had expired.

5         So, I suggest that unless the government was very

6    creative in their indictment, as they were with Dr. Ashqar,

7    with regard to making it into a RICO case and into a

8    conspiracy, the information that they were going to get was

9    very old.  And there were sources of information that the

10   government developed that gave them more current information.

11        For instance, Mr. Shorbagi.  Dr. Ashqar's failure to

12   testify did not keep the government from developing

13   Mr. Shorbagi as a source of information.  He gave them more

14   particularized information about what was going on with regard

15   to Hamas and HLF post the designation.  So, to suggest here

16   today that Dr. Ashqar had any information that they could use

17   about anything having to do with Hamas post the designation is

18   just -- is just ludicrous under the circumstances.

19        And if it was so important that they know about this,

20   why did they allow this evidence to sit for as long as they

21   allowed it to sit?  I suggest that the real impetus in this

22   case was what happened on 9/11/2001, when all of this evidence

23   became important to further so-called terrorism

24   investigations.

25        But I don't suggest that the inquiry into Hamas was

1   in any way affected by Dr. Ashqar.  They knew exactly what

2   Dr. Ashqar knew.  They searched his house.  They bugged his

3   phone.  They bugged the meeting in Philadelphia.  They bugged

4   his house.  All of this occurred in 1993.  All of this

5   occurred ten years before.  And the only piece of evidence

6   that the government suggested occurred post-1995 when the

7   designation was was the information that Mr. Shorbagi got.

8          And I suggest that Mr. Shorbagi was available to the

9   government to get him to testify.  He admitted that he had

10  contributed to HLF post the designation.  He took the position

11  that he knew at the time that he contributed to HLF that HLF

12  was doing -- working for Hamas.

13         I suggest that if you remember the testimony of

14  Judith Miller, the reason that Judith Miller was sent overseas

15  to see Mr. Salah in 1993 was that the Israeli government was

16  trying to convince the United States at that time that Hamas

17  was raising money.  This was pre-designation.

18         At that point, the government was not aware, did

19  not -- was not acting.  And part of this whole thing, I

20  suggest to you, was they found out in 1993 exactly what was

21  happening with Dr. Ashqar and what he was doing.  They took no

22  affirmative steps whatsoever to prosecute Dr. Ashqar or to

23  call him before a grand jury in 1993, when this information

24  was not stale.  And I would suggest that would have been the

25  appropriate time to call Dr. Ashqar.

1          After waiting ten years to and to call Dr. Ashqar

2   under those circumstances, plus understanding that there had

3   been almost what has been described as an even dozen of

4   meetings between Dr. Ashqar and the FBI from the years 1993 to

5   1996, having had Dr. Ashqar before a grand jury in New York,

6   having not moved to prosecute Dr. Ashqar at that time, by

7   2003, the government knew exactly what Dr. Ashqar's position

8   was well in advance before he was called.

9          As you know, he was held in civil contempt in New

10  York, went on a hunger strike to refuse, had taken the

11  position that he was not going to testify against people who

12  were fighting, what he perceived to be fighting for the

13  freedom of Palestinian people.  He was also aware at the time,

14  I would suggest to you, that the Israelis were involved in

15  this investigation.  He had been told that.

16          So, I suggest to you that to claim at this particular

17  point that they were shocked or nonplussed and it didn't

18  further their investigation sort of is belied by all of those

19  facts.  And I don't want to repeat myself, but it seems to me

20  that Mr. Bray's testimony, pretty much all of it, indicates

21  that everything that they knew and everything they were going

22  to ask Dr. Ashqar about were events that they knew about in

23  1993, people they knew about in 1993, relationships between

24  people that they knew about in 1993, the Philadelphia meeting

25  that occurred in 1993.  All of those things.  They were even

1   aware at the time that they called Dr. Ashqar -- and if you

2   remember, there was a discussion regarding the Philadelphia

3   meeting where the decision was made that the Al Aqsa fund

4   would go out of business.  There are no bank records

5   post-1993, no phone records post-1993, nothing with regard to

6   Mousa Abu Marzook past 1993, and nothing with regard to the Al

7   Aqsa fund post the phone call regarding the Philadelphia

8   meeting in 1993.

9           For all of those reasons, I suggest for the

10  government to suggest under these circumstances that

11  Dr. Ashqar inhibited their investigation because he didn't

12  provide them with information that at the time they were

13  asking for it was ten years -- between eight and ten years

14  old, if not older, because if you remember some of the

15  information that Mr. Bray testified to he said centered from

16  the mid 1980's.

17          So, you know, at the end of the day, a reliance on

18  Dr. Ashqar here had to be misplaced.  And it's really unfair,

19  I would suggest, to impose such an enhancement on him.

20          THE COURT:  Mr. Schar?

21          MR. SCHAR:  Judge, I think there are two distinct

22  issues that are kind of being argued by Mr. Moffitt, and one

23  I'm not sure you've asked for argument on yet, and that's the

24  concept of whether there was actual obstruction here.

25          What I understand you to be asking is given the

1   baseline, which is defendant Ashqar has been convicted of

2   obstruction of justice, did that obstruction, which has now

3   been found beyond a reasonable doubt, cause substantial

4   interference to the government within the concept of the

5   guideline.

6          And Agent Bray's testimony could not be clearer of

7   the amount of effort and exercises that had to occur because

8   of the fact that the government could not obtain the testimony

9   of Dr. Ashqar.  There's a lot of second guessing going on of

10  whether or not the government should have called Dr. Ashqar or

11  should have approached other people.

12         THE COURT:  You are correct, Mr. Schar.  I am just

13  taking now argument on the enhancement for substantial

14  interference with the administration of justice.

15         I know there's some overlap.  Some of Mr. Moffitt's

16  arguments regarding actual obstruction go to the terrorism

17  enhancement.

18         But I am just -- I am focusing now on the substantial

19  interference with the administration of justice enhancement.

20         MR. SCHAR:  And the focus on that, Judge, for the

21  government's perspective and, again, Agent Bray's testimony

22  laid out in detail, once defendant Ashqar obstructed justice

23  by refusing to testify, a number of things had to be done

24  which presumably otherwise would not have had to have been

25  done if he had chosen to cooperate with the grand jury's

1    investigation.

2          Agent Bray talked about the phone records, the calls,

3    the analysis that had to occur because defendant Ashqar would

4    not talk in the grand jury about the meaning of certain calls,

5    who he was in touch with, the actual names of the individuals

6    and the import of the conversations.

7          He talked -- Agent Bray testified at length about the

8    bank record analysis that had to occur, specifically the bank

9    records that had otherwise been obtained by the government

10   beyond the search documents.  How there were numerous,

11   numerous accounts that were on their face not -- the

12   connections were unclear because defendant Ashqar would not

13   talk about the connections and the import of those records, I

14   believe Agent Bray talked about the fact that volumes of

15   records actually had to be sent to FBI headquarters where I

16   think his phrase was hundreds, if not thousands, of hours had

17   to be taken to input those documents into databases, analyze

18   them and then provide the results to the Chicago agents and

19   government that were investigating the larger Hamas

20   conspiracy.

21         The documents that were taken out of defendant

22   Ashqar's house.  Prior to this point, those had been used, I

23   think, as Agent Bray said, primarily for purposes of

24   investigative intelligence, not been used with an eye towards

25   kind of a larger criminal trial or investigation.  Obviously,

1   the government was relying -- and this, in large part, will

2   actually -- will go to actual obstruction, but I will withhold

3   my comments on that.  Suffice it to say the government was

4   relying in large part on the person who maintained those

5   documents:  Defendant Ashqar, to explain which ones were

6   relevant, which ones were important, what they meant and which

7   ones the government should be spending time focusing on.

8          His refusal to provide any testimony regarding that

9   forced the government to go through a laborious process in

10  which essentially all the documents had to be translated

11  verbatim, quality controlled -- and this is all through Agent

12  Bray's testimony -- through hundreds of hours just to get a

13  fuller understanding of what actually was in the documents

14  because defendant Ashqar would not testify.

15         You know, I could go on, Judge, but on that

16  particular point, I think Agent Bray laid out over and over

17  again the various things that needed to occur in order for the

18  government to be able to move forward with its investigation,

19  and it was one of the reasons that defendant Ashqar's

20  testimony was so critical so early on is that he could have

21  resolved and negated the need to do many of the things the

22  government had to do because of his centrally located position

23  within this conspiracy.

24         The archivist, the phone -- kind of the phone, you

25  know, operator in a certain sense.  He was on the phone with

1   numerous people.  He had documents.  He had bank records of

2   his own and other individuals.  He could have provided

3   basically a roadmap to all of these things and permitted the

4   government to avoid spending time, resources of agents and

5   lawyers to do this.

6          As to some of the comments Mr. Moffitt made, I don't

7   want to go into any particular detail now, but I would just --

8   there seems to be a continuing belief that all of the

9   government's evidence somehow ended in 1993 and the phrases

10  were defendant Ashqar didn't have any knowledge of anything

11  that happened beyond that.

12         No one knows that, Judge, because he won't answer

13  questions.  To this day, he won't answer questions.  And I

14  will tell you -- and Mr. Moffitt made the point, I think,

15  rather aptly in his comments, he was put into the grand jury

16  in 2003.  At that point, we didn't know about Mohammad

17  Shorbagi.  We didn't know that in 1995, years after the search

18  had occurred, in fact, defendant Ashqar had sent documents to

19  Mr. Shorbagi.  That was only discovered later.  He could have

20  provided that information to the grand jury.  We could have

21  avoided a lengthier investigation of Mr. Shorbagi.

22         But beyond that, what other information is there that

23  he has locked in his mind right now that we don't know about?

24  Just because the government can't produce additional evidence

25  doesn't mean it doesn't exist because in 2003, we didn't know

1    about Mr. Shorbagi, but he sure existed and those documents

2    sure had been sent to him by defendant Ashqar.

3         And on and on it goes, Judge.  I'm happy to answer

4    additional questions, but I think that Agent Bray's testimony

5    laid out in great detail the type of things the government had

6    to incur.  And, frankly, everything that occurred at the trial

7    also laid out all the types of things that the government had

8    to do it would not have otherwise had to do had defendant

9    Ashqar agreed to testify.

10        MR. MOFFITT:  Your Honor, let me draw your attention

11   to Page 80 of Mr. Bray's testimony about -- that discusses the

12   translations and issues of the translations.

13        Agent Bray could not tell us what quantum of

14   documents had been translated before 2002.  He did tell us

15   that some of the documents had been translated, but he

16   couldn't tell us.  And he told us that some of those documents

17   had been translated nine years before this grand jury focused

18   on Dr. Ashqar.

19        He suggested that they had been translated as early

20   as 1994.  Certainly nobody was having Dr. Ashqar testify or be

21   called to a grand jury at that point.  He says that some of

22   those documents were transferred -- were translated

23   completely, but he was not sure of what documents had been

24   transferred completely.

25        Now, also, let's not lose sight of what happens here.

1   Assuming for the sake of argument, Mr. Ashqar -- or

2   Dr. Ashqar -- had cooperated.  And I've represented people who

3   have cooperated with the government.  They do not take as

4   gospel the words of the individual who was cooperating.  And

5   if they were going to ever try anybody with regard to these

6   translations or -- and the transcripts of these phone calls,

7   and if they were going to put Dr. Ashqar on to testify and

8   they wanted to use some of these phone calls, they were going

9   to have to translate them.

10          So, to suggest that the reason that they weren't

11  translated was that Dr. Ashqar had failed to cooperate

12  stretches -- again, stretches credulity.  Virtually every case

13  that I've ever been involved in that involves these kinds of

14  things involves translations that the government has got to

15  do.  And when they're going to produce evidence against a

16  person, they have to translate the matters.  When they're

17  going to use Dr. Ashqar as a witness, they were going to have

18  to translate and interpret the bank records.  They were going

19  to have to do all of the same things if Dr. Ashqar had been a

20  witness.

21          You know, this is -- to suggest -- every time I've

22  ever sat down at one of those debriefing sessions, the

23  government has created, before they've talked to the witness,

24  a list of information from the information that they possess.

25  And to suggest that the only reason -- the only time they were

1    going to do anything about preparing this information that

2    they had for eight years was if Dr. Ashqar cooperated with

3    them in their investigation again I think, you know, strains

4    the level of credulity here.  The government doesn't operate

5    that way.  They don't simply take the word of somebody that is

6    supposedly cooperating.  They do their homework beforehand or

7    at least anywhere that I've ever been.

8            So, to -- and they would have -- they would have

9    translated this, they would have talked to Dr. Ashqar, and

10   they would have tested him with regard to the translations

11   under these.  So, I don't think we should close our eyes to

12   how the government has operated, at least since I've been

13   aware.

14           THE COURT:  Guideline 2J1.2(b)(2) provides that if

15   the offense level resulted in substantial interference with

16   the administration of justice, increase the offense level by

17   three levels.  Note 1 to that guideline provides that

18   substantial interference with the administration of justice

19   includes a premature or improper termination of a felony

20   investigation, an indictment, verdict or any judicial

21   determination based upon perjury, false testimony or other

22   false evidence or the unnecessary expenditure of substantial

23   governmental or court resources.

24           The Seventh Circuit has also referred to this in U.S.

25   vs. Tankersley, T-A-N-K-E-R-S-L-E-Y, 296 F.3d 620.  That's a

1    2002 Seventh Circuit case.

2           The last part of that note is what the operative

3    provision in this case is, the unnecessary expenditure of

4    substantial governmental or court resources.

5           Before I get to your objection on whether or not this

6    applies, I want to first address, Mr. Moffitt, an objection

7    that you made to this enhancement, as well as to the others.

8    You have objected to the application of the preponderance of

9    the evidence standard by the Court in its fact-finding for

10   sentencing purposes.  That objection is overruled based on

11   clear Seventh Circuit law.  U.S. vs. Alwan, 279 F.3d, 431 at

12   440, a 2002 Seventh Circuit opinion; United States vs.

13   Emerson, 501 F.3d 804, an opinion from this year; and indeed,

14   in August of this year, the Seventh Circuit in U.S. vs.

15   Hollands, 498 F.3d, 622 at 633 reiterated that "judicial

16   fact-finding by a preponderance of the evidence is still a

17   legitimate basis for arriving at the applicable guidelines

18   range and does not violate the Constitution, so long as the

19   guidelines are advisory and the ultimate sentencing decision

20   is based on the Section 3553(a) factors."

21          I am -- based on clear Seventh Circuit precedent, I

22   am rejecting and overruling your constitutional arguments.

23          MR. MOFFITT:  Your Honor, if I might, I understand

24   what your Honor did, but I certainly wish to be heard with

25   regard to the terrorism enhancement.

1          THE COURT:  We're not at that yet.  If you want to be

2     heard on that, I certainly can.  You've made that objection as

3     to the applicable standard throughout, including to the

4     2J1.2(b)(2) enhancement.

5          MR. MOFFITT:  I understand.  I just want it be clear.

6          THE COURT:  And I'm overruling your objection.

7          I also find that the government has established by a

8     preponderance of the evidence that Dr. Ashqar's refusal to

9     testify before the grand jury resulted in a substantial

10    expenditure of time and money by the government, and the

11    substantial interference of administration of justice applies.

12         I'm basing this on several factors.  The evidence

13    that was introduced at trial established that the defendant's

14    knowledge and connection with Hamas leaders through phone

15    calls, through documents that were obtained at his residence,

16    including the list of individuals that was submitted at the

17    beginning of this sentencing hearing last week.  Agent Bray's

18    credible testimony established that the government had to have

19    investigators organize and analyze voluminous financial

20    records to determine relationships and connections among Hamas

21    co-conspirators, as well as the origin and final destination

22    of significant monetary sums.

23         Dr. Ashqar, based on the evidence obtained in his

24    residence and other documents admitted at trial, was in a

25    unique position to provide information regarding other Hamas

1   members in the United States.  The Jarad debriefing memo that

2   was written by Dr. Ashqar, which was admitted as an exhibit in

3   trial, is one piece of evidence of that.

4        Agent Bray also testified about the significant

5   resources that had to be expended by the FBI to address the

6   financial documents, as well as the communication among

7   individuals that they were focusing on in connection with

8   their investigation.  Agent Bray described this as a series of

9   needles in a haystack that they were trying to decipher and

10   that Dr. Ashqar's testimony could have provided relevant

11   information to them and could have helped them find those

12   needles in the haystacks.

13        His testimony, as well as the evidence admitted at

14   trial, more than satisfies the government's preponderance of

15   the evidence standard that significant resources on financial

16   documents and other documents found in his residence had to be

17   committed, hundreds if not thousands of hours he testified to,

18   had to be committed to decipher this information that could

19   have been deciphered by Dr. Ashqar.

20        In addition, something that came out during trial,

21   there were various confessions found from Hamas individuals in

22   Dr. Ashqar's residence that he was collecting and sending to

23   others as we heard at trial, including his co-conspirators or

24   charged co-conspirator, Mr. Salah's confession that was

25   discussed at length in trial and I'm not going to go into

1    here.  But that information, as Agent Bray testified to, was

2    very relevant to their information.  Why he had that, who

3    these individuals were, where was he obtaining that

4    information.  All of that is information that just supports

5    the substantial interference with the administration of

6    justice in this case.

7         I am overruling your objection to that three-point

8    enhancement, Mr. Moffitt, and I will adopt the presentence

9    investigation's calculation and apply the three-level

10   enhancement under 2J1.2(b)(2).

11        You made a point, Mr. Moffitt, that the government

12   would have translated all of these phone calls anyway.  It's a

13   lot easier to translate phone calls when you have one of the

14   participants in the phone conversation helping you translate

15   them.  And Dr. Ashqar did not provide that assistance.

16        For those reasons, I am applying the three-level

17   enhancement.

18        The next objection in the presentence investigation

19   report's calculation is to the application of the

20   cross-reference 2J1.2(c), the cross-reference applying 2X3.1.

21        2J1.2(c) provides that if the offense involved

22   obstructing the investigation or prosecution of a criminal

23   offense, apply 2X3.1, the accessory after the fact in respect

24   to that criminal offense if the resulting offense is greater

25   than that determined above.

1          The presentence investigation report applies the

2    offense level for murder pursuant to 2A1.2 -- 2A1.1.   I am

3    sustaining your objection to the application of this

4    enhancement.   The government did not originally seek this

5    enhancement.   This was something that was in the presentence

6    investigation report.

7          Based on all of the evidence that this Court heard

8    through the lengthy trial, in addition to Agent Bray's

9    testimony, this -- the application of this enhancement is too

10   tangential to this case.   Even Agent Bray, when he was asked

11   about specific murders, he answered, well, the answer to that

12   is yes and no, which I think was telling about connecting the

13   offense of conviction here to murders.   There is no specific

14   evidence that has tied Dr. Ashqar to any particular murders.

15   I think that application is just too tangential, and I will

16   sustain your objection.

17          Mr. Schar, if you want to put anything on the record,

18   you're certainly welcome to do so.   I know you addressed it in

19   your written submission, but if you feel the need to add

20   anything for purposes of the record, go ahead.

21          MR. SCHAR:   Judge, for purposes of the record, no.

22   We believe the PSR is accurate.   However, we will stand on the

23   brief in that regard.

24          THE COURT:   Okay.

25          The next enhancement is 3A1.4, which provides that if

1    the offense is a felony that involved or was intended to

2    promote a federal crime of terrorism, increase by 12 levels,

3    but if the resulting offense level is less than level 32,

4    increase to level 32.

5          Mr. Moffitt?

6          MR. MOFFITT:  Yes, ma'am.

7          THE COURT:  Again, please do not reiterate everything

8    in your 175-page submission.  I have reviewed that

9    extensively.  I've reviewed the government's response.  But I

10   know Agent Bray's testimony was relevant in part to this

11   enhancement.  So, I will give you the opportunity to add

12   anything you would like.

13         MR. MOFFITT:  Well, I would suggest to you our first

14   assertion here is that the government placed the issue of

15   what -- whether this was an obstruction to further Hamas

16   before the jury.  They placed it.  These two obstruction

17   pieces, the New York and the Chicago piece, were part of the

18   conspiracy that Dr. Ashqar was acquitted of.

19         In the closing argument of the government at Page

20   310, at Page 322, the government argued that the obstruction,

21   the two obstructions of Dr. Ashqar were predicate acts in

22   furtherance of the RICO conspiracy; and, therefore, Dr. Ashqar

23   could be found guilty on the RICO conspiracy by finding him to

24   have obstructed justice twice, that these were the typical of

25   the predicate acts and that this was something that the

1    government -- the judge -- I mean, the jury could find based

2    on these, the jury could find Dr. Ashqar guilty of the RICO

3    conspiracy.

4           In fact, as you know, the jury found Dr. Ashqar not

5    guilty of the RICO conspiracy.  And I suggest there has been a

6    jury finding with regard to this in light of the government's

7    placing these in the indictment and further in light of the

8    fact that they argued to the jury that these were predicate

9    acts in furtherance of the RICO conspiracy.  The jury

10   absolutely rejected it.

11          Therefore, the government, in seeking to aggravate

12   this, has done -- is doing exactly what Apprendi says they

13   can't do.  Having placed this issue before the jury, the

14   jury's finding of a reasonable doubt governs in terms of

15   aggravating the sentence with regard to Dr. Ashqar because it

16   expands this beyond the normal amount that you could give

17   Dr. Ashqar under the circumstances.  This is exactly the

18   issue, first of all, that Apprendi addressed.

19          So, to suggest at this particular point after having

20   placed this information before the jury and having had the

21   jury to reject it, that the government gets a second chance

22   now to go against that verdict and they get a second chance at

23   a lower standard is, I suggest to you, a violation of the

24   Sixth Amendment under any Apprendi line of cases.

25          Clearly, Apprendi said that, you know, other than the

1    fact of a prior conviction, any fact that increases the

2    penalty for a crime beyond the prescribed statutory maximum

3    must be submitted to a jury and proved beyond a reasonable

4    doubt.

5          Here it was submitted to a jury, and here it wasn't

6    proven beyond a reasonable doubt.  And I suggest that this

7    makes this case very different than most, if not all, of the

8    cases where the enhancement has been applied.  In most of

9    those cases, there has been a plea or a finding of guilt on

10    the underlying charge that forms the basis for which the

11    government seeks the enhancement.  This was neither a plea,

12    nor was there a finding of guilt.

13          So, our first line of discussion with you with regard

14    to this comes directly out of the Apprendi/Blakely line of

15    cases.  And to suggest here to attempt to aggravate Dr. Ashqar

16    beyond what the jury found would be, as discussed in those

17    cases, I suggest to you, a violation of the Sixth Amendment.

18          Beyond that, your Honor, there are problems that are

19    raised by Rita with regard to this situation.  This case is

20    the case that is discussed in Rita where there are Sixth

21    Amendment issues involved, and there's Sixth Amendment issues

22    involved simply because of what the jury has done.  This is a

23    case that is anticipated by both the concurrence and the

24    dissent in Rita where there are Sixth Amendment issues that

25    are on that particular point.

1          I would suggest, and I don't want to, again, repeat

2     any of our arguments.  Here clearly what is happening is they

3     are using the enhancement to increase the guideline sentence,

4     and I suggest to you that we have to examine whether or not at

5     this particular point what the statutory maximum is and

6     whether the statutory maximum is applied before the 3653

7     factors or whether the -- I guess the 3553 factors -- govern

8     whether there is enhancement.  That's the basis of Rita.

9          THE COURT:  Which statutory maximum?  Obstruction has

10    a ten-year, but contempt has life.

11         MR. MOFFITT:  Well, I said --

12         THE COURT:  He was convicted on both.

13         MR. MOFFITT:  I understand.

14         The first thing I would say to you is that the

15    obstruction and the contempt here, he was convicted of

16    obstruction because of the contempt.  They are not in any way

17    separated under this.

18         Further, I would suggest that an unreasonable result

19    here would be if he was sentenced to life.  And we've noted

20    that in our paper.

21         But beyond that --

22         THE COURT:  But I can get to that eventually, but I

23    think that's taken off the table in terms of the guideline

24    range with no accessory after the fact.

25         MR. MOFFITT:  I understand.

1          THE COURT:  So, you don't need to spend too much time

2   on that in terms of --

3          MR. MOFFITT:  Okay.

4          THE COURT:  -- the guidelines themselves.

5          MR. MOFFITT:  Again, I would suggest to you here that

6   the application of the guidelines, again which are advisory,

7   under the circumstances where a jury decided this issue and

8   giving him a life sentence under those circumstances would

9   violate virtually everything we know about our Sixth Amendment

10  jurisprudence.

11         But I also suggest to you the application of note 2

12  violates the Sixth Amendment in this case.  Again, we have to

13  go back to the Apprendi situation, and understanding that the

14  guidelines are no longer mandatory --

15         THE COURT:  Are you talking about Note 2(b)?

16         MR. MOFFITT:  I'll tell you when I look at my notes.

17         Hold on one second.  I believe so.

18         (Brief pause.)

19         THE COURT:  I assume that's it.

20         MR. MOFFITT:  I suggest that the real issue here is

21  what Justice Stevens and Justice Ginsberg focused on and

22  acknowledging that a rebuttable presumption of reasonable

23  standard may cause Sixth Amendment problems, and they suggest

24  even if some future unusually harsh sentence might violate the

25  Sixth Amendment because it exceeds a yet-to-be-determined

1   standard of reasonableness, this case -- that's the problem

2   that wasn't presented in Reda.

3           THE COURT:  I don't understand your argument,

4   Mr. Moffitt.

5           The rebuttable -- the presumption of reasonableness

6   is an appellate-level standard, not a district-court standard.

7           MR. MOFFITT:  Well, the rebuttal presumption is.

8           THE COURT:  An appellate-level standard.

9           MR. MOFFITT:  It is clearly, all right, but in and of

10  itself, it can create a Sixth Amendment problem here under the

11  circumstances of having a sentence that is beyond the scope

12  and beyond the parameters of reasonableness.

13          Once the reasonable standard must be applied, you can

14  create a Sixth Amendment problem by sentencing someone in such

15  a harsh sentence that it does not rationally support a

16  reasonable notion.  We've given you tremendous information

17  with regard to no sentence of contempt has ever gone beyond

18  five years.

19          There really isn't any reason under these

20  circumstances to impose a sentence of life on Dr. Ashqar.  I

21  suggest that that's so far out of the bounds of

22  proportionality, the Sixth Amendment would clearly be

23  implicated.  It was particularly implicated when this issue

24  was placed before a jury.

25          THE COURT:  Again, Mr. Moffitt, I'm addressing the

1   3A1.4 terrorism enhancement --

2          MR. MOFFITT:  But I don't think you can --

3          THE COURT:  I'm sorry, just let me finish -- with the

4   guidelines.  You're addressing the life issue, and a guideline

5   range that would have life imprisonment as a possibility would

6   be unreasonable, unconstitutional.

7          Given that I sustained your objection to the

8   cross-reference applying 2X3.1, a life-in-prison guideline

9   range is no longer possible.

10          So, I'm happy to hear anything you have to say,

11   but --

12          MR. MOFFITT:  Again --

13          THE COURT:  -- I think you're arguing a point that is

14   no longer a viable option under a guideline calculation.

15          MR. MOFFITT:  Well --

16          THE COURT:  Or I'm misunderstanding you.

17          MR. MOFFITT:  Well, I am concerned because the

18   contempt guideline does not, at the end of the day, allows you

19   to decide.  It doesn't impose a particular guideline range on

20   you because it's contempt.  And I suggest that by coupling the

21   obstruction with the contempt, it boosts the guideline

22   range -- it can possibly boost the guideline.

23          And I'm suggesting here that when you apply the

24   guidelines, if the guidelines are going to be the fount of

25   what we do here, your guideline decision because of the nature

1    of the contempt citation has to be -- function under the level

2    of reasonableness here.

3            And still, just despite the fact because of the

4    nature of the guideline having an unending possibility or one

5    that is not defined within the framework, the discretion --

6    the first discretionary call is here at where you think this

7    contempt guideline exists.

8            And that's still, I would suggest, by the case law

9    and by the Sixth Amendment, must fundamentally, that

10   determination, you are still bound by a reasonableness

11   standard at this particular point because there is no typical

12   guideline standard for the issue of contempt.  And the

13   contempt here is being used to boost the obstruction guideline

14   because it doesn't have one.

15           THE COURT:  Any further arguments on the terrorism

16   enhancement, Mr. Moffitt, under 3A1.4?

17           MR. MOFFITT:  Your Honor, I don't want to make all

18   the arguments that I made.  As you said, you've read my paper

19   and --

20           THE COURT:  Several times.

21           MR. MOFFITT:  -- I trust that.

22           THE COURT:  I think you know me well enough by now.

23           MR. MOFFITT:  Yes, I do.

24           But I would suggest that the only way that you could

25   find beyond -- here that the terrorism enhancement applies is

1    on judicially adjudicated facts post a jury verdict, and that

2    would be a violation of the Sixth Amendment.

3            THE COURT:  Mr. Schar?  The 3A1.4 enhancement.

4            MR. SCHAR:  Yes, Judge.

5            I may not be tracking Mr. Moffitt entirely, but as I

6    understand it, the contempt guideline based on your earlier

7    ruling is going to track the obstruction guideline.

8            THE COURT:  Yes.  I'm not revisiting my prior base

9    offense level.

10           MR. SCHAR:  And Apprendi and Blakely as a line of

11   cases are inapplicable to this situation because the statutory

12   maximum is set at ten years for obstruction and life.  There's

13   nothing that's going to change that.  There's no jury finding

14   that would have changed that.

15           And in Booker, obviously you have discretion now, and

16   the guidelines are simply a factor within your discretion that

17   aren't -- that don't implicate in this particular case

18   Apprendi or Blakely.

19           The acquittal, as you have repeatedly indicated in

20   written opinions and the government has argued, does not mean

21   anything in relation to this particular guideline.  In fact,

22   to the extent there's anything to be gleaned, there was an

23   obstruction finding beyond a reasonable doubt and conviction

24   when the charge was obstruction of this particular grand jury

25   investigation that was investigating terrorism.

1        We have laid out in our briefs, I think extensively

2   in relation to the terrorism enhancement, why it applies and

3   in particular, why I believe the case Biheiri out of the

4   Eastern District of Virginia and then the follow-up case,

5   which essentially just went along with the Biheiri reasoning,

6   are inaccurate or incorrectly decided at several levels,

7   including the need for actual obstruction.

8        We would urge you to find that those are standards

9   that are not required, and simply that district court made

10  some analogies such as to 3C1.1 which, in taking a step back

11  and looking, don't necessarily make sense.

12       That all being said, Agent Bray's testimony, Judge,

13  made crystal clear, as did this trial, but Agent Bray's

14  testimony in particular, that, in fact, there were specific

15  crimes of terrorism that were being investigated, both dating

16  back to 1993 and to the time when defendant Ashqar was called

17  before the grand jury.  As Agent Bray noted, this was shortly

18  after or around the time that there was a bombing next to the

19  American Embassy by Hamas in a bar called Mike's Place in

20  which individuals died in a bus bombing in which Americans

21  died.

22       So, there were specific actual acts that were being

23  investigated, but there were specific statutes as laid out in

24  the grand jury that were being investigated.  Indeed, an

25  indictment was returned on a material support count that did

1    not go to trial but clearly this grand jury was investigating.

2           As to actual obstruction, you've already hit on a

3    number of the things that the government would cover, and I

4    don't want to spend a lot of time going on it, but the Jarad

5    document, the who, what, when, where and why over and over and

6    over again, Judge, came up in Agent Bray's testimony and at

7    trial in ways that only defendant Ashqar can adequately

8    explain.  Why were aliases used?  Why was he using an alias?

9    Who did he transmit these documents to?  Why was he writing up

10   suggestions as to how to deal with certain things?  Who were

11   the people in Chicago that were upset that defendant Salah had

12   been sent on Hamas activities based on the report found in

13   defendant Ashqar's documents?

14          Yusif Saleh, Ahmed Yusif, defendant Ashqar again

15   could have provided significant information.

16          Mr. Constantine, who is Mr. Constantine?  Why is

17   defendant Ashqar on the phone with Mr. Constantine talking

18   about killing a rogue Hamas member?  Only defendant Ashqar can

19   answer those questions.

20          There is over and over and over again consistent

21   questions that were raised throughout the course of this

22   investigation, indeed throughout the course of the trial, that

23   only defendant Ashqar could answer.

24          And I think that was made plain when the government

25   had to publish documents repeatedly or publish phone calls,

1   and that's literally all we could do is simply lay out for the

2   jury, here's what was said.  What does it mean?  The person

3   who could answer that question is sitting on that side of the

4   courtroom, and he will not tell us.

5          So, to say, Judge, that there was actual obstruction

6   is an understatement, and indeed on facts significantly less

7   compelling than this, the Benkahala Eastern District case

8   found actual obstruction, as well.

9          So, we think that the standard is not that laid out

10  in Biheiri, but even if it is, the facts of this case by a

11  preponderance of the evidence demonstrate the terrorism

12  enhancement applies.

13         MR. MOFFITT:  Your Honor, let me just read something

14  to you.

15         THE COURT:  I'm sorry?

16         MR. MOFFITT:  Let me just read something to you.

17  This is from Page 322 of the closing argument.

18         "You have Abdelhaleem Ashqar, obstruction of justice,

19  the fifth one up there, committed two acts of obstruction of

20  justice, one in 1998, one in 2003.  That's two acts of

21  racketeering activity.  That in itself could establish the

22  pattern."

23         I suggest to you that when the jury said Dr. Ashqar

24  was not guilty of the racketeering in the face of that

25  argument, you can only glean that the jury thought that there

1   was another reason other than furtherance in -- furthering the

2   racketeering conspiracy for Dr. Ashqar's failure to testify.

3   And to suggest anything else under these circumstances would

4   be to suggest an untruth.

5          So, having the government place this in front of a

6   jury and having the jury reject that notion puts us squarely

7   within the Sixth Amendment issue.  And I suggest that you

8   can't revisit it now at this particular point, having done

9   that.

10         They didn't have to do it that way.  They didn't have

11  to do it that way.  And the reason they, frankly, did that

12  that way, your Honor, was to get it within the statute of

13  limitations.  Whatever conduct Dr. Ashqar had committed prior

14  to his testimony in 2003 or being called to testify in 2003

15  would have been well away from the statute of limitations.

16  And, therefore, Dr. Ashqar could not be charged.

17         So, in order to charge Dr. Ashqar, they put this in

18  as an act in furtherance of the RICO conspiracy.  That would

19  give them a case that was within the statutory limits, and,

20  therefore, they had to argue this.

21         Now, I don't know what reasons the jury decided to

22  acquit Dr. Ashqar, but they did.  And if any of this -- if any

23  of this stuff that we've heard about the jury being the

24  foundation and not being able to aggravate a sentence where

25  the government has placed this information before a jury

1   beyond a reasonable doubt and not gotten what they wanted, at

2   the end of the day, you know, that case law has to have some

3   meaning.

4           So, again, I would suggest to you that the first line

5   of defense here is the Apprendi line of cases and that once

6   the jury's decided this issue, this should not be an issue for

7   you because -- I will finally say because the acquittal's got

8   to mean something.  If that, then there is no point in ever

9   going to trial if the government gets to do what they couldn't

10  do in front of a jury in front of you where there has been a

11  jury finding.

12          THE COURT:  I am going to address in my ruling

13  regarding this enhancement all of the issues, not just the

14  ones you've raised today, but the ones you have raised in your

15  papers, as well.  So, my ruling on this is going to be lengthy

16  because of all of the issues you have raised.

17          I will start with -- first of all, the enhancement is

18  Section 3A1.4 that provides if the offense is a felony that

19  involved or was intended to promote a federal crime of

20  terrorism, increase by 12 levels; but if the resulting offense

21  level is less than 32, increase to a level 32.

22          I will start with your argument that the jury verdict

23  dictates this issue.  I am rejecting that argument on several

24  bases.

25          First of all, the jury was considering a separate

1    issue, whether or not Dr. Ashqar had committed a RICO

2    conspiracy or should be guilty of a RICO conspiracy.  Seventh

3    Circuit law is very clear that courts can't guess why juries

4    reached certain verdicts.

5         But this is a separate issue.  The question is

6    whether or not his refusal to testify before the grand jury

7    obstructed a federal crime of terrorism, which would be an

8    underlying terrorism investigation as set forth in the

9    application note that you pointed out to the Court previously.

10        Even if, Mr. Moffitt, your argument were correct,

11   that somehow it was the precise issue, again, the Seventh

12   Circuit -- which I don't think it is, but the Seventh Circuit

13   has been very clear that even acquitted conduct can be the

14   basis for sentencing enhancements.  But I don't rely on that

15   because it is a separate issue from what the jury determined.

16        I'm also rejecting your argument that Apprendi

17   dictates this.  Apprendi is not applicable here because the

18   statutory maximum, as Mr. Schar pointed out, is ten years for

19   obstruction of justice and life for contempt.  So, there is

20   not an Apprendi issue.

21        In addition, in United States vs. Hale, 448 F.3d 971

22   at 988, the Seventh Circuit in 2006 reaffirmed what it had

23   held in United States vs. Arnaout at 431 F.3d 994, 1001, a

24   2005 Seventh Circuit case.  Specifically, it held that "A

25   defendant need not be convicted of a federal crime of

1    terrorism as defined by Section 2332b(G)(5)(B) for the

2    district court to apply section 3A1.4.  Instead, the terrorism

3    enhancement is applicable where a defendant is convicted of a

4    federal crime of terrorism as defined by Section

5    2332b(G)(5)(B) or where the district court finds that the

6    purpose or the intent of the defendant's substantive offense

7    of conviction or relevant conduct was to promote a federal

8    crime of terrorism as defined by Section 2332b(G)(5)(B)."

9         The word "promote" as used in Section 3A1.4 signifies

10   that where a defendant's offense or relevant conduct helps or

11   encourages a federal crime of terrorism as defined in that

12   same section, then Section 3A1.4 is triggered.

13        Another argument you raised in your papers, again,

14   the beyond a reasonable doubt vs. clear and convincing versus

15   preponderance of the evidence standard, again, Arnaout and

16   Hale, the Seventh Circuit made clear that preponderance of the

17   evidence standard applies to the terrorism enhancement as

18   well.

19        You relied on U.S. vs. Kikumura, K-I-K-U-M-U-R-A, 918

20   F.2d 1084 at 1100, 1101, a Third Circuit case from 1990 in the

21   arguments that you submitted to the Court.  I am -- first of

22   all, this Court is not bound by that, nor am I persuaded by

23   the reasoning in that.

24        I also note that the Seventh Circuit rejected that

25   precise reasoning in U.S. vs. Reuter, R-E-U-T-E-R, 463 F.3d

 1   791, a 2006 Seventh Circuit opinion.  We are in the Seventh

 2   Circuit.  I am bound by Seventh Circuit law.

 3        And significantly, on September 10th of this year,

 4   the Third Circuit specifically overruled its ruling in

 5   Kikumura in U.S. vs. Fisher.  The Westlaw cite is 2007 Westlaw

 6   2580632.  The Third Circuit held, "This case presents the

 7   question we left open in our en banc decision in U.S. vs.

 8   Greer.  Does U.S. vs. Kikumura remain good law in light of the

 9   Supreme Court's landmark decision in U.S. vs. Booker?  We hold

10   that it does not."

11        Therefore, any reliance on Kikumura certainly in this

12   circuit and even in the seventh -- in the Third Circuit would

13   fail.

14        I am also rejecting your argument regarding acquitted

15   conduct for the reasons I've already addressed.  The Seventh

16   Circuit itself has specifically rejected that argument.  It

17   has held, "Conduct underlying an acquitted charge may be

18   included as long as that conduct is proved by preponderance of

19   the evidence."  I am citing U.S. vs. Rith, R-I-T-H, 461 F.3d

20   914 at 917, a 2006 Seventh Circuit case.

21        You can also look at U.S. vs. Horne, H-O-R-N-E, 474

22   F.3d 1004 at 1006, 07.  U.S. vs. Hurn, 496 F.3d 784, another

23   Seventh Circuit case.

24        Your First Amendment argument that you make regarding

25   the application of this enhancement, I am also rejecting that

1   for the reasons I've previously given and have given

2   throughout the proceedings in this case as I mentioned at the

3   beginning of today's hearing.

4           Here it is true, Mr. Moffitt, that Dr. Ashqar was

5   acquitted of the RICO conspiracy, but that does not answer the

6   question for the reasons I've already addressed.  I have to

7   look to determine whether or not the purpose or intent of the

8   defendant's offense of conviction; namely, the obstruction of

9   justice by failing to testify before a criminal grand jury

10  investigating the terrorist activities of Hamas and the

11  contempt conviction, was intended to promote a federal crime

12  of terrorism.

13          In making the Court's ruling, I start with the

14  definition of a federal crime of terrorism as the Seventh

15  Circuit has said that I must.  That is defined in the statute

16  I previously gave you, Section 2332b(G)(5)(B) under Title 18.

17  A federal crime of terrorism is defined as a listed offense

18  that was calculated to influence or affect the conduct of

19  government by intimidation or coercion or to retaliate against

20  government conduct.  And there are various things enumerated

21  in 18, United States Code, Section 1114.

22          I agree with Officer Rice's conclusion that the

23  enhancement applies here; namely, the obstruction of justice

24  of a federal grand jury investigating the terrorist activities

25  of Hamas.

1          Application 2 which you have pointed out to the Court

2    already to Section 3A1.4, this is in both the 2006 and the

3    2007 guideline, it's the same, provides that an offense that

4    involved obstructing an investigation of a federal crime of

5    terrorism shall be considered to have involved or to have been

6    intended to promote that federal crime.

7          Here, again, the offense of conviction was for

8    obstructing justice by refusing to testify even though his

9    testimony was compelled before a grand jury that was

10   investigating terrorist activities.

11         If you look at the Court's finding, the government

12   has met its burden of establishing this by a preponderance of

13   the evidence.  Looking at the evidence, we have first of all

14   Agent Bray's testimony regarding what the grand jury was

15   investigating, and Mr. Chanenson, who testified during trial,

16   also testified about what the grand jury was investigating.

17         The best evidence, frankly, is the testimony and the

18   transcript from Dr. Ashqar's testimony on June 25th, 2003,

19   before the grand jury.  This was admitted into evidence at the

20   trial.

21         The transcript makes clear that the prosecutor

22   explained to Dr. Ashqar before the grand jury that he was

23   appearing before a grand jury that was investigating federal

24   crimes of terrorism, including certain acts committed by

25   Hamas.

1          Looking at Pages 8 through 11 of the transcript, it

2    is, again, very clear -- I'm going to quote from this, this is

3    the prosecutor speaking:  "Let me just explain to you that

4    this grand jury -- I will tell you this grand jury is engaged

5    in a broad investigation involving federal crimes of

6    terrorism, including certain acts committed by Hamas.  I would

7    like to explain to you some of the laws that the grand jury is

8    investigating.  These are federal criminal laws that the grand

9    jury is investigating.  If you don't understand at any time

10   the laws I'm talking about or you would like further

11   explanation, feel free to interrupt me because I'm going to go

12   through a list of laws that the grand jury is investigating."

13         The prosecutor then went through a list of laws,

14   including conspiracy to kill, kidnap or maim under 18, United

15   States Code, Section 956; 18, United States Code, Section 1203

16   regarding hostage taking; Section 2332, which makes it a crime

17   to kill a United States national while the national is outside

18   of the United States; Section 2339(a), which makes it a crime

19   to provide material support and resources to terrorists;

20   Section 2339(b), which makes it a crime to provide material

21   support and resources to a terrorist organization, including

22   Hamas; Section 2339(c), which makes it a crime to finance

23   terrorists and terrorist organizations; Section 371, which

24   makes it a crime for people to conspire to break any of the

25   laws of the United States; Sections 1961 and 1962, which make

1    it a crime for individuals to participate in the affairs of an

2    enterprise through a pattern of racketeering activity or to

3    conspire to participate in affairs of an enterprise through a

4    pattern of racketeering activity; the money laundering

5    statutes are cited, false statements to government officials,

6    those are cited, and the mail and wire fraud are cited, as

7    well as Section 1503, corruptly obstructing the due

8    administration of justice, including a grand jury

9    investigation, and Section 1512, another obstruction.

10           Those were made very clear to Dr. Ashqar when he

11   appeared before the grand jury and refused to testify.  In

12   addressing one of your objections in your written submission

13   to the Court, Mr. Moffitt, not only were these made clear to

14   Dr. Ashqar when he first appeared in the grand jury, but they

15   were made clear to him at Pages 34 through 37 after he was

16   immunized and compelled to testify by the chief judge telling

17   him that what he said would not be used against him.

18           Dr. Ashqar refused to answer questions directly

19   relevant to this investigation, and I am making this ruling in

20   part based on the evidence that I heard during trial,

21   including the documents that were admitted, the phone

22   documents, the confessions from members of Hamas, the Jarad

23   memo.  He refused to answer every substantive question that

24   was put before him.

25           And when he refused to answer, he repeatedly said, "I

1    cannot and will not permit my answers to be used against my

2    relatives and colleagues who have committed no crimes or

3    wrongs but who are being singled out for their involvement in

4    the struggle for political legitimate rights as recognized

5    under international law.  I will never give evidence or

6    cooperate in any way with the grand jury or any other, no

7    matter what the consequence to me."

8         When asked if he would continue to refuse to answer

9    questions regarding the government's terrorism investigation,

10   despite the fact that his refusal to answer those questions

11   would harm the investigation, he read the prepared statement

12   again and informed the grand jury, "I will never give evidence

13   or cooperate in any way with the grand jury or any other, no

14   matter what the consequence is to me."

15        When asked a series of questions about specific

16   individuals that the grand jury was interested in, Dr. Ashqar

17   again incorporated his statement and refused to answer saying,

18   "I will never give evidence or cooperate in any way with the

19   grand jury or any other, no matter what the consequence is to

20   me."

21        When informed by the prosecutor that his refusal to

22   answer questions because he didn't want to give information

23   that could be used against others made it "extremely

24   difficult" for the grand jury to complete its investigation

25   and to properly investigate Hamas terrorist activities,

1  Dr. Ashqar, again, refused to testify, read his prepared

2  statement and told the grand jury, "I will never give evidence

3  or cooperate in any way with the grand jury or any other, no

4  matter what the consequence is to me."

5          After being immunized and compelled to testify by

6  then Chief Judge Kocoras, he still refused to answer any

7  questions regarding the investigation, regarding any terrorist

8  activities, regarding any terrorist activities of Hamas.  He

9  was informed, again, after he was compelled to testify, that

10  the United States thought the information he had was

11  "critically important to the grand jury's investigation into

12  Hamas and other terrorist activities" at Page 53 of the grand

13  jury transcript.

14          He was also advised that his refusal to answer the

15  questions would have a significant impact on the government's

16  investigation into terrorist activities.  At that point,

17  Dr. Ashqar again refused to testify and said, "I will never

18  give evidence or cooperate in any way with the grand jury or

19  any other, no matter what the consequence is to me."

20          The government has met its burden of proving, by a

21  preponderance of the evidence at a minimum, that Dr. Ashqar

22  intended to obstruct a terrorism investigation into Hamas

23  activities.

24          I know you have cited several Virginia cases

25  regarding what standard should apply.  Those aren't binding on

1  this Court, and I frankly don't need to address that issue

2  because I have found, based on Agent Bray's testimony, based

3  on the evidence heard during trial, and based on the

4  transcript, parts of which I have just reviewed with you, that

5  there was actual obstruction here.

6          I am rejecting and overruling your arguments,

7  Mr. Moffitt, that application note 2 is unconstitutional.

8  I've already addressed the First Amendment argument.  I am

9  rejecting your double jeopardy argument based on U.S. vs.

10  Hall, 109 F.3d 1227, a 1995 Seventh Circuit case.  And your

11  Eighth Amendment cruel and unusual punishment argument is also

12  inapplicable here, especially in light of the fact that the

13  guidelines are advisory and the Court looks to the Section

14  3553 factors to make its final sentencing determination.

15          For those reasons, I am overruling your objection to

16  the application of the terrorism enhancement under 3A1.4 of

17  the guidelines.  Based on that, the offense level increases to

18  a level 32 with a Criminal History Category of VI.

19          There is no role in the offense enhancement in this

20  case, given that Dr. Ashqar was the sole participant in the

21  obstruction.

22          For those reasons, our final guideline calculation is

23  an offense level of 32, a Criminal History Category of VI,

24  with a corresponding guideline range of 210 to 262 months.

25          With respect to sentencing, Mr. Moffitt, I will hear

1  from you.  And I will certainly consider some of the arguments

2  that you have already raised with this Court that I believe

3  are more applicable to the ultimate sentence and the Section

4  3553 factors than to some of the particular enhancements.

5       MR. MOFFITT:  Let me start by saying this is not a

6  case that I would suggest to you is contemplated by our

7  criminal law.  Dr. Ashqar is not a citizen of the United

8  States.

9       THE COURT:  Are you saying, just so I'm clear, that

10  the conviction or that the level of guidelines?

11       MR. MOFFITT:  Well, I'm talking about the entire case

12  at this particular point.  I'm assuming that you want me to

13  make my 3553 --

14       THE COURT:  I want to you make any arguments you have

15  regarding sentencing and certainly include 3553 in there.

16       MR. MOFFITT:  This is not a drug case.  This is not a

17  case that was compelled by the issue of greed or what

18  typically involves criminal cases in the United States.  This

19  case was not about money.  This case is about a people.

20       As I said, Dr. Ashqar is a Palestinian.  He was born

21  in Palestine, a country that is not even on the FBI computer.

22  He is a man who seeks the dignity that each and every one of

23  us seek and the right to be free in his own country.

24       He is a man, I would suggest to you, of great courage

25  and great ability.  And he is in many ways an example to all

1    of us.  I don't know how we call upon an individual whose

2    country has been occupied for 50 years, the occupation of his

3    country violates every norm of civilized justice.  And when

4    his people scream to be made free, fight to be made free like

5    every other country that has felt the sting of colonialism,

6    they're punished?  They should be punished?

7            I guess certainly under the theory that if the

8    British had won the American Revolution, then the people that

9    found this country should be punished because they found this

10   country for the same reasons Dr. Ashqar is before you.

11           So, if seeking freedom for his people in his country

12   can be made a crime in this country, how far have we come?

13   How far have we come?

14           There is no motive here other than Dr. Ashqar's

15   desire to end the occupation of his homeland.  And chronicles

16   and documents and words and things have been spoken for the

17   last 50 years here, overseas, and in the United Nations about

18   the illegality of that occupation, and nothing's happened.

19   It's still occupied.  The Israelis still build settlements in

20   the occupied territories.  They still confiscate Palestinian

21   land.  And it goes on and on and on and never ends.

22           When will it end?

23           And if we make the people who are most like us in

24   fighting for their freedom criminals because now we're an

25   established government, we're proud and we're powerful.

1          The history of our country was to look out for the

2   weak, not for the strong.  There are millions of people as we

3   speak in refugee camps as a result of what has happened in the

4   occupied territories.  Government witnesses won't even say the

5   word occupied.  The world has condemned the occupation, but

6   the world can't stop the occupation.

7          Just like in Ghana, just like in Angola, just like in

8   South Africa, it's up to the people who live in those

9   countries to stop them.  And I guess Dr. Ashqar will tell you

10  Nelson Mandela spent 27 years in jail on Robben Island

11  fighting for the freedom of African people in South Africa

12  because of an apartheid system.  Jimmy Carter, the President

13  of the United States, has suggested that what is going on in

14  Israel and the occupied territories is apartheid.

15         Yet what we're saying today in the face of the entire

16  world is that these people have no right to fight back.  They

17  have no Army.  They have no nuclear bombs.  They have nothing.

18  And in most cases they're fighting with sticks and stones, as

19  I told the jury.

20         And what are they fighting for?  We are a mature

21  enough democracy, I would suggest to you, or if we are not, we

22  should be to understand the difference between what is

23  happening in the occupied territories and what a terrorist

24  group like al Qaeda looks like.  These are two very different

25  things.  We are now the occupiers as opposed to the occupiees.

1  I asked myself over and over, again, if the situation were

2  reversed, if it was here that was occupied, if it was here

3  that a military power had imposed military courts, had

4  incarcerated my brothers, my sisters, myself, my nieces, my

5  nephews, on the basis of supporting that occupation; if my

6  wife's family had been run from the village that she was born

7  in because of the occupation, how much courage would I have?

8  Where would I stand?  Would I stand with the occupier, or

9  would I stand with the people who are fighting that

10  occupation?  Would I have the courage to stand up?

11         Now, one thing that's important to note here.

12  Dr. Ashqar's act here was an act of silence.  He didn't

13  mislead anybody.  He didn't lie to a grand jury.  And there's

14  got to be a difference, I would suggest to you, between

15  silence and perjury.  He chose to remain silent.  He chose to

16  remain silent out of his belief that he had a patriotic duty.

17         I've listened to Mr. Ferguson talk about Dr. Ashqar's

18  duty to the United States.  He had no duty to the United

19  States.  He's not a citizen of the United States.  He came

20  here to get an education, and he informed people about what's

21  going on in his country.  And you heard the kind of

22  information about what kind of man Dr. Ashqar was.  You heard

23  the people at the University of Mississippi testify that when

24  an Islamic student died, Dr. Ashqar was the person that they

25  went to to arrange the burial.

1             You also heard from the people at Mississippi that

2    from the very beginning, they were told and, conversely,

3    Dr. Ashqar was told, that this investigation began and was

4    being promoted at the behest of the Israelis.  Now, Dr. Ashqar

5    has a lot of experience with the Israelis.  You've seen it in

6    your letters, in the letters to you.  He has a lot of

7    experience with what the Israelis have done to him, his family

8    and what the occupation, not beginning with the British

9    occupation and his father, have done to his people.

10            Now, would I be willing to stand by and give evidence

11   to the occupier if I were asked to if this were my country

12   that was invaded?  I would hope that I have more courage than

13   that.  I hope that I would not lie.  I hope I would not

14   mislead.  I hope I would have the courage to remain silent.

15            You're not going to stop the occupation, the

16   brutalization of the Palestinian people.  You put him in jail.

17   Put him in jail for a long time, and that brutalization is

18   going to continue.  And it's going to continue in such a way

19   that people who are far less peaceful than Dr. Ashqar are

20   going to become more and more angry, and they're going to

21   become more and more angry about our support for that.

22            We sent you this (indicating).  This gives you an

23   example of what happens to people who have his nationality

24   simply because of his nationality.  Everything in our history

25   tells us that is not right, that is not fair.  The fourth

1   protocol of the Geneva Convention says that an occupying power

2   can't seize the land, can't build roads, can't build

3   obstructions, yet the whole world has ignored what has

4   happened.

5        And the Palestinians are a problem.  They're a

6   problem because they won't be quiet, because they want what

7   you and I want, and they want for their children what I want

8   for mine and they want for their grandchildren what I want for

9   mine.

10        And what is it about them that says they're not

11   entitled to it?  Is it because they're Muslim and they don't

12   necessarily believe the same things that we believe?  Is it

13   because of the color of their skin?  What happens when you for

14   50 years press a people, oppress a people, deprive people of

15   the fundamental notion of liberty and justice?  What happens?

16   Are they supposed to remain silent forever?  Are they supposed

17   to aid their oppressor out of some spirit that their oppressor

18   ought to be aided or some spirit of justice that I would

19   suggest to you is totally misplaced?  What is justice?  What

20   is just for him?  What is just under the circumstances?

21        Is he a drug dealer?  No.

22        Is he a racketeer?  No.

23        What is he after?  What is the goal here?  Freedom.

24   The right to determine for themselves what their country ought

25   to be.

1          And what happens?  What happens?  They have an

2     election.  And guess what?  Hamas gets elected.

3          Now, not one Palestinian, not one person with feet on

4     the ground that has a stake in that society made the

5     determination to call Hamas a terrorist group.  That was all

6     done over here in the pleasure of our homes as we are not

7     being victimized by an occupation.

8          Well, you know, we have a proverb.  Before you decide

9     to punish me, walk a moment in my shoes.  What created a Mousa

10    Abu Marzook?  What created Hamas?  What created Fatah?  What

11    created those problems?  These are not inherently violent or

12    mean people.  And this whole notion that anybody who supports

13    what happens in Palestine in the fight for power is evil is

14    ridiculous.  He's not an evil man.

15         But why are his wants and his desires for the things

16    we take for granted every day -- the right to determine what

17    kind of government he lives by, the right to worship in a way

18    he chooses, the right to decide whether religion ought to play

19    a role in the law of the country -- why should he be deprived

20    of that?

21         You've read that his parents had a farm and once the

22    occupation began, they could no longer sell their vegetables

23    and their fruit.  You read that his wife's parents were

24    removed from their village.  This is A History of the

25    Occupation (indicating) written by Israelis, and they discuss

1    the evils of what has happened.

2         I would suggest to you that the government's theory

3    of this case was that the Palestinians wanted to lord over the

4    whole state of what was called Judea or Israel.  And I suggest

5    to you they are combatted on the other side by an Israeli

6    government that wants to lord over it, as well.  And they have

7    made it impossible for the Palestinians to have a viable state

8    because that was their intent from the very purpose from this

9    book.

10        The man who over the years had sown scores of

11   settlements in order to thwart any possibility of a viable

12   Palestinian state reaped in this war what he may not and many

13   Israelis believe to be the very proof in a kind of

14   self-fulfilling wish.  The Palestinians are not deserving of a

15   state of their own because of their innate murderous

16   barbarity.  The great victory, therefore, that Sharon

17   succeeded in chalking up to his credit before his withdrawal

18   from Gaza was the casual disconnection of the Palestinian's

19   war against the 40-year Israeli occupation from any historical

20   context and from to his handiwork over the years.  From The

21   Lords of the Land, the History of the Settlements.

22        Well, in this courtroom, in this procedure, in that

23   indictment, there was a disconnect in the same way of the

24   historical context.  What are they to do?  What is your answer

25   to Dr. Ashqar when he says I want my people to be free?  The

1    government's answer was as follows:  Give up your citizenship,

2    give up your name, give up your heritage, give up what you

3    know has happened to your family, and come join us.  This is

4    what we offer to you.  We will put you in witness protection.

5    We will protect you from your own people.  All we want you to

6    do is further our investigation in the people who in your

7    country are fighting for liberty.

8              What is a terrorist?  Has there been a social

9    movement that resulted in change in this world that hasn't had

10   to use violence in some way to overturn a social order that

11   imposed the lack of any legitimate rights on the party?  Has

12   that ever happened?

13             Years ago, there were revolutionary movements.  It

14   was a revolutionary spirit.  We did it in the United States.

15   The French did it.  We salute the French Revolution and all of

16   its atrocities.  And over and over in the world, we have

17   saluted people who have overcome their oppression by fighting

18   because the oppressor never gives up without a battle, no

19   matter what the oppressor says.

20             What do we say to him?  Another 50 years?  Another

21   generation of people in refugee camps?  Another generation of

22   not resolving the issue in the Middle East?  And we wonder, we

23   wonder why people in the Middle East at this particular point

24   resent us.  Can't we draw a distinction between what is

25   happening and why people fight in Palestine and the difference

1   between al Qaeda?  Can we be sophisticated enough to

2   understand that difference?  The world demands that we

3   understand that difference.

4          This is a man who has suffered not only personally,

5   but he's been jailed by the Israelis, and yet these people

6   want to stand there in this place, in this country, unaffected

7   one way or another by this occupation, not worried about it at

8   all and make a value judgment against him?  One wonders what

9   Mr. Schar and Mr. Ferguson would do under those circumstances.

10  Would they have the courage of Abdelhaleem Ashqar?  I don't

11  know.  I would hope so.  I would hope so.

12         But how do we make a value judgment on Abdelhaleem

13  Ashqar in the face of what he's experienced, what his wife has

14  experienced, what his family has experienced, how do we say

15  that he was wrong?

16         And, Judge, I suggest to you there's got to be a

17  distinction between silence and lying.  There's got to be a

18  distinction.  He had the courage to stand up and say I'm not

19  going to mislead you, I'm not going to lie to you, but I'm not

20  going to tell you.  I'm not going to talk to you.  These are

21  people who are fighting in my country for our freedom.

22         And it's not even a country, according to us.  How

23  much dignity do we take away from these people?  And how long

24  do we take away their dignity and expect them to remain

25  peaceful?  The American native Americans didn't remain

1   peaceful as their land was being confiscated and taken from

2   them.

3          What in our history on this planet tells us people

4   are going to sit by and let this happen it them?  What else

5   tells us that 50 years of this they are not going to say I'm

6   sick and tired of being sick and tired?  Do they have a right

7   to be sick and tired?  How would anyone feel if they knew that

8   there were relatives in what amounts to concentration camps?

9          By what right does one people have to do that to

10  another?  And then by what right do we have to expect in the

11  face of the terror, in the face of all the things that

12  happened?  You've heard it.  You heard it from Mr. Hroub, the

13  censorship, the closing of the universities, the lack of

14  education, the lack of opportunity, the hours and hours it

15  takes to go from place to place because there are only --

16  there are roads in the occupied territory that only can be

17  traveled by Israelis.

18         When you look and sentence Dr. Ashqar, be mindful, be

19  mindful of what you're saying to him.  The Israelis imposed an

20  illegal occupation, illegal by any stretch of international

21  law, and you have no right to fight that.  And if you fight

22  it, we're going to punish you.

23         Well, I know Dr. Ashqar.  And if you told him that he

24  would have to spend the same amount of time that Nelson

25  Mandela spent in jail, 27 years, to vindicate his rights, he'd

 1  go and spend those 27 years.  That's not fair.  That's not

 2  just.  It wasn't just in Mr. Mandela's case.  It's not just in

 3  Dr. Ashqar's case.

 4         We are very comfortable here.  We have avoided many

 5  of the things that go on in the world.  We have gone from

 6  being a people that support poor people and people who are

 7  under colonial oppression to a colonializing power.  We have

 8  treated Arab people very badly.  And you can just look at what

 9  the Blackwater people were trying to pay for the life of an

10  Arab in Iraq.  We treat their lives as if they don't mean

11  anything, and we wonder why they're angry at us.  We

12  wonder why we're angry, because we set ourselves up as a

13  paragon of all the things he believes in, and we tell him that

14  he has no right to believe them, he has no right to fight for

15  them.

16         And then we say to the rest of the world this is our

17  history, aren't we proud.  Aren't we proud that some family

18  farmers got together and said no taxation without

19  representation and fought the British and threw tea off, and

20  we're proud of that.  We tell the whole world that as a

21  revolutionary example.

22         And then when another people with less opportunity

23  under far more oppression that faced the settlers here in this

24  country stand up and fight, we call them terrorists.  We call

25  them terrorists.  And if this country was under the same set

1   of occupation, I hope to God I would be a terrorist.

2          It's been a great pleasure to be here in your

3   courtroom.  It's been a greater pleasure to represent this man

4   because I've met him, I know him, I understand what he

5   represents.  I've read pleadings that suggested that while he

6   was at school, he was just running around creating problems.

7          You have a letter from his adviser.  You have a

8   letter from his adviser saying what kind of man he was.

9   You've seen numerous letters talking about what kind of man he

10  was.

11         I hope that when I leave this planet, there will be

12  those kind of testimonials to me.  You're going to do whatever

13  you think is right and just and fair, and I've appreciated

14  your fairness throughout this whole process.

15         I'm going to ask for it one more time.  One more

16  time.  I'm going to ask you to put yourself for a moment in

17  the shoes of Dr. Ashqar, in the shoes of a family that has

18  faced the oppression of an occupation, in the shoes of a young

19  man who in 1967 saw his community invaded and a military order

20  imposed, in the shoes of a man whose family has a history in

21  fighting the occupation, in the shoes of a man who has gone to

22  jail, who stood up for what he believed and fought for what he

23  believed in a place where the world has abandoned.

24         I ask you to take that into consideration in

25  sentencing Dr. Ashqar, and I suggest to you that this is

1   unlike any other criminal case that you will ever have before

2   you again.  This is not al Qaeda.  This is not Osama bin

3   Laden.  This is none of that.  We are not at war with the

4   Palestinian people.  They are not at war with us.  And to the

5   extent that we support this occupation, they are angry with

6   us.  But it's only human.  That's only right and just that

7   they be angry with us to the extent that we support this.

8           He is not an angry man.  And if you look at those

9   letters, nothing in those letters indicate that this is an

10  angry man who's looking for revenge against the United States

11  or that this was motivated by revenge.

12          I understand that you made a ruling about what you

13  thought this was motivated by, but I suggest that this was

14  motivated only by a sense of justice that exists in all of us,

15  and that's all I have to say.

16          THE COURT:  Mr. Moffitt, are you making any specific

17  recommendation?

18          MR. MOFFITT:  Well, I certainly am asking you, since

19  you have found the guideline being what it is, to depart from

20  that guideline, that the criminal history here is well

21  overstated far beyond what it was supposed to be.  And I

22  suggest to you the guideline itself overstates this man's

23  involvement and why this man was involved.

24          Judge, I'm not going to make a recommendation to you.

25  I'm going to leave it to you to decide.  You've heard all of

1   this.  You know -- you've read all of the letters.  You've

2   seen everything there is to know about this man.  You've seen

3   what kind -- you get from the sense of it.  If you remember

4   there is one letter that discusses the fact that when

5   Dr. Ashqar was running Al Aqsa, if you remember, there was a

6   student who wrote, and she said his charity was different from

7   everyone else's.  He was looking for books, for educational

8   information, and that was why she contributed books and what

9   have you.

10        This man, if you remember his speech in the

11   Philadelphia, his speech was about education and what the

12   Palestinian people have to do.  He was always trying to get

13   other people here to do that.

14        And I suggest to you one of the problems with

15   education is it makes oppression more difficult to stomach.

16   The more educated you become, the more -- the harder it is to

17   stomach oppression.  As long as you remain ignorant and

18   powerless, it's much easier to stomach oppression.  And the

19   people who found this country were the intellectual leaders of

20   their communities, just like Dr. Ashqar.

21        I've talked long enough.  I've said what I had to

22   say.  Again, I'm very proud to be standing with this man.

23             THE COURT:  Thank you, Mr. Moffitt.

24             MR. MOFFITT:  Thank you.

25             THE COURT:  If you need to sit until it's your time

1   to speak, you're welcome to do so.  You can stand if you'd

2   like, but I see you leaning over, Dr. Ashqar, if you want to

3   sit until you speak.

4           THE DEFENDANT:  That's okay.  I'm going to stand up

5   for everything, Judge.

6           THE COURT:  Mr.  Schar?

7           MR. SCHAR:  Judge, I want to start first with the

8   premise that there are two separate crimes and two separate

9   harms that have occurred here.

10          One is obviously the grand jury investigation for

11  which there's obstruction, and the second is the contempt,

12  which is actually a separate harm; that is, a judge's ruling

13  that was ignored and not abided by.  So, there are two

14  separate ills for which defendant Ashqar has been convicted.

15          I do not want to belabor, Judge, what is at a minimum

16  the overwhelming evidence of the type of critical information

17  that defendant Ashqar could have provided to this grand jury

18  investigation.  He was -- and this was demonstrated at trial,

19  on the phone with nearly every significant high-ranking member

20  of Hamas, including numerous founders, both in Israel and in

21  foreign countries such as Iran.

22          He was on the phone talking about the need to kill a

23  rogue Hamas member.  He was on the phone discussing coming up

24  with a code of communications between Hamas members.  He was

25  on the phone attempting to put Hamas leader Rantisi, one of

1   the founders of Hamas, in touch with the family of a Hamas

2   terrorist who had blown himself up on the way to commit a

3   terrorist attack.

4        He was on the phone discussing ways to protect Hamas

5   archives.  He was himself, as the evidence has demonstrated,

6   an archivist.  Countless documents, not just relating to

7   education, Judge, but relating to significant violent

8   activities by members of Hamas, including members he was in

9   touch with, were found in manners that only he to this day can

10  explain to the grand jury, to the government, such as the

11  Jarad document, the confessions which we've cited earlier, the

12  fact they were translated from Hebrew to Arabic.

13       Was he at the Philadelphia conference talking about

14  education?  He was.  He was at the Philadelphia conference

15  also talking about defendant Salah and the need to be careful.

16  And to this day, we don't know all the members who were at

17  that conference because those answers remain locked in

18  defendant Ashqar's head.

19       In the face of overwhelming evidence, defendant

20  Ashqar's significant role in Hamas, the government and, in

21  essence, the grand jury, went to him and granted him blanket

22  immunity for his involvement in order to attempt to unravel

23  several things.  First, to understand the Hamas terrorist

24  infrastructure in the U.S.; second to understand the full

25  scope of the involvement of Hamas members in the United States

1   and abroad in obtaining funding for Hamas terrorist activity;

2   and, third and critically, to learn about past and ongoing

3   terrorist activities both in the United States and abroad that

4   impacted the lives of numerous individuals -- and this is

5   critical, Judge, based on what I just heard Mr. Moffitt say --

6   including the lives of American citizens.

7           There was a long discussion just now about how this

8   is a two-state war that has nothing to do with the United

9   States.  And time and time, again, Judge, the evidence has

10  demonstrated that there are Americans -- Americans -- who are

11  losing their lives through Hamas terrorist attacks.

12          When Mr. Moffitt says no one here is being

13  victimized, I would have a difficult time explaining that to

14  the family members of people who were sitting in the United

15  States who have lost loved ones through terrorist attacks,

16  whether it's bus bombings or bullets in the head, because they

17  were in the wrong place at the wrong time when Hamas decided

18  to commit a terrorist attack.

19          This was never a case about the United States

20  providing information to the Israelis.  The Chief Judge made

21  crystal clear when Mr. Ashqar was taken before him that the

22  information he provided could not be shared with the Israelis.

23  That was taken off the table very early.

24          Judge, in short, the government's goal, as it has

25  always been, is to determine the extent of any criminal

activity, if any, that was occurring or still is occurring and

how such criminal activity could be stopped within the United

States in the hope of saving lives, including the lives of

Americans.  And as you'll recall, Mr. Ashqar was brought to

the grand jury at a time of increasing terrorist attacks

between 1998 and 2003, many of which claimed the lives of

Americans.

Despite being willing to forego his prosecution for

his criminal activity by granting him immunity, as we know now

obviously, Judge, defendant Ashqar refused to testify.

Despite being told by both the government, and at one point in

the transcript, Judge, the foreperson of the grand jury

informed the defendant Ashqar he was actively impeding and

obstructing their terrorism investigation, defendant Ashqar

refused to testify.  And indeed to this moment, to this moment

as we sit here, he holds within his head critical information

from the government's perspective regarding criminal activity

that has occurred within the confines of the United States

that only he can help bring to light.

And I think, Judge, the evidence makes fairly clear

that he knew, he knew very well that if he told the truth

about his activities, about the activities of other Hamas

members, his information would, in fact, significantly assist

the government in determining exactly the scope and level of

Hamas criminal activity in the United States and very likely

1    could have led to additional charges being brought.

2         We have heard repeatedly, your Honor, that all

3    defendant Ashqar wants is to be afforded the protections of

4    the Constitution, and yet the fact remains he's been afforded

5    every constitutional right to which he is due from the moment

6    he walked into the grand jury to his conviction in this

7    courtroom, and yet it is he, defendant Ashqar, who has refused

8    to abide by the civic duties required of every individual in

9    the United States.  Now, obviously, most specifically that

10   legal duty that comes with being called to a grand jury, being

11   legally ordered by a judge to provide such testimony and the

12   need to, in fact, provide that testimony.

13        Defendant Ashqar, despite enjoying all of his

14   constitutional rights, has failed in return to comply with his

15   civic duties.  And he didn't make a split-second decision to

16   obstruct justice, Judge.  He came to the grand jury with a

17   prepared statement knowing full well what he was going to do,

18   that he would never assist, as you pointed out, this grand

19   jury investigating terrorism despite the government's

20   willingness to engage him in conversations about whatever he

21   felt was important or needed to protect both his well-being

22   and the well-being of his family.

23        And when defendant Ashqar went into the grand jury

24   room and refused to assist the grand jury, he made a decision,

25   a decision that had significant ramifications.  He made, in

1      essence, a decision to take over the grand jury's role.  He

2      made a decision that he, he alone, would determine what was

3      and was not important for the grand jury.  He chose to protect

4      Hamas members.  He chose to protect Hamas activities.  He

5      chose to do what he could to make sure the grand jury would

6      not be able to uncover terrorist activity.  In short, Judge,

7      he chose to stand with Hamas over the law.

8              The guideline range unquestionably is significant in

9      this case, but in many ways it also makes sense.  Because

10     defendant Ashqar chose to help make sure there were certain

11     Hamas members, certain terrorists who would not be brought to

12     justice.  And so he chose to sit in the well of this courtroom

13     and accept their jail time, instead of allowing a grand jury

14     to determine whether they would face indictment and a petit

15     jury to determine whether or not they would be convicted and

16     face time.

17             Judge, every individual, every individual -- and this

18     is not a case where a message is going to be sent to one

19     particular people or to another particular people.  If

20     anything, a message should be sent that when called upon to do

21     so, every individual must abide by the law and assist a grand

22     jury's attempt to uncover information about terrorist

23     activity.  No person -- no person -- is above the law.  No

24     person, including defendant Ashqar, may decide by him or

25     herself what is or is not important to a grand jury's

1    investigation, particularly one dealing with terrorism.

2         No person on his own may take over the grand jury's

3    role and decide whether a crime has occurred or whether or not

4    he's simply a freedom fighter and, therefore, no crime has

5    occurred.  And yet that is exactly what defendant Ashqar has

6    done.  To determine that anything that he has done is

7    permissible or should not be severely punished, Judge, would

8    lead quite simply to chaos, a chaos in every case.  No

9    individual decides what is and is not important.

10        Accordingly, Judge, it is the government's view,

11   respecting your rulings, that a sentence within the

12   recommended guideline range is appropriate, and that's what we

13   would ask you to impose in this case.

14        THE COURT:  Dr. Ashqar, before the Court imposes

15   sentence, is there anything you would like to say, sir?

16        MR. MOFFITT:  Dr. Ashqar would like to take a break

17   for a moment.

18        THE COURT:  Okay.  Ten minutes, is that sufficient?

19        MR. MOFFITT:  Yes.

20        THE COURT:  We'll pick up in ten minutes.

21        (Brief recess.)

22        THE COURT:  Before we broke, Dr. Ashqar, I asked you

23   if there was anything you would like to say before the Court

24   imposes sentence, sir.

25        THE DEFENDANT:  Certainly, your Honor.

1          Can I proceed?

2          THE COURT:  Please.

3          THE DEFENDANT:  Okay.

4          In the name of Allah, the most compassionate, the

5    most merciful, honorable Judge Amy J. St. Eve, respected

6    counsels, reporters, brothers and sisters.  November 6, 2007,

7    two days before last sentence hearing, my nephew, Assam Ashqar

8    appeared in front of a martial court to renew his

9    administrative detention.  He was detained in March 2006.

10          In January of that year, he was promoted to full

11   professor in physics.  He was a former chairman of department

12   of physics at Najaf National University.  Two months later, he

13   was detained.  He was taken at 2:00 a.m. in the morning in

14   front of his wife, his six kids.  He was taken, put away and

15   placed over detention center.

16          He was given six months by the administrative

17   detention, then kept extending.  On that date, he was given

18   another four months.

19          So, when he finish -- when he finishes these four

20   months, it will be two years, and they could extend that.  And

21   they put just one offer on the table:  Leave -- you can leave

22   this jail if you agree to leave -- to deport -- to be deported

23   voluntarily.

24          His brother Hasan, my second nephew, he's the mayor

25   of my town and assistant principal of the school.  March this

1    year he was taken.  At checkpoint, he was taken, placed in

2    administrative detention, given four months, extended four

3    months.  That was March 18th.  Yesterday -- day before

4    yesterday, I'm sorry, he was released from jail after spending

5    eight months.  No charges, no indictment, no trial, nothing.

6    Just for security reasons, the martial court extended that

7    administrative detention.

8              As of now, there are 2200 Palestinian prisoners in

9    administrative detention, civic leaders, mayors, university

10   professors, trade union leaders, student council -- student

11   activists and so on and so forth.  This has been going on

12   since 1967.  Almost 20 percent of the detainees, except in the

13   first uprising, are placed in administrative detention.

14             October 22nd -- 22nd, '07, 2:00 a.m., a unit from the

15   Israeli Army called Nafshun raided a Negev desert -- Negev

16   jail.  It's in the middle of Negev desert.  I heard the news

17   that 250 detainees have been injured.  My nephew Hasan who was

18   released two days ago wasn't there.  I called the family and I

19   was told you have another relative there.  His name is Hamnat

20   Zaltal Ashqar.  He is injured, and he is in critical

21   condition.  He's in coma in Siroka Hospital in Beer Sheva.

22   Around midnight of that day, he passed away.  A bullet

23   penetrated his head, and they couldn't do anything to save his

24   life.  He was 23 years old.  He marks No. 192 of Palestinian

25   prisoners to be killed in Israeli jails since 1967.  But from

1   the second uprising, 2000, he marked No. 68.

2         His brother, Lua'i, he was detained, subjected to

3   severe torture, and he was released seven months later half

4   paralyzed.  As of now, they didn't even allow him to leave the

5   territories to seek treatment.

6         May 7th, 2006, my nephew is the son of my sister,

7   around midnight the Israelis raided his apartment.  They

8   wouldn't even go, no chance, just start firing on them.  No

9   chance to surrender even if they were wanted by the Israelis.

10  Looks that you were injured.  They didn't allow any ambulance,

11  anyone to come and save him.  In the morning, they allowed the

12  people to get in, looks that he was injured and he stayed for

13  some time alive, and he was writing with his blood on the

14  walls.

15        My sister, 2002, she had severe headache.  They took

16  her in a car, no ambulance in my town, to the hospital in the

17  city about 11 miles from my town.  The checkpoints, there are

18  four checkpoints from my town to that -- to that city.  They

19  didn't allow her.  She didn't look sick.  They said she had

20  severe headache.  They said no, nothing.  At night, she

21  entered into coma.  Then they allowed her.  She stayed several

22  days in the hospital.  She woke up from the coma.  They said

23  you have to leave.  We have no place for you in the hospital.

24  The number of injured Palestinians exceeded our capacity.  You

25  have to stay home.  27 days later, she passed away.  She was

1    about 50 years old.

2          Majid Samir Ashqar, another relative, again, he was

3    killed, target killing.  They raided the town.  They raided,

4    he's wanted.  They killed him.  No chance to surrender or to

5    be taken into custody.  All of them were in their 20s.

6          Sayyid Solomon Ashqar, another relative, close

7    relative.  He was killed in September, 2005, the same way

8    others were killed.  His brother, Rommi Balil Ashqar, he was

9    killed in December, 2003, almost two years and three months

10   after that.

11         Zahi Azel Ashqar, he was killed in July, 2004.  And

12   they demolished his home.  Not an action, nothing.  And Damri

13   Adil Ashqar, Moelia Ahmad Al-Ashqar, close relatives.  They

14   were opening the door of their repair shop store.  It

15   exploded.  It was wired by bomb by the Israelis, and they were

16   killed.  They were in their 20s.

17         Amilis Idil Ashqar, August, 2002, she was opening the

18   door of her store, and it just exploded.  Her son was wanted

19   by the Israelis.  She was in early 50s, and she was killed.

20         Her son-in-law was killed, although he was half

21   paralyzed.  The list goes on and on.

22         From my family, just from my family, since 2002 up to

23   this moment, eight have been murdered by the Israelis.

24   Neither Mr. Ferguson, neither -- nor Mr. Schar talk about

25   it -- them.  And they don't care to talk about them.  The only

1   thing they do care about is to talk about the Israelis, as if

2   we don't count, as if we were no human beings.

3          Yes, we are not Americans and they are not Americans.

4   But the number of Palestinian-Americans who have been killed

5   by Israelis exceeded the number of Americans, although I do

6   care and I feel sorry for every drop of bloodshed.  Exceeded

7   the number by tens of times.

8          And it was represented earlier on by Mr. Deutsch to

9   this Court the list of Palestinians who -- American

10  Palestinians who were killed by the Israelis.  But no one talk

11  about them.  Unless we talk about them, who is going to talk

12  about them?

13         I don't trust anybody to talk about them unless we

14  talk about them.

15         Judge, my saga with the Israelis goes on and on and

16  goes for centuries.  Not decades, centuries.  1897 my father

17  was born.  In that year, his father was taken into custody for

18  standing up against oppression and corruption.  He spent six

19  years in jail.  At that time, Palestine was part of Ottoman

20  Empire or under Turkish role -- rule.

21         At that time, Palestine was under Turkish rule or

22  part of the Ottoman Empire.  1917, Palestine -- in 1917

23  Balfour -- issued what's called Balfour Declaration in which

24  it grants Palestinians -- Israeli homeland, Jewish homeland in

25  Palestine.  And that then started revolutions.  It started

1    civil disobedience.  1920, Palestine fell under British

2    mandate, and the problems started since then.

3           They allowed the Jews from all over around the world

4    from Manhattan, from New York, from Chicago, from Russia, from

5    Europe, from Eastern Europe, from Africa, from Middle East to

6    immigrate and in the other -- to immigrate to city, to buy

7    land, to arm.  And the Palestinians not to get arms, bars

8    embargo, and anybody who gets a piece of arm faces capital

9    punishment and embargo, a political embargo, to force them to

10   sell their lands to the new immigrants.

11          In 1936, there was six months civil disobedience by

12   Palestinians to protest the Jewish immigration to Palestine

13   and the British complicity with the new immigrants.  My father

14   was detained by the British, and he was placed in a jail

15   called Jeffer Detention Center.  And he was accused of

16   participating in civil disobedience and conflicting with the

17   event, et cetera.

18          Anyway, the deal was like that, your Honor.  And I'd

19   like you to listen, please -- everyone to listen.

20          Okay.  At that time, Palestine, there were no roads,

21   routes, roads between -- just between cities, not between

22   villages and cities.  And the British soldiers used to move

23   from one place to another on horses.  And they need to move

24   their arms, their food, supplies.  And they used the detainees

25   as animals to carry their arms, food and supplies.  And they

1    said, okay, if you carry this can of food, meat, can food, you

2    could be released in one week.  If you carry this, in two

3    weeks, in one month.  And they came to my father.

4         He said, I'm not an animal.  I'm not -- you cannot

5    treat me like -- with dishonor.  I'm a human being.

6         He spent six months, and he was released after that.

7         Not a long time after that, the same situation

8    continued.  In 1948, Israel was established and a new era in

9    the life of Palestinians started.  It was established in 78

10   percent of the historical land of Palestine.  There was no

11   Israel before.  It was established, 78, and according to U.N.

12   statistics, about 700,000 Palestinians were forced out.  Every

13   day I'm reminded with this tragedy and a black moment in the

14   history of the human being with my family, with my wife's

15   family.

16        They were living in a town called Masmir Kabira

17   between Tel Aviv and Jerusalem not far away from Tel Aviv.

18   North of Tel Aviv, they were forced to Syria and Lebanon.

19   East of Tel Aviv, they were forced to West Bank and Jordan.

20   South of Tel Aviv, which is the case of my wife's family, they

21   migrated to Gaza.

22        Usually, Haganah and other Jewish organizations used

23   to raid the village or the town, start to shoot, and they give

24   the people -- the citizens or the inhabitants just an hour or

25   so to leave the town.  They used to leave with nothing.  Her

1   grandpa used to own wheat mill, wholesale business, citrus

2   grove.  He left with nothing.  Even sometimes the families,

3   some went to the south, some went to the north.  They didn't

4   know about each other.  What happened?

5        They went to Gaza.  There was no infrastructure,

6   nothing.  They stayed -- some of them who had relatives stayed

7   with them.  Others stayed nowhere.  They thought it could be

8   days.  They didn't have even money.  Her grandpa who was so

9   rich, he couldn't have any money to spend.  It took months for

10  the United Nations to get involved.  They provided them with

11  tents.  That's all.

12        It took until 1952, they were able to settle in

13  camps.  They settled in small, tiny, made-of-zinc houses.  And

14  with the help of U.N., they were providing them with

15  necessities, just the basics to survive.  Even the medical

16  assistance, it was almost nothing.  No work.  Nothing.  You

17  know, it was no infrastructure whatsoever.

18        And they were not -- it took them years and years to

19  wake up from the shock, to leave everything in one night and

20  to find themselves living in refugee camps.  It started, as I

21  mentioned, with temporary houses made of zinc.  Then it was

22  promoted to what is banned in the U.S. now, to asbestos.  And

23  they are still living in these houses up to this time, the

24  21st century.  In houses made of bricks, covered with asbestos

25  up to this moment.

1          And they settled in what's called Jabalya camp, which

2  is more to 60 to 70,000 live there, generations and

3  generations.  The only thing they could do, the U.N. started

4  to open schools.  And my deceased father-in-law at that time,

5  he finished.  He was teaching while he was in the Middle East

6  school.  And he was given three kilos of lentil and three

7  kilos of chickpeas.  By the time he finished -- three kilos,

8  about 6.6 pounds of lentil and 6.6 pounds of chickpeas.

9          In the early '50s, they start to get -- to look for

10  works -- for work.  Nothing in Palestine.  Nothing that -- 20

11  percent left Palestine.  So, they started to migrate to

12  Kuwait.  My father-in-law, when he finished high school, he

13  got a job as a school teacher in Kuwait.  My half brothers

14  migrated to Kuwait to get any work.  Doesn't matter.  Just to

15  get any work.  They start to work and subsidize their families

16  back at home.

17          And my father-in-law, he started to work as a school

18  teacher and to work on his degree.  He finished bachelor

19  degree in Arabic language at University of Lebanon afterwards.

20          My brothers -- three brothers -- migrated to Kuwait.

21  And like many other Palestinians -- by the way in 1990, when

22  Saddam Hussein invaded Kuwait, there were about 450,000

23  Palestinians living in Kuwait just working.  They start with

24  education.  Working in any field just to do something because

25  in Palestine there was nothing.

1          In 1971, he passed away.  And his family was given

2     few months to pack up and leave.  Anyone who is not Kuwait

3     cannot stay there unless he is doing some work.  They are

4     not -- although my wife, for instance, was born there, but she

5     was not given the Kuwait citizenship.

6          She went back to Gaza to start another struggle.  The

7     whole family went back to Gaza in a tiny town.  When we talk

8     about Gaza, they think that, you know, it's like a state or --

9     it is 100 -- 250 square miles.  Now 1.5 million live there.

10          And only five -- five check -- entrances to that, all

11     of them now they closed.  Nothing can go inside or outside,

12     even after the Israelis withdraw from Gaza, without the

13     permission of the Israelis.

14          For instance, the case of my brothers who moved to

15     Kuwait, because their income was below a certain level, they

16     were not allowed to bring their families.  Their families

17     stayed at home, my hometown.  They used to go one year, get

18     back.  At that time, there was no communication, no phone

19     calls.  Letters used to take one month or two months.  Money

20     wires to go to -- the same thing, they used to wire to Amman,

21     Jordan and they have to send a letter to pick it up from

22     there.  Something like that.

23          But 1967, when there was another turning point in our

24     lives.  I was born in 1958.  At that time, I was nine years

25     old almost, and new influx of immigration of migrants started

1   again.  But this time to Jordan and to other.  According to

2   U.N. statistics, 2,000 -- 209,000 were immigrated from West

3   Bank and Gaza Strip to Egypt, to Jordan and to everywhere.

4          Nowadays, the size of population of Palestinian

5   refugees in the world are 6 million.  3.5 million live in West

6   Bank and Gaza Strip, and 1.2 million live what's called Arab

7   Israel.  And nowadays, the Israelis, they are talking about

8   transfer.  Not the transfer of us only, transfer of the Arab

9   Israelis to be forced out because this is a Jewish state.

10         Your Honor, in 1967, I was a student in the school,

11   elementary school.  We used to have an elementary school.

12   Three classes before the Israeli occupation, three teachers.

13   Every two classes in one classroom.  After 1967, we just had

14   one teacher for the six grades.

15         We learned one thing since 1948.  The only thing to

16   live if we want to live in honor and dignity, we don't have

17   much resources, the only thing we do, we can do is to continue

18   our education.  To live in honor and dignity, that's the only

19   thing we can do, because we are determined to live in honor

20   and dignity.  We don't want to live any life -- any kind of

21   life.

22         So, the elementary school, we finished the elementary

23   school.  At that time, as I mentioned, three classes.  No

24   running water.  No running sanitation.  No sanitation.  No

25   health center.  No phone service.  No electricity.  Nothing.

1    It took us until 1971, end of 1971 to get electricity by

2    generator for four hours every night.  We used to read on

3    kerosene candles, to read like that (indicating), and in the

4    morning to have the ashes in our noses.

5            Health center, it was not built until 19 -- until the

6    end of 1970.  And just a nurse and the doctor used to come

7    once a day for half a day, and the nurse to -- just to give

8    shots and stuff like that.  And if we need a doctor, we have

9    to go to the city.  Every city is surrounded by a cluster of

10   villages.  My town, Tulkarim, is surrounded by 60 villages

11   until early '90s.

12           We used to go to the city to private physicians and

13   there was a hospital.  We have to pay -- although it's

14   governmental, small one, but we have to pay for it and it's

15   very primitive.

16           I finished the school, but that's not -- you know,

17   our concern was the school.  Our families pushed us for to

18   continue our education.  We used to have citrus grove, as

19   Mr. Moffitt mentioned -- I'm sorry, black plum grove, olive

20   trees, apricot, almonds.  But these are -- you know, when the

21   season comes, we have to collect it in days, and we have to

22   sell it, except the olive.  The markets, no markets.

23   Sometimes we have to sell it at a cost below shipping cost.

24   Happened in 1967, 1968.  So, we have to remove the black plum,

25   the cherries, the apricot.  What we left with is olive trees,

1    and it gives every other year the harvest.  We collect it

2    every other years.  Because it doesn't -- I don't know why, it

3    doesn't give harvest every year.

4         And that's the only thing left because we can store

5    it.  The rest we cannot store it.

6         And settlements start to take over our lands.

7    Nowadays settlements take more than 40 percent of our land,

8    occupies more than 40 percent of our lands.  What can we do

9    about it?  To complain to U.N.

10         As of now, hundreds of U.N. resolutions, none has

11   been implemented when it comes to the Israeli issue.  None.

12   Zero.  Zilch.  Why?  Because we are not counted.  As I have

13   been watched through the course of this trial, we should

14   suffer and we should continue to suffer and we should beg for

15   standing -- for standing up for our people and standing up to

16   live in honor and dignity.

17         I finished the high school -- the elementary school.

18   There is no middle school in my town.  We have to go to

19   another village.  Two miles in the morning going down the

20   hill, two miles in the afternoon, no transportation, no

21   whatsoever.

22         We finished middle school.  We went to the high

23   school.  It's five miles from my town.  Sometimes we could

24   find transportation, sometimes we have to walk, and sometimes

25   we cannot use the road because there are some demonstrations

1   somewhere, and the Israelis might detain the students.  So, we

2   have to go through agriculture or scenic roads.

3        Your Honor, I went through this for one just purpose,

4   to live in honor and dignity, and we had an opportunity.  I

5   didn't wait until 2002 or 1996 to be given that opportunity to

6   live as a traitor or as a collaborator.  I was given that --

7   everyone was given that opportunity to serve the Israelis, to

8   provide information, to become an informant for the Israelis.

9   We didn't have to go to school.  "Just work as an informant,

10  and we could protect you."  We had that as informant.  But we

11  are determined to live in honor and dignity like any other

12  human being as long as it takes.

13        I went to the university.  I didn't want to go.  I

14  got an admission at university in Jordan.  I didn't want to go

15  to Jordan.  I didn't want to go anywhere.  I want to stay in

16  my homeland.  Although it was costly, I went to the

17  university.  I enrolled at university in January 1978.

18        I was taking, as I have been as a student, to take

19  every opportunity to finish as early as I can.  And that's

20  what I did.  I used to take the summer course.  But during

21  that time, during I should graduate in 1981 -- anyway, during

22  the course of my education at the university, the university

23  was closed in different times for one years by the Israelis.

24  One full year, two months, three months, two months, three

25  months, and so on and so forth.

1           Each time there is a demonstration, Israelis come,

2    raid the university, fire tear gas, rubber bullets, live

3    ammunition, injure some students, then a military order

4    closing the university because consider it as military zone.

5    One year.  One full year.

6           Anyway, in 1981, in November 2nd, Tulkarim before

7    declaration, there was an administration at the university

8    speech.  Within the university.  The Israelis besieged

9    university.  They didn't allow anyone in or out.  By the

10   afternoon -- by the evening, they allowed the students to

11   leave after the Red Cross intervened and with the

12   administration to allow the students leave peacefully, and we

13   left.  Half an hour later, Israelis raided my home and

14   arrested me and I was charged with participating in actions

15   against the Israeli Army.

16          During the trip from Bir Zeit University to the

17   Ramallah detention center, it was like eight miles.  During

18   that we were kicked, beaten in the head, on our knees, by all

19   means, by the guns in their -- to press on our feet.  And we

20   were hurt whatever you could imagine from words like donkeys,

21   animals, stuff like that.

22          Then we were presented with Hebrew.  "Sign it, sign

23   it."

24          "What's that?"

25          They say, "This is indictment."

1        "What is it?  We have not done anything."

2        I was placed in a small cell with five detainees,

3 sometimes seven.  There are 16 students in that day.  There

4 was no bathroom in that room.  We were given two jars, one for

5 drinking water and one to use it for urine and if we needed

6 for bowel movement.

7        During the day, they used to allow us once to use the

8 bathroom in the other room.  And it was no heat, and it was so

9 cold in Ramallah at that time.  And the doors are bars.  It's

10 so cold.  We given just a few blankets, and we have to manage

11 to keep ourselves warm.

12        I was -- we, after next day, they -- all universities

13 went to the administration, and after 16 days they decided to

14 release us.  We were given, like here, some -- some what's

15 called options.  "What are these options?"

16        "To plead guilty.  Time served and you pay fine, you

17 go home."

18        "But I'm not guilty."

19        "Okay, you have another option.  Testify not against

20 the whole people or against some people you know, just against

21 one of the students who were arrested with you, and we'll set

22 you free like that."

23        "I can't do that."

24        "So, okay, you are going to face a trial and you

25 might be placed for your life in jail because facing the

1    Israeli Army is a serious, serious crime."

2         "Okay.  Do whatever you want, but I have not done

3    anything wrong.  I have not -- I just commemorated the

4    anniversary.  Is that even too much for me to do?"

5         We were released.  We were brought to the court just

6    once.  We paid -- the university paid a fine.  We don't know

7    what happened to that.  And after that, they didn't call us

8    because they knew there was no case.

9         And, you know, detaining Palestinians as of now --

10   and I'd like everyone to know, Mr. Schar, Mr. Ferguson,

11   Bradley Benavides, Mr. Bradley Benavides, Mr. David Bray,

12   Mrs. Jill Pettorelli, Ms. Kelly Rice to know as of now 650,000

13   Palestinians have been detained.  If you take -- it's 20

14   percent of the whole population.  But if you know that, like

15   95 percent of the them are men.  Men detainees.  And know that

16   about 60 percent of the Palestinian who are under here, then

17   you come to conclusion more than 70 percent of other pop --

18   men population have been detained for nothing.

19        Just they want them to become informers.  This is the

20   first offer on the table.  Or to curse them, to threaten them,

21   to scare them, or to have them -- subject them to too much

22   torture.  Once they are released, hoping that they will depart

23   and live in diaspora.

24        As of now, 650,000 Palestinians, 650,000

25   Palestinians, as of now more than 1100 -- 11,000 Palestinians

1    are in jails in substandard conditions.  Negev desert that I

2    told you about just a few minutes ago, there are 2400

3    Palestinians in that -- detainees, political detainees.  1,000

4    in permanent buildings.  1400 in tents in the middle of the

5    desert.  Many, many times you woke up to find a snake sharing

6    just the warmth or other reptiles sharing the warmth under the

7    blanket.

8         You, Judge -- your Honor, these are some.  As of now,

9    more than 5,000 Palestinians have been killed not since 1967,

10   but since 2000.  They are killed by Israeli Army.  224 target

11   killings.  In a missile they leave nothing sometimes with

12   them.  They fire missile at a human being.  And I never heard

13   Mr. Ferguson or Mr. Schar call it terrorism.  To leave -- to

14   collect their parts from trees and from stones, this is not

15   terrorism because it is held -- it's conducted by what's

16   called democracy.

17        Well, to be fair, I think we have to be sorry for

18   each drop of blood, whether from Israelis or from

19   Palestinians.  This is, I think, it is -- it's an education

20   for human beings, not just asking for extra for their minds

21   for being educated or being officials.  We have to be careful.

22   If they are weak and couldn't stand for themselves, we have to

23   stand up for themselves.  We have to talk about their

24   sufferings and to expose their atrocities, the Israeli

25   atrocities.  And that's what I have been doing since I came to

1    this country.

2           Your Honor, I finished bachelor degree 1982.  I

3    couldn't find a job.  As I mentioned, no infrastructure, but I

4    have an opportunity to become an informant and to become rich.

5    But I never tried to build a career in espionage or

6    intelligence.  It's not in my mind.  It's not -- I'm not that

7    type of person to hurt any human being whomever that human

8    being is.

9           I couldn't find a job.  The only opportunity to find

10   a job in my field is to immigrate to Saudi Arabia.  I didn't

11   want to immigrate.  I want to live and die in my homeland.

12   That's as simple as that.

13          So, universities were established.  The Israelis

14   allowed a few universities to establish and expand.  There was

15   only one university, Bir Zeit University.  It started in 1973.

16   Another one start, Najaf National University in 1978.  Then

17   they start to allow Islamic University of Gaza in 1978, too.

18          And we are -- when I got an admission at Middle East

19   Technical University in Turkey where the language of

20   instruction is English because at that time, I did not want to

21   spend more time studying languages.

22          By the time we got there, we're faced with the

23   reality that we are Palestinians, and we don't have much -- we

24   don't have many opportunities like other human beings.  Our

25   admissions were cancelled.  They said, you know, there was a

1  military court, and they treated Palestinians as an extension

2  for leftists.  So, they cancelled our admission.

3       I didn't know what to do.  I was told there are some

4  American universities in Greece.  So, I traveled to Greece,

5  and I get an admission at an American university there, which

6  was established to serve the needs of the military personnel

7  at American bases in Greece.  I never looked.  We always look

8  high to the U.S. as a country of opportunities, state-of-art

9  education, state of art in everything.

10      I got an admission in that university, and I was

11  given permission to enter the American bases whenever I

12  wanted.  I never did because I have nothing to do.  I don't

13  need to know anything about that.  All my courses were off the

14  bases.

15      So, I finished in 1985.  I got an opportunity to work

16  at a bank in Greece.  They were badly in need for Arab

17  graduates to work who know English, know Arabic, and at that

18  time, I was -- I knew, I could say I knew Greek language.  I

19  didn't want to stay overseas.  I went back.

20      And in that year, 1985, the Israelis deported 60

21  university professors from the Islamic University of Gaza.

22  Why?  Because they are Palestinians.  They have rights, but

23  because when the Israeli occupation took place in 1967, they

24  were studying abroad.  They were not -- so they don't have the

25  right to live in that country.  They don't have the right to

1   live in their homelands.  They were given permission to teach

2   at the university.  In that year, for political reasons, they

3   revoked their permission.  And they were badly in need for

4   staff, you know, the academy staff.

5          I got a job as lecturer at school of business to

6   teach business, and it was another shock in my life.  I went

7   to the university.  I never been to that university before.

8   And reminded me of the atrocities of the occupation.

9          The university, there's a permanent building called

10  administration.  Classrooms were held in temporary buildings,

11  covered with asbestos.  Covered with asbestos.  When it

12  rained, we couldn't teach.  We have to stop.  There were 5,000

13  students in that university.

14         I was teaching -- I was, you know, because of a

15  shortage of the number of professors, there were 120 students

16  in the senior level.  This is the small size of class.  And

17  sitting on chairs, no issue -- as I mentioned, no carpet, just

18  on that -- and asbestos.  Covered with asbestos.  That's it.

19         At 1986, I was given the position of director of

20  public relations department.  Honestly, I accepted, although I

21  knew it was costly, but it was an opportunity to expose the

22  atrocities of the Israelis against my people.

23         I visited the camps, and it tells the story.  As I

24  mentioned, covered with asbestos, open sanitation, kids

25  playing in that, no medical, health -- no health coverage for

1  everybody.  Just schools run by United Nations, and it looks

2  like jails.  No accommodations, no AC.  They have to stand in

3  line and forced to drink milk in the morning and to take some

4  tablets, vitamins or fish tablets, or I don't know what's

5  called in the morning, and my wife went to that school, to

6  these schools, these type of schools and her sisters and

7  brothers.

8          I started -- then the Israelis went after me.  I was

9  summoned the first time and threatened.  By the end of '86

10  they given -- they gave me 24 hours to leave Gaza Strip, and

11  they said we are fed up with you.  Why?  Because I was the

12  editor of the university magazine.  I was meeting with

13  diplomats from different diplomatic missions in Tel Aviv and

14  Jerusalem, meeting with reporters, talking of the Israeli

15  atrocities against my people and against the university.  It

16  was not recognized.  The president of the university was

17  deported.  As I mentioned, in one year, 60 were forced out.

18  And more than that.

19          Each time there was a meeting in the university or a

20  commemoration of any universities, the Israelis used to

21  besiege the universities.  Sometimes, and in one incident in

22  April '87, the Israelis raided the university with bulldozer.

23  They damage whatever they could damage.  80 students were

24  injured.  Ten cases of abortion because of the tear gas.

25          And just I wrote about it.  I was summoned.  At that

1  time, I was a newlywed, and I was threatened with deportation

2  unless, unless I stop talking about the Israelis atrocities.

3       And my stand was like my stand today.  I'm going to

4  speak for those who cannot speak up for themselves.  Shortly

5  afterwards, the uprising started.

6       At that time, 1985, '86, I applied for U.S. Thomas

7  Jefferson fellowship.  It is financed by USAID, administered

8  by Amethyst.  And they grant a scholarship for every year for

9  a Palestinian in each field.  One year in business, physics,

10 engineering, education and stuff like -- so, I applied in

11 1985.  I got the admission in 1989.

12      The uprising started in '87.  December '87.  And the

13 university was closed.  My wife was a student at the

14 university.  She couldn't finish her diploma.  She was in the

15 last year.  The university was closed.  Not just Islamic

16 University of Gaza, all universities, all schools, all

17 kindergartens were closed.  It was not closed for one year.

18 No one talked about it.  It was closed from December '87 until

19 1991, '92.  All academic institutions from the kindergarten

20 until the universities were closed.

21      My wife was not able to finish her diploma until

22 1990.  She was given these courses or the tests in these

23 courses by her professors in their homes.  We were not allowed

24 to use churches or mosques or any public schools for teaching.

25      So, when the university closed, we couldn't do much

1   except to talk about what's going on.  In 1989, April, 1989, I

2   got an admission.  I didn't apply for it.  Amethyst applied

3   for it.  And I got the admission to the University of

4   Mississippi.  Just I provided them with all documents and they

5   got the admission for me.  I never dictated when I can go,

6   where to go.  And I applied for a certain field, which is

7   business administration or operations management because we

8   were badly in need in the Holy Land for that major.

9        I got to the U.S. in November 16th, 1989, 18 years

10  ago and five days.  I enrolled in January.  The reason I left

11  early, because in November 16th, marked the second anniversary

12  of announcing the Palestinian state.  In 1988, it was

13  announced in -- by former PLO chief -- chair Yasir Arafat in

14  Algeria in 1988.  And there was demonstrations, and we lived

15  under curfew for 16 full days.  At that time, I was in Gaza

16  living -- I'm original from West Bank.  At that time, I was in

17  Gaza.  I was living in Gaza at that time moving between Gaza

18  and West Bank.

19       Then was curfew.  Full week without any interruption,

20  without any break.  After one week, they allowed us two hours

21  to get supplies, food and medicine.  After two hours -- after

22  one week for two hours.  Then they started to allow us every

23  day or every other day for two hours for 16 full days.

24       So, I decided to leave in November 16th in the second

25  anniversary.  I was afraid that curfew might be imposed, and I

1    would not be able to leave.  And I didn't leave easily.  The

2    Israelis didn't allow me to leave.  I wanted to catch the

3    first semester, to enroll in the first semester, but the

4    Israelis didn't allow me.

5            And we have to get authorization, permission to

6    leave.  And they didn't leave -- and, you know, I start to

7    seek permission.  I applied for permission.  I obtained an

8    attorney, and they said you need to see the intelligence

9    department.  I did.  And I met what's called Mr. Ben, alias.

10   This alias is not -- you know, it's part of our culture

11   nowadays.

12           Anyway, I met Mr. Ben.  He said, well, we have

13   nothing against you, but you are an activist, and we don't

14   want you to go to the U.S. to become an activist.  It's more

15   harmful for us to become an activist there than to become an

16   activist here.

17           I retained an attorney after while, big-shot attorney

18   as it's called.  He was a member -- he was a minister of

19   Menachem Begin government.  Anyway, he get me permission.  I

20   talk to him.  I met him the first time and said what's going

21   on?  Tell me what's going on in your life.  I told him.  I

22   said nothing there but occupation.  Makes your life miserable.

23   That's it.  Pack your stuff and leave.  It was Monday.  He

24   said you can leave by Thursday.

25           Anyway, I get permission.  At that time, my mother --

1    I got the permission, but my mother passed away.  She was --

2    she had cancer, breast cancer.  I waited until two months

3    almost after that, and I left.

4         I came to the U.S.  I enrolled as a full-time student

5    taking every summer semester, teaching, working as a teaching

6    assistant, working as a research assistant.  And the

7    scholarship was working fine with me.  I was -- they used to

8    pay the tuition fees and allowance, books, everything and

9    medical insurance.  Everything went fine in 1990.

10        '91, things started to change.  I was told by

11   Mrs. Nancy Rogers, assistant director of international

12   programs, Mrs. -- referring student adviser Leslie Benningham,

13   they were contacted many occasions by Agent Steve Taylor, and

14   there he told them we have nothing against him.  It is the

15   Israelis who instigated the investigation.  We have nothing to

16   do against him.  We have nothing to worry.

17        And December 17th, 1991, I was -- Mr. Taylor called

18   me and he met me.  He interviewed me, and he said this

19   interview takes place per the request of the State Department.

20   I never -- again, I never looked at the U.S. -- I never

21   maintained a hostile relationship.  I never looked at them

22   negatively.  So, I went and I talked with them.  It was eight

23   minutes.  That's all.  And he give me his card and said, okay,

24   if you face any problem, let me know.

25        But the inquiries continued.  Each time I meet

1   Mrs. Rogers or Mrs. Benningham, they tell me that we were

2   contacted by FBI and by Mr. Taylor.

3          1994, that second interview took place, but before

4   that and that's what scared me the most, your Honor.  In '92,

5   I finished the major comprehensive exam.  In January '93, I

6   finished the comprehensive exam in the minor.  In three years,

7   I finished the work, the course work.  I passed the

8   comprehensive exams from the first time.  I published two

9   papers.  And I was teaching, working as a teaching assistant

10  or as a research assistant.  Everything went fine.

11         I finished the comprehensive exam, ready to work on

12  my dissertation.  The academic adviser, he was so helpful, so

13  understanding.  Things have changed.  When I call him, he said

14  where are you calling from?  If I say from house, he said

15  okay, I'm busy now, I'll call you.  If I say from the

16  university, he would talk with me.  And I didn't know what's

17  going on.

18         I submitted the first proposal in my dissertation.  I

19  was trying to finish in four years.  I didn't want to stay.  I

20  want to go back.  That's what I came for.  And I came on visa.

21  I never tried to change it.  Before it expired, I wanted to go

22  back.  That's where I wanted to live and die.

23         I submitted the first proposal.  He said, well, you

24  have to change it.  I talked with other committee members,

25  they said his name was Dr. Ed Gillimorter (phonetic), told us

1    not to read it.  I knew something fishy was going on, but I

2    didn't know what's going on, to be honest with you.  I would

3    not think that -- I would not think in my dreams ever it will

4    go to that level.

5          Anyway, second proposal, third proposal.  Later on,

6    until September '96, he told me that I was interviewed many

7    times by agent, FBI Agent Mr. Steve Taylor.  And he told me

8    that I was scared.  I could change the university, but the

9    same thing could happen.  And I couldn't go back without

10   finishing my degree.

11         October, 1994, 26th, Mr. Steve Taylor called me and

12   he said, "We need to see you."

13         I said, "Okay.  How about tomorrow?"

14         He said, "No, today.  Because there are some people

15   who wants to meet with you."

16         And I went there.  It was Mr. Avery Rollins,

17   supervising special agent from Jackson, Mississippi, and

18   Mr. Taylor.  And they said they didn't allow the director of

19   international programs to come with me.  He was with me, but

20   they didn't allow him to attend the meeting.

21         Anyway, they said okay.  This interview was taking

22   place per the request of the Israeli government.  And we did

23   talk for one hour, 40 minutes.  I didn't have any problem

24   talking with FBI.  Again, I never viewed the relationship as

25   hostile, or I never looked at them as enemies.  I have just

1    one enemy, the occupiers of my homeland.  That's all.  And if

2    they leave my homeland, then I would look at them like I look

3    at every other human being.

4           Anyway, your Honor, we talked about many issues.

5    They asked me about Al-Aqsa education fund, how much money did

6    you raise?  Why did you establish it?  How did you spend the

7    money?  I talked about it.

8           I didn't have any problem talking with them because

9    I'm not doing anything wrong.  I'm not -- I have not done

10   anything under the table.  Everything in the light, everything

11   in the phone, from my house.  So, I did talk to them about

12   everything.

13          By the end of the meeting, I said, "Okay, hold on, I

14   have just a few complaints."

15          They said, "Go ahead."

16          "Number one, I said we have been receiving harassing

17   calls for years.  Each time my wife answers the call, they

18   said okay, where's Ashqar.  If she said who is speaking, who

19   is calling, they would hang up.

20          "If I answer the phone, they would hang up."

21          I talked with them about what I repeat.  Then I told

22   them about packages that we received without return address.

23   And I talked with them about some tampering with my credit

24   cards.  I told them in one occasion, we receive adultery

25   movies ordered by 911 Jackson Avenue, Suite 242, Oxford,

1  Mississippi, 38655, and that is the address of FBI, ordered to

2  be delivered to my address and charged to my credit card.

3          On another occasion, Circuit City called to verify an

4  order.  It was placed by your address to my address -- to your

5  address, I'm sorry, on my credit card for a camera.  In a

6  third -- anyway, many occasions.  I talked with them about.

7          They said, "Okay, could be the Israelis.  We have

8  nothing to do with that."

9          And they ask me this question, and I'd like everyone

10  to hear it.  They said, "Well, if you knew someone would harm

11  us, someone would do anything against the U.S., would you tell

12  us?"

13          I said, "Absolutely.  I don't want anything -- I

14  don't want to see anyone do anything against anyone in the

15  U.S."

16          Our message is simple.  We need to mobilize

17  Palestinians, Arabs, and Muslims and everyone to change the

18  American foreign policy.  But that can be done through

19  political means, not through violence.  And I have been saying

20  this in the board rooms, in my lectures, everywhere, anywhere.

21          They said, "Okay, go back to your normal life."

22  That's his words, Mr. Avery Rollins.  "Nothing to worry about.

23  Go back to your normal life."

24          Although I was faced with the realities.  The

25  apartment next to me was occupied by FBI.  Besides bugging my

1  home, besides wiring my phone, besides since 1996 following me

2  wherever, whenever, the apartment next to me was occupied.

3  And I'm not psychic reader.  No.  I saw the FBI agent leaving

4  that apartment and black curtains on the windows of that

5  apartment.  No one was leaving, going in or out, except one

6  time I encounter Mr. Taylor leaving that apartment.

7        So, I know I am under scrutiny, and I'm not doing

8  anything -- nothing to fear, nothing to be intimidated,

9  although my course of work, my dissertation was badly hurt.  I

10 couldn't -- I continue -- the subjective, you know -- the

11 course work is objective, but the comp exams are subjective.

12 They started to contact my advisers in '93 after I'm done with

13 the course work, after I was done with the comprehensive exam.

14       But the dissertation is subjective work, and it could

15 be affected by everything.  And I was trying to finish up

16 before my scholarship expired.  And I don't want to live in

17 this country.  I don't want to stay in this country.  I want

18 to go back to my country.

19       February, '95, I fell -- fly down the stairs,

20 bouncing on my back and I fractured my -- I fractured the

21 coccyx.  Anyway, it was displaced, and the pain has -- the

22 pain became chronic.  I started the journey over treatment in

23 Oxford, Mississippi, Jackson, Mississippi, New Orleans,

24 Louisiana, Memphis, Tennessee.  Then I move to north Virginia

25 and so on and so forth.  Just -- I was living on painkillers.

1    I was taking two painkillers every four to six hours, plus

2    muscle relaxer, plus anti-inflammatory plus -- anyway, I was

3    fully dependent on medications.

4          '96, my wife finished the degree in '93 -- '93, '94.

5    She was not working.  She got an admission for Ph.D.  But when

6    she saw what I had been through, she decided not to pursue it,

7    to leave it there.  She finished her master's degree in

8    education.  She couldn't find a job in Oxford.  She got a job

9    in New Jersey in '96.  And we were ready to leave because my

10   scholarship expired.  I couldn't work, and we need a source of

11   income.  And she needs to do something.  She couldn't stay in

12   a small town doing nothing.

13         Then Mr. John Hailman contacted me, chief of the

14   Criminal Division in the U.S. Attorney's Office in Northern

15   Mississippi.  He contacted me.  We were scheduled to leave on

16   Sunday.  He contacted me on Thursday, September 5th.  We met

17   at Nancy -- Mrs. Rogers' office at the University of

18   Mississippi.

19         And they said, "Okay, this is the situation.  FBI,

20   CIA, INS -- or Immigration Naturalization Service, at that

21   time -- Criminal Division of U.S. Attorney concluded their

22   investigation.  You have four options:  Option 1, deportation;

23   option 2, subpoenaed to New York where the U.S. Attorney and

24   FBI offices are dominated by Jews who are pro-Israel; or

25   third, option 3, exposing whatever documents we have and

1    eventually Hamas would kill you; 4, helping us build cases.

2    Helping us incriminate some people."

3            I said, "Well" -- "and we can provide you with

4    protection.  You have to change your name.  And I'll find out

5    if your wife can call her sister."  Her sister was living in

6    New Orleans.

7            I said, "Mr. Hailman" -- and he was presented to me

8    as pro-Palestinian.  "Mr. Hailman, why now?"  I said.

9            Just "We concluded our investigation."

10           I said, "Okay, listen, it looks from what you told me

11   I don't have four options.  I have only one option because I

12   don't have control over the other options.  You want to deport

13   me or if you want to subpoena me to New York or if you want to

14   expose whatever you have, I have no control over that.  And if

15   you want to hurt me, don't seek my permission.  The only

16   option is in my hand is to become a traitor or a

17   collaborator."

18           He said, "No, no, it's not like that."

19           I said, "Okay, call it whatever you want.  Something

20   I can't do, I will not do as long as I live.  I'm supporting

21   the cause of freedom, justice, equality.  I'm not going to

22   turn against my people."

23           So, he said, "Okay."

24           I said, "Okay.  Why now, again?  Is it because I'm

25   moving to New Jersey?"

1         He said, "Yes.  We don't want you to move because,

2    you know, there the FBI and U.S. Attorney offices are

3    controlled by Jews."  Take it into my mind I was not -- I was

4    given that he's pro-Palestinian, although that contradicts

5    that.  But I was not -- lack of understanding of the American

6    legal system, lack of understanding of -- anyway, I told him,

7    "Okay, what if we call it off."

8         He said, "Go back to your normal life, nothing to

9    worry about."

10        I said, "Okay, we'll call it off."

11        The hardest part was to convince my wife.  We packed.

12   We were already packing our stuff, rented a truck, ready to

13   move, and she got a job contracted from Al-Azal School in New

14   Jersey.  So, we call it off.

15        And I thought that the end of it.

16        October 2nd, 200 -- I'm sorry -- 1996, they called

17   me, said, "We need to see you."

18        I said, "Okay."

19        "Did you think about what our offer?"

20        At that meeting, there were Mr. John Hailman,

21   Mr. Avery Rollins, Mr. Jim Frere, the head of FBI Mississippi,

22   Mr. Steve Taylor, and Mr. Richard Calcano, supervising special

23   agent, the head of FBI office in Oxford, Mississippi.

24        And I said, "Okay."

25        "Did you think about offer?"

1          I said, "You know, there was no offer to me."

2          And they said, "Go back to your normal life."

3          They said, "Well, the Department of Justice in

4    Washington wanted to pursue this issue with you, and we need

5    your help and" -- anyway, he gave me a speech.

6          I said, "Sir, I'm not going to hurt any human being.

7    I'm not going to stand as a traitor or as a collaborator."

8          Then he said, "Okay.  How about talking with your

9    wife and come back tomorrow with your wife."  And I went.  My

10   wife and I went and attended that meeting.  That was October

11   3rd.  The meetings were held in Ramada Hotel, not in the FBI

12   department or office.

13         Anyway, we went there, and they said what they said.

14   They repeated their offers, and we told them our stand.

15         Now, they moved to another thing, inducements.  They

16   offered me citizenship for me and my wife, employment for me

17   and my wife, money to start business.

18         I told them, "Guys, gentlemen, you know, I don't want

19   to build a career in espionage or intelligence.  I just want

20   to live in honor and dignity like any human being.  I don't

21   want to become a traitor or collaborator.  I don't want to

22   turn against my people."

23         "How can the world help an investigation initiated by

24   the government of Israel that you buy on my homeland against

25   my people, how do you want me to come and take the stand and

1      testify against them?  Tell me."

2            Said, "Okay, what do you want?"

3            I said, "I don't want anything.  Just let me live

4      normal."

5            Said, "Okay, how about helping you to become a

6      minister in Arafat's government?"

7            I said, "Okay, you know, it looks that you don't

8      understand me.  To me, goal is important, but more importantly

9      for me how to pursue that goal.  The means are more important.

10     If I want money, I could make it any way I want.  Not to come

11     to the U.S.  I could become an informant."

12           Then said, "Okay, think about it, and we'll talk

13     about it next meeting."

14           Next meeting, Mr. John Hailman showed up by himself

15     in the same hotel, and he said, "Okay, now we don't want you

16     to testify against anybody."

17           "Okay.  What do you want me to do?"

18           He said, "We need your help to understand the

19     situation in Palestine."

20           I said, "Well, that thing I have been doing in

21     public, I have been doing in universities, I have been doing

22     everywhere.  I don't have problem with that.  But okay, this

23     is the -- I don't want -- please, don't ask me about anybody.

24     I'm not going to answer any question without my attorney."

25           Needless to say, your Honor, that in October 2nd

1    meeting I enlisted legal counsel, and in a way they told me

2    no.  They said, well, this would hurt you, not help you.

3    Therefore, it's better not to have a legal counsel.

4          We met -- do you know how many meetings did we meet?

5    We met in October 2nd, October 3rd, October 7th, October 17th,

6    October 16th, October 18th, November 4th, November 20th,

7    December 5th, December 19th, January 23rd about 15 -- all the

8    meetings that took place since 1991 until that meeting, 15 --

9    almost 15 meetings.  I didn't have any reservation.  I didn't

10   have any problem to talk about general situation Middle East

11   to help them understand the situation.

12         I'm not an informant.  I'm not an FBI analyst.  I'm

13   not a CIA analyst.  I was given a job to become an overseas

14   operations officer for CIA.  I declined it.  I don't want to

15   build a career in espionage or intelligence.

16         My ultimate objective was at that time to become

17   university professor.  Things started to change, and I want to

18   get involved in politics later on.  But at that time, I didn't

19   want to build a career in espionage.  They offered me a job

20   with the CIA, and I could be stationed back in my home, but I

21   didn't want that.  I received it in writing.

22         So, meetings continued, and at one point they

23   introduced Mr. Atkins.  And they said, "Okay, things have

24   changed.  Now national security service is taking control of

25   the investigation.  It's not criminal.  And Joe Atkins will

1   continue with you."

2          And I met with him, and he start to ask me questions

3   and I told him, "Per the agreement, I am not going to name

4   names.  I'm not going to answer any questions without my

5   attorney."

6          Anyway, on December -- on January 24th, 1997, after a

7   sort of tense meeting, I told -- I inform Nancy Rogers who

8   organized these meetings, "I'm not going to meet with them."

9   And she conveyed a message to me from Mr. John Hailman:  "We

10  are not going to let you live normally or peacefully, any

11  way -- any way."

12         I said, "Well, I think there is a law in this country

13  and this country's not run by Mr. Hailman.  I'm not going to

14  intimidate -- to get intimidated by his statement, and I'm not

15  going to meet with him again.  If they want me, they can get

16  in touch with my attorney."

17         I consulted after that with Mr. David Cohen,

18  Georgetown University, and Albert McKiver from Washington,

19  D.C.

20         February 14th -- March 14th, 1997, my adviser passed

21  away.  April 27th I defended my dissertation.  It was done for

22  a long time.  I defended my dissertation and graduated in May

23  of that year, '97.

24         I moved after while in August of that year to

25  Washington, D.C. and started to work -- I didn't have any

1   valid passport.  I used -- I came to this country on Israeli

2   travel document, renewable every year.

3          After the establishment of the Palestinian Authority

4   in '93, '94, they said you have to get a Palestinian passport,

5   we are not going to renew it.

6          And, unfortunately, I was denied a Palestinian

7   passport until 2003.

8          So, I didn't have any valid passport.  I couldn't

9   leave.  I start work with my passport to get a valid passport.

10  And I get a job to work to find a place to live until I can go

11  back to my homeland country.  Although now if I go back, I

12  will not be able to be united with my wife.  She is from Gaza

13  Strip.  She cannot go to West Bank.  I cannot go to Gaza

14  Strip.  Everyone, we have to be apart.

15         I started to at least to watch things might change.

16  So, I try to get work on temporary basis until things settle

17  down and being able to get together.  I watch then --

18         THE COURT:  We're going to take about a ten-minute

19  break, Dr. Ashqar, and you can continue when we come back.

20         THE DEFENDANT:  Okay.  Thank you, your Honor.

21         (Brief recess.)

22         THE COURT:  Dr. Ashqar, you may continue.

23         THE DEFENDANT:  Your Honor, I was served the first

24  subpoena in November '97.  I tried to leave the country

25  honestly.  And I had an interview on Monday.  Then I was

1   served the subpoena, I think, Wednesday or Thursday just a day

2   before the Thanksgiving and to appear right after the

3   Thanksgiving.  And I informed them through my attorney that

4   I'm going to take the Fifth.

5         Anyway, they deferred it until February 20th, I

6   think.  They sent me the subpoena.  Two FBI agents were

7   waiting in front of my house, and they said the subpoena, they

8   said, "We need to talk with you."

9         I said, "Talk with my attorney."

10         They said, "We need to talk with you."

11         I said, "I think I did talk with you more than

12   enough."

13         And they said, "Either you talk with us or we serve

14   you with a subpoena anyway."

15         They serve me with the subpoena.  I appeared in front

16   of honorable Judge Cote in New York -- Denise Cote -- and I

17   refused to answer any questions, and she held me in civil

18   contempt.  I started hunger strike immediately, extreme

19   measures in extreme conditions.  I have been through too much,

20   more than the comprehension of any human being.  I don't

21   want -- I cannot -- I couldn't -- I cannot, I will not help

22   anybody build cases against my people or incriminate anybody.

23   I couldn't.  I cannot, I will not hurt any human being.

24         I told them this is a political case, I'm not going

25   to testify.  And I was held in civil contempt, and I took

1    again the extreme measure and extreme conditions to start a

2    hunger strike to protest the way I was treated by FBI and U.S.

3    Attorney, mainly in Mississippi.

4         And I was held in MCC in Manhattan for 11 days.

5    Eight days' incarceration, I was just taking water and only

6    water.  Then I was moved to Winchester ward -- Winchester Jail

7    where I placed in a ward.  And I was fed through my veins in

8    hands and legs for one month.  Then they collapsed, the IV

9    couldn't go through.  Then they placed the IV in my neck,

10   three stitches without anesthesia.  It came out, they push it,

11   and I became infected.  It was infected, and I had fever, had

12   infection.

13        Twice, the first time three stitches, but when it

14   came out, they placed two stitches without anesthesia, and

15   they -- after one month it came out and started to feed me

16   again through my vein, in my veins, my hands, on my legs.  Two

17   months.  Then collapsed.  They couldn't -- the IV couldn't go

18   through anymore.  They used to place it -- I swear the last

19   one time in three days they tried to place it 50 times, put it

20   forward, backward, to the right, to the left.  My veins

21   collapsed.

22        After four months, the judge issued a force order,

23   feeding order, and I was fed from my nose, NG tube from my

24   nose through my throat into my stomach.

25        I was kept in the same room in the same bed with

1    seriously ill patients.  Just in one month, in one month two

2    patients, cancer patients, passed away in front of me.  And

3    after six weeks, my nose inflammated, my throat inflammated

4    and I placed a request:  "Please, feed me with my veins until

5    at least my throat and my nose heals."

6          They said, "You have no say.  We have a forced

7    feeding order."

8          I said, "You know, we are human beings.  Let's

9    communicate as human beings.  It's hurting.  It's killing me.

10   I can't tolerate it."

11         You know, because they used to put the medicine in

12   the IV, and it used to clog.  Therefore, they used to take it

13   every two days, every three days and replace and I became

14   inflamed.

15         And I said, okay, if you want to place it, go ahead

16   and place it, but over my dead body because I can't take it

17   anymore, and they shackled me.  And they start to place the IV

18   into my nose, right nose.  It didn't go through and start to

19   bleed.  Into my left nose and it came out of my mouth.  Then

20   into my right nose.  Then into my left nose.

21         Judge -- and they shackled me.  They shackled me

22   three weeks.  My hands and my legs like that (indicating).

23   After that, after six months, 130 days sharp, the judge

24   released me from civil contempt.  And, again, I thought that

25   my ordeal is over and I could go back to live a normal,

1    peaceful life.  And still I had no place to go.

2            So, and still, you know, I had the fracture, the

3    muscle diminished, everything, you know.  And it took me one

4    year of physical therapy treatment to change the consequences

5    of the hunger strike.  And I did manage checkups and I was --

6    up to this moment, I'm still taking medications.

7            I applied for political asylum.  In December '98, my

8    visa expired, and I didn't want to stay illegally in this

9    country.  And I couldn't leave.  I couldn't -- I have no -- I

10   had no place to go.

11           February '99, it was granted, then revoked and

12   referred to an immigration court.  The government keep -- kept

13   continuation, continuation until I was not allowed to work for

14   six months.  This is, you know, for once anybody applies for

15   political asylum, he cannot work for six months, or he cannot

16   get the work permission after six months until they decide on

17   his -- anyway, they didn't decide.

18           They referred it to an immigration court.

19   Continuation after continuation until at that time I started

20   to work.  I worked after I get the work permission, and I

21   didn't want to stay away from my field.  I was teaching as

22   adjunct professor at university -- District of Columbia

23   University, Strayer University, and I started to teach at

24   Towson University in Maryland, 80 miles from my home.  I got

25   it through some friends.  I didn't want to waste the

1    opportunity.  I didn't want to stay away from my field.  I was

2    driving 80 miles back and forth four days a week on temporary

3    basis until I got a job at Howard University.

4           Anyway, in 2000, I got a job at Howard University.

5    In 2002, in September, 2002, assistant dean of the university,

6    Howard University School of Business, told me, "We know who

7    you are.  Someone from Mississippi" -- I don't know who's that

8    person is -- "sent us your file, and we know who you are."

9           I said, "Who from Mississippi sent you my file and

10   why?"

11          He said, "I can't tell you."

12          Anyway, later on they told me we are not going to

13   renew your contract despite a recommendation by the

14   appointment committee to hire me on tenure track.  Every three

15   years -- the first of three years on temporary basis, after

16   that on tenure track.  The appointment committee fought

17   against one, recommended the appointment, but they told me we

18   are not going to recommend -- we are not going to renew it.

19   I'm sorry.

20          Anyway, the judge -- immigration judge -- set a day

21   for a hearing, final hearing, and he said, "I'm not going to

22   renew it.  I'm not going to continue the case."  June 16th,

23   2003, and he schedule it for hearing.

24          The FBI provided nine volumes of information, the

25   same volumes that were used in my case, the same -- everything

1    the same by FBI.  Judge scheduled six weeks for hearing.

2    Suddenly -- and I'd like everyone to pay attention, your

3    Honor.  Your Honor, he scheduled six weeks for a hearing.

4    Suddenly, the FBI presented stipulation:  "Stipulate to this

5    and you don't need to testify, they don't need information,

6    they don't need the truth."

7            What are these stipulation?  The same thing that they

8    have been asking:  To build cases to incriminate some people.

9    To stipulate that Holy Land Foundation is a terrorist

10   organization, IAP -- Islamic Association for Palestine -- is a

11   terrorist organization, so-and-so is a terrorist.

12   Philadelphia meeting is -- was organized by Hamas.  Hamas --

13   there's Hamas in the U.S.

14           And I told my attorney, "I think it's time for me to

15   leave.  I'm not going to stipulate.  I think I can't find any

16   place to go.  I can't take it anymore."

17           We sign the agreement to depart voluntarily within

18   two months.  In June 16th, 2003, I was served a subpoena to

19   appear in front of grand jury in Chicago, on the same day, to

20   appear on the 18th.  And I got the termination of contract

21   from Howard University on the same date, June 16th.

22           Your Honor, it was not enough time.  We seek

23   continuation for grand jury appearance, and I was granted

24   until June 25th.  But they said you have to call to report to

25   FBI twice a day in Chicago at 10:00 a.m. and 7:00 p.m., not to

1   leave your town.  And I abided by the agreement.  I was

2   calling in twice.  I was calling FBI twice a day, not leaving

3   my town without their permission.

4           And I appeared and took the same stand because I know

5   two things:  Number one, this case is initiated by the

6   government of Israel.  American security is not the Israeli

7   security.  No Palestinian did anything against the security of

8   the U.S. in the U.S.

9           Second, I'm determined to live in honor and dignity.

10  I cannot turn against my people as long as it takes.  And I

11  took the same stand.  I was held in civil contempt, and I took

12  the same stand not to testify -- not to eat or drink anything,

13  just water, to protest the way I was treated.

14          But this time something happened unusual.  Three days

15  after my incarceration, they cut off the water.  They kept me

16  in a dry cell from Monday until next Sunday when I was rushed

17  to the hospital -- Bethany Hospital.  They took me once to the

18  medical clinic in jail and placed the IV despite my rejection

19  and gave me 300 cc.

20          And after that, the case was moved to your Honor.  I

21  was indicted with criminal contempt and later on with

22  obstruction of justice later, then with RICO.  And since

23  November 5th -- November 3rd, I'm sorry, 2003, I was placed

24  under some electronic monitoring, started with home arrest,

25  then curfew.  Then again I was detained for one month, almost

1    one month.  Then released to home incarceration, and I stayed

2    in home incarceration wearing the ankle bracelet from

3    September 15th, 2004, until March 26th this year.  And the

4    course of the trial, which is exhaustion of a person

5    financially, emotionally.

6          You don't know what we have been through.  And before

7    that, we were struck by another tragedy, stabbing to death of

8    my sister-in-law in New Orleans, Louisiana.  We are still

9    living that tragedy, still an open case.  No one has been

10   charged.  No apprehension.  No whatsoever.  And we are

11   reminded every day with that tragedy with my sister-in-law's

12   son Ahmed living with us.

13         And I found myself in a place that I couldn't go to

14   New Orleans to help my family through that hard time.  I had

15   to stay home.  We buried -- they couldn't take even -- we

16   tried to take the body, the coffin to be buried back in

17   homeland in her homeland, but the borders were closed, and we

18   couldn't do that.

19         Your Honor, I think -- I did what I did.  I'm taking

20   responsibility what I did.  And if I'm going to test-  -- if

21   I'm -- they are going to subpoena me again, I'm going to take

22   the same stand.  I'm not going to turn or to take the stand

23   and testify against people, my people.  I'm not going to help

24   anybody build cases, incriminate my people, as long as it

25   takes.

1        But I'm a Palestinian.  I'm not an American.  I have

2   a commitment towards my people.  And I never hurt anyone or

3   knew of anyone would do anything against the U.S. and held

4   that information.  But to designate my people and go after

5   them for the sake of the Israelis, I think something -- not

6   me, every Palestinian would not do.

7        Your Honor, I think we have been through too much,

8   beyond the comprehension of any human being.  When I came to

9   this country, the first thing I did, to get a driver's license

10  because I didn't have a driver's license because to get a

11  driver's license, you have to get clearance from security, and

12  I was denied that.

13       Second thing, I kept records of everything and for

14  the first time in my life I have appointment book.  And I

15  started to keep, which turned to be -- then to be called

16  documents afterwards.  I had the appointment book, '90, '91,

17  '92, '93, almost 1400 pages out of 1600 pages to be called

18  documents.

19       The first time my wife joined me after she finished

20  her degree in March '90, she said, "This is the first time in

21  my life almost to live to feel peace and to feel in peace and

22  security and tranquility."

23       We used to sleep in our clothes because we expected

24  the raid of the Israelis any time to detain us.  And they

25  could break the door without any notice.  So, we used to sleep

1    in our clothes.

2         "This is the first time."  That's her statement.

3         Your Honor, I think it's time for me to pick up

4    what's left in my life to live in peace, harmony, dignity, and

5    to join my family back at home.  I have been out of this --

6    out of my homeland 18 years and six days -- five days, I'm

7    sorry.  My brothers get married.  I don't know his kids.

8    Many, many nephews.  Many nieces got married.  Many cousins.

9    I don't know anyone.  Those who I mentioned were murdered or

10   detained.  I don't know.  They were in the early 20s.  When I

11   left, some of them were two years, three years, four years

12   old.  I don't recall all of them.  I don't remember all of

13   them.

14        Although my tale of pain and suffering would not end.

15   I don't know where to go if I'm going to be granted status to

16   stay or not or the Israelis would go after me.

17        All documents that was taken from my home was used

18   against my people back at home.  Since '92 has been used.  And

19   if I went through what I have been through in this country,

20   then you can imagine what would happen to me if I go back.

21        Your Honor, thank you for your understanding and for

22   your patience.  This is the first time to have an opportunity

23   to tell my story.

24        Thank you.

25        THE COURT:  Thank you, Dr. Ashqar.

1      THE DEFENDANT:  Your Honor, before you move, can I

2  just thank -- I'm sorry, I forgot to thank my counsels, my

3  legal counsel Bill Moffitt, his wife Edna Moffitt, for working

4  hard on my case, for their help and understanding and, more

5  importantly, believing in me.

6      Also, to thank Mr. Keith Spielfogel, Professor Andrea

7  Lyon and anyone -- and Sean and everyone who worked in my

8  case.

9      Also, I'd like to thank the community for supporting

10  me, who stood up for me and believing in me and trusting my

11  brothers and sisters.  You are supporting a cause of freedom

12  and justice.  Helping the Palestinian people is supporting a

13  cause of freedom and justice.

14      Also, I'd like to thank my wife who has been through

15  this with me.  We got married; after two months, I was

16  threatened with being deported by the Israelis.  My nephew,

17  Ahmed Muhammad, and my mother-in-law has been captive with me.

18  She couldn't leave.  And now things will not be the same for

19  us until we have a grave.

20      Thank you.

21      THE COURT:  The sentencing guidelines, as the Court

22  has already addressed, there's a range of 210 to 262 months.

23  The guidelines are advisory.  In fashioning the sentence in

24  this case, as the Court is directed to do so by the Supreme

25  Court and the Seventh Circuit, the Court looks to Section 3553

1   and the factors in Section 3553.

2        The sentence that the Court is going to impose is

3   based upon those factors and will satisfy and address the

4   factors in Section 3553.  The first factor the Court must look

5   at under 3553(a)(1), the nature and circumstances of the

6   offense and the history and characteristics of the defendant.

7        Refusing to testify before the grand jury after you

8   have been immunized and compelled to do so is a serious

9   offense.  The grand jury process in this country is essential

10  to obtain information for law enforcement and for our country.

11       I strongly disagree with your statement, Mr. Moffitt,

12  that Dr. Ashqar had no duty to the United States.  When living

13  in this country, you have a duty and an obligation to follow

14  the laws and comply with the laws or suffer the consequences.

15       Part of the honor and dignity in living in this

16  country is abiding by those laws and complying with those

17  laws.  Refusing to comply with the court order and failing to

18  testify before the grand jury is a very serious offense.

19       In looking at the nature and circumstances of the

20  offense, I note, however, that there is no evidence that you,

21  yourself, Dr. Ashqar, have ever participated in any violent

22  acts or intended to do so.  There also has not been any

23  evidence in this case that the terrorist activities that were

24  under investigation by the grand jury were directed at the

25  United States.

1          In looking at your history and characteristics,

2   Dr. Ashqar -- and I have reviewed all of the letters,

3   Mr. Moffitt, that you have provided to the Court, but I'm also

4   looking at the evidence that has been provided to this Court

5   during the course of the trial and through the sentencing

6   hearing and through Dr. Ashqar's own statements today.  I

7   respect that you want to support your family members,

8   Dr. Ashqar, but when you're in this country, you must do it

9   legally, and refusing to testify before the grand jury when

10  you've been immunized and compelled to do so is not doing it

11  legally.

12          And you, yourself, told the grand jury, "I will never

13  give evidence or cooperate in any way with the grand jury or

14  any other, no matter what the consequences to me," and there

15  are consequences.

16          I reiterate what I said before, though.  There is no

17  evidence that you have participated in any violent acts.  You

18  do not have a criminal history.  You have not been convicted

19  other than in this action of any crimes before coming here.

20  So, I take all of that into consideration.

21          One other thing I do note in looking at your history

22  and characteristics, although you indicated that you are

23  accepting responsibility for your actions, in the

24  hour-and-a-half plus that you have spoken, I have not seen any

25  remorse from you for the crime that you committed here.

1           I also heard from you exactly the opposite, that if

2    you were in the same situation again, that you would do the

3    exact same thing and refuse to testify before the grand jury.

4           The sentence that the Court is going to impose will

5    reflect the seriousness of the offense of conviction here, the

6    obstruction of justice and the contempt.  It will promote

7    respect for the law.

8           Mr. Moffitt, you argued that a lengthy sentence would

9    be contrary to the principles of liberty and justice that this

10   country was founded upon.  The exact opposite is true.  The

11   ability of the government to prosecute cases depends upon

12   truthful testimony before the grand jury.  It is not up to any

13   one individual to decide if they agree with the grand jury,

14   disagree with the grand jury, if they can protect people.

15          When a witness has been immunized and compelled to

16   testify before a grand jury, he cannot deliberately ignore

17   that order and interfere with the law enforcement process

18   without consequences.  And that is certainly true where a

19   grand jury is investigating terrorist activities.

20          Those actions undermine a critical part of our

21   investigatory process and our prosecutorial process in the

22   United States.  In providing -- the sentence the Court is

23   going to impose will provide just punishment for the offense.

24   It will also provide adequate deterrence to criminal conduct

25   of others.  It is essential to send a message that you cannot

1   walk into grand juries when you've been immunized and

2   compelled to do so and say I'm going to take things into my

3   own hands, and I'm not going to do that.  You cannot do that

4   without significant consequences.

5           In terms of protecting the public from further crimes

6   of you, you refused to testify in New York.  You refused to

7   testify in Chicago.  You have disregarded your legal

8   obligations of living in this country.

9           Having said that, I'm not sure that any sentence the

10  Court would impose would ever deter you from refusing to

11  testify again.  I just don't think you would ever do that,

12  Dr. Ashqar, based upon on your own statements today and

13  everything that the Court has seen.

14          The final factor in Section 3553 is to provide the

15  defendant with needed educational or vocational training.  I

16  don't really think that is a factor here.

17          There is a criminal offense level of 32 and a

18  Criminal History Category of VI, as the Court has previously

19  said.  For alternate reasons, looking at Category VI and

20  guideline 4A1.3(b)(1), I do think that substantially

21  over-represents the seriousness of your criminal history in

22  this case.  You have no convictions other than the one before

23  this Court.  You have not been arrested.  A Category VI

24  significantly and substantially over-represents that.

25          Based upon everything that the Court has seen, I

1  think a Category I is more appropriate, and my sentence will

2  reflect a guideline offense level of 32 with a Criminal

3  History Category of I, which has a 121-to-151-month guideline

4  range.

5          For all of the factors in Section 3553, that I have

6  just given, even if the Court should not have a Criminal

7  History Category of I, even if the category of VI is more

8  appropriate, under the Section 3553 factors, I would deviate

9  from the Category VI guideline range to the guideline range

10  that I have just noted.

11          For all of those reasons, pursuant to the Sentencing

12  Reform Act of 1984, Dr. Ashqar, it is the judgment of the

13  Court that you are hereby committed to the custody of the

14  Bureau of Prisons to serve a term of imprisonment of 135

15  months on Counts Four and Five of the second superseding

16  indictment.

17          You must pay a $100 special assessment on each count

18  of conviction for a total of $200.  I am also imposing a fine

19  of $5,000.

20          Upon your release from imprisonment, you shall be

21  placed on supervised release for a term of two years on each

22  count to run concurrent.

23          Within 72 hours of your release from the custody of

24  the Bureau of Prisons, you shall report in person to the

25  probation office in the district to which you are released.

1        While on supervision, you shall not commit another

2   federal, state or local crime.  You shall comply with the

3   standard conditions that have been adopted by this Court and

4   also comply with the following additional conditions:

5        You shall not possess a firearm or a destructive

6   device.

7        You shall refrain from any unlawful use of a

8   controlled substance.

9        You shall submit to one drug test within 15 days of

10  your release from imprisonment and random drug tests

11  thereafter not to exceed 104 tests per year, as conducted and

12  directed by the U.S. Probation Office.

13       You shall cooperate in the collection of a DNA sample

14  to the extent one is authorized by the law.

15       In addition, you shall comply with the following

16  special conditions:

17       Upon completion of your imprisonment, you are to

18  surrender to a duly authorized official of the Homeland

19  Security Department for a determination on the issue of your

20  deportability by the appropriate authority in accordance with

21  the laws under the Immigration and Nationality Act and the

22  established implementing regulations.

23       If ordered deported, Dr. Ashqar, you shall not

24  re-enter the United States without obtaining in advance the

25  express written consent of the Attorney General or the

1    Secretary of the Department of Homeland Security.

2             I am going to waive the costs of incarceration and

3    supervision based on your limited ability to pay.

4             You have the right to appeal your conviction in this

5    case, Dr. Ashqar, as well as the sentence that has been

6    imposed by the Court.  If you wish to do so, you must file a

7    notice of appeal with the Seventh Circuit within ten days, and

8    you can talk to Mr. Moffitt about how to go about doing that.

9             Is there anything further?

10            MR. SCHAR:  Several things, Judge.  On Counts Four

11   and Five, the statutory max on Count Four is 120 months.  I'm

12   not sure if Count five is 135 or simply additional time to run

13   consecutive.

14            THE COURT:  Thank you for clarifying that.

15            Count Four is the contempt which does have the

16   statutory maximum.  I will --

17            MR. SCHAR:  The obstruction has that.

18            THE COURT:  I'm sorry?

19            MR. SCHAR:  The obstruction has the statutory.

20            THE COURT:  Has the statutory maximum, which is

21   Count -- Count -- because of the -- it was Three and Four at

22   the time it went to trial.  Under the second superseding

23   indictment, it's Four and Five.  Five is the obstruction with

24   the 120 months.

25            So, I'm sentencing you on Count Four to the 135

 1   months, and the sentence on Count Five is 120 months to run

 2   concurrent with the sentence on Count Four of the second

 3   superseding indictment.

 4         I think it's a ten-year statutory cap, not a five.

 5         MR. SCHAR:  Yes, ten, years, Judge.

 6         THE COURT:  Okay.  Is there anything further?

 7         MR. MOFFITT:  Your Honor --

 8         THE COURT:  Mr. Moffitt?

 9         MR. MOFFITT:  Yes.  I would ask that Dr. Ashqar be

10   allowed to self-surrender.

11         MR. SCHAR:  Judge -- I'm sorry, go ahead.  There is

12   one other issue before we get to that issue because the

13   government does have an opinion on that.  I'm not sure you set

14   a fine schedule, which I think is now required pursuant to

15   Seventh Circuit law.

16         THE COURT:  Any fine that remains unpaid at the time

17   of supervised release will become a condition of supervised

18   release to be paid in the amount of 10 percent of the

19   defendant's gross net income -- gross income.

20         Thank you.

21         MR. SCHAR:  Yes, Judge.

22         THE COURT:  Yes.

23         MR. MOFFITT:  He is currently still on bond.  He has

24   appeared timely at every -- on occasion that he's been

25   required to.  We're not -- we're not asking for a long period

1   of time.

2           THE COURT:  What are you asking for, Mr. Moffitt?

3           MR. MOFFITT:  I would like to ask for 45 days so he

4   might be able to spend the last of the holiday season with his

5   family.

6           MR. SCHAR:  Judge, our position is under 3143 remand

7   is required.  I would note he's not on electronic monitoring

8   anymore, and I would also note repeatedly throughout his

9   statements, he indicated a willingness and wish to leave the

10  country.

11          He's under an order, essentially agreed order, of

12  deportation, and now the reality is he's looking at over ten

13  years in the federal penitentiary, and his reasons for fleeing

14  have gotten significant as this reality has now struck.  And

15  we would ask that he be remanded immediately.

16          MR. MOFFITT:  He was looking at life imprisonment at

17  one point.  He returned every time.  He came to hearings that

18  he wasn't even required to come.  This is a man who I would

19  suggest to you from everything that he has told you carries

20  with him the notion that the dignity of his people is

21  important.

22          I would suggest that it would be against his nature

23  at this particular point to run in the face of this.  If he

24  was going to run, he certainly would have run when we got the

25  probation report and it said that he was facing life.  I mean,

1    the reality that he was facing jail time has been a reality

2    that he certainly faced up to long before this.

3              And certainly Mr. Salah was allowed to surrender

4    himself.  I don't see where Dr. Ashqar, in light of the fact

5    that there's no violence in his history, is any different.

6              THE COURT:  I don't think you can compare this case

7    to Mr. Salah's case.  He was convicted of different charges

8    and facing different guidelines and had some very, very strong

9    community ties to Chicago.  So, I don't think you --

10             MR. MOFFITT:  Well --

11             THE COURT:  -- can compare this case to his case.

12             MR. MOFFITT:  -- I would suggest to you that he has

13   community ties.  Some of them are in the courtroom, and we're

14   not asking for a long period of time.

15             MR. SCHAR:  Judge, I think we're talking about a

16   significant period of incarceration.  The statute's fairly

17   clear in this regard.  It's not a danger-to-the-community

18   issue.  It's simply a risk-of-flight issue at this point.

19             There are no significant appellate issues, your

20   Honor, from the government's view, nor is there clear and

21   convincing evidence that he is not a risk of flight at this

22   point.  Again, he's not on any type of monitoring, and he has

23   every reason to leave the country and not face this sentence

24   and continue to feel currently very strongly about, which is

25   his fight for the Palestinian people.

1          MR. MOFFITT:  Where does he go?  He has no passport.

2     There's no place for him to go.

3          THE COURT:  In looking at Section 3143, the statute

4     directs that the defendant be taken into custody unless the

5     Court finds by clear and convincing evidence that he is not

6     likely to flee or to pose a danger to the safety of any other

7     person or the community.

8          I agree, I don't think Dr. Ashqar is a danger to the

9     community.  However, I do not find by clear and convincing

10    evidence that he's not likely to flee.

11         He's facing a substantial sentence.  I am concerned

12    by statements that he himself has made, that you want to

13    return, you're trying to return.  I am concerned that -- at

14    your lack of remorse for what has happened here.  I am

15    concerned that you've indicated you'd go out and commit the

16    same crime again.

17         For all of those reasons, there is not clear and

18    convincing evidence, as required by the statute, and I will

19    order that the defendant be taken into custody.

20         MR. SCHAR:  Thank you, Judge.

21         THE COURT:  Is there anything further?

22         MR. SCHAR:  No, Judge.

23         THE COURT:  Thank you.

24    (Which were all the proceedings heard.)

25

1                              CERTIFICATE

2      I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   */s/Joseph Rickhoff*                    *September 3, 2008*

6   _____         _____
    Joseph Rickhoff                 Date
    Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25