1

1           IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3  UNITED STATES OF AMERICA,          ) Docket No. 03 CR 978
                                       )
4                      Plaintiff,      )
                                       )
5              vs.                     )
                                       )
6  ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                       ) November 8, 2007
7                      Defendant.      ) 10:00 o'clock a.m.

8                          VOLUME ONE
               TRANSCRIPT OF PROCEEDINGS - SENTENCING
9              BEFORE THE HONORABLE AMY J. ST. EVE

10 APPEARANCES:

11 For the Plaintiff:        HON. PATRICK J. FITZGERALD
                             United States Attorney
12                           BY:  MR. JOSEPH M. FERGUSON
                                  MR. REID J. SCHAR
13                                MS. CARRIE E. HAMILTON
                             219 S. Dearborn St., Suite 500
14                           Chicago, Illinois  60604

15 For Deft. Ashqar:         MR. WILLIAM MOFFITT
                             11582 Greenwich Point Road
16                           Reston, Virginia  20194

17                           MR. KEITH ALLAN SPIELFOGEL
                             20 North Clark Street, Suite 1200
18                           Chicago, Illinois  60602

19 Also Present:             S/A JILL PETTORELLI, FBI
                             MS. KELLY RICE, Probation
20
   Court Reporter:           MR. JOSEPH RICKHOFF
21                           Official Court Reporter
                             219 S. Dearborn St., Suite 1232
22                           Chicago, Illinois  60604
                             (312) 435-5562
23
              * * * * * * * * * * * * * * * * * *
24
                     PROCEEDINGS RECORDED BY
25                   MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED BY COMPUTER

```
 1              THE CLERK:  03 CR 978, USA vs. Abdelhaleem Ashqar.

 2              THE COURT:  Good morning.

 3              MR. SCHAR:  Good morning, Judge.

 4              MR. SPIELFOGEL:  Good morning, Judge.

 5              MR. SCHAR:  Reid Schar, Joseph Ferguson and Carrie

 6   Hamilton on behalf of the United States.

 7              MR. SPIELFOGEL:  Bill Moffitt and Keith Spielfogel on

 8   behalf of Dr. Ashqar, Judge.

 9              MS. RICE:  Kelly Rice on behalf of Probation, your

10   Honor.

11              THE COURT:  We are here for sentencing.

12              Are you ready to proceed?

13              MR. SCHAR:  Yes, Judge.

14              MR. SPIELFOGEL:  Yes, Judge.

15              THE COURT:  Before you do, I understand, Mr. Schar,

16   that the government intends to call one witness.

17              Is that accurate?

18              MR. SCHAR:  That is accurate, Judge.

19              THE COURT:  And that is?

20              MR. SCHAR:  Special Agent David Bray of the FBI.

21              THE COURT:  And, Mr. Spielfogel, do you intend to

22   call any witnesses?

23              MR. SPIELFOGEL:  No, Judge.

24              THE COURT:  Okay.

25              Go ahead.  We will proceed.
```

1          MR. SCHAR:  Thank you, Judge.

2          MR. FERGUSON:  The government calls David Bray to the

3     stand.

4          THE COURT:  Please come forward, Agent Bray.

5               DAVID BRAY, PLAINTIFF'S WITNESS, SWORN

6          MR. FERGUSON:  All set?

7          THE COURT:  You may proceed.

8          THE WITNESS:  Set.  Thank you.

9                    DIRECT EXAMINATION

10    BY MR. FERGUSON:

11    Q.  Would you please state your name and spell your last name

12    for the record?

13    A.  My name is David Bray.  My last name is spelled B-r-a-y.

14    Q.  And how are you employed?

15    A.  I'm an FBI agent.

16    Q.  And how long have you been with the FBI as a special

17    agent?

18    A.  A little over ten years.

19    Q.  You've testified in these proceedings and, specifically,

20    at trial; is that correct?

21    A.  Yes, I have.

22    Q.  All right.

23          MR. FERGUSON:  With the Court's leave, I'll dispense

24    with background information about Agent Bray, since that's --

25          THE COURT:  That is fine.

Bray - direct

4

1          MR. FERGUSON:  -- already in the record.

2          THE COURT:  I am familiar with the record in the

3   case.  That is fine.

4   BY MR. FERGUSON:

5   Q.  Special Agent Bray, prior to the filing of the second

6   superseding indictment -- upon which this case went to

7   trial -- in August, 2004, and from -- specifically, from --

8   2002 to 2004, were you the case agent for a grand jury

9   investigation looking into matters concerning Hamas?

10  A.  Yes, I was.

11  Q.  And that grand jury investigation was conducted here in

12  the Northern District of Illinois?

13  A.  Yes, it was.

14  Q.  Would you describe -- and we're going to discuss this in

15  some detail, but would you describe in broad outline what the

16  nature of the investigation was that was conducted at that

17  time?

18  A.  In a broad sense, we were conducting an investigation of

19  Hamas in the United States.

20  Q.  Okay.

21          And what about Hamas in the United States?

22  A.  Hamas members, associates, their interactions, their

23  activities with one another, what type of support they

24  provided to Hamas abroad in Israel.

25  Q.  At the time that you were assigned to this case and

Bray - direct

5

1   working it as a case agent, had you previously worked on any

2   other investigations concerning Hamas?

3   A.  No, I had not.

4   Q.  Were there specific statutory violations or crimes related

5   to Hamas or its members that the investigation was

6   specifically pursuing?

7   A.  Yes, there were.

8   Q.  Can you name some of them?

9   A.  Some of them were racketeering conspiracy; material

10  support to a foreign terrorist organization; conspiracy to

11  kill, kidnap, maim or injure; hostage taking; money

12  laundering; certain fraud statutes, mail and wire fraud;

13  obstruction.

14  Q.  Passport or travel document fraud?

15  A.  Yes.

16  Q.  Other types of fraud?

17  A.  Yes.

18  Q.  Including financial fraud --

19          MR. MOFFITT:  Objection.  Leading.

20          MR. FERGUSON:  Two things, Judge.  First of all, all

21  of this is in the record.  I want to get through it fairly

22  quickly.

23          Second of all, the rules of evidence don't apply

24  here.  He's not going to be led throughout all of this, but

25  I'd like to get to the particulars.

 1          THE COURT:  Objection overruled.

 2          These are preliminary matters; and, second, the rules

 3     of evidence do not apply here.

 4          So, for the preliminary matters, it is fine.

 5     BY MR. FERGUSON:

 6     Q.  I want to focus your attention on a couple of the specific

 7     statutory violations that were the subject of investigation.

 8     Let's take obstruction, for example.

 9          Can you give examples of specific acts of obstruction

10     in connection with Hamas or Hamas members that the

11     investigation was conducting?

12     A.  Yes, I can.

13          In 1998, in the Southern District of New York,

14     Dr. Ashqar was called before a grand jury conducting an

15     investigation; he was immunized by the Chief Judge; and, he

16     failed to answer questions posed to him during the grand jury.

17     Q.  And that was -- he was -- questions were posed with

18     respect to Hamas?

19     A.  Yes.

20     Q.  All right.

21          Additional instances of acts of obstruction related

22     to Hamas that were under investigation?

23     A.  Yes.

24     Q.  Name some.

25     A.  Another individual, Ismael El-Barasse, was also called

1   before the grand jury in the Southern District of New York

2   during the same year.  He was immunized, as well, and refused

3   to answer questions regarding the grand jury's investigation

4   of Hamas.

5   Q.  And within the context of the Hamas enterprise that was

6   being investigated, were there any acts of obstruction that

7   were also being further investigated here in the Northern

8   District of Illinois?

9   A.  Yes.  In 2000, in the Northern District of Illinois, an

10  individual, Sharif Alwan, was also called before a grand jury

11  here.  He was immunized, as well, by the Chief Judge and

12  refused to answer questions posed to him by the grand jury.

13          THE COURT:  Mr. Ferguson, I am sorry to interrupt,

14  but would you please clarify for me -- the first two acts that

15  Agent Bray testified to that took place in '98, I was not sure

16  if he was saying those were part of the grand jury in

17  Chicago's investigation or not.  If you would clarify that.

18  BY MR. FERGUSON:

19  Q.  Was the Chicago grand jury investigation, as part of its

20  investigation into the Hamas enterprise, conducting an

21  investigation into possible acts of obstruction that occurred

22  in New York in 1998 by Ismael El-Barasse and Abdelhaleem

23  Ashqar?

24  A.  Yes.

25          THE COURT:  Thank you.

Bray - direct

8

1  BY MR. FERGUSON:

2  Q.  Were there acts of obstruction of Muhammad Salah, a

3  co-defendant in this matter, that were also being

4  investigated?

5  A.  Yes.

6  Q.  And what were they in connection with?

7  A.  In particular, civil proceedings regarding a U.S. citizen

8  that was killed in a drive-by shooting, for which Hamas

9  claimed responsibility, in Israel.

10  Q.  And that's the Boim litigation that was brought under a

11  civil analogue to the terrorism code?

12  A.  Yes.

13  Q.  And, of course, we're here today because of Abdelhaleem

14  Ashqar's obstruction before the grand jury in the Northern

15  District of Illinois; is that correct?

16  A.  That is correct.

17  Q.  All right.

18        And that, too, was the subject of investigation, as

19  well; is that right?

20  A.  Yes.

21  Q.  All right.

22        I want to focus your attention on -- you mentioned

23  murder, murder conspiracy, a number of other federal statutes

24  that involve killing, kidnapping, maiming individuals.

25        At the time the investigation was being conducted,

Bray - direct

9

1   were you investigating specific murders?

2   A.   Well, yes and no.  In the context of -- we were looking at

3   Hamas as an enterprise.  We knew from confessions obtained by

4   Israeli authorities of Muhammad Salah, he mentions specific

5   acts of murder:  The murder of another Palestinian advocating

6   peace --

7   Q.   Is that Sari Nusseibah?

8   A.   Yes.

9           -- the murders of three Israeli engineers in a plot

10  that he was -- Muhammad Salah was -- discussing with Adil

11  Awadallah, another co-conspirator.

12  Q.   And was the investigation also inquiring into the murder

13  and kidnapping of Ilan Sa'doan, an Israeli soldier?

14  A.   Yes, it was.

15  Q.   And just as a brief refresher to the Court, what was the

16  general nature of that investigation?

17  A.   Well, during his time in Israel, Muhammad Salah attempted

18  to negotiate his release; the release of a Hamas leader, Salah

19  Shahadah; and, also, at one point in time, the return of money

20  that was confiscated from Muhammad Salah.  He was attempting

21  to barter, exchange information that he had regarding the

22  burial location of an Israeli soldier for whom Hamas kidnapped

23  and killed and took responsibility for -- claimed

24  responsibility for.

25  Q.   You've focused thus far in your remarks on specific

1  instances of murder or discussions about murder as it related

2  to Muhammad Salah.  Were there other acts of murder or

3  terrorist activities that were also under investigation?

4  A.  Yes.  I mean, we looked at any terrorist attack,

5  essentially, for which Hamas claimed responsibility.  There

6  were even acts in and around the time that Abdelhaleem Ashqar

7  appeared before the grand jury here in the Northern District

8  of Illinois.

9  Q.  Can you name a couple of those?

10  A.  Yes.  There was, in April of 2003, I believe it was, a

11  suicide bombing at an establishment -- Mike's Place -- in Tel

12  Aviv, Israel.  It's essentially a pub, if you will, that's

13  adjacent to the American Embassy frequented by Westerners and

14  Americans.

15  Q.  You said that was April of 2003; is that right?

16  A.  Yes.

17          MR. FERGUSON:  I believe, Judge, just for the record,

18  that is referenced and was the subject of testimony from the

19  government's expert, Matthew Levitt, and also submitted as

20  part of the Levitt Timeline that was admitted into evidence.

21          THE COURT:  Okay.

22  BY MR. FERGUSON:

23  Q.  That was in April, 2003, I think you said?

24  A.  Yes.

25          And I believe there were three fatalities and

1   numerous injuries involved.

2   Q.  Okay.

3        And that establishment -- have you visited that

4   establishment yourself?

5   A.  Yes, I have.

6   Q.  All right.

7        You indicated it was adjacent to the American

8   Embassy.  What types of individuals frequent that

9   establishment?

10  A.  Americans.

11  Q.  And that was approximately two months before Abdelhaleem

12  Ashqar was called into the grand jury here in Chicago; is that

13  right?

14  A.  Yes.

15  Q.  All right.

16        Can you name another -- give us another -- example of

17  a Hamas terrorist strike that occurred during the period of

18  investigation and around the time that Abdelhaleem Ashqar was

19  called into the grand jury in Chicago?

20  A.  Yes.  In August of 2003, there was a bus bombing in

21  Jerusalem that resulted in 21 fatalities, including five

22  American citizens.

23  Q.  You said that was August, 2003?

24  A.  Yes.

25  Q.  And that was during the period of time that contempt

1    proceedings -- civil contempt proceedings -- were ongoing with

2    respect to --

3              MR. MOFFITT:  Again, I'm going to object to leading

4    questions at this point.  I don't think this is preliminary.

5              MR. FERGUSON:  It's in the record, Judge.  I --

6              THE COURT:  Objection overruled at this point.

7              And the rules of evidence do not apply in hearings

8    such as this.

9    BY MR. FERGUSON:

10   Q.  You've indicated that Hamas was being investigated as an

11   enterprise; is that right?

12   A.  Yes.

13   Q.  And, in fact, they were charged as an enterprise; is that

14   right?

15   A.  Yes, they were.

16   Q.  Were any and all attacks undertaken by Hamas -- terrorist

17   attacks undertaken or claimed by Hamas -- of interest and the

18   subject of some amount of investigation in the context of the

19   Northern District of Illinois case that you were pursuing?

20   A.  Yes, they were.

21   Q.  And what, with respect to individuals in the United States

22   or entities in the United States, were you investigating in

23   relation to those acts?

24   A.  We were clearly trying to define whether or not there was

25   support -- financial support, logistical support,

1  communication support, whatever that may be -- by persons here

2  in the United States that supported those activities abroad,

3  those terrorist attacks.

4        From the Muhammad Salah confessions, we know that

5  money came into the U.S., passed through U.S. bank accounts,

6  eventually made its way back overseas, which he personally

7  handed off to Hamas military operatives where that money was

8  used to further their cause and was used to support military

9  operations by Hamas.

10 Q.  And at the time of Dr. Ashqar's June, 2003, appearance in

11 the grand jury here in Chicago, what was Hamas' legal status

12 in the United States?

13 A.  It was a foreign terrorist organization.

14 Q.  Designated by the United States government?

15 A.  Yes.

16 Q.  And when was it so designated?

17 A.  There were two designations, but the one designation as a

18 foreign terrorist organization occurred in 1997.

19 Q.  Now, was part of the investigation, at that time and when

20 Dr. Ashqar was called in to the grand jury, to determine

21 whether individuals or entities in the United States were

22 possibly engaged in acts of material support to Hamas as a

23 designated entity at that time?

24 A.  Yes.

25 Q.  Slightly redirect your attention.

1           Were there individuals who you were specifically

2     looking at with an eye towards possible charges of material

3     support of Hamas as a terrorist organization?

4     A.   Yes.  Muhammad Salah and Abdelhaleem Ashqar.

5     Q.   And was there a material support charge actually returned

6     by the grand jury through whom you conducted the investigation

7     in this case?

8     A.   Yes, of Muhammad Salah.

9     Q.   That charge never went to trial; is that right?

10    A.   It did not.

11    Q.   But the grand jury returned a material support charge; is

12    that right?

13    A.   Yes.

14    Q.   What was Muhammad Salah's legal status at the time of

15    Dr. Ashqar's appearance in the grand jury?

16    A.   He was a specially-designated terrorist.

17    Q.   And how long had he had that status?

18    A.   Since 1995.

19    Q.   Because he was a specially designated terrorist, were

20    there certain obligations that he had or restrictions placed

21    upon him from the Treasury Department?

22    A.   Yes, there were.  In order to conduct financial

23    transactions, open a bank account, have any money given to

24    him, employment, all of that had to be cleared with the

25    Treasury Department.

Bray - direct

15

1   Q.  And was your investigation specifically looking into

2   violations -- criminal violations -- of those obligations and

3   legal strictures that attended Muhammad Salah's special

4   designated terrorist status?

5   A.  Yes.

6   Q.  Was any information related to Muhammad Salah and anything

7   having to do with his activities of interest to your

8   investigation?

9   A.  Yes.

10  Q.  Was Mousa Abu Marzook a target of your investigation?

11  A.  Yes, he was.

12  Q.  Just as a brief refresher, who is Mousa Abu Marzook?

13  A.  He currently is the Deputy Chief of the Hamas Political

14  Bureau.  He is also a specially-designated terrorist by the

15  U.S. government.

16  Q.  And was the investigation focused, in some part, on the

17  material support of Hamas through Marzook or individuals and

18  entities in the United States to which Marzook was connected?

19  A.  Yes.

20  Q.  Was Dr. Ashqar, at the time of his grand jury appearance

21  in Chicago, in June of 2003, understood to have knowledge of

22  people directly connected to Salah and Marzook?

23  A.  Yes.

24  Q.  Can you name some of them?

25  A.  Sure.  Ismael El-Barasse, Nasser Al-Khatib, Abdel Aziz

Bray - direct

1   Al-Rantisi, Anwar Hamdan, Zyad --

2   Q.  Mohammad Jarad?

3   A.  Mohammed Jarad.

4   Q.  Zyad Hamdan?

5   A.  Zyad Hamdan.

6   Q.  Yousif Saleh?

7   A.  Yousif Saleh.

8   Q.  Were there others?

9   A.  Yes.

10  Q.  And what led you, as the case agent, to believe that

11  Dr. Ashqar had either dealings with or some knowledge of some

12  of these people who you've named, and others, in connection

13  with Hamas?

14  A.  The materials that we had obtained from investigations of

15  Dr. Ashqar; materials being financial records, telephone

16  records, search documents, amongst others.

17  Q.  And I want to focus your attention, just by way of

18  example, on one such document.

19          MR. FERGUSON:  Which, Judge, is in the record

20  admitted into evidence at trial.  It was found at -- in -- it

21  was placed into evidence as Ashqar Search Document Tab 6.

22  These are pages ASH 185 and 186.

23          May I approach, Judge?

24          THE COURT:  You may.

25          MR. FERGUSON:  I have another copy for the Court.

Bray - direct

17

1    I've provided a copy to defense counsel.

2           (Document tendered to the Court and witness.)

3    BY MR. FERGUSON:

4    Q.  Are you familiar with this document, Agent?

5    A.  Yes.

6    Q.  What is it, in general?

7    A.  Document ASH 185 is a -- it says -- as it says on the top,

8    "Important Telephone and Fax Numbers, Section

9    Palestine/America," and then it has a listing of 35 names --

10   Q.  Where was this --

11   A.  -- countries or cities, fax numbers and telephone numbers

12   associated with those names.

13   Q.  Where is this document from?

14   A.  From the search of Dr. Ashqar's apartment in Mississippi.

15   Q.  And I want to go through some of the names of significance

16   to the investigation that appear on this document.

17          The first one you've already mentioned:  Mousa Abu

18   Marzook.  At the time, I think you've already indicated, he

19   was the Deputy Chief of Hamas --

20          MR. MOFFITT:  At what time?  Objection.  What time?

21          THE COURT:  Sustained.

22          MR. MOFFITT:  The search of his apartment took place

23   in 1993.

24          THE COURT:  Sustained.

25          The testimony was as of today that was his title.

1  So, clarify that, please.

2  BY MR. FERGUSON:

3  Q.  In 2003, what was Dr. Marzook -- Mr. Marzook's -- status

4  within Hamas?

5  A.  He was the Deputy Chief of the Hamas Political Bureau.

6  Q.  And in the 1990s, up until approximately 1997, what was

7  his status?

8  A.  He was the Chief of the Hamas Political Bureau.

9  Q.  And he's on this America list; is that right?

10  A.  Yes.  No. 1.

11  Q.  Next, "Ahmad Yousif."  Is that individual also known by

12  another name?

13  A.  Yes.  Yousif Saleh.

14  Q.  I'm going to come back to him in a moment.

15       No. 5, "Mohammad El-Mezzain," was that someone of

16  general interest to the investigation?

17  A.  Of general interest.  He was of more interest to Dallas

18  FBI.

19  Q.  And was Mohammad El-Mezzain investigated and actually

20  charged with material support of terrorism somewhere?

21  A.  Yes.

22  Q.  Where?

23  A.  In Dallas, as part of the Holy Land Foundation

24  investigation.

25       MR. MOFFITT:  When did this occur?

1              This document was found in 1993.  He wasn't indicted

2    until 2005.  I mean, I don't think you can assume certain

3    things from a document found in 1993 that would be -- unless

4    Dr. Ashqar is presumed to be prescient about when he would be

5    indicted by the United States government.

6              MR. FERGUSON:  Judge, we don't know what's in

7    Dr. Ashqar's mind, so we're talking about what's in the

8    agent's mind right now and why these people were of

9    significance.  And this is cross-examination.

10             MR. MOFFITT:  This is not cross-examination.  This is

11   direct examination, although Mr. -- is treating it as if it

12   were cross.

13             I would suggest to you that the fact that it was

14   found in 1993 doesn't mean that it was relevant at the time

15   that they were doing their investigation.

16             THE COURT:  I think what this is, Mr. Moffitt, is

17   argument that is more appropriate later on, when the Court is

18   addressing the Guideline issues.

19             You may proceed.

20   BY MR. FERGUSON:

21   Q.  "Ismael El-Barasse," what significance of he generally --

22   was he generally -- to the investigation in 2003?

23   A.  He was essentially a secretary, if you will, or associated

24   closely with Mousa Abu Marzook, especially on Mousa Abu

25   Marzook's financial accounts, financial transactions.  They

1   were actually listed as co-signers on various bank accounts.

2   Q.  And did he have some connection to Muhammad Salah?

3   El-Barasse, that is.

4   A.  Yes.

5   Q.  No. 8, "Ghassan El-A'She," was that individual

6   specifically under investigation in Chicago?

7   A.  Not specifically.  Again, he was under investigation by

8   Dallas FBI.

9   Q.  And was he subsequently charged -- subsequent to

10  Dr. Ashqar's appearance in the grand jury, was he subsequently

11  charged with material support of terrorism?

12  A.  Yes.

13  Q.  No. 18, "Shukri Abu Baker."

14          MR. MOFFITT:  What year he was charged, please?

15          MR. FERGUSON:  2004.

16          THE COURT:  Do you want to ask the agent?

17          MR. FERGUSON:  Judge, it's -- sure.

18  BY MR. FERGUSON:

19  Q.  When -- there is a case that was charged in Dallas

20  charging material support against a number of individuals in

21  an organization.  Are you familiar with such a case?

22  A.  Yes.

23  Q.  What was the lead organization?

24  A.  Holy Land Foundation.

25  Q.  And a number of the individuals on this page in

1   Dr. Ashqar's possession back in 1993 were also co-defendants

2   in that case; is that right?

3   A.  Yes.

4   Q.  And when was that case charged?

5   A.  2004.

6   Q.  And that was subsequent to Dr. Ashqar's appearance in the

7   grand jury; is that right?

8   A.  Yes.

9   Q.  No. 22, "Muhammad Salah."  That was -- that person was of

10  interest to the investigation?

11  A.  Yes.

12  Q.  All right.

13        No. 25, "Omar Yahya," was that a person of interest

14  to the investigation?

15  A.  Yes.

16  Q.  "Nihad Awwad," No. 32, was that a person of general

17  interest to the investigation?

18  A.  Yes.

19  Q.  A couple of these names that I've mentioned, including the

20  last two, aside from their appearance on this list here, did

21  the investigation also have evidence of Dr. Ashqar's direct

22  dealings with them in a meeting that occurred in 1993?

23  A.  Yes, a meeting --

24  Q.  And where was that meeting held?

25  A.  Philadelphia.

Bray - direct

22

1   Q.  I want to turn your attention to the second page, ASH 186.

2   It has the title, "Important Telephone and Fax Numbers,

3   Section Palestine/outside America."

4          Did the investigation know who many of these people

5   were?

6   A.  No.

7   Q.  And what would it have liked to have known from Dr. Ashqar

8   when he appeared in the grand jury in June of 2003?

9   A.  Who these people were; why he had a list of their names,

10  telephone numbers, fax numbers.  Where did he get them?  For

11  what purpose did he need them?  Did he talk with them

12  frequently; if so, what about?

13  Q.  Direct your attention to No. 28, "Eisa Mohammad Ahmad,"

14  Dubai.

15  A.  Yes.

16  Q.  Aside from the appearance of that name here, did that name

17  appear elsewhere in Dr. Ashqar's papers in connection with

18  financial transactions?

19  A.  Yes, it did.

20  Q.  I want to direct your attention to No. 33, "Dr. Abdullah

21  Azam."

22  A.  Yes.

23  Q.  As a general matter, would Dr. Ashqar's knowledge about

24  this individual have been of concern or interest to the FBI

25  when he was called into the grand jury in 2003?

1   A.   Absolutely.

2   Q.   Who was Dr. Abdullah Azam, as the FBI understood it at the

3   time of Dr. Ashqar's appearance?

4   A.   Dr. Abdullah Azam was a Palestinian.  He was an Islamic

5   scholar -- an influential Islamic scholar -- from Gaza, who

6   later left Gaza to Jordan and, then, made his way to

7   Afghanistan, where he served as a spiritual adviser and mentor

8   to Osama Bin Laden.

9        MR. MOFFITT:  I'm going to object to that.

10       May we approach the bench, please?

11       THE COURT:  You may.

12       (Proceedings had at sidebar:)

13       MR. MOFFITT:  Their investigation, according to

14   everything I know about it and everything that he was supposed

15   to -- testimony he was supposed to -- be putting on, was

16   supposed to do with an investigation of Hamas.  Now he's

17   suggested that there's some connection between Dr. Ashqar and

18   Osama Bin Laden.  That's -- the whole purpose of that is just

19   to smear it, to put it in the newspapers.  It has nothing to

20   do with what we're supposedly here for.

21       There was no -- there was no need for that, I suggest

22   to you.  This was not supposed to be an investigation of Osama

23   Bin Laden.  And I believe any information that they have would

24   indicate that Dr. Ashqar has never had any direct or indirect

25   contact with Osama Bin Laden.  And the sole purpose of that

Bray -

1   was to smear that into the record.

2        MR. FERGUSON:  Judge, the name is on a list in

3   Dr. Ashqar's possession on a list of people who are connected

4   to the Hamas organization.  That was of interest with respect

5   to the Hamas organization that was being investigated in this

6   case.  And anything else he would have had to say about it,

7   obviously, would have been of interest, as well.

8        MR. MOFFITT:  But it's curious, none of the times

9   that this person is alleged to have this connection with Osama

10  Bin Laden are relevant to this list.  This list was found in

11  1993.  They can't establish that he had a connection with

12  Osama Bin Laden in 1993 -- even the person they're talking

13  about -- or even knew Osama Bin Laden in 1993.

14       The suggestion that because his name is on this list,

15  Dr. Ashqar had some connection with him is just absurd, in

16  light of when the list was found.

17       MR. FERGUSON:  Judge, he is on a list with the Hamas

18  leadership.  The Hamas -- Hamas, itself, continued to conduct

19  terror attacks that resulted in the deaths of Americans.  The

20  investigation was trying to ferret out who these people were;

21  what their connections were overseas; how, if in any way, that

22  the individuals in the United States, through their

23  connections here and outside, were serving Hamas and its

24  terrorist operations through various forms of support.

25       All of this is argument.  He is positing over -- in

1   his papers -- this is Mr. Moffitt.  He posits in his papers

2   that there's no connection.  He posits here before the Court

3   there's no connection.  And the fact of the matter is the only

4   person who could have answered that was Dr. Ashqar, and that's

5   why we're here.

6          MR. MOFFITT:  But I suggest to you that the point is

7   being made because a name is on a list in 1993 and that name

8   somehow gets connected at a later time -- and we don't even

9   know because he hasn't even bothered to put in the time that

10  he supposedly traveled and became involved with Osama Bin

11  Laden -- that that has some connection and that that fact has

12  some relevance to this investigation.

13         We don't even know whether his connection with Osama

14  Bin Laden occurred during the time that this investigation was

15  going on.

16         MR. FERGUSON:  Exactly.  We don't know.  Because no

17  questions were answered.

18         THE COURT:  Mr. Ferguson, address your comments to

19  me, not to Mr. Moffitt.

20         The objection is overruled.

21         You are free to cross-examine on these issues, Mr.

22  Moffitt.  And I will certainly give you leeway in cross-

23  examining.

24         And a lot of this is argument for the Court.  The

25  agent has stated that at the time that Dr. Ashqar appeared

Bray -

1   before the grand jury, that that is who this individual was.

2            MR. MOFFITT:  I don't --

3            THE COURT:  In terms of inferences that can be made,

4   all of that is argument for the Court.

5            Also, there is no jury here; it is the Court; and,

6   so, there is no harm.  I can -- certainly, in terms of the

7   fact-finding, I can distinguish between what may or may not be

8   relevant.

9            MR. MOFFITT:  Well, if your Honor's telling me that I

10  shouldn't make any objections because there's no rules of

11  evidence and there's no jury here and things that I think, I

12  won't make any more.  But --

13           THE COURT:  No, I am not telling you not to make any

14  objections.  I responded to your "leading" objection that

15  under the Federal Rules of Evidence, those do not apply in

16  sentencing hearings.

17           I am not saying do not object.  You are free to

18  object to anything that you want to.  I am ruling by the law,

19  Mr. Moffitt; and, the law on leading questions is, they are

20  fair game during sentencing hearings.

21           MR. MOFFITT:  Fine, your Honor.  And this is -- this

22  goes beyond the leading question as far as I'm concerned.

23           THE COURT:  I did not take this as a "leading

24  question" objection.  I took this as really a relevance

25  objection.

 1          So, you are free to cross-examine on it.

 2          (Proceedings had in open court:)

 3          THE COURT:  You may proceed.

 4    BY MR. FERGUSON:

 5    Q.  You indicated, Agent Bray, some of the things the

 6    investigation wanted to inquire of Dr. Ashqar with respect to

 7    the people outside the United States.  Did they apply equally

 8    with respect to the list of names of people within the United

 9    States?

10    A.  Yes.

11    Q.  In fact, at the time that Dr. Ashqar appeared in the grand

12    jury, in June of 2003, were some of these people on this list

13    in the United States?

14    A.  Yes, they were.

15    Q.  As an example, I want to have you speak to one of the

16    names on the list.  It is the third name on ASH 185, Ahmad

17    Yousif, who you indicated was also known as Yousif Saleh?

18    A.  Yes.

19    Q.  At the time that Dr. Ashqar appeared before the grand

20    jury -- well, tell us, who is Yousif Saleh as understood by

21    the FBI?

22    A.  He was a founder of an organization called United

23    Association for Studies and Research or UASR.  It's actually

24    founded, I believe, around 1990 in Chicago and, in the early

25    '90s, moved to -- moved its operations to -- Virginia.

Bray - direct

1    Q.  And introduced into evidence in this case were certain

2    founding documents and financial documents related to money

3    going to Yousif Saleh and UASR.  Who was the source of those

4    funds from that material introduced in evidence?

5    A.  Mousa Abu Marzook.

6    Q.  The head of Hamas?

7    A.  Yes.

8    Q.  And who is one of the named founding members in the

9    Articles of Incorporation of UASR?

10   A.  Mousa Abu Marzook.

11   Q.  And did UASR, as run by Yousif Saleh, employ any

12   individuals of significance to the investigation?

13   A.  Yes.  UASR employed both Muhammad Salah and Dr. Ashqar.

14   Q.  In relation to Dr. Ashqar's appearance in the grand jury

15   in June of 2003, what subsequently became of Yousif Saleh?

16   A.  Soon thereafter, he left the country.

17   Q.  How long had he been in the country when he left?

18   A.  I think approximately 15 years.

19   Q.  And did he ever return to the United States?

20   A.  No, he did not.

21   Q.  Did he pop up somewhere?

22   A.  Yes, he did.

23   Q.  Where?

24   A.  He's in Gaza.  He is a senior adviser to Hamas leadership

25   in Gaza; particularly, Ismael Haniyeh and Mahmoud --

1  Q.  Zahar?

2  A.  -- Zahar.

3  Q.  And those two names that you just mentioned, were those

4  names -- individuals -- who were recorded in conversations

5  with Dr. Ashqar on the 1993 wiretap?

6  A.  Yes, they were.

7       And I might add that Mahmoud Zahar was co-founder of

8  Hamas or a founding member of Hamas.

9  Q.  So, the investigation, at the time that Dr. Ashqar

10 appeared in the grand jury, was seeking information about

11 Yousif Saleh, correct?

12 A.  Yes.

13 Q.  All right.

14      And you also indicated that it was pursuing any

15 information about Ismael El-Barasse, right?

16 A.  Yes.

17 Q.  About 14 months after Dr. Ashqar's grand jury appearance

18 and days after the second superseding indictment was returned

19 in this case, was there an investigative event of some

20 significance in relation to those two individuals?

21 A.  Yes, there was.

22 Q.  What was that?

23 A.  Ismael El-Barasse, who we believed to be out of the

24 country, was arrested by Maryland authorities.  Subsequent to

25 his arrest, the FBI executed a court-authorized search warrant

1   of El-Barasse's residence.

2   Q.   And, in general, what was found in that search?

3   A.   Significant amount of documents regarding Hamas, Muslim

4   Brotherhood, the founding of Hamas in the United States.

5   There were financial records.  Financial records that we had

6   attempted to get -- gather -- in our investigations.  These

7   were actual statements that appeared to be of various account

8   holders.

9   Q.   Including Mousa Abu Marzook's accounts?

10  A.   Yes.

11  Q.   And were there also documents relating to UASR?

12  A.   Yes.

13  Q.   And what did you come to understand to be El-Barasse's

14  relationship to UASR and how he had these documents?

15  A.   Basically, once Yousif Saleh left, El-Barasse went and

16  took all the documents from UASR and maintained it kind of as

17  an archivist, I guess.

18  Q.   Based on his employment relationship and other forms of

19  relationships suggested by the materials that the FBI had in

20  hand, at the time that he appeared in the grand jury in June

21  of 2003, do you have an opinion as to whether Dr. Ashqar might

22  have had personal knowledge of the existence of these types of

23  documents subsequently found in the possession of El-Barasse?

24          MR. MOFFITT:  I'm going to object to his opinion.

25          THE COURT:  What is your response?

1            MR. FERGUSON:  I'll rephrase the question.

2            THE COURT:  Rephrase the question.

3   BY MR. FERGUSON:

4   Q.  Do you have an opinion about whether Dr. Ashqar, when he

5   appeared in the grand jury, may have had information regarding

6   the existence of these documents?

7   A.  Yes.

8   Q.  What's your opinion?

9   A.  That he would have known.  He worked for UASR.

10  Q.  What was Dr. Ashqar's legal status or situation when he

11  was called to the grand jury to testify in June of 2003?

12  A.  I think he was at the culmination of a long legal battle

13  to stay in the United States, at which point he had finally

14  given up; and, he agreed to be voluntarily deported.

15  Q.  And just by way of refresher -- it's in the transcript,

16  itself, but was anything offered to Dr. Ashqar with respect to

17  him possibly staying in the grand jury if he would testify?

18            THE COURT:  Stay in the grand jury?

19  BY MR. FERGUSON:

20  Q.  Sorry, stay in the United States, if he would testify in

21  the grand jury.

22  A.  Yes.  He was offered a chance to be allowed to stay in the

23  United States.

24  Q.  Him alone?

25  A.  No, him and his family.

Bray - direct

1   Q.  All right.

2        So, why was it that Dr. Ashqar's testimony in June of

3   2003 was of particular importance to your investigation?

4   A.  It was clear from the body of materials that we had that

5   Dr. Ashqar was an insider.  An insider of Hamas; specifically,

6   Hamas in the United States.

7        The financial records indicated that he was a

8   conduit, if you will, for monies, both coming from overseas

9   and monies being transferred among individuals in the United

10  States.

11       Telephone records also indicate that -- I mean, he

12  would get thousands and thousands of phone calls.  Either he

13  would place them or receive them.  Many of them international

14  calls.  So, based on those records, he appeared to also be a

15  communications conduit.

16       And, then, the search documents of the apartment.  He

17  had various documents that we were keenly interested in.

18  Q.  And, in general, what about those documents were you

19  keenly interested in?

20  A.  The basics:  The who, what, when, where and why.  Who did

21  they come from?  Why did he have them?  What was his purpose

22  for having them?  What did he do with them?

23  Q.  The -- there has been suggestion in the filings in this

24  case that from these Ashqar materials, the government already

25  knew everything it would need to know about Dr. Ashqar and the

1   substance of those materials.

2           Is that correct?

3   A.  No.

4   Q.  All right.

5           I want to focus your attention on some examples of

6   areas where Dr. Ashqar's testimony would have significantly

7   enhanced the FBI's understanding of these and other materials

8   and, conversely, his refusal to testify significantly hurt the

9   investigation.

10           First, financial documents.  Were voluminous

11   financial records gathered as part of this investigation?

12   A.  Yes, they were.

13   Q.  And many of them were introduced into evidence at trial;

14   is that right?

15   A.  Yes.

16   Q.  Were these all Dr. Ashqar's account records?

17   A.  No.

18   Q.  Were some of them?

19   A.  Some of them were, yes.

20   Q.  And beyond his own accounts, were there documents -- and I

21   want to focus your attention on the search documents.

22           Were there documents in his possession that related

23   to accounts and transactions that were not his?

24   A.  Yes.

25   Q.  Including transactions to accounts associated with Mousa

1    Abu Marzook?

2    A.  Yes.

3    Q.  With respect to Dr. Ashqar's own account transactions,

4    what information was kept from the investigation and the grand

5    jury by Dr. Ashqar's refusal to testify?

6    A.  In looking at Dr. Ashqar's personal accounts -- keeping in

7    mind that at the time, you know, he was a student in

8    Mississippi -- there were hundreds of thousands of dollars

9    flowing through these accounts.

10         Of interest would have been, why?  What was the

11   source of the money?  Why was it sent to him?  What was he

12   instructed to do with it?  What did he do with it?  For what

13   purpose.

14         I mean, the financial documents and records in and of

15   themselves are a snapshot, but they don't tell the whole

16   story.

17   Q.  And with respect to transactions of others -- not him --

18   that he had documents relating to, what did Dr. Ashqar's

19   refusal to testify keep from the investigation and the grand

20   jury that you wanted to inquire about?

21   A.  It clearly deprived us of the information as to why he

22   would have in his personal possession financial records of

23   others, deposit slips, things of that nature.  For what

24   purpose did he need those?  If those people needed to engage

25   in financial transactions, why didn't they just engage in them

1  directly?  Why would he need those types of documents or

2  instruments?

3  Q.  And among the search documents introduced into evidence

4  eventually at trial, but in the possession of the

5  investigation in 2003, did they include many handwritten or

6  typewritten notations concerning distributions of funds to

7  purposes relating to Hamas, as the investigation understood

8  it?

9  A.  Yes.

10  Q.  At the time that Dr. Ashqar was called into the grand jury

11  in June of 2003, had the investigation deciphered what those

12  notations and summaries related to and how, if at all, they

13  synced up with the voluminous bank records that were gathered

14  as part of the case?

15  A.  No.

16  Q.  Was that one of the things that you sought information

17  from Dr. Ashqar on?

18  A.  Yes.

19  Q.  What were the investigative consequences of Dr. Ashqar's

20  refusal to testify on these matters that we've been

21  discussing?

22  A.  Significant resources had to be expanded to try to get our

23  arms around all this.  Records -- we had literally thousands

24  of pages of financial records.  In a lot of instances, those

25  were our original source documents.  Again, we're talking

Bray - direct

36

1    about bank records from the 1990s.

2         So, in order for us to do any type of analysis of

3    those, they had to first be photocopied, because we didn't

4    want to lose track of them, which was somewhat labor

5    intensive.  They had to all be organized, kind of categorized.

6         They were all shipped to FBI headquarters, where a

7    unit there essentially data-entried all of these financial

8    transactions in an effort to get some type of computer

9    analysis of them.  Reports were generated.

10        Financial analysts examined the reports, provided

11   those reports to the case agents and the prosecutors who were

12   trying to make heads and tails of it and take those types of

13   documents and, then, compare them to handwritten ledgers, if

14   you will, found during the search of Dr. Ashqar's apartment.

15   Q.  And what you've discussed thus far, how time consuming and

16   undertaking was that in terms of manpower hours?

17   A.  Hundreds if not thousands of hours were.  Not just --

18   again, not just -- case agents here.  Support personnel here,

19   people at FBI headquarters, obviously prosecution.  So --

20   Q.  Let me stop you there.

21        Were the prosecutors expending significant time on

22   this same effort of comparing up search documents to financial

23   records?

24   A.  Oh, absolutely.

25   Q.  I want to ask you a general question about that process.

1          Was it simply a matter of going through the materials

2    once to come up with an answer as to what they meant or where

3    the connections were?

4    A.   No.

5    Q.   Describe the process, please.

6    A.   You would go make a pass-through once.  You might make

7    certain connections.  You might see the relevance of certain

8    things.  And you would continue on.  And, then, you would come

9    across something else that would give meaning to something

10   that previously seemed innocuous or not significant.

11          So, then you were constantly going back and re-

12   looking, re-examining things.  I mean, you were -- this was

13   literally the needle in the haystack.

14   Q.   And did that process of re-review occur continuously

15   throughout the investigation, after Dr. Ashqar refused to

16   testify?

17   A.   Yes.  It continued to occur not with just financial

18   documents, telephone records.  I made the reference to a

19   needle in a haystack.  We weren't just looking for a needle in

20   a haystack.  We were looking for a series of needles in a

21   series of haystacks.  And we were essentially trying to string

22   them with a common thread, all these needles.

23   Q.   Was there a person who constituted the common thread?

24   A.   Yes.

25   Q.   Who?

1   A.   Dr. Ashqar.

2   Q.   Would Dr. Ashqar's testimony about these records -- his

3   own search records and financial records in his possession --

4   and what they were linked to, would they have eliminated all

5   of this work that you're describing?

6   A.   No, not all of it.

7   Q.   What impact would it have had on the work that had to be

8   done?

9   A.   Oh, it would have significantly focused our attention, our

10  efforts and our resources to transactions, telephone calls,

11  documents in his apartment, documents that were essentially

12  for the most part in Arabic that all first had to be

13  translated.

14        It would have guided us, if you will, to things that

15  were significant to our investigation, allowing us to focus on

16  significant relationships versus what we were left with; which

17  was, trying to look at everything with a limited amount of

18  resources.

19  Q.   All right.

20        You've mentioned in passing phone records.   There

21  were voluminous phone records gathered as part of the

22  investigation; is that right?

23  A.   Yes.

24  Q.   And they included records relating to Dr. Ashqar's own

25  phone and fax line; is that right?

1   A.   Yes.

2   Q.   Were details about these calls and the records matters for

3   which the investigation would have benefitted from

4   Dr. Ashqar's testimony?

5   A.   Yes.

6   Q.   Would you please describe how?

7   A.   Well, the phone records -- as with any phone records, toll

8   records -- give you either the number that -- your particular

9   number -- in this case, Dr. Ashqar's number -- who he was

10  either calling or who was calling him.

11          As I mentioned earlier, we're talking about thousands

12  of phone calls, many of them international calls.

13  Q.   I want to focus your attention -- stop there -- on

14  international calls.

15  A.   Yes.

16  Q.   You've got a phone record that reflects a connection here

17  with Dr. Ashqar's phone to an international number.  How does

18  the FBI go about identifying who the subscriber is of that

19  number?

20  A.   Well, the initial stage is to determine whether we have

21  previously determined a subscriber to that number, whether

22  through another investigation, whether we have it in some sort

23  of database that we would be able to query.

24          If that produces nothing, then we are left to try to

25  seek the assistance of a foreign government to provide us with

Bray - direct

40

 1  subscriber information.

 2  Q.  And when making requests of foreign governments, do you

 3  always get the subscriber information?

 4  A.  No.

 5  Q.  Was it the case in this investigation that many of these

 6  numbers the FBI, at the time that Dr. Ashqar was called into

 7  the grand jury, really didn't know who the subscriber was to

 8  these numbers?

 9  A.  That's correct.

10  Q.  And, so, it would be fair to say, with respect to these

11  numbers, you're left simply with what is on the face of a

12  billing statement?

13  A.  Correct.

14  Q.  That were --

15  A.  You have it --

16  Q.  Go ahead.

17  A.  Someone associated with this number called someone

18  associated with that number.

19  Q.  Okay.

20          So, it was -- at the point in time Dr. Ashqar was

21  called into the grand jury, what did the FBI believe the phone

22  -- or Dr. Ashqar's phones -- were, in part, being used for?

23  A.  As I --

24          MR. MOFFITT:  What time?  Objection.  At what time?

25  When?

1          THE COURT:  I think he said at the time he was called

2    into the grand jury.

3          If you did not, clarify it --

4          MR. FERGUSON:  I did.

5          THE COURT:  -- but that is what I understood your

6    question to be.

7          MR. FERGUSON:  That's what I said, I believe.

8    BY THE WITNESS:

9    A.  Repeat your question, please.

10   BY MR. FERGUSON:

11   Q.  At the time that Dr. Ashqar was called into the grand

12   jury, did the FBI have a belief that Dr. Ashqar's phone was

13   being used in a certain way?

14   A.  Yes.

15   Q.  What was that belief?

16   A.  As almost like a switchboard, as a means for Hamas

17   leadership abroad to communicate with Hamas membership in the

18   United States and, in some instances, back to Hamas members

19   abroad.

20   Q.  And we're talking specifically on the basis of records and

21   other information that related to the period of 1991 to

22   approximately 1994; is that right?

23   A.  Yes, yes.

24   Q.  Okay.

25          What did the investigation want to know from

Bray - direct

1   Dr. Ashqar about that particular function for which his phone

2   was being used?

3   A.   Again, we get back to the who, what, where, when and why.

4        Who established this need?  Why would people in a

5   foreign country need to call Dr. Ashqar, who would then route

6   their call back to the same foreign country?  What was the

7   purpose?  Who decided that this should be done?  Why was it

8   done?  Why was he chosen to be this person to do it.

9   Q.   So, what consequences, if any, were there to the

10  investigation -- investigative or work consequences to the

11  investigation -- to Dr. Ashqar's refusal to testify about the

12  subject of communications as reflected in these various

13  records?

14  A.   Again, it's similar to the scenario I gave you with the

15  financial records.  We had to take all these toll records;

16  generally, they had to be copied, organized, boxed up, sent to

17  people who would data-entry line by line thousands and

18  thousands and thousands of telephone calls; which, from a

19  computer analysis, you would basically get back your target

20  number, other numbers, if the known subscriber -- if we had

21  that information, that would be in there.

22       But you would get essentially a frequency report.  It

23  would give frequency of calls between two numbers.  You could

24  group it by date ranges, et cetera.  An analytical tool at

25  best.

1   Q.  For calls for which numbers could be identified --

2   subscribers of these numbers could be identified -- was

3   Dr. Ashqar's testimony something that could have elucidated

4   aspects of those calls?

5   A.  Yes.

6   Q.  What could they have elucidated?

7   A.  First of all, who was on the calls.  Just because a number

8   is subscribed to someone doesn't necessarily mean that that's

9   the party on the phone.

10  Q.  And that was the subject of a continuing defense objection

11  at trial.

12          Okay.  So, who actually was on the other end of the

13  phone, because you don't know that simply from subscriber

14  information, correct?

15  A.  That's correct.

16  Q.  Okay.

17          What else could Dr. Ashqar have elucidated?

18  A.  The content of the calls.  Some calls we had recorded,

19  many we had not.

20          In addition to just -- again, I'll use the term

21  "snapshot" -- the snapshot, the content of that call.  You

22  still don't know -- even if you have it recorded, you still

23  don't know -- the who, why, what, where, when, how.

24          You can see where the call originated from, but you

25  don't know who decided that that phone call needed to take

Bray - direct

44

1  place; was there some purpose for that phone call; when you

2  hang up the phone, what that person does with that information

3  that they gathered.

4  Q.  I want to focus, by way of example, your attention on one

5  period of time for which charts were admitted into evidence

6  showing a convergence of telephone calls.

7  A.  Okay.

8  Q.  Specifically, in January of 1993, calls coming from either

9  Muhammad Salah's phone or Abdelhaleem Ashqar's phone on the

10  one hand, and calls to numbers that were associated to Mousa

11  Abu Marzook or to Mohammed Kathem Sawalha, also referred to at

12  trial as Abu Obadah.

13         Quickly, by way of refresher, who was Abu Obadah in

14  the context of the case?

15  A.  Abu Obadah is a Hamas member based in London.  He's the

16  same individual that both Muhammad Salah -- when he went to

17  Israel in January of 1993, he stopped in London and met with

18  Abu Obadah, as well as Mohammad Jarad.

19  Q.  All right.

20         And I'm directing your attention to January, 1993 --

21  a convergence of calls between those numbers in early January

22  of 1993.  What was the significance of that period to the

23  investigation; particularly, to the investigation of Muhammad

24  Salah?

25  A.  Well, if you look at the backdrop of the time period, in

1  December of 1992, the Israeli government deported

2  approximately 400 Hamas -- some Islamic Jihad -- leaders,

3  activists to Lebanon.  We know from Muhammad Salah's

4  confessions that this essentially created a void within the

5  occupied territories for Hamas.

6        We also know from his confessions that Mousa Abu

7  Marzook essentially dispatched him from Chicago to Israel to

8  assess the damage done, and to return and debrief him as to

9  the conditions for Hamas.

10  Q.  And on the way to Israel, he stopped off where?

11  A.  In London.

12  Q.  And these calls, did they immediately precede his trip?

13  A.  Yes.

14  Q.  All right.

15        What of interest was Dr. Ashqar believed to be

16  positioned to tell the investigation at the point in time he

17  was called into the grand jury, in June of 2003, about this --

18  these calls?

19  A.  We would have attempted to corroborate Muhammad Salah's

20  statements that, "Mousa Abu Marzook is the one that sent me."

21  Q.  First of all, was the investigation interested in knowing

22  whether Abdelhaleem Ashqar had knowledge of Salah's mission on

23  the basis of these calls and other information?

24  A.  Yes, absolutely.

25  Q.  All right.

 1          Given his own phone activity to these same numbers,

 2    was he positioned to answer that question?

 3    A.   Yes.

 4    Q.   And if he had information, what would the investigation

 5    wanted to have known about it?

 6    A.   It would have wanted to know, again, the who, what, when,

 7    where, why.  Who initiated the phone calls?  For what purpose?

 8    What was discussed?

 9          Again, trying to corroborate other evidence that we

10    had gathered.  What was Muhammad Salah's mission?  What was he

11    instructed to do when he met with Abu Obadah, if anything?

12    Q.   Before moving on, there's one more topic relating to phone

13    calls I want to have you address.

14          You've already mentioned the fact that it was clear

15    from trial that for a period of time, Dr. Ashqar's calls were

16    recorded; is that right?

17    A.   That's correct.

18    Q.   All right.

19          In the case of recorded calls, you have the content

20    of the calls, right?

21    A.   Yes.

22    Q.   Did that mean the investigation had all the information it

23    wanted or needed about those telephone calls that were

24    recorded?

25    A.   Absolutely not.

Bray - direct

47

1   Q.   Can you give some examples of what Dr. Ashqar could have

2   provided in the way of information concerning the calls on

3   which he was recorded?

4   A.   Sure.

5            In some calls, you don't know who the party is at the

6   other end.   They may refer to themselves by a first name only.

7   In many instances, the calls that were monitored of

8   Dr. Ashqar's, individuals referred to themselves as their Abu

9   names.   Some of them were common, so you couldn't always

10  tell -- even though you had the recording -- who that was on

11  the other end of the line.

12           In addition to that, again, that is just a snapshot

13  in time.   You don't know events leading up to that phone call

14  or events taking place after that phone call is terminated.

15  That would have been important information to us.

16  Q.   Did any of the calls contain coded language?

17  A.   Yes.

18  Q.   Did they contain aliases?

19  A.   Yes.

20  Q.   Did Dr. Ashqar use various aliases?

21  A.   Yes.

22  Q.   Is that all facets of these calls that the FBI was --

23  would have been interested in knowing from Dr. Ashqar?

24  A.   Yes.

25  Q.   Could you give an example -- I would like to actually have

Bray - direct

48

1  you focus on an example of one such instance; and, these were

2  calls that were introduced at trial in the Ashqar Call Log --

3  Call Binder -- and they were Calls 25, 26 and 29 -- between

4  Dr. Ashqar and an individual by the name of Mr. Constantine or

5  who was identified on the phone by the name Mr. Constantine.

6        In summary, would you refresh the Court on what the

7  general topic of the conversation between Dr. Ashqar and

8  Mr. Constantine was?

9  A.  Yes.  In summary form, their discussions were concerning

10 the killing of a Hamas operative and videotaping this killing.

11 Apparently, the Hamas operative had deviated from Hamas

12 orders, and the purpose was to send a message.

13 Q.  And Call 27 that was introduced into evidence, did

14 Dr. Ashqar relay the information from this Mr. Constantine --

15 the proposal to kill an operative and videotape it -- to a

16 Damascus, Syria, telephone number?

17 A.  Yes, to an individual -- I believe we knew him -- or he

18 was referred to as Abu Hamam.

19 Q.  Would the FBI have wanted to know who this Mr. Constantine

20 was that Ashqar was discussing engaging in a possible murder

21 of an operative?

22 A.  Yes.

23 Q.  Does the FBI today know who Mr. Constantine is?

24 A.  No.

25 Q.  All right.

Bray - direct

49

1        We've had -- there's been a few references to the

2   Ashqar search documents.  I want to focus your attention on

3   some of those specific documents.  But before doing so, I just

4   want to ask you, generally, were these documents in English?

5   A.   Some were, but the vast majority were not.

6   Q.   All right.

7        What needed -- what language were they in?

8   A.   Arabic.

9   Q.   And what needed to be done with them to understand and

10  organize them?

11  A.   They needed to be translated.

12  Q.   At the point in time that Dr. Ashqar was called into the

13  grand jury in June of 2003, had these documents all been

14  translated verbatim?

15  A.   No.

16  Q.   Had certain of them been summarized?

17  A.   Yes.

18  Q.   In light of that, what was Dr. Ashqar in a position to do

19  to immediately further the FBI's understanding of those

20  materials and what was in them?

21  A.   Again, I mean, these were documents found in his

22  possession at his residence.  He could have guided us as to

23  which documents -- I believe there were 1611 -- which

24  documents were important, significant; why they were

25  significant.

1          We could have targeted our limited Arabic translator

2     resources to focus on those.  We could have triaged what we

3     had; put the ones that he might have said, "These aren't

4     significant" -- we would still need somebody to take a look at

5     them to corroborate them, but we wouldn't necessarily need to

6     go full-bore verbatim on everything.

7     Q.  From your involvement in this investigation, was it the

8     case that in going through the verbatim translation process,

9     there are instances where translators indicated there are

10    multiple possible meanings to various terms in documents?

11    A.  Yes.

12    Q.  What process would have to be gone through to try to glean

13    what the best interpretation of them was?

14    A.  Their translations would be passed up, if you will;

15    quality controlled.  Others would look at them to see their

16    interpretation of the meaning -- meaning of certain words or,

17    you know -- and, again, there were certain things we just

18    couldn't tell.  They were illegible.

19          So, various passes were made by different

20    individuals -- translators -- examining these documents.

21    Q.  Okay.

22          Dr. Ashqar -- would Dr. Ashqar's testimony on these

23    sorts of things have saved time and effort by the FBI?

24    A.  A significant amount of time and effort.

25    Q.  Again, by way of example, I want to turn your attention to

1   one document in particular that was suggestive of Dr. Ashqar's

2   contact with a person of high significance to the

3   investigation, Mohammad Jarad.

4           Let me just ask you, was Mohammad Jarad a subject of

5   the investigation?

6   A.  Yes.

7   Q.  All right.

8           And just to refresh the Court briefly, who is

9   Mohammad Jarad?

10  A.  He is a Chicago resident who also, in January of 1993,

11  departed Chicago, stopped in London and made his way to

12  Israel.  He was arrested by Israeli authorities around the

13  same time as Muhammad Salah.  He was jailed and returned to

14  Chicago at the end of July, 1993.

15  Q.  All right.

16          And was there an event of significance indicated from

17  Dr. Ashqar's documents that occurred within a couple weeks of

18  Mr. Jarad's return from jail in Israel?

19  A.  Yes.

20  Q.  And what was that?

21  A.  There was a summary -- a debriefing, if you will -- by

22  Dr. Ashqar of Mohammad Jarad concerning Mohammad Jarad and

23  Muhammad Salah's mission to Israel.

24  Q.  And was that summary found in Dr. Ashqar's documents

25  obtained in the search?

1    A.  Yes.

2              MR. FERGUSON:  Permission to approach, Judge?

3              THE COURT:  You may.

4              MR. FERGUSON:  I'm handing the witness and the

5    Court -- and I've handed it to defense counsel -- a document

6    previously admitted into evidence at trial that was admitted

7    in the Ashqar Search Binder at Tab 3 and, specifically, Pages

8    ASH 044 to 049 -- or at least the translation of them.

9              (Document tendered to the Court and witness.)

10   BY MR. FERGUSON:

11   Q.  Agent Bray, just very briefly, what is this document?

12   A.  Again, it's a summary report.  The first sentence after

13   the caption there indicates that the writer met with Mohammad

14   -- Abu Anas, which we know to be Mohammad Jarad -- on two

15   days, August 6th and 7th of 1993; and, then, it goes into

16   saying, "He provided me the following information."

17   Q.  All right.

18              In general -- we're going to get to some of the

19   specifics in a moment; but, in general, when Dr. Ashqar was

20   called into the grand jury in June of 2003, what was the FBI

21   interested in knowing about this document?

22   A.  In general, again, the who, what, where, when and why.

23   Who instructed Mohammad Jarad to have this meeting with

24   Dr. Ashqar?  Why was he instructed to have this meeting, for

25   what purpose?  Where did it take place?  When did it take

1    place?

2          We had the dates.  Did it take place all day?

3    Certainly, we would want to know who else may have been

4    present during this meeting, and of significant importance

5    would have been what was done with this information after the

6    meeting.

7    Q.  Was this report signed in Dr. Ashqar's own name?

8    A.  No, it was not.

9    Q.  What name was it signed in?

10   A.  Samir.

11   Q.  Would you have wanted to know anything about the use of

12   that name?

13   A.  Yes.

14   Q.  What would you have wanted to know?

15   A.  Why Dr. Ashqar used an alias of Samir on this report.

16   Q.  I want to turn your attention to some of the aspects of

17   this document, more particularized things that the FBI was

18   interested in knowing from Dr. Ashqar.

19          Specifically, I want to turn your attention to the

20   last page, which, at the top, has the marking "ASH 048-049,"

21   and it's captioned, "Follow-Ups, Comments, Recommendations

22   (Abu Al-Anas and the Brothers)."

23          "Item 1.  The people of Chicago are disturbed and

24   very upset that Abu Ahmad was chosen for these duties.  They

25   all agree, and God is the witness, that his intellect does not

1  match the strength of his body.  They have not been consulted

2  about them.  Had they been consulted, they would not have

3  recommended him because of his naivete and lack of scheming

4  and trickery."

5       What would the FBI have wanted to know about this

6  summary item written by Dr. Ashqar?

7  A.  Many things.  I mean, "the people of Chicago," start

8  there.  Who?  Are these other Hamas people in Chicago?

9       Why are they disturbed and very upset that Abu Ahmad

10 was chosen for these duties?  What duties are they referring

11 to?

12      Clearly, they agreed that he was the wrong person for

13 this mission.  What mission?  Specifically, what did they know

14 about his mission?

15      They had not been consulted about him.  Who needed to

16 consult with them?  Why would they have needed to consult with

17 them?

18      And, again, had they been consulted, they say they

19 would have not recommended him.  Under whose authority?

20 Q.  "Item 2.  Brothers on the inside are upset because someone

21 like Abu Ahmad was sent with this much information and within

22 such a short time, and to all the regions and for various

23 matters."

24      What would the FBI have been interested in knowing

25 from Dr. Ashqar about this summary line that he wrote?

1   A.  Again, who are the brothers on the inside?  Why are they

2   upset?

3         I glean from this the brothers on the inside are

4   mindful of compartmentalization, which clearly it looks like

5   in this instance that was not adhered to because one

6   individual had a lot of information and went to various

7   regions.  And it could be for those reasons that they were

8   susceptible to intelligence agents.

9   Q.  "No. 3, Saleh Al-Arouri had requested Abu Ahmad not be

10  sent."

11        Was this suggestive to the FBI of any sort of

12  relationship between Muhammad Salah and Saleh Al-Arouri?

13  A.  Yes.

14  Q.  And was that a matter of interest to corroborate or

15  confirm in any way, shape or form possible at the time that

16  Dr. Ashqar was called into the grand jury?

17  A.  Yes.

18  Q.  "No. 6, the attorney, Jawad, says, 'You want to send a

19  person that not like this one.'"

20        What of significance was there to the FBI that they

21  wanted to know from Dr. Ashqar, when they called him to the

22  grand jury in June of 2003, about this summary statement that

23  he wrote?

24  A.  The reference to the attorney, Jawad.  Mohammad Jarad's

25  attorney while he was in Israel was Jawad Boulus.  Clearly, it

Bray - direct

1   appears as if this attorney is giving them advice on people to

2   select and send for Hamas missions.

3   Q.  And what did that suggest about -- to the FBI about --

4   Jawad in relationship to Hamas?

5   A.  He was a co-conspirator.

6   Q.  And did the name "Jawad Boulus" appear on other documents

7   and in telephone calls conducted by Dr. Ashqar that the FBI

8   had in its possession?

9   A.  Yes.

10  Q.  And would the FBI have wanted to know everything that

11  Dr. Ashqar himself knew about Jawad Boulus as a possible Hamas

12  co-conspirator helping people in the United States?

13  A.  Yes.

14  Q.  The heading "Requests," "No. 1:  Increase of monetary

15  support."

16          What of interest -- what of there -- let me try that,

17  again.

18          What was there of interest to the FBI they wanted to

19  know from Dr. Ashqar at the time they called him into the

20  grand jury, in June of 2003, about that summary statement of

21  his?

22  A.  Who was requesting an increase of monetary support?  Was

23  Hamas in the occupied territories requesting that someone in

24  the United States attempt to increase monetary support

25  provided there?

1              And for what purpose?  Were these military activities

2    that they were looking to have increased monetary support for?

3    Who were they looking to get money from?

4    Q.   And this is monetary support to Hamas?

5    A.   To Hamas.

6    Q.   At the bottom of the page, there's a line that says,

7    "Finally," and then there's three items -- enumerated items --

8    below that.

9              "No. 2, Abu Ahmad informed Abu Al-Anas that he still

10   has a large amount of money in his account.  However, Um Ahmad

11   denied the matter.  So, what is the truth of the matter?"

12             What would the FBI have wanted to know from

13   Dr. Ashqar about that summary statement that he wrote?

14   A.   Well, from the statement, Abu Ahmad is a reference to

15   Muhammad Salah, who is informing Mohammad Jarad that he still

16   has a large amount of money in his account.

17             We know that money was deposited in Muhammad Salah's

18   account before he left in January of 1993, money that we

19   traced back to be from Mousa Abu Marzook.

20             The reference, "However, Um Ahmad -- " is a reference

21   to Muhammad Salah's wife " -- denied the matter."  So, they're

22   seeking the truth.  Essentially, they're wanting to know what

23   happened to their money.

24   Q.   Did the FBI want to know what happened to their money in

25   relationship to Hamas?

1  A.  Yes.

2  Q.  Ultimately, Muhammad Salah or his family maintained

3  control of that money, based on the bank records; is that

4  right?

5  A.  Yes.

6  Q.  All right.

7        Was the FBI interested in knowing from Dr. Ashqar

8  whether that was an authorized act and whether Hamas, in fact,

9  agreed to allow that family to keep that money to support the

10  family while Mr. Salah was in jail?

11  A.  Yes.

12  Q.  Last line on this Page 3, "Abu Al-Anas will write in

13  detail in the next few weeks."

14        What was the FBI curious to know from Dr. Ashqar

15  about that line?

16  A.  Whether he actually did; and, if he did it, where it was

17  and for what purpose was it to be used?  Did Dr. Ashqar

18  receive such a communique; and, if he did, who did he give it

19  to?

20  Q.  Was the issue of Muhammad Salah's treatment while he was

21  in custody in Israel, the voluntariness and the accuracy of

22  his statements, a subject of interest to the FBI in this case?

23  A.  Absolutely.

24  Q.  I want to direct your attention to passages on ASH 045 and

25  046, which read -- the middle of ASH 045.  Again, these

1    are the Samir summary statements of Dr. Ashqar.

2          "Abu Ahmad confessed about the spreading of Islam and

3    Hamas within the first few days, although he had not been

4    beaten or tortured and the bag was not placed over his head

5    except once."

6          Turn to ASH 046:  "Approximately two weeks later, Abu

7    Ahmad was brought into the birds room.  They told him, 'You

8    have ruined us.  You have destroyed all the work we have done.

9    You have confessed about 40 persons.  You're a spy.'

10          "He told them, 'I have only confessed about trivial

11    matters and not the -- not about the rest of the positive

12    matters.'

13          "So, they said, 'Let's salvage what we can.  Write

14    down everything, so we can send it to the leadership.'

15          "Indeed, he did write down almost everything he knew

16    about the positive matters.  The investigators became

17    exceedingly happy.  They said, 'We didn't think we could get

18    this much in such a short time.'

19          "He stayed with them for five days."

20          Last paragraph:  "After the first three weeks, when

21    Abu Ahmad wrote everything, he felt regret for the wrong he

22    had done.  So, he tried to provoke the Army to beat him to

23    prove the brothers that he is strong and dependable.  The

24    brothers advised him to stop doing that.  He told them, 'I put

25    out the effort but erred.'  It's important to note that the

Bray - direct

1    brain convinced him he's a big official and a leader, so he

2    started acting accordingly."

3         When Dr. Ashqar was called into the grand jury in

4    June of 2003, was one of the things the FBI attempting to do,

5    to try to get evidence that would permit this document to be

6    admitted at trial as a co-conspirator statement?

7    A.   Yes.

8    Q.   And, in fact, it wasn't, because there was no testimony to

9    support it?

10   A.   That's correct.

11   Q.   So, these are statements from one Hamas co-conspirator to

12   another about what Muhammad Salah said about his treatment in

13   Israel?

14        MR. MOFFITT:   I'm going to object.

15   BY MR. FERGUSON:

16   Q.   What --

17        MR. MOFFITT:   I'm going to object.   He was found not

18   guilty of the conspiracy.   I still object on that basis to the

19   question because the question is argumentive.

20        THE COURT:   Rephrase your question.

21   BY MR. FERGUSON:

22   Q.   In the absence of witness testimony in the United States

23   from people with immediate or once-removed knowledge of

24   Muhammad Salah's treatment in Israel and the circumstances of

25   his confessions, what did the FBI have to do to try to get his

1    confessions admitted?

2    A.   We expanded extraordinary efforts to get those confessions

3    admitted into evidence.   We -- "we" being FBI agents,

4    prosecutors alike -- made numerous trips to Israel, meeting

5    with interrogators, interviewing interrogators, meeting with

6    representatives -- legal representatives -- in an effort to

7    corroborate the nature and circumstances for which Muhammad

8    Salah's confessions were obtained.

9    Q.   And were there hearings on that subject in this courtroom?

10   A.   Yes, there were.

11   Q.   And did the FBI have to expend resources in order to bring

12   witnesses from Israel over for those hearings?

13   A.   Yes, we did.   Significant resources.

14   Q.   And if there were individuals in the United States --

15   co-conspirators -- who either saw or had information about

16   what Muhammad Salah said and how he was treated, would all of

17   those efforts have been needed?

18   A.   Not all of them, no.

19   Q.   You indicated that Mohammad Jarad was a subject of the

20   investigation.   Was he someone that the investigation was

21   looking into possibly charging?

22   A.   Yes.

23   Q.   Did Dr. Ashqar's refusal to testify have any impact on

24   Jarad's status in the investigation?

25   A.   Yes, it did.

Bray - direct

1   Q.   What impact did it have?

2   A.   His failure to comply with the Judge's order and provide

3   the grand jury with information deprived us of information

4   that we could use to confront Mohammad Jarad with.

5   Q.   And did the investigation attempt to get the information

6   from Mohammad Jarad, himself?

7   A.   Yes.

8   Q.   And would you describe the outcome of those attempts?

9   A.   He was called to the grand jury on numerous occasions.

10  His wife was also called.  During his grand jury testimony, he

11  appeared to have failed memory of events that did not seem

12  logical, that he could not remember.  He appeared to be

13  purposely evasive.

14  Q.   And with information in hand from Dr. Ashqar about Jarad

15  and his dealings with Jarad and the information received from

16  Jarad, would the investigation have been able to handle

17  Mr. Jarad differently?

18  A.   Yes.

19       I mean, we had credit card statements of Mohammad

20  Jarad that showed he rented a car, he stayed in a hotel in

21  Mississippi around the time this meeting took place.  However,

22  that was really it.

23       We had nothing to confront him.  Details that

24  Dr. Ashqar certainly knows.  Details about the meeting,

25  whether or not there was anybody else present at this meeting

1    that we could talk to.

2          We were looking for leads.  Leads that would provide

3    us with information so we would be in a much better position

4    to confront Mohammad Jarad and, hopefully, flip him and have

5    him testify.

6    Q.  You mentioned a number of names that the FBI was

7    interested in at the outset.  One of them was Anwar Hamdan?

8    A.  Yes.

9    Q.  Was an attempt made to approach Anwar Hamdan for

10   information and testimony?

11   A.  Yes, in Louisiana.

12   Q.  And what was the result of that attempt?

13   A.  He, as well, was evasive.  He claimed, I believe -- I

14   wasn't the agent that went on the interview, but he claimed --

15   to not understand English or have a limited understanding of

16   English.

17   Q.  Where was Anwar Hamdan born?

18   A.  United States.

19   Q.  Where was he raised?

20   A.  United States.

21   Q.  Okay.

22          So, he had failure of understanding of English in the

23   interview, and what else?  Was his memory equally failed on

24   critical events?

25   A.  Yes.  Yes.

Bray - direct

1   Q.  And in the absence of information and testimony from

2   Dr. Ashqar, what ultimately happened with the attempts to

3   investigate Mr. Hamdan as part of the conspiracy?

4   A.  They failed, and Anwar Hamdan left the country.

5   Q.  And never returned?

6   A.  Never returned.

7   Q.  One final category of documents I want to have you briefly

8   direct your attention to.

9        In Dr. Ashqar's documents obtained in the search of

10  his residence, there were confessions of other Hamas members.

11       Do you recall that?

12  A.  Yes.

13  Q.  Were some of those Muhammad Salah's confessions?

14  A.  Yes.

15       MR. FERGUSON:  And those were, for the record, Ashqar

16  Search Documents, Tabs 8, 9 and 13.

17  BY MR. FERGUSON:

18  Q.  Were those confessions as they were held in Dr. Ashqar's

19  papers in exactly the same form and condition as the official

20  statements taken from him by Israeli National Police officers?

21  A.  No, they were not.

22  Q.  What was different about them?

23  A.  These were Arabic translations.

24  Q.  What would you have wanted to know from Dr. Ashqar about

25  these confessions?

1    A.   Where he got them, who he got them from.  Why were they

2    sent to him?  What did he do with them?  Did he send them to

3    anybody else?  And for what purpose might he'd sent them to

4    somebody else?

5    Q.   There were confessions of other Hamas figures, as well, in

6    Dr. Ashqar's papers; is that right?

7    A.   Yes.

8    Q.   I want to direct your attention to the confession of an

9    individual -- or confessions of an individual -- by the name

10   of Mahmoud Ramahia that were introduced into evidence as

11   Ashqar Search Documents Tab 11.

12           And those were admitted into evidence in redacted

13   form.

14           MR. FERGUSON:  Permission to approach, Judge?

15           THE COURT:  You may.

16           MR. FERGUSON:  I'm handing counsel, the witness and

17   the Court a copy of Ramahia confessions --

18           (Document tendered to the Court, witness and counsel.)

19           MR. FERGUSON:  -- in the redacted form in which they

20   were admitted into evidence.  They're found at Tab 11 of the

21   Ashqar Search Documents.

22   BY MR. FERGUSON:

23   Q.   There are numerous redactions on here.  Why were these

24   documents redacted?

25   A.   The redactions are of Abdelhaleem Ashqar's name.

1    Q.  And Muhammad Salah's name?

2    A.  Yes.

3    Q.  So, in unredacted form, these confessions contain

4    statements regarding activities of Abdelhaleem Ashqar; is that

5    fair?

6    A.  Yes.

7    Q.  All right.

8              What would you have wanted to know from Dr. Ashqar

9    about these documents relating activities of his involvement

10   with Mahmoud Al-Ramahia, Mousa Abu Marzook and others?

11   A.  Again, we're looking at the nature of his activities, the

12   scope of Hamas in the United States.  He talks about setting

13   up meetings with Mahmoud Al-Ramahia with Mousa Abu Marzook in

14   Tennessee.  I would look to corroborate that those events took

15   place, why those meetings took place, what was discussed.

16   Q.  I want to focus your attention on one specific passage of

17   many pages.  It's on the second page, ASH 263, about 80

18   percent of the way down the page beginning, "There are two

19   other committees abroad, a Political and an Informational

20   Committee"; and, then, after that, "In 5-92, I was in Chicago,

21   in America, where I opened a bank account -- illegible,

22   illegible -- in America by himself.  This individual requested

23   from me that we directly and together contact America, but I

24   refused.  The Coordination Committee in the central region was

25   founded by Muin Shabib."

1          Was Muin Shabib an individual of interest to the

2    investigation?

3    A.  Yes.

4    Q.  And was there evidence in the case of direct

5    communications and contact between Muin Shabib and Abdelhaleem

6    Ashqar?

7    A.  Yes.

8    Q.  Was that information about the relationship and those

9    activities something that the investigation sought from Muin

10   Shabib, who, on the basis of this document, had connections to

11   the Hamas terrorist organization?

12   A.  Yes.

13   Q.  All right.

14          I turn your attention to the last page, ASH 255, the

15   top.

16          "On 4-92, I opened an account in Chicago, and then I

17   received a deposit of $10,000 a month.  The total amount

18   deposited reached $100,000."

19          Did the investigation have in its possession

20   documents relating to an account opened in the United States

21   by Mahmoud Ramahia that were introduced into evidence at

22   trial?

23   A.  Yes.

24   Q.  And as introduced into evidence at trial, that account was

25   funded with money that came from Mousa Abu Marzook and his

Bray - direct

1    associates.

2            In the absence of testimony from Dr. Ashqar about

3    Mahmoud Ramahia -- who, on the basis of this document, he was

4    in direct communication and contact with -- did the

5    investigation ever figure out exactly what all those

6    structured transfers in and structured transfers out were

7    about?

8    A.   No.

9    Q.   The purpose why they were transferred in structured

10   fashion from Marzook's associates?

11   A.   No.

12   Q.   The reason why they were structured to a greater degree

13   out of the United States, so that they could be received in

14   Israel and the West Bank?

15   A.   No.

16   Q.   You mentioned that one of the things that you would want

17   to know from Dr. Ashqar about these confessions was who he

18   sent them to?

19   A.   That's correct.

20   Q.   At a later stage -- in fact, after the case was charged --

21   did the FBI come into possession of documents that reflected,

22   in fact, that Dr. Ashqar had transferred or directed these

23   confessions and other materials to other individuals in the

24   United States?

25   A.   Yes.

1  Q.  Who received the documents from Dr. Ashqar?

2  A.  Mohammad Shorbagi.

3  Q.  And as admitted into evidence, that bundle was with a

4  cover letter from Dr. Ashqar; is that correct?

5  A.  Yes.

6  Q.  With Dr. Ashqar's return address on it?

7  A.  Yes.

8  Q.  And to refresh the Court, was Dr. Shorbagi charged and

9  convicted with any crime in 2006?

10  A.  Yes.  He was charged with material support.

11  Q.  Of terrorism?

12  A.  Of terrorism.

13  Q.  And was that in connection with the Holy Land Foundation?

14  A.  Yes.

15  Q.  If Dr. Ashqar had answered the questions about all the

16  individuals to whom he sent these documents, would the FBI

17  have known of Mohammad Shorbagi -- who now stands convicted of

18  material support of terrorism -- at a much earlier time than

19  actually occurred?

20        MR. MOFFITT:  Objection.  Objection.  In fact,

21  Shorbagi's conviction occurred well after -- and his

22  admissions about when he sent money to Hamas occurred after --

23  Hamas was actually designated.  That was a point that was made

24  during the course of the argument, that he was not charged

25  with any offenses prior to the designation of Hamas.  The

1  designation of Hamas occurred well after the transfer of these

2  documents.

3          THE COURT:  But I think the question was:  If

4  Dr. Ashqar had answered their questions about who he sent the

5  documents to, would they have known -- would the FBI had known

6  -- that such documents went to Shorbagi?

7          MR. MOFFITT:  Well, would they have known--

8          THE COURT:  Not that --

9          MR. MOFFITT:  The question was whether they would

10 have known that Shorbagi was giving material support to Hamas.

11 What Mr. Shorbagi pledged to -- pled to -- was --

12         THE COURT:  That was not the question.  I am reading

13 it now.

14         You can rephrase, Mr. Ferguson.

15         But that was not the way the question was phrased.

16 BY MR. FERGUSON:

17 Q.  If Dr. Ashqar testified truthfully and completely, would

18 the FBI have known of Mohammad Shorbagi as an individual

19 associated with Hamas at a much earlier time than they did?

20 A.  Yes.

21         MR. FERGUSON:  No further questions.

22         THE COURT:  Let us take a ten-minute break, and then

23 we will begin with cross-examination.

24         (Brief recess.)

25         THE COURT:  Mr. Moffitt, cross-examination.

1                    CROSS- EXAMINATION

2   BY MR. MOFFITT:

3   Q.  Good morning, Mr. Bray.

4   A.  Good morning, Mr. Moffitt.

5   Q.  You've now testified for, I guess, about an hour-and-a-

6   half or two hours, correct?

7   A.  Correct.

8   Q.  And you've told us a lot of things.  I would like to ask

9   you, before you came to testify today, what were -- what did

10  you look at in order to prepare yourself for your testimony

11  today?

12  A.  I looked at previous grand jury transcripts.

13  Q.  Of whom?

14  A.  Dr. Ashqar.

15  Q.  Okay.

16  A.  Mohammad Jarad.

17  Q.  All right.

18  A.  Mrs. Jarad.

19  Q.  Okay.

20          (Brief pause.)

21  BY MR. MOFFITT:

22  Q.  Who else?

23  A.  I think that was it.

24  Q.  What other documents did you look at?

25  A.  I looked at search documents from Dr. Ashqar's apartment.

Bray - cross

1    I looked at telephone call transcripts.

2    Q.   Uh-huh.

3    A.   Recorded calls.

4    Q.   You also --

5    A.   Confessions.  I looked at part of the confessions.

6    Q.   Mr. Salah's confessions?

7    A.   Mr. Salah's confessions, Mr. Ramahia's confession.

8    Q.   Uh-huh.

9         What else?

10   A.   Oh, I looked at the credit card statements -- statement --

11   for Mohammad Jarad concerning his trip to Mississippi.

12   Q.   Uh-huh.

13        You talked about a conversation that you had with

14   some translator about documents and about how things were

15   translated and how statements were -- could have many

16   meanings?

17   A.   Conversations I had with translators -- I mean, we would

18   get a document translated.  At times, one translator might see

19   or have something phrased --

20   Q.   Well, I --

21   A.   -- differently.

22   Q.   I want to know where you -- how you remember those

23   conversations.  What -- did you look at any documents --

24   A.   No, no.

25   Q.   -- concerning those conversations?

1  A.  No.

2  Q.  What other documents did you look at?

3  A.  I think what I've just given you was essentially it.

4  Q.  That's all the documents you looked at?

5  A.  To the best of my knowledge, yes.

6  Q.  Now, you know that Dr. Ashqar didn't testify in front of

7  the grand jury, right?  He was called into the grand jury, but

8  provided no testimony?

9  A.  He did provide answers to certain things.

10  Q.  What did he answer?

11  A.  His name.

12  Q.  What else?

13  A.  I can't remember in certain instances if he provided his

14  address.  He provided certain things and, then -- up to a

15  point; and, then, he had his statement, which he read to the

16  grand jurors.

17  Q.  Statement concerning what he believed people were fighting

18  for in Palestine, right?

19  A.  Yes.

20  Q.  And that he wasn't going to turn on a people who were

21  fighting for their freedom in Palestine, right?

22  A.  Yes.

23  Q.  That's the statement you're talking about?

24  A.  Yes.

25  Q.  All right.

1          Now, Mr. El-Barasse, he -- what did he say in the

2    grand jury?  He couldn't remember, right?

3    A.  I -- in preparation for today, I didn't look at

4    Mr. El-Barasse's grand jury testimony.

5    Q.  All right.

6          But you were able to testify to what you recalled

7    about it?

8    A.  I recalled that he went into a grand jury, he was

9    immunized and he did not provide any substantive information.

10   Q.  He said something about he couldn't remember; is that

11   right?

12   A.  I don't recall.

13   Q.  Okay.

14         Did you look at anything else?

15   A.  To the best of my knowledge, no.

16   Q.  All right.

17         Now, in -- you testified that your -- you became

18   involved in 2002; am I right?

19   A.  Correct.

20   Q.  All right.

21         And in 2002 -- or when did you -- your attention

22   focus on Dr. Ashqar?

23   A.  Almost immediately.

24   Q.  Almost immediately in 2002?

25   A.  In 2002.

Bray - cross

1   Q.  All right.

2           Did you know whether Dr. Ashqar was a citizen of the

3   United States?

4   A.  Yes, I did.

5   Q.  Did you know where he was born?

6   A.  Yes.

7   Q.  Where was he born?

8   A.  I don't know how you pronounce it.  Tulkarim, I believe.

9   He said it was in Jordan.

10  Q.  Who said it was in Jordan?

11  A.  Dr. Ashqar.

12  Q.  Dr. Ashqar told you --

13  A.  Uh-huh.

14  Q.  -- he was born in Jordan?

15  A.  Uh-huh.

16  Q.  Told you that?

17  A.  Yes.  I remember distinctly when we were fingerprinting

18  Dr. Ashqar, concerning country of birth, he did not want

19  Israel to be his country of birth.  He told me the city.  And

20  I said -- he wanted Palestine to be his country of birth.

21  That wasn't available in our -- as a country that we could

22  select in the computer.  So, I told him Israel or Jordan,

23  and --

24  Q.  So, it was as a result of what you told him wasn't in your

25  computer that he told you Jordan?

1   A.   Yes.

2   Q.   He told you that his home where he was born was Palestine?

3   A.   Correct.

4   Q.   But that's not a country according to you, so he

5   couldn't -- you couldn't use it?

6   A.   Not according --

7   Q.   Okay.

8   A.   It's not a country not according to me.  I don't -- the

9   program that I was using --

10  Q.   So, he didn't --

11  A.   -- I didn't make.

12  Q.   He didn't lie to you about where he was born, right?

13  A.   I don't think so, no.

14  Q.   He told you he was born in Palestine --

15  A.   Correct.

16  Q.   -- correct?

17          You know that Palestine is an occupied territory,

18  right?

19  A.   I know there are occupied territories in Israel, yes.

20  Q.   All right.

21          Do you know the difference between the West Bank and

22  the Gaza Strip, sir?

23  A.   Yes.

24  Q.   Have you ever been to the West Bank or Gaza Strip?

25  A.   No.

1   Q.  Have you ever seen how people live in the West Bank or

2   Gaza Strip?

3   A.  From newspaper media I've seen, television.  But I am not

4   allowed to go there.

5   Q.  You are not allowed to go there.

6           Okay.  Let me ask you another question.

7           You knew that he was born in Palestine.  Did you know

8   whether -- at the time he was born, whether -- it was

9   occupied?

10  A.  No, I don't -- I don't recall off the top of my head his

11  date of birth.

12  Q.  All right.

13          And in your investigation of Dr. Ashqar, did you

14  determine how many members of his family had been jailed by

15  the Israelis?

16  A.  No.

17  Q.  Did you determine how many members of his family had been

18  tortured by the Israelis?

19  A.  No.

20  Q.  Did you determine how many members of his family had been

21  killed by the Israelis?

22  A.  No.

23  Q.  Do you know today as you sit there?

24  A.  How would I know?  He wouldn't tell me.

25  Q.  Well, sir, you were involved in an investigation; were you

1   not?

2   A.  Yes.

3   Q.  And part of your investigation involved the Israelis,

4   correct?

5   A.  Our investigation focused on Hamas in the United States.

6   Q.  Part of your investigation involved talking to the

7   Israelis; did it not?

8   A.  Yes.

9   Q.  Did you ever discuss with the Israelis Dr. Ashqar and his

10  origins?

11  A.  No.

12  Q.  You weren't curious as the investigating officer?

13  A.  No.

14  Q.  Okay.

15          Now, the documents you've talked about -- all the

16  documents you've talked about -- all the documents you've

17  talked about being recovered from Dr. Ashqar, correct?  You've

18  talked about documents that were recovered as part of a

19  search?

20  A.  Yes.

21  Q.  That search took place when?

22  A.  In December of 1993.

23  Q.  December of 1993.

24          That was 11 years before your grand jury started,

25  correct?

Bray - cross

1    A.   That is correct.

2    Q.   That was nine years before your investigation started,

3    correct?

4    A.   Correct.

5    Q.   Okay.

6            Now, according to you, these were all very important

7    documents, correct?

8    A.   Some were very important, not all.

9    Q.   Well, important to your investigation, which you began in

10   2002 --

11   A.   Yes.

12   Q.   -- correct?

13   A.   Yes.

14   Q.   Where had they been for nine years?

15   A.   They had been in Mississippi and, also, in Washington.

16   Q.   Well, where in Mississippi?

17   A.   At the Oxford resident agency, which is a satellite office

18   of our Jackson, Mississippi, office.

19   Q.   And where in Washington?

20   A.   The Washington field office.

21   Q.   Now, they had sat there for nine years and there wasn't an

22   invest- -- nobody investigated?

23   A.   That's not true.

24   Q.   All right.

25           Well, for nine years, they had sat there and nothing

Bray - cross

1  had been translated?

2  A.  That's not true, either.

3  Q.  Okay.

4       Well, can you tell me the quantum of documents that

5  had been translated prior to 2002, when you began your

6  investigation?

7  A.  They had been translated in various degree, summary form.

8  They were translated with an eye towards gathering

9  intelligence value.

10 Q.  I don't know what that means.

11 A.  Well, at the time the investigation was conducted, the

12 investigation concerned Dr. Ashqar as an agent of a foreign

13 power, Hamas.  So, these translations of these documents

14 obtained in this search were translated in summary fashion for

15 what you would call or deem intelligence purposes.

16      It wasn't until much later -- the time period that

17 you're referring to, 2002 -- that these documents were

18 available for criminal use.

19 Q.  Well, wait a minute.  Wait a minute.  Let me see if I

20 understand.

21      You had the documents, and you had the documents for

22 nine years before you began your investigation, right?

23 A.  Yes.  Roughly, nine years.

24 Q.  Nine years.

25      And yet these documents you had had since 1993, and

Bray - cross

```
 1   they had been translated for intelligence purposes.

 2           When had they been translated for an intelligence

 3   purpose?  What year?

 4   A.  During the years after they were recovered.

 5   Q.  Well, can you tell me what year they were translated?

 6   A.  I would surmise 1994.

 7   Q.  1994.

 8           So, that's eight years before you began your

 9   investigation, correct?

10   A.  Yes.

11   Q.  All right.

12           And this included the documents from the search,

13   correct?

14   A.  Yes.

15   Q.  From the search -- the 1600 documents --

16   A.  Yes.  Yes, sir.

17   Q.  -- that you talked about --

18   A.  Yes, sir.

19   Q.  -- regarding the search?

20           Were any of those documents completely translated in

21   those eight years?

22   A.  I'm sure that some of them were completely.  When you say

23   "completely," I'm assuming you mean as a verbatim.

24   Q.  Yes.

25   A.  I'm assuming that they were.  Again, they were done in
```

1    various degrees of completion.  Some were summary form.

2    Q.  Well, what quantum of these documents -- since we've

3    talked about them in the way that we've talked about them --

4    were translated at that time?  How many of them?

5            MR. FERGUSON:  I'm sorry, Judge, I'm unclear as to

6    what "that time" is referring to.

7    BY MR. MOFFITT:

8    Q.  I'm talking about 1993, 1994, eight years before your

9    investigation began.

10   A.  Again, I can't tell you.  I wasn't there in 1994.  I don't

11   know when specifically they were translated.  I don't know

12   what time period in which they were translated, all of them.

13           I do know in 2002, we did have -- we obtained these

14   documents, in addition to documents, records, from various

15   investigations; combined them here in Chicago under one roof

16   for our criminal investigation.

17   Q.  Okay.

18   A.  We had those documents.  I know there were translations

19   done of them.  We essentially re-translated all of them

20   verbatim for the purposes of use in criminal proceedings.

21   Q.  Well, you didn't tell Mr. Ferguson that you re-translated

22   them, did you?  You didn't say that at all in your direct

23   examination, did you?

24   A.  I don't know that he asked me.

25   Q.  Okay.  Well, let me be sure that I make sure I ask you all

1   the right questions.

2           Okay.  So, now your investigation begins and you have

3   documents from 1992 and 1993, correct?

4   A.   That --

5   Q.   Those are documents regarding Dr. Ashqar -- the search of

6   Dr. Ashqar's home.

7   A.   The search was conducted in December of 1993.  I don't

8   know -- as far as documents from 1992, I don't know when the

9   documents in Dr. Ashqar's possession, when they were created.

10  Q.   Well, you talked about a document today that discusses the

11  events that occurred in 1992; am I right?

12  A.   Correct.  Like I said, I don't know when all the documents

13  were created.  I know you can look at some of them and

14  determine approximate dates of when they were created.

15  Q.   Well, you certainly know that they were not created post

16  the search of his home, right?

17  A.   That's correct.

18  Q.   Which was nine years before your investigation started,

19  right?

20  A.   Roughly nine, yes.

21  Q.   Okay.

22          Now, there was also, as you said, a wiretap, correct?

23  A.   Yes.

24  Q.   A wiretap on Dr. Ashqar's telephones?

25  A.   Yes.

1   Q.  There was a bug, correct?

2   A.  Yes.

3   Q.  A bug of Dr. Ashqar's home?

4   A.  Yes.

5   Q.  All right.

6       And when was that information and when did that

7   occur?

8   A.  When did the bugging of his apartment occur?  When did the

9   telephone?

10  Q.  Yes.

11  A.  I can give you approximate dates.  Again, it would have

12  been 1994 time period.

13  Q.  Okay.

14      That's eight years before your investigation,

15  correct?

16  A.  Yes.

17  Q.  And when you bug someone's home, you hear every

18  conversation that goes on in the home, correct?

19  A.  No.

20  Q.  Okay.

21      Well, tell me what happens.

22  A.  The technical difficulties involved -- you can't hear

23  everything that happens in a house.  You could go in a corner

24  of a house, you could have a quiet conversation.  Sometimes

25  during technical difficulties, you can't pick everything up.

1   But --

2   Q.  Help me, sir.  You have seen the product of that bugging;

3   have you not?

4   A.  It's been years since I've seen it; yes.  But I have seen

5   it.

6   Q.  Well, tell me how many years it's been since you've seen

7   it.

8   A.  I probably looked at it in 2000- -- late 2002/2003 time

9   period.

10  Q.  Okay.

11          And this was, I guess, a surreptitious bugging,

12  correct?  No one told Dr. Ashqar that there was a bug in his

13  house?

14  A.  That's correct.

15  Q.  The idea was to secretly record what was going on in

16  Dr. Ashqar's house?

17  A.  Correct.

18  Q.  So, if the bug was working, it would have picked up the

19  conversations that occurred in the house --

20  A.  Yes.

21  Q.  -- correct?

22          And if there were meetings in the house and there

23  were other things that happened in the house, all of those

24  things would have been picked up?

25  A.  Yes.

1  Q.  And that would have occurred -- how long was that bug in

2  Dr. Ashqar's house?

3  A.  I don't have to -- I don't recall.  I'd have to go back

4  and look at the orders.

5  Q.  Well, you knew you were going to testify today, right?

6  A.  Yes.

7  Q.  But you didn't bother to look at that?

8  A.  I did not look at that.

9  Q.  All right.

10       Now, there was also -- because the bug wasn't enough,

11  there was also a wiretap on the telephone, correct?

12  A.  That is correct.

13  Q.  So, not only were you recording the conversations inside

14  the house and at least one side of the conversations on the

15  telephone by the bug, you were also recording his

16  conversations on the telephone, correct?

17  A.  Correct.

18  Q.  All right.

19       And when was the telephone wiretap placed on Dr.

20  Ashqar's home?

21  A.  Again, I'd have to go back and look for specific dates.

22  Q.  You didn't --

23  A.  1993/1994 time period.

24  Q.  You didn't look at that, either?

25  A.  Not the dates of when they were -- it was initiated and

1    terminated, no.

2    Q.  All right.

3         Is it fair to say -- well, let me ask you this:  How

4    long was the bug in Dr. Ashqar's house -- was it maintained?

5    How long did it stay on?

6    A.  What, do you mean?  Throughout the day or the week?

7    Q.  No, I mean, what was the duration of the bugging of his

8    house?  How many months, how many days, how many years?

9    A.  Again, I would have to go back and review that.

10   Q.  You don't know?

11   A.  I don't know.

12   Q.  All right.

13        And with regard to the wiretap, what was the duration

14   of the wiretap?

15   A.  I would have to go back and review to give you the actual

16   dates.

17   Q.  Now, it is fair to say that if Dr. Ashqar is involved in

18   espionage and counter-intelligence and what have you, you can

19   extend a bug and a wiretap; am I right?  You go and get an

20   extension --

21   A.  Yes.

22   Q.  -- from a court?

23        How many extensions were involved with Dr. Ashqar?

24   A.  I would have to go and look --

25   Q.  You don't know?

1    A.   -- to see.

2            I don't know.

3    Q.   All right.

4            Do you know when the bug was removed from Dr.

5    Ashqar's house?

6    A.   No.

7    Q.   Was it in 2002?

8    A.   It would have been before then.

9    Q.   Well, was it in 1995, 1994?

10           MR. FERGUSON:  Objection.  The witness said he

11   doesn't know.

12           THE COURT:  Overruled.

13           You can answer, if you can.

14   BY THE WITNESS:

15   A.   I don't know.

16   BY MR. MOFFITT:

17   Q.   When was the wiretap removed from Dr. Ashqar's house?

18   A.   It wouldn't have been done at his house, but I don't know

19   when the monitoring of his telephones ended, either.

20   Q.   Would you say to me that it was years before you began

21   your investigation?

22   A.   Yes.

23   Q.   You just don't know how many years?

24   A.   Correct.

25   Q.   All right.

1           And all of the documents -- well, let me ask you

2   this:  The bank records that you talked about -- and you

3   talked about voluminous bank records, correct?

4   A.  Yes, sir.

5   Q.  What were the years of these voluminous bank records that

6   you talked about?

7   A.  Some from the late '80s --

8   Q.  Okay.

9   A.  -- through the 1990s.

10  Q.  Through what era in the 1990s?

11  A.  There would be various.

12  Q.  Let's speak about Dr. Ashqar for a moment.

13          What years did you have his bank records for?

14  A.  I would have to go and look at the actual statements.

15  Q.  Do you have any bank records for Dr. Ashqar beyond 1994?

16  A.  I believe we do, yes.

17  Q.  What year?

18  A.  I remember looking at certain transactions.  It was

19  involved around the time that he was running for president

20  of -- so, that --

21  Q.  What year was that?

22          UNKNOWN SPEAKER 1:  2005.

23          UNKNOWN SPEAKER 2:  2005.

24          (Laughter.)

25  BY MR. MOFFITT:

Bray - cross

90

1    Q.   What year was that?  You don't know, do you?

2    A.   I can give a guess now.

3         (Laughter.)

4    BY MR. MOFFITT:

5    Q.   All right.  Well, don't guess for me.

6         Help me with this a second:  The bank records that

7    were introduced at the trial were not for 2005, were they?

8    A.   No, I don't believe so.

9    Q.   All the bank records that were introduced during the

10   course of the trial were before -- on or before -- 1994,

11   correct?

12   A.   I believe that is correct, yes, sir.

13   Q.   All right.

14        Now, in fact, Hamas was not designated until when?

15   A.   There were two designations:  One in 1995 and one in 1997.

16   Q.   And all the bank records that were introduced at trial

17   were prior to either of those designations; am I right?

18   A.   Correct.

19   Q.   Now, let's go to the telephone records for a second.  You

20   talked about extensive telephone records, correct?

21   A.   Yes, sir.

22   Q.   All right.

23        What were the years of the telephone records that you

24   were talking about?

25   A.   Again, I would have to go and look at the actual records

1   themselves.  My estimate would be from the late '80s at least

2   through the mid-'90s.

3   Q.  Okay.

4           And all of the telephone records that were introduced

5   at trial were prior to the designation of Hamas as a terrorist

6   organization, correct?

7   A.  Again, without knowing the actual dates, I don't know if

8   there were records obtained in 1995 that were introduced at

9   trial.  I just don't recall.

10  Q.  All right.

11          Well, if you're starting in the '80s -- and you

12  introduce records, a lot of -- voluminous, as you described

13  them, right?

14  A.  Yes, sir.

15  Q.  And maybe some of them were in 1995.

16          Would it be fair to say that most of them were before

17  1995?

18  A.  Yes, that would be fair.

19  Q.  And would it, then, be fair to say that most of the

20  telephone records that were produced in the trial were before

21  the designation of Hamas?

22  A.  Yes.

23  Q.  And as you sit there, can you recall one phone call to

24  Mousa Abu Marzook from Dr. Ashqar post the designation of

25  Hamas?

1   A.  No.

2   Q.  Can you recall one bank transfer between Mousa Abu Marzook

3   and Dr. Ashqar post the designation of Hamas?

4   A.  No.

5   Q.  Okay.

6           So, the bank records and the telephone calls that you

7   talked about today, most of them occurred before the

8   designation of Hamas?

9   A.  Yes, sir.

10  Q.  Okay.

11          And your investigation began in 2002?

12  A.  Correct.

13  Q.  That was seven years after the designation of Hamas,

14  correct?

15  A.  Correct, after the 1995 designation.

16  Q.  So, all these inquiries about phone calls, about documents

17  and about people relate to events that occurred in the 1993 to

18  1995 period of time, correct?

19  A.  Roughly that time period, yes, sir.

20  Q.  Okay.

21          So, you were looking back in time to talk to

22  Dr. Ashqar allegedly about these so-called relationships?

23          MR. FERGUSON:  Judge, I'm unclear.  Are we talking

24  about the investigation?  Are we talking about Dr. Ashqar's

25  appearance in the grand jury?

Bray - cross

1          MR. MOFFITT:  I'm talking about the investigation.

2    I'm obviously talking about his investigation.

3          THE COURT:  Overruled.

4          You can answer.

5    BY THE WITNESS:

6    A.  Yes.  We were going back in time to investigate phone

7    records, financial records that showed relationships to

8    Dr. Ashqar and those individuals.

9          Many of those individuals --

10   BY MR. MOFFITT:

11   Q.  Hold on.

12   A.  -- were still here.

13   Q.  In those years, right?

14   A.  Yes.

15   Q.  Now, you didn't know what those -- if those relationships

16   were maintained, or if they continued, or if they changed over

17   the eight years from 1994 to 2002?

18   A.  Correct.  Due to Dr. Ashqar's refusal to comply with the

19   Judge's order and testify before the grand jury, you're right,

20   I did not know whether he continued those relationships;

21   whether he maintained any type of contacts with those

22   individuals.

23   Q.  Okay.

24   A.  You're correct.  I did not know.

25   Q.  Well, I want you to look at ASH 185.  You have that in

1   front of you?

2   A.  I do not.

3          MR. MOFFITT:  Did you take it back from him?

4          THE COURT:  That is the list of names; correct, Mr.

5   Moffitt?

6          MR. MOFFITT:  That is the list of phone calls and

7   names.

8          (Document tendered.)

9   BY MR. MOFFITT:

10  Q.  Would you look at this with me?

11  A.  Yes, sir.

12  Q.  How many names are on here?

13  A.  35.

14  Q.  How many of those names live in the United States?

15  A.  Well, as you can see, the second column lists the country

16  and city.  Most of these -- some don't have any.  At the time

17  this document would have been created, it appears that most of

18  these -- I do see one reference to Canada.  Again, there are

19  some that have no country or city identified on the document.

20  Q.  Let me ask you this:  How many of them don't have phone

21  numbers next to them?

22  A.  All but two.

23  Q.  Everybody has a phone number, right?

24  A.  It has a phone number associated with that name, yes.

25  Q.  All right.

Bray - cross

1       And all of them have area codes, correct?

2   A.  Yes, sir.

3   Q.  Some of them even have fax numbers, correct?

4   A.  Yes, sir.

5   Q.  And the majority of them have cities, correct -- and

6   countries?

7   A.  Yes, sir.

8   Q.  Now, on the first page, at least, the vast majority of

9   those countries are in the United States, correct?

10      THE COURT:  You mean cities, Mr. Moffitt?

11      MR. MOFFITT:  Cities.  I'm sorry.

12  BY THE WITNESS:

13  A.  Yes, sir.

14  BY MR. MOFFITT:

15  Q.  Okay.

16      Now, in 2002, when your investigation began, where

17  was Mousa Abu Marzook?

18  A.  He was either in Jordan or Syria.

19  Q.  He had been, in fact, deported in 1996; am I right?

20  A.  Correct.  I'm not sure about the date and whether or not

21  "deported" is the correct term.

22  Q.  Well, had the United States government done anything to

23  force Mousa Abu Marzook to leave the country?

24  A.  Yes.

25  Q.  When did that occur?

Bray - cross

1    A.  I want to say around the mid-1990s.  1995.

2    Q.  Okay.

3    A.  1996.

4    Q.  1995.  All right.

5         But you -- he had been forced to leave the country by

6    the United States; but you, as an agent of the United States,

7    had begun an investigation of him in 2002, seven years after

8    he had been asked to leave the country by the United States,

9    correct?

10   A.  Correct.  I mean, he was extradited, I think, would have

11   been -- would have been -- the proper term.

12   Q.  Well, he wasn't in the country, right, when you began your

13   investigation of him, correct?

14   A.  No, he was not.

15   Q.  All right.

16        And where and in what country was he in in 2002, when

17   you began your investigation?

18   A.  I think I already answered that.  I'm not sure.  It was

19   either perhaps Jordan or maybe Syria.

20   Q.  All right.

21        And you weren't going to get him back from Syria,

22   were you?

23   A.  No.

24   Q.  Okay.

25        So, you were conducting a grand jury investigation of

1   a man in 2002 that had left the country in 1995 and was then

2   in Syria, and you had no hope of getting him back, correct?

3   A.  I wouldn't say that.  I mean, I can't foretell the future.

4   I don't know if he were to ever -- I think there are instances

5   where he has traveled out of Syria.

6   Q.  Okay.

7        Now, the next name on here is "Mohammad Akram,"

8   right?

9   A.  Yes, sir.

10  Q.  The country -- the city that he lives in or lived in, in

11  1993, was Chicago, correct?

12  A.  Correct.

13  Q.  There was a phone number, correct?

14  A.  Yes, sir.

15  Q.  And, of course, you went out and interviewed Mohammad

16  Akram?

17  A.  I don't recall that we did, no.

18  Q.  Okay.

19        And, of course, you subpoenaed him -- because he was

20  living in Chicago, correct? -- in your grand jury?

21  A.  No, we did not subpoena him to the grand jury, that I'm

22  aware.

23  Q.  And that was because you weren't curious why his name

24  would have appeared on a list with Mousa Abu Marzook, right?

25  A.  What was your question, again?

1  Q.  You weren't at all curious about why his name would have

2  appeared on a list with Mousa Abu Marzook?

3  A.  I would have been curious, certainly.  I don't know if at

4  the time, in 2002, that I knew where this individual was.  I

5  just don't recall.

6  Q.  Oh, I see.

7       Let me see.  You weren't sure in 2002 that this list

8  that you had gotten in 1992 or '93 had any validity at all in

9  terms of addresses or anything, correct?

10 A.  Correct.  I mean, I know that some addresses were not

11 correct.

12      No. 3, "Ahmad Yousif" -- Yousif Saleh -- city,

13 Chicago.  I knew that he was not in Chicago.

14 Q.  I see.

15      Now, did you call 312-563-0937 to determine whether

16 it was accurate with regard to Mohammad Akram?

17 A.  I don't recall doing that, no.

18 Q.  Okay.

19      Now, you knew that Mr. Yousif was no longer in

20 Chicago, correct?

21 A.  Correct.

22 Q.  When had he left?

23 A.  I'm not sure of the date of when he left, but I knew he

24 was in Virginia.

25 Q.  Well, when did he go to Virginia?

1   A.  I don't know.

2   Q.  Okay.

3        He was also reachable, then, by subpoena; was he not?

4   If he lived in Virginia, you could serve a grand jury subpoena

5   on him, correct?

6   A.  That's correct.

7   Q.  Did you?

8   A.  No.  We served a subpoena on Dr. Ashqar shortly

9   thereafter, as I --

10  Q.  I know you served a subpoena on Dr. Ashqar.  I asked you

11  did you serve a subpoena on Ahmad Yousif?

12  A.  We did not.

13  Q.  All right.  Okay.

14       "Yassir Bushnaq."  You know that name?

15  A.  Yes.

16  Q.  He was one of the people that was discussed to come to the

17  Philadelphia meeting; was he not?

18  A.  I believe so, yes.

19  Q.  All right.

20       And did you attempt to find Mr. Bushnaq?

21  A.  Yes.

22  Q.  All right.

23       Where was Mr. Bushnaq located?

24  A.  I don't recall specifically where he was located.  I know

25  that other agents -- another agent assigned to our

Bray - cross

1   investigation -- attempted to interview him.

2   Q.  He was located in Virginia, running an organization in

3   Virginia; was he not?

4   A.  I don't recall.

5   Q.  Did you issue a grand jury subpoena for Mr. Bushnaq?

6   A.  I would have to go back and see.

7   Q.  Well, as you sit there, do you recall issuing a grand jury

8   subpoena for Mr. Bushnaq?

9   A.  I do not recall, no.

10  Q.  All right.

11          No. 5, "Mohammad El-Mezzain."  He's listed in New

12  Jersey, correct?

13  A.  Correct.

14  Q.  201-279 as a fax number, correct?  279-6362?

15  A.  Yes, sir.

16  Q.  And 201-279-3574, correct --

17  A.  Correct.

18  Q.  -- as a phone number?

19  A.  Correct.

20  Q.  Were you able to locate Mr. El-Mezzain?

21  A.  I believe Dallas was focused on Mr. El-Mezzain.

22  Q.  Okay.

23          Was he called before a grand jury?

24  A.  I don't know if he was or not.

25  Q.  Did you call him in front of your grand jury?

Bray - cross

1  A.  I do not believe so.

2  Q.  Okay.

3       And you didn't call him because Dallas was focused on

4  him?

5  A.  I know he was the subject, yes, of Dallas investigation.

6  Q.  Well, did you not call him because you knew he was a focus

7  of the Dallas investigation?

8  A.  I don't recall.

9  Q.  All right.

10       "Ismael El-Barasse," right?  That's No. 6?

11  A.  Yes, sir.

12  Q.  All right.

13       That has Washington, D.C.?

14  A.  Yes, sir.

15  Q.  In 2002, where was Mr. El-Barasse?

16  A.  I don't know if he was on the East Coast, Virginia-

17  Washington, D.C., area.

18  Q.  Did you interview him or attempt to interview him?

19  A.  I believe information we had at the time, we did not feel

20  he was in the country.  I'd have to go back and, again, look

21  to see what led us to believe that.  I do know within a day or

22  two of our indictment, he was located.

23  Q.  Okay.

24       Well, I'm talking about 2002 through 2004, before

25  your indictment.

Bray - cross

1    A.   Okay.

2    Q.   Did you interview him?

3    A.   No.

4    Q.   All right.

5          How about "Ghassan Dahdoli" or delo (phonetic)?

6    That's No. 7.

7          I may be mispronouncing the name.

8    A.   Yes, sir.  I can't help you there, either.

9    Q.   Okay.

10         THE COURT:  Mr. Moffitt or Mr. Ferguson, can I ask

11   one of you for an extra copy of this for Joe, please, so he

12   can get all these names?

13         MR. MOFFITT:  I only got the one copy Mr. Ferguson

14   gave me.

15         THE COURT:  Mr. Ferguson, do you have an extra copy?

16         (Document tendered.)

17         THE COURT:  Thank you.

18         I am sorry, Mr. Moffitt.  Go ahead.

19         MR. MOFFITT:  That's quite all right.

20         THE COURT:  Trying to make the record look better.

21   BY MR. MOFFITT:

22   Q.   There was a phone number and a fax number for him, right?

23   A.   Yes, sir.

24   Q.   And I guess this is an attempt to spell "Tucson."  That's

25   what I came up with.

Bray - cross

1   A.   I would agree with you.

2   Q.   Seems to me that's the area code for that.

3        Did you make any effort to interview him?

4   A.   No.

5   Q.   Okay.

6        And No. 8, that's Los Angeles, right?  "Ghassan

7   El-A'she" or A'she?

8   A.   Correct.

9   Q.   With a hyphen in between?

10  A.   Uh-huh.

11  Q.   You have both a phone number and a fax number, correct?

12  A.   Correct.

13  Q.   Any effort to interview him?

14  A.   Ghassan El-A'she, as I understand, was, again, part of a

15  Dallas investigation.  I believe he had also been indicted on

16  an InfoCom investigation that concerned financial dealings

17  with Mousa Abu Marzook.

18  Q.   So, you knew that somebody was suggesting that he had

19  information concerning Mousa Abu Marzook, correct?

20  A.   Yeah, that would be a safe assumption.

21  Q.   Did you make any effort to get him to cooperate at all in

22  your investigation?

23  A.   I don't know what his status was -- his legal status.  As

24  far as whether or not he was willing to -- I'm sure he had

25  representation.

Bray - cross

1    Q.  Did you make any effort to get him to cooperate in your

2    investigation?

3    A.  Not that I recall.

4    Q.  "Isam El-Saraj."  Do you see that?

5    A.  Yes, sir.

6    Q.  Washington, right?

7    A.  Yes.

8    Q.  And, then, there's a 703 phone number, correct?

9    A.  Yes, sir.

10   Q.  You know 703 is a Virginia area code, correct?

11   A.  Correct.

12   Q.  All right.

13           Did you speak with him?

14   A.  No.

15   Q.  Did you make any effort to speak with him?

16   A.  No.

17   Q.  All right.

18           "Omar El-Sobani," East Lansing.  There is a phone

19   number there, correct?

20   A.  Yes, sir.

21   Q.  Did you make any effort to contact Mr. Saboni?

22   A.  No.

23   Q.  No. 11 is "Ismael Jaber," right?

24   A.  Yes, sir.

25   Q.  Chicago --

1  A.  Yes, sir.

2  Q.  -- right?

3       Phone number and fax number, correct?

4  A.  Correct.

5  Q.  Did you try to contact him?

6  A.  I don't recall.  I don't believe so.  The name's not

7  familiar.

8       MR. FERGUSON:  Judge, let me see if I -- I don't want

9  to steal Mr. Moffitt's thunder here, but --

10      MR. MOFFITT:  Why did you get up if you didn't want

11  to steal my thunder?

12      (Laughter.)

13      MR. FERGUSON:  I think we can save us some time and

14  some trouble.

15      There were not efforts to -- with the exception of

16  Yassir Bushnaq and Ismael El-Barasse and Fawaz Mushtaha, there

17  were not efforts undertaken to contact, interview in this

18  investigation any of these other people, either because they

19  could not be found; they were the subject of investigation;

20  they had charges pending on them; or, because we simply don't

21  confront everybody that we're looking at.  No effort was made

22  except for those three people.

23      THE COURT:  Mr. Moffitt?

24      MR. MOFFITT:  Now, the problem is that I have asked

25  him several questions.  He said he made no effort.  He didn't

Bray - cross

1  say he made no effort because they had charges on them.  He

2  mentioned one or two people that may have had charges.  Then

3  that prompted another series of questions from me.  I'd like

4  to continue.

5          THE COURT:  You may continue.

6          MR. MOFFITT:  Thank you.

7  BY MR. MOFFITT:

8  Q.  We were at Isam El-Saraj, right?  With the 703 phone

9  number, correct?

10  A.  No, I think we had gotten past him, actually.  We were

11  down to number --

12          THE COURT:  11.

13  BY THE WITNESS:

14  A.  -- 11.

15  BY MR. MOFFITT:

16  Q.  Okay.

17          Ismael Jaber, right?

18  A.  Yes, sir.

19  Q.  Right here in Chicago was his phone number and fax number,

20  right?

21  A.  Yes, sir.

22  Q.  What did you do with respect to contacting him?

23  A.  I don't believe we attempted to contact him at all.

24  Q.  What kind of charges did he have against him?

25  A.  I'm not aware of any charges against him.

Bray - cross

1    Q.  Okay.

2          Was there any impediment at all, that you were aware

3    of, in contacting Mr. Jaber?

4    A.  No, other than not having -- other than this list -- a

5    backdrop for any reason to give him a call.

6    Q.  Okay.

7          Now, "Mohammad Abbas" has a phone number, correct?

8    801-583- --

9    A.  Correct.

10   Q.  -- 3325, right?

11   A.  Correct.

12   Q.  Did you phone Mr. Mohammad Abbas?

13   A.  No.

14   Q.  Okay.

15          Did you attempt to contact him in any way?

16   A.  No.

17   Q.  Okay.

18          Was he under criminal indictment?

19   A.  Not that I'm aware.

20   Q.  Okay.

21          How about "Fawaz Mushtaha"?

22   A.  Mushtaha.

23   Q.  Mushtaha.

24   A.  Yes.

25   Q.  Thank you.

Bray - cross

108

1    A.   You're welcome.

2    Q.   He has a phone number.  Another 703 number, correct?

3    A.   Correct.

4    Q.   Did you contact him?

5    A.   He was subject of FBI investigation.

6    Q.   Oh, I see.

7         Was he subpoenaed before your grand jury?

8    A.   No.

9    Q.   Where was the investigation?

10   A.   I'm trying to think if it was out of our Washington field

11   office.  And perhaps it may have had ties to another field

12   office.

13   Q.   I see.

14        Did you make any efforts to see if he would cooperate

15   in your investigation?

16   A.   I'm trying to remember.  I think he may have left the

17   country.

18   Q.   You're not sure?

19   A.   I'm pretty sure he did, but --

20   Q.   When did he leave the country?

21   A.   That, I don't recall.

22   Q.   All right.

23        Do you recall whether it was before or after you

24   began your investigation?

25   A.   No -- I would surmise it was after.

Bray - cross

1   Q.   Okay.

2        "Izzat Mansour," okay?  You see that name?

3   A.   Yes, sir.

4   Q.   And there are -- and there's a fax number and a phone

5   number, correct?

6   A.   Correct.

7   Q.   Did you contact him?

8   A.   I do not believe so.  The name is very familiar to me;

9   but, sitting here right now, I can't put into context where.

10  I don't believe we attempted to contact him, but --

11  Q.   Was it --

12  A.   -- the name is familiar to me.

13  Q.   Well, was he under charges or --

14  A.   I don't think so, no.

15  Q.   Okay.

16       "Hamood Salem."  You have a number for him, as well,

17  correct?

18  A.   Yes, sir.

19  Q.   Stillwater, Oklahoma, right?  405?

20  A.   Yes, I see "Stillwater."  I --

21  Q.   All right.

22       You're not familiar with the area code for Oklahoma?

23  A.   No, sir, I'm not.

24  Q.   Okay.

25       Did you make an effort to contact him?

Bray - cross

1    A.   No.

2    Q.   What charges was he under that didn't -- that you didn't

3    want to contact him?

4    A.   I'm not aware of any charges he was under.

5    Q.   Did you issue a subpoena for him to the grand jury?

6    A.   No.

7    Q.   "Nader Jawad," Washington, D.C., right -- or Washington?

8    A.   Yes, sir.

9    Q.   Another 703 phone number?

10   A.   Yes, sir.

11   Q.   Did you contact him?

12   A.   No.

13   Q.   What charges was he under?

14   A.   I'm not aware of any.

15   Q.   Did you subpoena him before your grand jury?

16   A.   No.

17   Q.   "Rasheed Qarman," Alabama, right?

18   A.   Yes, sir.

19   Q.   Phone number there, too?

20   A.   Correct.

21   Q.   Okay.

22         Did you contact him?

23   A.   No, not that I'm aware of.

24   Q.   What charges was he under?

25   A.   None that I'm aware of.

1    Q.   Okay.

2              Now, "Shukri Abu Baker," right?

3    A.   Yes, sir.

4    Q.   Indianapolis?

5    A.   Yes, sir.

6    Q.   Now, you knew that was wrong?

7    A.   Correct.

8    Q.   Because Shukri Abu Baker was living in Dallas, Texas,

9    right, at that time?  Or Fort Worth or Dallas?

10   A.   I believe so, correct.  You're correct.

11   Q.   Right?

12   A.   Yes.

13   Q.   And you knew him to be associated with the Holy Land

14   Foundation, correct?

15   A.   Correct.

16   Q.   And you also knew that -- well, let me ask you this:  When

17   you were beginning your grand jury investigation, amongst the

18   things that you listened to was the Philadelphia -- what was

19   described as the Philadelphia meeting, right?

20   A.   Yes.  I mean, there were recordings of the meeting in

21   Philadelphia.  The actual translation of that meeting was

22   conducted by linguists at our Dallas field office.

23   Q.   But when your investigation started in 2002, that had

24   already been translated; had it not?

25   A.   There were probably summary translations of it; but, no,

Bray - cross

112

1   not in verbatim.  I'm not aware.

2   Q.  Well, that was -- that meeting occurred when?

3   A.  October of 1994.

4   Q.  '94.

5        So, it was in all of that evidence that was either in

6   Mississippi or in Washington and had sat there for all those

7   years, right?

8   A.  Or Philadelphia.

9   Q.  Oh, Philadelphia.

10        There was evidence in Philadelphia, too?

11  A.  Yes, sir.

12  Q.  Okay.

13        And how did the evidence get to Philadelphia?

14  A.  That's where the meeting was.

15  Q.  Oh, okay.

16        So, it was maintained in the Philadelphia field

17  office?

18  A.  Yes, sir.

19  Q.  All right.

20        When you started your investigation, you must have

21  read the summaries, right, at least?

22  A.  Yes, sir.

23  Q.  And, so, you were aware that Shukri Abu Baker was at the

24  Philadelphia meeting?

25  A.  Correct.

Bray - cross

1   Q.  You were also aware from the wiretap -- well, let me --

2   you had a bug at the meeting, right?

3   A.  Yes, sir.

4   Q.  The FBI had a bug in the Philadelphia meeting?

5   A.  Yes.

6   Q.  So, it heard most, if not all, of what was going on in the

7   Philadelphia meeting in 1993?

8   A.  Yes.  As with any meeting, there were overlapping

9   conversations; but, yes.

10  Q.  And, so, you knew -- you also had at that time a wiretap

11  on Dr. Ashqar's telephone, right?

12  A.  Yes.

13  Q.  So, you knew that there were conversations between

14  Dr. Ashqar and Shukri Abu Baker, right?

15  A.  Correct.  And I believe there was one conversation about

16  whether or not to invite Mohammad Jarad to the Philadelphia

17  meeting.

18  Q.  There was also a conversation about inviting Yassir

19  Bushnaq, right?

20  A.  I don't recall.

21  Q.  Okay.

22          When did you become aware of the Dallas or Fort Worth

23  or Texas investigation?

24  A.  That would have probably been in 2002.

25  Q.  When you initiated your investigation?

1   A.   I don't remember if at the time I initiate- -- well, at

2   the time I was brought onboard this investigation.  But it

3   would have been probably shortly thereafter.

4   Q.   Well, in fact, evidence was shared between these two

5   investigations; was it not?

6   A.   Yes.  I mean, Dallas certainly had an interest in some of

7   the evidence that we had.  As a matter of fact, I believe in

8   their trial, evidence from the Ashqar search and also

9   evidence -- the Philadelphia meeting was entered as evidence

10  in their trial.

11  Q.   How about evidence from the El-Barasse search?

12  A.   Yes, that, as well.

13  Q.   All right.

14          So, you and Dallas -- or Fort Worth -- were

15  proceeding along parallel lines, correct?

16  A.   Things overlapped.  I wouldn't say they were parallel

17  lines.

18  Q.   Okay.

19          And I'm sure that you had discussions with them,

20  correct, about your investigation and their investigation?

21  A.   From time to time.

22  Q.   And decisions about who to subpoena and talk to sometimes

23  were made in discussions with them, correct?

24  A.   Correct.

25  Q.   All right.

Bray - cross

1      And I'm sure what information you got that you

2  thought was relevant to their investigation, you gave them;

3  and, what information they got that you thought was -- they

4  thought was -- relevant to your investigation, they gave you,

5  correct?

6  A.   To the best of our abilities, yes, we shared information.

7  Q.   All right.

8      And the Dallas/Fort Worth investigation was the

9  investigation into Holy Land, correct?

10  A.   Correct.

11  Q.   And that's the case that resulted recently in the hung

12  jury, correct?

13  A.   Correct.

14  Q.   All right.

15      Now, Shukri Abu Baker was a target of their

16  investigation?

17  A.   Yes.

18  Q.   When did you become aware of that?

19  A.   It would have been around the same time.  I knew -- I

20  would say 2002.

21  Q.   And Abdelhaleem Ashqar was a target of your investigation?

22  A.   Correct.

23  Q.   And he was -- he remained a target of your investigation,

24  whether he spoke to you or not; did he not?

25  A.   Correct.

Bray - cross

1    Q.   In fact, when he came to the grand jury, he was informed

2    that he was, indeed and in fact, a target of the

3    investigation, correct?

4    A.   I'm not so sure in so many words.  I'd have to go back and

5    look.

6    Q.   Okay.

7         And essentially what would happen with the immunity

8    is only statements that he made could not be used against him,

9    directly or indirectly, if he made any statements, right?

10   A.   Truthful statements.

11   Q.   Truthful statements.

12   A.   Uh-huh.

13   Q.   He never lied to you about anything, did he?

14   A.   I'm not aware that he did, no.

15   Q.   Okay.

16        But he could still be prosecuted with evidence that

17   was independent of his statements, right?

18   A.   Yes.  I mean, I don't think -- I've seen the term -- I'm

19   not a lawyer -- "transactional immunity."  I believe --

20   Q.   He wasn't given transactional immunity.  He was given only

21   use immunity on under 6001, 6002, correct?

22   A.   That, I couldn't answer.

23   Q.   All right.

24        Were you aware of whether or not he had been given

25   transactional immunity?

Bray - cross

1  A.  Well, I was aware of that.  I'm -- I'm -- when I said I'm

2  not aware, I'm -- you're talk -- citing statutes or --

3  Q.  Okay.

4       Well, do you know whether he was given transactional

5  immunity or not?

6  A.  He was not given transactional immunity.

7  Q.  All right.

8       So, he could still have been prosecuted?

9  A.  Correct.

10  Q.  Okay.

11       And did you make any effort to contact Shukri Abu

12  Baker?

13  A.  No, I did not.

14  Q.  And that was because of his status in the Dallas

15  investigation?

16  A.  Yes.

17  Q.  Did you make any attempt to see if Shukri Abu Baker was

18  willing at all to cooperate?

19  A.  I did not.

20  Q.  Okay.

21       "Mohamad Abu Ameriyeh," okay?  That's -- and I

22  butchered that name.

23  A.  You did as well as I would.

24  Q.  Okay.

25       Had a phone number for him, right?

Bray - cross

1   A.   Yes, sir.  It looks like a Los Angeles number.

2   Q.   All right.

3            Did you contact him?

4   A.   I did not.

5   Q.   What impediment was he acting under?  Was he being

6   charged?  Was he being a target of anything?

7   A.   I'm not aware of any.

8   Q.   Okay.

9            "Jamal Said."  Chicago, right?

10  A.   Yes, sir.  Yes, sir.

11  Q.   Do you know where Jamal Said was in 2002 when you began

12  your investigation?

13  A.   Yes, sir.

14  Q.   Where was he?

15  A.   Chicago.  Bridgeview.

16  Q.   All right.

17           Did you subpoena him?

18  A.   No.

19  Q.   Did you talk to him?

20  A.   No.

21  Q.   Any impediment in talking to him?

22  A.   Not that I can answer to.

23  Q.   What do you mean not that you can answer me.  I don't know

24  what that means, sir.  Why can't you answer?

25           MR. FERGUSON:  Can I have a sidebar, Judge?

Bray - cross

1    BY MR. MOFFITT:

2    Q.   I want to know in 2002, when you began your investigation,

3    and through 2004, were you aware of any impediment in talking

4    to this man?

5              THE COURT:   Sidebar?

6              MR. FERGUSON:   Yeah.

7              THE COURT:   Yes, we can have a sidebar.

8              (Proceedings had at sidebar, consisting of Pages 120

9         through 125, were ordered sealed by the Court:)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bray - cross

1          (Proceedings had in open court:)

2          THE COURT:  Mr. Moffitt, you have indicated you have

3    approximately an hour left on your cross-examination.

4          Is that correct, sir?

5          MR. MOFFITT:  Yes, ma'am.

6          THE COURT:  Okay.

7          In light of that, we will take about an hour break

8    for lunch and pick up here at about five after 2:00.

9          We will not be able to go this evening past 4:00

10   o'clock.  So, I hope we can conclude everything by 4:00

11   o'clock.  If not, I will give you a date next week to come

12   back and conclude this.  But my hope -- and I think it is your

13   hope, as well -- is to conclude things by 4:00 o'clock today.

14          So, we will break until about five after 2:00.

15          (Whereupon, a recess was taken at 1:06 o'clock p.m.,

16      until 2:05 o'clock p.m., of the same afternoon.)

17

18

19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    UNITED STATES OF AMERICA,          ) Docket No. 03 CR 978
                                         )
 4                         Plaintiff,    )
                                         )
 5               vs.                     )
                                         )
 6    ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, ) Chicago, Illinois
                                         ) November 8, 2007
 7                         Defendant.    ) 2:05 o'clock p.m.

 8              TRANSCRIPT OF PROCEEDINGS - SENTENCING
                  BEFORE THE HONORABLE AMY J. ST. EVE
 9
      APPEARANCES:
10
      For the Plaintiff:        HON. PATRICK J. FITZGERALD
11                              United States Attorney
                                BY:  MR. JOSEPH M. FERGUSON
12                                   MR. REID J. SCHAR
                                     MS. CARRIE E. HAMILTON
13                              219 S. Dearborn St., Suite 500
                                Chicago, Illinois  60604
14
      For Deft. Ashqar:        MR. WILLIAM MOFFITT
15                              11582 Greenwich Point Road
                                Reston, Virginia  20194
16
                                MR. KEITH ALLAN SPIELFOGEL
17                              20 North Clark Street, Suite 1200
                                Chicago, Illinois  60602
18
      Also Present:            S/A JILL PETTORELLI, FBI
19                              MS. KELLY RICE, Probation

20    Court Reporter:          MR. JOSEPH RICKHOFF
                                Official Court Reporter
21                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
22                              (312) 435-5562

23              * * * * * * * * * * * * * * * * * *

24                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
25                   TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1            THE CLERK:  03 CR 978, U.S. vs. Abdelhaleem Ashqar.

 2            THE COURT:  Mr. Moffitt, are you ready?

 3            MR. MOFFITT:  Yes, ma'am.

 4            You may continue.

 5            MR. MOFFITT:  Okay.

 6        DAVID BRAY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 7                    CROSS-EXAMINATION - Resumed

 8   BY MR. MOFFITT:

 9   Q.  I don't want to talk about, I believe, Jamal Said anymore,

10   okay?

11   A.  Yes, sir.

12   Q.  All right.

13            And I'm going to try to short-circuit this a little

14   bit, but I want to talk to you about "Anan El-Karmi."

15            Do you see that?

16            THE COURT:  Is that No. 21?

17            MR. MOFFITT:  21.

18   BY THE WITNESS:

19   A.  Yes, sir.

20   BY MR. MOFFITT:

21   Q.  All right.

22            And his resident city was listed as Chicago, correct?

23   A.  That is correct.

24   Q.  And there was a phone number for him?

25   A.  Yes, sir.
```

Bray - cross

1   Q.   Did you talk to him?

2   A.   I did not talk to him.

3   Q.   Did anybody talk to him?

4   A.   I don't recall.  Again, he's similar to one of the other

5   individuals on the list.  The name is very familiar to me from

6   early on in an investigation.  I would have to go back and

7   look to see whether or not we attempted to locate him, whether

8   any attempts were made to contact him.  I personally do not

9   ever recall trying to talk to him or talking to him.

10  Q.   And he most assuredly was not subpoenaed before the grand

11  jury, correct?

12  A.   Not to my knowledge.

13  Q.   All right.

14       And, of course, we know who Muhammad Salah is, right?

15  A.   Yes, sir.

16  Q.   And his phone number is not even on here, correct?

17  A.   Correct.  And neither is there a city for him, as well.

18  Q.   There's not a city for him, either?

19  A.   Correct.

20  Q.   All right.

21       I'd like to go -- I'll go through a couple of them

22  here.  I want to talk to you about collectively No. 23, which

23  is "Ayman Saraj El-Dien"; No. 24, "Ahmed Agha"; I'm going to

24  pass 25 because I would like to talk to you separately about

25  him; and, I'd like to talk about 26, 27, 28, 29, 30, 31; I

Bray - cross

1    want to pass 32, and I want to pass 33; and, I want to go to

2    34, and I want to pass 35.  Okay?

3         Do you have in your head who we're talking about?

4    A.  (No response.)

5    Q.  After "Muhammad Salah," "Ayman Saraj El-Dien," right?

6    A.  Yes, sir.

7    Q.  Any -- did you do anything with Ayman --

8    A.  Not that -- not that I recall, sir, no.

9    Q.  Any impediment that you're aware of?

10   A.  None that I'm aware of, sir.

11   Q.  All right.

12        Again, No. 24, did you -- Ahmed Agha?

13   A.  Again, no, not that I'm aware of.

14   Q.  Any impediment you're aware of?

15   A.  None that I'm aware of.

16   Q.  Okay.

17        I want to skip to No. 26, okay?

18   A.  Yes, sir.

19   Q.  "Akram El-Kharobe."  Did you talk to him?

20   A.  No, sir.

21   Q.  Any impediment that you're aware of?

22   A.  No.

23   Q.  All right.

24        27, Walid Abu Shakaray (phonetic) or Shakar

25   (phonetic)?

Bray - cross

1   A.   "Sharakh."

2        Yeah, no.

3   Q.   Did you talk to him?

4   A.   Not that I recall, no.

5   Q.   Any impediment?

6   A.   Not that I'm aware of.

7   Q.   Walid Renno?

8   A.   No, sir.

9   Q.   Any impediment that you're aware of?

10  A.   Not that I'm aware of, sir, no.

11  Q.   29 is in Canada.  I'll pass him, okay?

12  A.   Yes, sir.

13  Q.   30, "Hazem El-Eshe."  Do you see that?  L.A.?

14  A.   Yes, sir.

15  Q.   Talk to him?

16  A.   No, sir.

17  Q.   Any impediment that you're aware of?

18  A.   I'm not sure if that's one of the El-Eshes that may have

19  been involved in either -- what I mentioned before, the

20  InfoCom.

21  Q.   All right.

22        Well, there's two El-Eshes.  One's spelled with an

23  "E," one spelled with an "A," 30 and 31?

24  A.   Correct.

25  Q.   How do the people at InfoCom spell theirs?

Bray - cross

132

1    A.  Well, as you can see from No. 8, they're spelled

2    differently.

3    Q.  All right.

4         Now, you --

5    A.  I know that there is a group that is related that their

6    last name is El-Elashi (phonetic).  Like I said, I don't know

7    if these are just the same individuals.  Sometimes --

8    Q.  Well, do you --

9    A.  -- their names are spelled -- like Muhammad, it's spelled

10   different.  I don't know if -- if that's what this case is

11   here.  They're both L.A.

12   Q.  Well, here, 30 is E-l-e; 31 is E-l-a?

13   A.  Correct.

14   Q.  All right.

15        And as you said, up at the top it's spelled

16   E-l-dash-A and with an apostrophe S-h-e, right?

17   A.  Correct.

18   Q.  So, there are three different spellings here?

19   A.  Correct.

20   Q.  And your assumption was that this was Dr. -- a list that

21   Dr. Ashqar had possessed, correct?  This was taken from his

22   home?

23   A.  Yes.

24   Q.  All right.

25        So, he would know the Arabic, right?  He --

Bray - cross

1  A.  Again, I don't know who --

2  Q.  Well, did you --

3  A.  -- created --

4  Q.  -- ever talk to any of these -- those two people?

5  A.  No. 30 and 31?

6  Q.  Yes.

7  A.  No, not that I'm -- not that I recall.

8  Q.  All right.

9        And you're not aware of any impediment as you sit

10 there?

11 A.  Again, as I tried to describe earlier, I'm not sure if

12 they are -- I don't know.

13 Q.  Okay.  All right.

14        34, "Nabeel El-Sadoon."  Talk to him?

15 A.  I don't think so.

16 Q.  Aware of any impediment?

17 A.  No.

18 Q.  Okay.

19        Let's go back to No. 25 --

20        MR. FERGUSON:  Could I have a sidebar?  I'm sorry, we

21 need to re-raise the issue that was discussed at the prior

22 sidebar.

23        MR. MOFFITT:  If it is, if you want to put it on the

24 record right now --

25        MR. FERGUSON:  Yeah.

Bray - cross

134

1          MR. MOFFITT:  -- that's fine.

2          THE COURT:  Okay.

3          (Proceedings had at sidebar, consisting of Pages 135

4     through 137, were ordered sealed by the Court.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings had in open court:)

2          MR. MOFFITT:  We're talking about -- can I go?

3          THE COURT:  You may.

4          MR. MOFFITT:  We're talking about 25, 32 and 33?

5          THE COURT:  Correct.

6          MR. MOFFITT:  Okay.  Just so I know.

7          THE COURT:  Correct.

8    BY MR. MOFFITT:

9    Q.  No. 35 is "Muhammad El-Hanouti"?

10   A.  Yes, sir.

11   Q.  All right.

12          Do you know who he is?

13   A.  I hate to keep repeating this.  His name is familiar to

14   me.

15   Q.  Does it refresh your recollection that he --

16   A.  Again, his name is familiar to me.  More so than some of

17   the other ones that we've gone over.  But as I sit here right

18   now, I would have to go back and look to see where I'm getting

19   that from.

20   Q.  Let me see if this helps you.

21          Did you know that he is the Grand Mufti of

22   Washington, D.C., a religious figure?

23   A.  He may be.

24   Q.  Okay.

25          Your answer to me is that he may be; you don't know?

Bray - cross

136

1   A.  I -- no, I could not tell you for a fact that I know that.

2   Yes.

3   Q.  Did you ever talk to him?

4   A.  No.

5   Q.  And I'm particularly interested in the years 2002 to 2004,

6   when your grand jury was going -- was ongoing.

7        Now, you said some things earlier about monitoring

8   Muhammad Salah's expenditures of money, correct?

9   A.  Yes, sir.

10  Q.  When -- what year was it that Muhammad Salah was declared

11  or was designated?

12  A.  1995.

13  Q.  All right.

14       So, Muhammad Salah was designated two years after

15  this list was taken from Dr. Ashqar's residence?

16  A.  Approximately two years.  It was probably a little less

17  than that.

18  Q.  And the phone records that you had regarding Dr. Ashqar's

19  contacts with Muhammad Salah, you had no phone records that

20  indicated that Dr. Ashqar had any contact with Muhammad Salah

21  after Muhammad Salah had been designated, right?

22  A.  That is correct.

23  Q.  All right.

24       And yet you thought that Mr. -- or Dr. -- Ashqar

25  could give you information about how Muhammad Salah was

1    spending his money after he had been designated, correct?

2    A.   (No response.)

3    Q.   Remember testifying on --

4    A.   Yes, sir.

5    Q.   -- direct today --

6    A.   Yeah.  If you could repeat your question for me again,

7    please?

8    Q.   Sure.

9         Do you remember testifying on direct that you were

10   interested in how Muhammad Salah was spending his money after

11   he had been designated?

12   A.   Yes, sir.

13   Q.   And you remember saying that you thought that Dr. Ashqar

14   would have information concerning how Muhammad Salah was

15   spending his money after he had been designated?

16            MR. FERGUSON:  Judge, I think that mischaracterizes

17   the testimony.

18            THE COURT:  I cannot hear you, Mr. Ferguson.

19            MR. FERGUSON:  That mischaracterizes the testimony.

20            MR. MOFFITT:  All right.  Well, let me do it this

21   way.

22   BY MR. MOFFITT:

23   Q.   You were interested in that.  You talked about that this

24   morning, right?

25   A.   Interested in financial transactions with Muhammad Salah

Bray - cross

138

1  after his designation?

2  Q.  Yes.

3  A.  Yes, sir.

4  Q.  You have no information that indicated that Dr. Ashqar was

5  in communication with Muhammad Salah after he was designated,

6  right?

7  A.  None that I recall, no.  That's correct.

8  Q.  Okay.

9      Now, the grand jury that was investigating, you

10  called members of Muhammad Salah's family to determine how he

11  was spending his money, correct?

12  A.  I don't know that -- to determine how he was spending his

13  money.  Whether or not he was given money by people.

14  Q.  Right.

15      So, you were talking directly -- you had information

16  from members of his family about the information about

17  Muhammad Salah and his sources of income?

18  A.  Yes.  Certain members of his families were -- did appear

19  before the grand jury and asked questions concerning whether

20  or not they give him money.

21  Q.  How many certain members of his family?

22  A.  I remember at least two, possibly three.

23  Q.  Okay.

24      So, you could call people other than Dr. Ashqar to

25  find that information out, right?

Bray - cross

139

1    A.  Correct, certainly.

2    Q.  Okay.  Thank you.

3         Now, you talked about USAR.  Remember that?

4    A.  Yes, sir.

5    Q.  And what was USAR?

6    A.  UASR?

7    Q.  UASR.  I'm sorry.

8    A.  That's all right, no.

9         United Association for Studies and Research.

10   Q.  And you said that both Dr. Ashqar and Muhammad Salah had

11   worked there?

12   A.  Correct.

13   Q.  All right.

14        And how did you know that?

15   A.  I believe Dr. Ashqar said in the grand jury that he worked

16   there.

17   Q.  All right.

18        He said -- what year did Dr. Ashqar work there?

19   A.  I don't specifically recall the year.  I think it was

20   obviously after he had moved from Mississippi to Virginia.

21   Q.  Well, what year --

22   A.  That would have --

23   Q.  Well, he was --

24   A.  Sometime during the latter part of the 1990s.

25   Q.  All right.

Bray - cross

1      When he was called before the grand jury, he was no

2   longer working at UASR, right?

3   A.  That is correct.

4   Q.  He was working where when he was called before the grand

5   jury?

6   A.  I believe he was working at Howard University, Washington,

7   D.C.

8   Q.  He was a professor?

9   A.  Yes, sir.

10  Q.  Okay.

11      How long did he work at UASR?

12  A.  Off the top of my head, I don't recall.

13  Q.  Do you know whether he was working there at the same time

14  allegedly Mr. Salah was working there?

15  A.  I would not think he would have been, no.

16  Q.  Okay.

17      And who was it that was the principal of UASR

18  initially?

19  A.  Both Mousa Abu Marzook and Yousif Saleh.

20  Q.  Okay.

21      And where was Yousif Saleh in 2002?

22  A.  In Virginia.

23  Q.  I see.

24      Did you call Yousif Saleh before your grand jury?

25  A.  No.

1    Q.   Okay.

2         And, of course, Mr. Marzook was -- had left the

3    country by then?

4    A.   Yes, sir.

5    Q.   He -- did you talk to Yousif Saleh?

6    A.   No, sir.

7    Q.   Okay.

8         And how long had Yusif Saleh been involved with UASR?

9    A.   Since its inception.

10   Q.   And when was that?

11   A.   Around 1990.

12   Q.   And, so, by 2002, when you began your investigation,

13   Yousif Saleh had had 12 years of a relationship with this

14   entity, correct?

15   A.   Yes.

16   Q.   And how long a duration was allegedly Dr. Ashqar's

17   relationship with this entity?

18   A.   Again, I don't know the period of time that he worked for

19   UASR.

20   Q.   It certainly wasn't 12 years, right?

21   A.   No, sir, I don't believe so.

22   Q.   All right.

23        And he certainly was not the originator of UASR,

24   right?

25   A.   Correct.

Bray - cross

142

1   Q.  And you were aware of who that person was?

2   A.  Yes, sir.

3   Q.  You were aware of the nature of the relationship between

4   that person and UASR, correct?

5   A.  Yes.

6   Q.  And if you wanted information about UASR, he's a likely

7   candidate to give you information, correct?  The person who

8   originated it and had been there for 12 years?

9   A.  Yes.

10  Q.  But you didn't call him?

11  A.  That is correct.

12  Q.  All right.

13          MR. MOFFITT:  Bear with me a second.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Certainly.

16          (Brief pause.)

17  BY MR. MOFFITT:

18  Q.  You talked about Mr. Al-Khatib; is that right?

19  A.  Yes, sir.

20  Q.  What was his full name?

21  A.  Nasser.  I believe Nasser Al-Khatib.

22  Q.  All right.

23          And where was Nasser Al-Khatib in 2002?

24  A.  I don't specifically recall.

25  Q.  Was he in the United States?

Bray - cross

143

1   A.   I'm not sure.

2   Q.   Did you call Nasser Al-Khatib?

3   A.   No.

4   Q.   Now, he -- am I right, your belief was he was Mousa Abu

5   Marzook's secretary at one point?

6   A.   Well, he -- he -- yes.  Assistant, secretary.

7   Q.   But that would mean that there was a -- it was his

8   assistant.  What do you mean by his assistant?

9   A.   Well, it seemed like he helped him in his affairs --

10  financial affairs.  He shows up on bank records.

11  Q.   Shows up on bank records?

12  A.   Bank accounts.

13  Q.   Checks?

14  A.   Yes.

15  Q.   Accounts, correct?

16  A.   Yes, sir.

17  Q.   Did you make any effort to call him in front of the grand

18  jury?

19  A.   I do not believe we did, no.

20  Q.   Now, he would have been pretty close to Mr. Marzook,

21  right?

22  A.   Absolutely.

23  Q.   And inasmuch as he was writing checks and doing things

24  like that, he would have been a great source of information

25  for you, right?

Bray - cross

144

1    A.   Yes.

2    Q.   Okay.

3            Do you know where he is today?

4    A.   No.

5    Q.   You're the case agent in this case and this grand jury

6    investigation?

7    A.   I was the case agent.

8    Q.   Oh, okay, you were.

9            Now, we talked about Mr. El-Barasse, right?

10   A.   Yes, sir.

11   Q.   All right.

12           Were you aware of Mr. El-Barasse in 2002?

13   A.   Yes, sir.

14   Q.   In fact, his home had been searched, correct?

15   A.   His home was searched not in 2002, but in 2004.

16   Q.   In 2004.

17           Was it searched before or after your investigation

18   had ended?

19   A.   I'm sorry?

20   Q.   Was it searched before or after your investigation had

21   ended?

22   A.   During the time of our investigation.

23   Q.   So, your investigation was going on at the same time there

24   was a search of Mr. El-Barasse's home?

25   A.   Correct.

Bray - cross

1  Q.  And I'm sure -- and under whose auspices was Mr.

2  El-Barasse's home searched?  I mean, was it a particular

3  agency and a particular place?

4  A.  It was a court-authorized search warrant.  The FBI

5  conducted the search.

6  Q.  The same FBI that you're a member of?

7  A.  The one and the same.

8  Q.  Okay.

9         And were you aware at the time of the search during

10  the course of your investigation that the search was going to

11  go on?

12  A.  Yes, sir.

13  Q.  So, you knew before the end of your investigation and

14  before the search went on that El-Barasse's home was going to

15  be searched, right?

16  A.  I knew his home was going to be searched, yes.

17  Q.  Now, when it was searched, there was information that was

18  a product of that search, right?  Stuff was seized?

19  A.  Yes, sir.

20  Q.  And, of course, you had a chance to look at the stuff that

21  was seized, correct?

22  A.  Yes, sir.

23  Q.  And because it was seized from his home, it was available

24  to you to confront Mr. El-Barasse with it, correct?

25  A.  Yes, sir.

Bray - cross

1    Q.  Was Mr. El-Barasse called to the grand jury?

2    A.  I remember a material witness warrant was served for

3    Mr. El-Barasse.  I don't think -- he -- I don't recall he ever

4    appeared before the grand jury.

5    Q.  Well, was he served with a material witness warrant?

6    A.  Yes, sir.

7    Q.  All right.

8            Was he held as a material witness?

9    A.  I don't know if he was held.

10   Q.  All right.

11           Well, was he placed on bond --

12   A.  I don't --

13   Q.  -- as a material witness?

14   A.  I don't recall.

15   Q.  Was he called before your grand jury?

16   A.  Not that I recall.

17   Q.  Was he confronted with the materials that you had obtained

18   from his home?

19   A.  No.

20   Q.  You described him as an archivist?

21   A.  Yes, sir.

22   Q.  Of Hamas, correct?

23   A.  Yes, sir.

24   Q.  That is the same role that Dr. Ashqar was described as

25   having been in his trial, correct?

Bray - cross

147

1    A.   Correct.

2    Q.   Now, where was Mr. El-Barasse in 2004?

3    A.   Virginia and Maryland.

4    Q.   And you knew where he was?

5    A.   Not until he was arrested.

6    Q.   And when was he arrested?

7    A.   I think it was the day after our indictment.

8    Q.   Well, let me see if I understand it.  His home was

9    searched before your indictment was returned?

10   A.   No, it was not searched before our indictment was

11   returned.

12   Q.   When was it?

13   A.   Several days after our indictment was returned.

14   Q.   I see.

15        You knew of Mr. El-Barasse before your indictment was

16   returned, didn't you?

17   A.   Yes, sir.

18   Q.   What efforts did you make to subpoena him before your

19   grand jury before your indictment was returned?

20   A.   Again, I think back at the time, we -- I was under the

21   impression he was not in the United States.

22   Q.   Well, where did you get that impression?

23   A.   At the top -- I don't recall.

24   Q.   All right.

25        Now, you talked about two gentlemen that was

Bray - cross

1    subpoenaed that had problems with recollection, correct?

2    A.  Yes, sir.

3    Q.  All right.

4         Who were they, again, please?  And let's talk about

5    them individually, one by one.

6    A.  Anwar Hamdan.

7    Q.  Uh-huh.

8    A.  Who was in Louisiana.

9    Q.  All right.

10        Let's talk about Mr. Hamdan.  Mr. Hamdan came and

11   actually appeared before your grand jury?

12   A.  No.

13   Q.  Oh, he wasn't called to appear before your grand jury?

14   A.  Not that I recall.  I know we went -- another agent went

15   to interview him.

16   Q.  I see.

17        Went to interview him?

18   A.  And I don't recall if they served him with a grand jury

19   subpoena at the time or not.

20   Q.  All right.

21        Do you know whether he appeared before your grand

22   jury?

23   A.  No.

24   Q.  And when the agent went to visit him, did the agent have

25   an interview with him?

Bray - cross

149

1  A.  I believe so, yes.

2  Q.  And it was in the course of that interview that you said

3  he had a failure of recollection?

4  A.  Yes, among other things.

5  Q.  All right.

6          Now, lying to a federal agent is a violation of 18

7  U.S.C. 1001; is it not?

8  A.  Yes.

9  Q.  And you believed that he was lying when he said he had a

10 failure of recollection, correct?

11 A.  I believe so, yes.

12 Q.  All right.

13         But you never called him before the grand jury to see

14 if a grand jury subpoena would loosen his tongue, correct?

15 A.  I know he left the country.

16 Q.  You never called him before a grand jury to see if a grand

17 jury subpoena would loosen his tongue, correct?

18 A.  Again, I wasn't the agent handling that aspect.  So, I

19 don't know if he was served with a federal grand jury subpoena

20 and called to appear, had an appearance date later and left

21 the country --

22 Q.  Oh, you mean --

23 A.  -- in lieu of appearing.  I just don't recall whether or

24 not the grand jury subpoena was given to him.

25 Q.  But you're here as the case agent.

Bray - cross

150

1    A.  I'm not -- I was the case agent during a time.

2    Q.  And you actually knew today -- because you went over this

3    testimony with my colleague here (indicating) who didn't want

4    to steal my thunder, Mr. Ferguson, you knew today he was going

5    to ask you about this gentleman, correct?

6    A.  I knew he was going to ask me about other people that --

7    Q.  You knew --

8    A.  -- we --

9    Q.  -- he was going to ask about this particular gentleman,

10   right?

11   A.  Yes.

12   Q.  And you didn't determine whether or not he was ever called

13   before the grand jury?  You didn't go look?

14   A.  No.

15   Q.  And you also knew that somebody like me was going to

16   cross-examine you, right?

17   A.  Yes, sir.

18   Q.  Okay.

19        But you didn't look about this particular gentleman?

20   A.  That is correct.

21   Q.  All right.

22        Now, it is fair to say that he was not the first

23   human being who when interviewed by the FBI didn't remember

24   something or said that they didn't remember, right?

25   A.  That is correct.

Bray - cross

151

1    Q.   That happens in investigations all the time?

2    A.   Yes, sir.

3    Q.   And a lot of times after that happens, people then get

4    issued grand jury subpoenas, correct?

5    A.   Correct.

6    Q.   Okay.

7         Who is the other person that you talked about who had

8    gotten a grand jury subpoena that you had a problem -- let me

9    finish with this -- the first gentleman.

10        What was his name, again?

11   A.   Anwar Hamdan.

12   Q.   Hamdan.  All right.

13        Was Anwar Hamdan indicted, because of his failure of

14   recollection, for obstruction of justice?

15   A.   No.

16   Q.   Now, who is the next gentleman that we were talking about?

17   Is that Mr. Alwan?

18   A.   Sharif Alwan?

19   Q.   Yeah, is that the other person?

20        Who else did you say?  You said two people.

21   A.   We mentioned Sharif Alwan.  I mean, I've mentioned a lot

22   of people.  I'm not --

23   Q.   You don't remember what you said this morning?

24   A.   No, I remember.  That's not what I said.  I said I've

25   mentioned a lot of people.  You said I mentioned two people.

1    Q.  Well, I'm talking about people that were subpoenaed before

2    the grand jury that had failures of recollection.  I believe

3    that was my question.

4    A.  Yes, sir.  And since you phrased it that way, I now

5    remember.

6    Q.  Okay.  I'm glad I could help.

7    A.  Thank you.

8    Q.  Who was that second person?

9    A.  Mohammad Jarad.

10   Q.  Mohammad Jarad.  Okay.

11          Now, where did Mr. Jarad live?

12   A.  Where did he live?

13   Q.  Yes.

14   A.  Chicago.

15   Q.  So, he was right down the street, huh?

16   A.  Yes, sir.

17   Q.  Okay.

18          And he was called before the grand jury?

19   A.  Yes, sir.

20   Q.  And he had a failure of recollection?

21   A.  What appeared to me, reading the transcripts of the grand

22   jury, to be a failure of memory, yes.

23   Q.  All right.

24          But he was called and had this failure of memory.

25   Did you have any discussions with anybody about the fact that

1   he had had this failure of memory?

2   A.  Yes.

3   Q.  Did you make an effort to determine whether people thought

4   it was a real failure of memory or whether he was still hiding

5   something?

6   A.  Yes.

7   Q.  All right.

8          And what was the consensus?

9   A.  That he was deliberately being evasive.

10  Q.  All right.

11         And was he indicted for obstruction of justice

12  because of his deliberate evasion?

13  A.  No, he was not.

14  Q.  So, you thought he was lying, right?

15  A.  Yes.

16  Q.  Okay.

17         He didn't just remain silent, he actually

18  affirmatively lied to you?

19  A.  Yes.  Well, not to me.

20  Q.  Well, to the grand jury?

21  A.  Yes.

22  Q.  Because lying to you is one thing; lying to a grand jury

23  is a much bigger thing, right?

24  A.  Yes.

25  Q.  Okay.

Bray - cross

154

1          Now, you talked about Mr. Boulus, right?

2     A.  Yes, Jawad Boulus -- Boulus.

3     Q.  Now, Jawad Boulus -- and you help me if I'm wrong -- he is

4     a lawyer in Israel, right?

5     A.  Yes, sir.

6     Q.  Okay.

7          And you are aware, certainly, that he has represented

8     people in Israel regarding Hamas who were alleged to have been

9     Hamas members in Israel?

10    A.  Yes.

11    Q.  Has Mr. Boulus ever been to the United States?

12    A.  I believe he may have.

13    Q.  Do you remember when?

14    A.  Not exactly.  It may have been early 2000.

15    Q.  Okay.  Early 2000.

16         But certainly before your investigation began?

17    A.  It may have been after the investigation began.

18    Q.  Okay.

19    A.  I don't -- I don't recall for sure.

20    Q.  If it was after the investigation began, did you attempt

21    to serve a subpoena on him?

22    A.  Not that I recall, no.

23    Q.  And did you get any information from the Israelis

24    regarding Mr. Boulus?  And I mean in the course of your

25    investigation, not just you personally.

1    A.   Not that I recall.  I don't know if he was mentioned in

2    any confessions that were obtained by Israeli authorities.  It

3    wasn't like they -- I don't recall ever them providing me

4    specifically directly with information.

5    Q.   Were you exchanging information with the Israelis?

6    A.   To a degree, yes.

7    Q.   Okay.

8         Now, you do know that the first time anybody had any

9    contact with Dr. Ashqar was when from the FBI?

10   A.   That would have been in the early 1990s.  19- -- I don't

11   know if it was as early as 1992/'93 time period.

12   Q.   And what was Dr. Ashqar -- what was happening in

13   Dr. Ashqar's life when he was contacted by the FBI?

14   A.   He was a student at the University of Mississippi.

15   Q.   And you are aware that the first people that were

16   contacted regarding Dr. Ashqar were people in the Foreign

17   Student Office at the University of Mississippi, correct?

18   A.   First people contacting him?

19   Q.   Yes.

20        Do you remember a woman named Nancy Rogers?

21   A.   Yes.

22   Q.   And she, in fact, testified that the FBI had come to her

23   office and contacted her about Dr. Ashqar?

24   A.   I wasn't here for her testimony; but, yes, I am familiar

25   with who she is.

Bray - cross

156

1   Q.  And you were aware that she testified under oath that when

2   asked about why the FBI was interested in Dr. Ashqar, she was

3   told because it was a result of the Israelis?

4           You're aware that she testified that?

5   A.  No, I'm not.

6   Q.  You mean these gentlemen here (indicating) sitting here,

7   and this young lady, didn't tell you about that?

8   A.  No.

9   Q.  Okay.

10          And you were aware also, I assume, that Dr. Ashqar

11  had continually expressed concern about providing information

12  that would be used by the Israelis?

13  A.  Yes.  I think that served as a basis for his refusal to

14  comply with the Judge's order --

15  Q.  Were you aware --

16  A.  -- to testify to the grand jury.

17  Q.  Were you aware that Nancy Rogers had told Dr. Ashqar that

18  the FBI told him that they weren't interested in him, it was

19  the Israelis that were interested in him?

20  A.  No.

21  Q.  Okay.

22          Now, do you know as you sit there today what things

23  have happened to Dr. Ashqar and Dr. Ashqar's family as a

24  result of the Israelis' interest in him?

25  A.  No.

Bray - cross

157

1   Q.  Do you know whether Dr. Ashqar or any members of his

2   family have been arrested or held by the Israelis?

3   A.  No.

4   Q.  So, you can't say of yourself whether he had a real fear

5   of information falling into the hands of the Israelis, can

6   you?

7   A.  No, I can't say what's going on in his mind.  He wouldn't

8   tell me.

9   Q.  Now, you talked to us today about offering Dr. Ashqar the

10  Witness Protection Program, right?

11  A.  I didn't use that term; but, yes, I know what you're

12  referring to.

13  Q.  Well, whether you -- we were talking about the witness --

14  that's how you were going to protect him, right?  If he made

15  any statements, he was going to have to go into the Witness

16  Protection Program, right?

17  A.  That's one avenue.

18  Q.  Well, tell me how else you were going to protect him.

19  A.  I wouldn't tell you that.

20  Q.  Well, you said you were going to protect him.  You

21  testified.  What were you going to do to protect him?

22  A.  I --

23          MR. FERGUSON:  Objection, Judge.

24          MR. MOFFITT:  I don't -- I think this is fair.  They

25  were the ones who opened this door.

1          MR. FERGUSON:  The offer was made to him in the grand

2    jury.  It wasn't made by this agent.  And the agent's

3    disclosure of methods and means by which we would protect him,

4    it is privileged information.

5          THE COURT:  Mr. Moffitt?

6          MR. MOFFITT:  Well, I think -- the government made a

7    big deal out of that.  He's got to be satisfied that he's

8    going to be, in fact, protected.

9          THE COURT:  But I do not think this witness said he

10   would protect him.  I mean, you are asking this witness to

11   testify --

12         MR. MOFFITT:  I said, "How was he going to be

13   protected?"

14         THE COURT:  That is not what you said.

15         Rephrase.  Ask him your question.

16         MR. MOFFITT:  I'm sorry.

17   BY MR. MOFFITT:

18   Q.  How was he going to be protected?

19         MR. FERGUSON:  Same objection, Judge.

20         THE COURT:  Sustained.

21   BY MR. MOFFITT:

22   Q.  Well, there was a discussion about witness protection,

23   wasn't there?

24         THE COURT:  Where, Mr. Moffitt?

25         MR. MOFFITT:  In the grand jury.

1    BY THE WITNESS:

2    A.   There was discussions about permitting him to stay in the

3    United States.  And there were discussions about, if he was

4    fearful for his personal safety and that of his family --

5    BY MR. MOFFITT:

6    Q.   Okay.

7    A.   -- that the U.S. government would assist --

8    Q.   Let me see if I --

9    A.   -- in ensuring his safety.

10   Q.   Now, also, there were conversations about his protection

11   in Mississippi, weren't there?

12          THE COURT:  In the grand jury or --

13          MR. MOFFITT:  In Mississippi, in the early '90s, when

14   the FBI first came to the University of Mississippi and began

15   asking questions about Dr. Ashqar.

16   BY THE WITNESS:

17   A.   I believe there were.  I believe there were discussions

18   had about -- held about -- how if he decided to cooperate and

19   he was fearful of his personal safety and security.

20   BY MR. MOFFITT:

21   Q.   Well, he wasn't just fearful of his personal safety.  He

22   had family that was still in Israel or in the occupied

23   territories, correct?

24   A.   I don't know that, but that would be logical, yes.

25   Q.   It would be logical.

Bray - cross

160

1          You don't -- this is a man you were pursuing.  You

2    don't know anything about him and his personal life?

3    A.  I don't know where his family members were physically

4    located in the early 1990s.

5    Q.  In that place that's not in your computer, okay?

6          Did you ask him, did he have any siblings?

7    A.  I didn't ask him anything.

8    Q.  You never asked him anything.  I thought you asked him

9    about where he was born.

10   A.  I didn't ask him that.

11   Q.  Oh.

12         I thought you said he told you that he was born in

13   Jordan.

14   A.  The agent that was processing him for fingerprinting asked

15   him that.

16   Q.  Well, you have no idea where his family was, correct?

17   A.  Correct.

18   Q.  Okay.

19   A.  I have no -- again, I know what he said as far as what

20   village -- and I apologize if I'm mispronouncing it --

21   Tulkarim, something to that effect.

22   Q.  But --

23   A.  I don't know if that --

24   Q.  That really -- that was the village that he was told to

25   say was in Jordan?

Bray - cross

161

1    A.  I don't know if his -- that's where his immediate family

2    still lives, lived at the time.  That information, you are

3    correct, sir, I do not know.

4    Q.  Okay.

5         Now, since we can talk about the Witness Protection

6    Program -- all right? -- that was one of the ways you would

7    protect somebody like Dr. Ashqar, right?

8    A.  Yes.

9         MR. MOFFITT:  Is there something that Mr. Ferguson

10   wanted to say to you that you couldn't say, you had to look at

11   him?

12        THE WITNESS:  He stood up.  That's why I looked at

13   him.

14        MR. FERGUSON:  Stood up.

15        THE COURT:  The record will reflect that he stood up.

16   BY MR. MOFFITT:

17   Q.  They would change his identity, right?  In the Witness

18   Protection Program, they change people's identity?

19        MR. FERGUSON:  I'm going to object to the question as

20   relevant because the offer was made; he did not take up on the

21   offer; he did not pursue it in any way, shape or form.  So,

22   what that offer would have been comprised of is completely

23   irrelevant here because he did not pursue it.

24        MR. MOFFITT:  Well --

25        THE COURT:  Mr. Moffitt --

1          MR. MOFFITT:  It is not irrelevant.

2          THE COURT:  Mr. Moffitt, listen to my question first.

3          This is my question in terms of relevance:  If

4    something was conveyed to Dr. Ashqar in terms of what type of

5    protection would be offered to him, I can see the relevance to

6    that.  But you are now asking about general protections that

7    some program might afford, without any evidence that --

8          MR. MOFFITT:  I'll lay a foundation.

9          THE COURT:  -- such information was ever conveyed to

10   Dr. Ashqar.

11         MR. MOFFITT:  I'll lay a foundation.

12         THE COURT:  Okay.

13   BY MR. MOFFITT:

14   Q.  How many conversations did the FBI have with Dr. Ashqar in

15   Mississippi?

16   A.  I would say approximately a dozen.

17   Q.  And from what years to what years?

18   A.  Again, without looking at the reports, 1992/1993/1994 time

19   frame.

20   Q.  Okay.

21         And there were many topics that Dr. Ashqar had

22   discussions with the FBI about where he had no problem giving

23   them information, correct?

24   A.  Correct.

25   Q.  Discussed about the history of the Middle East, various

Bray - cross

1    factions, correct?

2    A.  Yes.

3    Q.  All of those things.

4         There came a point where he began to be asked more

5    particular questions about people, correct?

6    A.  I believe so.  Generally, yes.

7    Q.  Over the course of these 12 -- all right.

8         Are you aware of what, if any, offers were made to

9    Dr. Ashqar during the course of the discussions he had with

10   the FBI?

11   A.  Again, in general terms that we have discussed, I recall

12   there being conversations with Dr. Ashqar about whether or not

13   he was fearful of his personal safety and security and that of

14   his family.

15   Q.  All right.

16        But this is a family you don't know how far it

17   extended, right?  You don't know whether he's talking about

18   his family here, whether he's talking about his family over

19   there, because you never inquired -- or it was never inquired

20   of -- what portion of his family that he was talking about,

21   right?

22   A.  I don't know if it was ever inquired or not.

23   Q.  All right.

24        Well, you certainly were aware of the interviews in

25   Mississippi, right?

Bray - cross

164

1  A.  Yes, sir.

2  Q.  Did you talk to the agents down there?

3  A.  I believe we talked with some because they were called as

4  witnesses at trial.

5  Q.  Did you talk to an Assistant United States Attorney named

6  Hailman?

7  A.  No.

8  Q.  You know that Dr. Ashqar was interviewed by an Assistant

9  United States Attorney named Hailman?

10  A.  Yes.

11  Q.  Do you know what offers Mr. Hailman made regarding what

12  Dr. Ashqar's alternatives were?

13  A.  Offers about what his alternatives were?

14  Q.  Whether he could talk; if he didn't talk, what was going

15  to happen to him; what offers they made to him if he talked.

16        Were you aware of any of those?

17  A.  I was aware there were general conversations along those

18  lines.

19  Q.  Well, what did those general conversations that you're

20  aware of, what do you recall of them?

21  A.  I know that AUSA Hailman talked to Dr. Ashqar.  I can't --

22  it seems like there were conversations about potential

23  charges.

24  Q.  That he might be charged?

25  A.  That he might be charged, might be contemplated being

Bray - cross

165

1   charged; whether or not Dr. Ashqar was willing to cooperate

2   with the U.S. government.

3   Q.  And by that, you mean name names, right?

4   A.  Provide information, name names.

5   Q.  Well, he had provided information; had he not?

6   A.  General.  General information.

7   Q.  He had no problem providing that information, correct?

8   A.  No.

9   Q.  But as early as that time, he told members of the FBI that

10  he was not going to name names, correct, from that -- as early

11  as that period of time?

12  A.  I would say that's a good characterization, yes.

13  Q.  All right.

14        And do you recall or do you know whether Mr. Hailman

15  offered the choice if he did not talk to them -- to the FBI or

16  so-called, as you say, cooperate -- that they would tell

17  people that he had cooperated and Hamas would hurt him?

18  A.  I'm not aware of that.

19  Q.  You're not aware of that.

20        Do you know whether Mr. Hailman offered him, if he

21  cooperated, a position in Yasir Arafat's government?

22  A.  No.

23  Q.  But you haven't talked to Mr. Hailman?

24  A.  I haven't talked to Mr. Hailman, no.

25  Q.  So, you don't know what Mr. Hailman might have offered

Bray - cross

166

1    him?

2    A.  Correct.

3    Q.  Do you know that in that period of time that he was being

4    interviewed by -- in Mississippi, the investigation was being

5    moved to New York, right?

6    A.  The investigation of Dr. Ashqar?

7    Q.  The investigation of Hamas.

8    A.  I don't know what you mean by that, sir.

9    Q.  Well, somebody was investigating Dr. Ashqar or Hamas or

10   something in Mississippi, right?

11   A.  Yes.

12   Q.  Well, what were you investigating in Mississippi when you

13   were interviewing Dr. Ashqar on those dozen occasions?

14   A.  Dr. Ashqar and his activities with Hamas.

15   Q.  So, Dr. Ashqar was the target of that investigation?

16   A.  The investigation in Mississippi?

17   Q.  Uh-huh.

18   A.  Yes.

19   Q.  Was he ever told he was the target of that investigation?

20   A.  I don't know.

21   Q.  You don't know?

22   A.  No.

23   Q.  All right.

24          That investigation, however, ended, right?

25   A.  No.

1    Q.  Well, it got -- what happened to it, sir?

2    A.  He moved to another territory.

3    Q.  He moved to another ter- -- I thought New York was a

4    state?

5    A.  Well, he didn't move to New York.

6    Q.  Well, what territory of the United States did he move to?

7    A.  Virginia.

8    Q.  Oh, Virginia's a territory.  I thought it was a

9    commonwealth?

10   A.  Well, territory of the FBI.  I know what you're saying.

11   Q.  Okay.

12        Help me.  So, a Mississippi federal investigation

13   can't investigate somebody who moved from Mississippi to

14   Virginia?

15   A.  No, the federal government certainly can investigate

16   somebody that moves from Mississippi to Virginia.

17   Q.  All right.

18        But you're saying the reason that that investigation

19   ended was because he moved?

20   A.  I said the investigation did not end.  You said it ended.

21   I said, no, it did not.

22   Q.  All right.

23        Well, what happened to the Mississippi investigation

24   when he moved, and why are we quibbling over this?

25   A.  That investigation moved with him.

Bray - cross

168

1  Q.  And where did that investigation move?

2  A.  Washington field office.

3  Q.  All right.  Okay.

4       And did Washington field office have any additional

5  interviews with Dr. Ashqar after the dozen interviews it had

6  undertaken in Mississippi?

7  A.  I do not believe so, no.

8  Q.  All right.

9       And did that investigation move, again?

10  A.  Yes.

11  Q.  And when did it move, again?

12  A.  2003/2004 time period.

13  Q.  All right.

14       Well, wasn't there an investigation in New York, sir?

15  A.  I believe you're referring to Mousa Abu Marzook?

16  Q.  Well, let me ask you something.  Help me because I'm kind

17  of lost.

18       Was Dr. Ashqar -- I think you talked about it this

19  morning -- subpoenaed in New York?

20  A.  Yes.

21  Q.  Well, what was going on there?

22  A.  Extradition proceedings of Dr. -- or of Mousa Abu Marzook.

23  Q.  He was subpoenaed to a grand jury regarding extradition

24  proceedings?

25  A.  Well, they were also investigating Mousa Abu Marzook, I

Bray - cross

169

1    believe.

2    Q.  Right.

3          Because, generally, you don't subpoena people for

4    purposes of extradition, do you?

5    A.  I don't know.  No, I would -- I mean, generally, the grand

6    jury's used to conduct a criminal investigation.

7    Q.  Right.

8          So -- and an extradition is not typically considered

9    that kind of investigation, is it, that you would subpoena

10   somebody before a grand jury?

11   A.  I would say typically not, no.

12   Q.  Okay.

13         So, something was being investigated in 1998,

14   correct?

15   A.  Yes.

16   Q.  And Dr. Ashqar, who was a target of another investigation,

17   was subpoenaed to New York to give testimony?

18   A.  Correct.

19   Q.  Did anybody in -- you looked at that grand jury testimony,

20   right?

21   A.  New York, yes.

22   Q.  Did anybody tell Dr. Ashqar that he was a target of an

23   investigation in Washington, D.C., when he was called to

24   testify in New York?

25   A.  No.

1   Q.  And what happened in New York was a continuation of what

2   happened in Mississippi, right?  Dr. Ashqar told them that he

3   was not going to testify, correct?  He was not going to name

4   names?

5   A.  Correct.  He did not provide information that the grand

6   jury sought.

7   Q.  And, in fact, he made the same statement in New York that

8   he made here in Chicago?

9   A.  Essentially, yes.

10  Q.  All right.

11        And that statement was that people were fighting for

12  freedom and he was not going to name them because it was

13  against the people in his country, right?

14  A.  Essentially, yes.

15  Q.  Essentially.

16        And Dr. Ashqar was held in civil contempt, correct?

17  A.  Yes.

18  Q.  He actually went to jail, correct?

19  A.  Yes, he did.

20  Q.  And had a hunger strike, right?

21  A.  That is correct.

22  Q.  And ultimately was released after six months, right?

23  A.  Yes.

24  Q.  And was never charged in New York with criminal contempt,

25  correct?

Bray - cross

1   A.   That is correct.

2   Q.   So, by the time your investigation started in 2002, you

3   were aware that Dr. Ashqar was not willing to name names in

4   Mississippi, correct?

5   A.   Correct.

6   Q.   Was not willing to name names in New York, correct?

7   A.   Correct.

8   Q.   That he even went to jail to avoid naming names, right?

9   A.   Correct.

10  Q.   Took the position it was against his religion and against

11  his feelings of Palestinian liberation; and, he did that

12  openly and without prompting, correct?

13  A.   Yes.

14  Q.   Now -- so, by the time you subpoenaed him, you knew that

15  this was a man who was willing to accept contempt rather than

16  name names?

17  A.   I knew he had done it in New York in 1998.  I knew that

18  FBI agents in Oxford, Mississippi, had attempted to get his

19  cooperation.

20  Q.   And you knew that he had been at least offered some form

21  of protection in both places, correct?

22  A.   Yes.

23  Q.   Now -- yet you were going to base your investigation in

24  Chicago on a man who had refused to test- -- who had refused

25  to "cooperate," on what he considered to be his principles, in

1    Mississippi and refused to testify upon those same principles

2    in New York, right?

3    A.  You say base our investigation.  He was called to the

4    grand jury in our investigation, yes.

5    Q.  All right.

6           But those are -- that's information that you had

7    before he was called, correct?

8    A.  Yes, sir.

9    Q.  All right.

10          Now, do you know what, if anything, was going on with

11   his family in 19- -- in the occupied territories in 1998, when

12   he was called before the grand jury?

13   A.  No.

14   Q.  Do you know how many members of his family might have been

15   in jail or imprisoned by the Israelis at that time?

16   A.  No.

17   Q.  All right.

18          And during the course of this whole affair with

19   Dr. Ashqar -- which began sometime in the early '90s, ended

20   with his failure to testify in your grand jury -- do you have

21   any idea what, if anything, was happening in the occupied

22   territories to members of Dr. Ashqar's family?

23   A.  No.

24   Q.  Now, Dr. Ashqar is not a citizen of the United States,

25   correct?

Bray - cross

1    A.   That is correct.

2    Q.   In fact, he sought asylum.  You talked about that today,

3    right?

4    A.   Yes, he was seeking asylum here.

5    Q.   On the basis of his treatment and the treatment of his

6    family in the occupied territories, correct?

7    A.   Correct.

8    Q.   You've seen the asylum petition, right?

9    A.   (No response.)

10   Q.   Right?

11   A.   I'm thinking.

12          (Brief pause.)

13   BY THE WITNESS:

14   A.   I know of -- I believe I have seen it, yes.

15   BY MR. MOFFITT:

16   Q.   And you were aware that it raised the conditions that he

17   had lived under in the occupied territories?

18   A.   Again, I believe I've seen it.  I don't know that I read

19   the entire document.

20   Q.   Well, this was a guy -- let me see if I understand.  This

21   is a guy you wanted to testify, right?

22   A.   Yes, sir.

23   Q.   You didn't want to know as much about him as possible

24   before you called him?

25   A.   I didn't look into his family's situation in the occupied

Bray - cross

174

1  territories --

2  Q.  You didn't --

3  A.  -- no.

4  Q.  You didn't want to know what might influence whether or

5  not he was willing to testify?  That -- you weren't curious

6  about that?

7  A.  I would have loved to talk to him about it, yes.

8  Q.  All right.

9       But you had sources of information about him that

10  didn't require you to talk to him, right?  For instance, an

11  asylum petition?

12  A.  Correct, I knew that there was asylum proceedings that had

13  been going on for some time.

14       At the time of our seeking to have him into the grand

15  jury, those had ended and he agreed to voluntarily depart the

16  United States.

17  Q.  Well, did you monitor those asylum proceedings?

18  A.  Me personally, no.

19  Q.  Well, let me ask you this:  I know you didn't do very much

20  personally; but, as a case agent, did you have somebody

21  monitoring the asylum proceedings?

22  A.  Agents at the Washington field office were.

23  Q.  And who were they?

24  A.  What were their names?

25  Q.  Yes.

1   A.   Monica Traxel.

2   Q.   So, you were curious about the asylum proceeding, right?

3   A.   I was curious about the status.

4   Q.   Oh, you weren't curious about the information that was

5   being revealed?

6   A.   I don't remember focusing it on the time, no.

7   Q.   This was a guy, again, you wanted to testify, right?  You

8   wanted him to cooperate --

9   A.   Yes.

10  Q.   -- right?

11       And this was a source of information about him, about

12  things that he thought about and all of that, but it wasn't --

13  you weren't curious about it at all?

14  A.   Again --

15            MR. FERGUSON:  Judge?

16            THE COURT:  Sustained --

17            MR. FERGUSON:  Just so we're clear --

18            THE COURT:  -- on form.

19            MR. FERGUSON:  -- the witness does not question

20  people in the grand jury; the prosecutors question.

21            MR. MOFFITT:  The witness gets his information --

22            THE COURT:  Mr. Moffitt, ask your next question,

23  please.

24            MR. MOFFITT:  Well -- okay.

25  BY MR. MOFFITT:

Bray - cross

1   Q.  You don't question witnesses in the grand jury, do you?

2   A.  No.  I'm not even permitted to be in there when they are

3   questioned.

4   Q.  But you provide information to these folks (indicating),

5   don't you?

6   A.  Yes.

7   Q.  And that was the way you conducted the grand jury in this

8   case, wasn't it?

9   A.  Yes.

10  Q.  You provided information?

11  A.  Sure.

12  Q.  Okay.

13          Now, let me ask you a question.  Holy Land was

14  ultimately indicted, correct?

15  A.  Yes.

16  Q.  And they were indicted in Texas?

17  A.  Yes.

18  Q.  When?

19  A.  I believe they were indicted 2004.

20  Q.  All right.

21          And that grand jury terminated around the same time

22  your grand jury terminated, right?

23  A.  I don't know.

24  Q.  Well, your grand jury terminated 2004, right, by the

25  return of an indictment?

Bray - cross

1  A.  We got an indictment 2004, yes.

2  Q.  Okay.

3        And Holy Land got an indictment in 2004, correct?

4  A.  I believe so, yes.

5  Q.  Now, the Holy Land indictment involved Holy Land

6  Foundation for Relief and Development, correct?

7  A.  Yes, sir.

8  Q.  Shukri Abu Baker, correct?

9  A.  Yes, sir.

10  Q.  Muhammad El-Mezain, correct?

11  A.  Correct.

12  Q.  Ghassan Elashi, E-l-a-s-h-i?

13  A.  Yes.

14  Q.  Haitham Maghawri -- h-a-w-r-i?

15  A.  Yes.

16  Q.  Akram Mishal, right?

17  A.  I believe so, yes.

18  Q.  Mufid Abdulqader?  And I've butchered that.

19  A.  Yeah, I -- I believe so, based upon your pronunciation

20  there.

21  Q.  Abdulrahman Odeh, right?

22  A.  Yes.

23  Q.  And they were indicted and Dr. Ashqar didn't testify,

24  correct?

25  A.  Correct.

1   Q.  Now --

2           THE COURT:  Mr. Moffitt, if you have a document with

3   the spelling of those names --

4           MR. MOFFITT:  Yes.

5           THE COURT:  -- I know Joe would appreciate it.

6           MR. MOFFITT:  I have a document -- I have two

7   documents, in fact.

8           THE COURT:  Okay.  Thank you.

9           (Document tendered.)

10  BY MR. MOFFITT:

11  Q.  Now, in the course of -- that was also an investigation of

12  Hamas, correct?

13  A.  Yeah.  The grand jury rendered an indictment that included

14  material support charges.

15  Q.  Wasn't their investigation -- you know what their

16  investigation was, right?  It was about Hamas, wasn't it, and

17  Holy Land's connection to Hamas?

18  A.  Yes.

19  Q.  All right.

20          I mean, if Holy Land wasn't connected to Hamas, there

21  wouldn't have been any reason to indict him, right?

22  A.  Correct.

23  Q.  Okay.

24          Now --

25          MR. MOFFITT:  Your Honor, can we get another copy of

Bray - cross

179

1    this?  I'm sorry, I didn't bring another copy.

2           THE COURT:  I do not have a copy machine in here.

3           What is it?

4           MR. MOFFITT:  It is a court document from Holy Land.

5    I think it was attached to my original motion when I came.

6           THE COURT:  Is that what you gave to Joe?

7           MR. MOFFITT:  No, I gave him another document from

8    Holy Land.

9           THE COURT:  Are you going to seek to introduce this

10   document?

11          What are you --

12          MR. MOFFITT:  I'm going to ask him some questions

13   about it.

14          THE COURT:  Okay.

15          Have you shown Mr. Ferguson the document?

16          MR. MOFFITT:  I think they saw it when I filed my

17   motion.  I think it was an attachment to my original motion.

18          MR. FERGUSON:  It was an attachment to the

19   discovery -- sentencing discovery -- motion, but we don't

20   have --

21          MR. MOFFITT:  Maybe I have a copy of that motion.

22          (Brief pause.)

23          MR. MOFFITT:  I'm sorry, I didn't bring it.  I'm

24   sorry.

25          THE COURT:  Show the agent the document.

Bray - cross

180

1           Do you have it marked?

2           MR. MOFFITT:  No, I have not marked it.

3           THE COURT:  Okay.

4           Mark it for the record, please, and show it to the

5  agent.

6           MR. MOFFITT:  I'd ask the Court to take judicial

7  notice of this.  This is a document filed by the government in

8  Holy Land.

9           THE COURT:  I am not familiar with it, either.

10          (Document tendered to the Court.)

11          THE COURT:  I can take judicial notice that it is

12  Attachment A in the United States District Court for the

13  Northern District of Texas, Dallas Division, "List of

14  Unindicted Co-Conspirators and/or Joint Venturers."

15          Beyond that, Mr. Moffitt, I am not familiar with that

16  case.  I do not know if this was filed there.  I do not --

17  there is no certification.

18          MR. MOFFITT:  Let me --

19          THE COURT:  I do not know if Mr. Ferguson has any

20  knowledge of it, if he will stipulate to it.  I just do not

21  know.

22          You are asking me to take judicial notice of

23  something that I am not familiar with.

24          MR. MOFFITT:  Okay.

25          MR. FERGUSON:  Judge, I don't know the docket in the

1    Texas case.

2            THE COURT:  And I do not know if Agent Bray -- ask

3    the witness.  Maybe he knows.

4            (Document tendered to counsel.)

5    BY MR. MOFFITT:

6    Q.  The Texas case was a conspiracy?

7    A.  Yes.

8    Q.  In fact, the case agent in the Texas case -- I forget his

9    name -- testified in our case against Dr. Ashqar; did he not?

10   A.  Yes.

11   Q.  What was his name?  Miranda was his name?

12   A.  Robert Miranda.

13   Q.  He was the case agent in the Texas case, correct?

14   A.  Yes, one of the case agents.

15   Q.  The case that Mr. Ferguson -- well, let me ask you

16   something.

17   A.  Yes, sir.

18   Q.  In the course of your investigation and Agent Miranda's

19   investigation, did you all have conversations with one

20   another?

21   A.  Yes.

22   Q.  And did you have conversations about the progress of the

23   investigation?

24   A.  Yes.

25   Q.  Did you relay those conversations to either Mr. Ferguson,

Bray - cross

182

1  Mr. Schar or anybody associated with the prosecution of

2  Dr. Ashqar?

3  A.  To a degree.  A lot of our conversations -- most of our

4  conversations -- dealt with translation matters.

5  Q.  Well, you had enough conversation with him that he became

6  the witness that was called with respect to the Philadelphia

7  meeting, right?

8  A.  Correct.

9       As I mentioned before, it was the Dallas Division

10  that essentially took ownership of that for purposes of

11  translating it.

12  Q.  All right.

13       Now, at the top of this document -- do you see that

14  at the very top?

15       Will you look at that for me, please?

16       (Document tendered.)

17  BY MR. MOFFITT:

18  Q.  Do you see the very top?

19  A.  Where it references what appears to be a case number,

20  document number, filed, et cetera?

21  Q.  Yes.

22  A.  Yes, sir.

23  Q.  That's in a different type than what's in the body of the

24  document; is it not?

25  A.  You mean typesetting?

Bray - cross

183

1  Q.  Yes.  Font.

2  A.  Font?

3         Appears to be.

4  Q.  All right.

5         And it references a case number 3-04-CR-00240,

6  correct?

7  A.  Yes.

8  Q.  Document No. 656-2, correct?

9  A.  Yes.

10  Q.  Filed on 05-29-2007, correct?

11  A.  Yes.

12  Q.  Page 1 of 11.

13         THE COURT:  Mr. Moffitt, if that document is the same

14  as the attachment to your motion filed on October 9th, here

15  are two copies.

16         (Documents tendered.)

17         MR. MOFFITT:  Yes, that is.  That's exactly the

18  document.

19  BY MR. MOFFITT:

20  Q.  And that document purports to be a list of unindicted

21  co-conspirators and joint venturers, correct?

22  A.  Yes.

23  Q.  And do you know how many people and entities are named in

24  the course of that document as unindicted co-conspirators and

25  joint venturers?

Bray - cross

184

1   A.   I do not.  I mean, I can --

2   Q.   Well, would the -- if I told you that I counted them and

3   it's 300, would that surprise you?

4   A.   Looking at this, no.

5   Q.   Okay.

6         Now, what I'd like you to do is help me for a second

7   -- because I don't want to take you through this whole

8   thing --

9   A.   Thank you.

10  Q.   -- all right?

11        But I'd like you to look at it -- take a few minutes

12  to look at it -- because I want to ask you a few things about

13  it with regard to how many of these people were subpoenaed

14  before your grand jury.

15  A.   Okay.

16        (Brief pause.)

17  BY MR. MOFFITT:

18  Q.   And when you come to one that was subpoenaed before your

19  grand jury, mark it.

20        (Document tendered.)

21        (Brief pause.)

22  BY MR. MOFFITT:

23  Q.   Done?

24  A.   Whenever you're ready, yes, sir.

25  Q.   Okay.

Bray - cross

185

1          May I -- I'll switch with you --

2    A.   Sure.

3    Q.   -- okay?

4    A.   You want your list back?  Okay.  Here's your pen.

5    Q.   No, I'll give you my list because I want to see who you --

6    and I want to also be fair to you because I don't want this to

7    be misconstrued, okay?

8    A.   Okay.

9          (Document tendered.)

10   BY MR. MOFFITT:

11   Q.   Now, you can --

12          THE COURT:  Just for the record, you have handed him

13   a copy of the document that he just marked?

14          MR. MOFFITT:  Yes.  Yes, ma'am.

15          THE COURT:  Okay.

16          MR. MOFFITT:  Yes, ma'am.

17   BY MR. MOFFITT:

18   Q.   Let me ask you a few questions, so that we can be fair.

19          This list of alleged co-conspirators and joint

20   venturers is broken up into several headings; am I right?

21   A.   In several pages or --

22   Q.   Headings.  Like, if you look at the first page, it has

23   "Item No. 1" and that's in bold type?

24   A.   Yes, sir.

25   Q.   And that "Item No. 1" says, "The following are individuals

1   who were -- " "who are or who were, in part, a part of the

2   Hamas social infrastructure in Israel and the Palestinian

3   territories," correct?

4   A.  Yes, sir.

5   Q.  All right.

6           And, obviously, these were not people that you could

7   subpoena, because they were in Israel or in the territories,

8   right?

9   A.  Yes.

10  Q.  So, we won't -- let's not talk about them.

11          And that goes on from 1 through 8 to 1 through 46,

12  correct?  And to 84 until it gets to 92, right?

13  A.  Correct.

14  Q.  Now, these were people who it was alleged that were part

15  of the Hamas social structure in Israel and the Palestinian

16  territories, right?

17  A.  Yes, that's what the caption is.

18  Q.  And this allegation was made about these people acting in

19  the territories and in Israel without the testimony of

20  Dr. Ashqar, correct?

21  A.  Correct.  Dr. Ashqar did not testify in this matter.

22  Q.  Okay.

23          So, that was 92 people who were in Israel and the

24  territories that were named as having some association Hamas

25  as a result of the investigation that occurred in Texas,

Bray - cross

187

1    right?

2    A.   It appears to be, yes.

3    Q.   All right.

4         Now, the next category is a category that begins,

5    "The following individuals -- " "The following are individuals

6    who participated in fundraising activities on the behalf of

7    the Holy Land Foundation for Relief and Development," correct?

8    A.   Yes, sir.

9    Q.   And the allegation was that Holy Land was acting to

10   provide money and resources and various other things to Hamas,

11   correct?

12   A.   Correct.

13   Q.   And the allegation was that that had begun even before

14   Hamas had been designated, correct?

15   A.   I believe that is the case, yes, sir.

16   Q.   All right.

17        And it doesn't tell us where these people were, does

18   it?

19   A.   What do you mean?  As far as that time continuum?

20   Q.   Category 2.  That Category 2.

21   A.   Oh, location of where they are?

22   Q.   Yes.

23   A.   No, it does not identify a location.

24   Q.   Do you recognize any of those people?

25   A.   The first one.

Bray - cross

188

1    Q.  All right.

2          Abdallah Azzam?

3    A.  Uh-huh.

4    Q.  And where is he?

5    A.  Well, I recognize the name.  I don't know who that --

6    Q.  Do you know whether any of these people were located in

7    the United States?

8    A.  I'm also aware of No. 21.  I'm not -- whether they are in

9    the United States, no, I -- I don't know that.

10   Q.  All right.

11         So, to be fair, you don't know whether you could have

12   subpoenaed the people in this group.

13         Did you look at the next page?  Because the group

14   goes on from 1 to 38?

15   A.  Yes, sir.

16   Q.  All right.

17         Do you recognize any of those names?

18   A.  In 1 through 38?

19   Q.  Uh-huh.

20   A.  Yes.

21   Q.  Okay.

22         Which ones do you recognize?

23   A.  No. 21.

24   Q.  21.

25         What's that name, sir?

1   A.   Jamal -- Jamil Hammami a/k/a Abu Hamza.

2   Q.   And he was named as an unindicted co-conspirator or a

3   joint venturer here?

4   A.   On this document, yes.

5   Q.   Yes.

6   A.   Yes.

7   Q.   Without Dr. Ashqar's testimony, right?

8   A.   Correct.

9   Q.   Any more in the 1 through 38?

10  A.   Yes, No. 25.

11  Q.   What's that name?

12  A.   Mahmud Zahar.

13  Q.   All right.

14        And what is his -- the best you can recall during the

15  period of your investigation, what was his residence?

16  A.   During our invest- -- I know -- I believe he's in Gaza

17  now.

18  Q.   I'm talking about in the years 2002 through the years

19  2004.

20  A.   I would assume that's where he was then, but I don't know.

21  Q.   Okay.

22        Any more in that 1 through 38?

23  A.   No. 27's a name I'm familiar with, but -- Mohamed Siam.

24  Q.   All right.

25        And do you have any idea where he was located --

Bray - cross

1   A.  No.

2   Q.  -- during the course of your investigation?

3   A.  No.

4   Q.  All right.

5        And who is Omar Al Ashqar?

6   A.  I don't know.

7   Q.  All right.

8        Do you know whether he's related to Dr. Ashqar or

9   not?

10  A.  I do not.

11  Q.  Okay.

12       And, again, all these people were named as joint

13  venturers or co-conspirators, again, without Dr. Ashqar's

14  testimony, right?

15  A.  It appears that way, yes.

16  Q.  All right.

17       The next category of people is Category No. 3, right?

18  That begins with, "The following are individuals and entities

19  who are or were members of the U.S. Muslim Brotherhood's

20  Palestine Committee and its organization," correct?

21  A.  Yes, sir.

22  Q.  Now, in the course of your investigation, were you aware

23  of a U.S. wing of the Muslim Brotherhood?

24  A.  I was aware of an organization referred to as the

25  Palestine Committee.  I think there was a Palestine Committee

Bray - cross

1   in the U.S. that drew its origins from the Muslim Brotherhood.

2   Q.  Well, this describes it as the U.S. Muslim's Brotherhood's

3   Palestine Committee, right?

4   A.  Yes.

5   Q.  Were you aware of a U.S. Muslim Brotherhood, first of all?

6   A.  Yes.

7   Q.  All right.

8        And were you aware that the U.S. Muslim Brotherhood

9   had a Palestine Committee?

10  A.  Yes.  I've seen documents where it's referred to as the

11  Palestine Committee.

12  Q.  All right.

13       And where did -- what was the source of those

14  documents?

15  A.  I believe we looked at one earlier today.  The source of

16  it was from Dr. Ashqar's apartment.  I believe -- and, again,

17  I would have to go back and look, as far as similar items

18  being found during the search warrant of Ismael El-Barasse.

19  Q.  Okay.

20       Now, is the Palestine -- the Muslim Brotherhood --

21  Hamas or is that something different?

22  A.  To my knowledge, Hamas had its origins from the Muslim

23  Brotherhood.

24  Q.  Well, is the Muslim Brotherhood Committee Hamas or is it

25  something different?

1    A.   I don't know.

2    Q.   All right.

3           Interestingly enough, you checked the first name that

4    you saw that was supposed to be an individual or an entity who

5    was a member of the U.S. Muslim Brotherhood Palestine

6    Committee, correct?

7           That first name is Abdelhaleem Ashqar, correct?

8    A.   Yes, sir.

9    Q.   So, their grand jury identified him as an unindicted

10   co-conspirator and a member of the Muslim Brotherhood, right?

11          MR. FERGUSON:   Judge, I'm going to object.  This is

12   not a grand jury document.  This is a prosecution document --

13          MR. MOFFITT:   All right.

14          Well, excuse me.

15          MR. FERGUSON:   -- apparently filed in the --

16          MR. MOFFITT:   I'll correct it.

17   BY MR. MOFFITT:

18   Q.   The prosecution.

19          THE COURT:   I am also -- I am going to sustain on

20   foundation.

21          This is a document from the Texas case.  You are

22   asking questions about what is on here and construction of

23   this document and the context of what is printed on here.  And

24   Agent Bray -- it is not even clear if he has ever seen this,

25   much less has any --

Bray - cross

1          MR. MOFFITT:  He was involved --

2          THE COURT:  -- investigating input.

3          MR. MOFFITT:  -- in an investigation that -- where

4    they were discussing what was going on here and in Texas.  One

5    of the Texas -- the lead investigator in the Texas

6    investigation testified in his case.  They exchanged and

7    shared information.

8          THE COURT:  But, again, you are asking him specific

9    questions about a document filed in Texas and interpreting

10   stuff on this document.

11          And you can try to lay the foundation, but you are

12   not there yet on your last question, Mr. Moffitt.

13          MR. MOFFITT:  Okay.

14   BY MR. MOFFITT:

15   Q.  You knew that the grand jury in Texas was investigating

16   the Holy Land Foundation, correct?

17   A.  Yes, sir.

18   Q.  You knew that the investigation involved the Holy Land

19   Foundation's connections to Hamas?

20   A.  Yes, sir.

21   Q.  And you knew that it had been alleged that the Holy Land

22   Foundation was the largest fundraiser for Hamas stationed in

23   the United States, correct?

24   A.  Yes, sir.

25   Q.  And you also knew, from your phone calls and the things

Bray - cross

194

1  that you overheard, that before Hamas ever was designated,

2  there was an Al-Aqsa fund that was raising money, correct?

3  A.  Yes.

4  Q.  That Al-Aqsa fund was related to Dr. Ashqar, correct?

5  A.  Correct.

6  Q.  And you knew, from the phone calls, that there were

7  discussions regarding Holy Land versus Al-Aqsa, which one was

8  going to survive, correct?

9  A.  Yes.

10  Q.  And all of those conversations happened in 1993, prior to

11  the designation of Hamas, correct, because that's when you had

12  the wiretap?

13  A.  Correct.  Roughly 1993, yes.

14  Q.  All right.

15         And you knew that Al-Aqsa stopped collecting money

16  and distributing money and Holy Land continued to distribute

17  money --

18  A.  Yes.

19  Q.  -- collect money?

20  A.  Yes, sir.

21  Q.  So, Al-Aqsa had stopped collecting money and providing

22  money prior to the designation of Hamas, correct?

23  A.  I'm not sure when it last collected money, but I would

24  assume that that's safe to say, that it was before 1995.

25  Q.  All right.

Bray - cross

195

1            So, that would have made it prior to the --

2  A.  To OFAC's designation.  The Treasury Department's --

3  Q.  The first designation?

4  A.  Yes, sir.  Yes, sir.

5  Q.  Okay.

6            And you were likewise -- likewise, I mean, they were

7  investigating a funding source for Hamas, and you were

8  investigating a funding source for Hamas, correct?

9  A.  We were investigating whether anyone was providing

10  material support to Hamas, yes.

11  Q.  So, you were both operating along similar lines, correct?

12  A.  To a degree, yes.

13  Q.  Okay.

14            Well, both of you were interested in funding sources

15  for Hamas, right?

16  A.  Yes.

17  Q.  And both of you were interested not only in funding

18  sources for Hamas in 1993, but you were both interested in

19  funding sources for Hamas post its designation, correct?

20  A.  Yes.

21  Q.  And I assume that you talked to one another often about

22  what was going on with these investigations?

23  A.  We were aware generally what was going on with each

24  other's investigations, but you make -- I wasn't in daily --

25  not even weekly conversations with him.

Bray - cross

196

1   Q.   Were you in bi-weekly conversations?

2   A.   No.

3   Q.   Did you talk to him every month?

4   A.   Some months, no; some months, yes.

5   Q.   All right.

6        And were you discussing people who were appearing

7   before the grand juries, witnesses to be called and who would

8   call whom?

9   A.   On occasion.  They were certainly aware of who we might be

10  calling to a grand jury.

11  Q.   And was -- likewise -- you aware of who they might be

12  calling to a grand jury?

13  A.   You know, I don't ever recall having a specific

14  conversation with them about who they were calling into the

15  grand jury, no.

16  Q.   All right.

17       Let me ask you a question.  When you had these

18  conversations would you make notes of the conversations that

19  you had with them?

20  A.   No.

21  Q.   Okay.

22  A.   Typically, not.

23  Q.   Well, did you ever make notes of the conversation?

24  A.   I may have.  I don't know.

25  Q.   Where are those notes now?

Bray - cross

197

1    A.   Who knows.

2    Q.   Who knows?

3    A.   I mean --

4    Q.   Excuse me?

5    A.   I didn't write up a 302 about a conversation I had with

6    another agent about what they were doing, if that's what

7    you're --

8    Q.   Did you ever write up an insert?

9    A.   No.

10   Q.   A blue sheet?

11   A.   Anything -- any communication discussions between our

12   office and their office, if it was written up, would have been

13   written up on a memorandum.

14   Q.   How about an Airtel?

15   A.   No.

16   Q.   You know what an Airtel is, right?

17   A.   I've seen them.

18   Q.   You've seen them?

19   A.   Yeah.  They don't get used too frequently anymore.

20   Q.   Okay.

21        That was a message between offices?

22   A.   Yes.

23   Q.   Okay.

24        And -- so, you all don't write messages between

25   offices anymore or you don't call them Airtels?

Bray - cross

198

1   A.   We don't call them Airtels.

2   Q.   Okay.

3          What do you call them when you write up a message

4   between offices?

5          MR. FERGUSON:  Judge, objection.  Relevance to all of

6   this.  I have no idea what this is for.

7          THE COURT:  Mr. Moffitt, it is --

8          MR. MOFFITT:  I want to know if --

9          THE COURT:  Wait, wait, wait, please.

10         It is quarter to 4:00.  I have given you a lot of

11  leeway in cross-examination.  What is the relevance of what

12  they call something?

13         MR. MOFFITT:  The reason is if I don't call it the

14  right name in front of this witness, he's not going to tell me

15  whether it was written.  So, I want to make sure that there's

16  no Jencks material that I have not received, because it's

17  important to me to know what communications went on between he

18  and the grand jury, who were pursuing what has to be described

19  as parallel lines.

20         THE COURT:  Why do you not just ask him if there was

21  any communication between him and the office regardless of

22  what it is called.

23         MR. MOFFITT:  Okay.

24  BY MR. MOFFITT:

25  Q.  Was there any written communication between the two

Bray - cross

1   offices regarding which way their investigations were going?

2   A.   Regarding which way our investigations were going?

3         I mean, there were -- again, there were --

4   Q.   Were there any written communications between the two

5   offices?

6   A.   Yes.

7   Q.   Were there written communications between the two offices

8   concerning the investigations?

9   A.   Yes.

10   Q.   Were there written office -- communications between the

11   two offices concerning witnesses?

12   A.   There may have been.  There were witnesses that we

13   interviewed jointly.

14   Q.   Okay.

15   A.   Which we would have turned over the 302s.

16   Q.   Uh-huh.

17         And were there --

18   A.   But there -- I'm sorry.

19   Q.   Were there witnesses that you interviewed for them, you

20   know, and turned over the 302s under that score?

21   A.   I don't recall.  It seems like there was an instance where

22   they were interested in somebody here, but I don't remember if

23   we interviewed them or not for them.

24   Q.   Is it fair to say that you all cooperated in this

25   investigation?

Bray - cross

1    A.   Sure.

2    Q.   Is it fair to say that you discussed leads and lines of

3    investigation?

4    A.   Yes.

5    Q.   All right.

6         Is it fair to say that you got some idea from them

7    about which way their investigation was pursuing or which way

8    it was going?

9    A.   In a general sense, yes.  And it was more focused, again,

10   on what documents, whether they be financial records or search

11   documents, or et cetera -- or you've mentioned the

12   Philadelphia meeting -- things that we had that they might

13   want to use.  As I mentioned, some of those items were

14   admitted as evidence in their trial.

15        That's what most of any conversations I might have

16   with them was about.  What was the status of translation, how

17   complete were they.  That encapsulates the majority of our

18   conversation.

19   Q.   Were you -- did you ever ask them if they had interviewed

20   anybody that might be helpful in your investigation?

21   A.   I don't recall.  I mean, I can query names, and if they've

22   interviewed them, I will know that.

23   Q.   Well, did you ever do that?

24   A.   Sure.  I query names all the time.

25   Q.   Did you ever do that in -- with respect to the Holy Land

Bray - cross

1   Foundation investigation?

2   A.  It wouldn't be limited to just the Holy Land Foundation.

3   Q.  I'm asking you about only the Holy Land Foundation

4   investigation.

5   A.  Did I ever go in and specifically query the Holy Land

6   Foundation to see if they had interviewed anybody that I was

7   interested in?

8   Q.  Yes.

9   A.  I don't recall doing that, no.

10  Q.  Okay.  All right.

11         There are names on this list that are also on the

12  phone list that you saw today, right?  Yassir Bushnaq's name

13  is on there?

14  A.  Yes.  Yes, sir.

15  Q.  Okay.

16         Do you know whether he was called in as a witness in

17  Holy Land?

18  A.  I do not.

19  Q.  All right.

20         It's somebody that you were interested in, right?

21  A.  Yes.

22  Q.  All right.

23         There's a name on here, Mr. Alamoudi, right?

24  A.  On the Dallas document you gave me?

25  Q.  Yes.

1                Let me see if I can find it.

2    A.   Yeah, if you direct me towards --

3    Q.   You know who that is, don't you?

4    A.   Yes.

5    Q.   Who is he?

6    A.   Well, I -- I know he was interviewed.  He was interviewed.

7    He's incarcerated, I believe, in Virginia.

8    Q.   He's cooperating with the government?

9    A.   Yes.

10   Q.   Was he called before your grand jury?

11   A.   No.

12                (Brief pause.)

13   BY MR. MOFFITT:

14   Q.   Now, the other information that was provided, the search

15   documents for Dr. Ashqar's home, those documents were provided

16   to the people in Texas, correct?

17   A.   That is correct.

18   Q.   The product of the bug with regard to Dr. Ashqar's home,

19   that information was provided in Texas, correct?

20   A.   Yes.

21   Q.   All right.

22                The Philadelphia meeting -- the bug of the

23   Philadelphia meeting -- that information was provided in

24   Texas, correct?

25   A.   Yes.

Bray - cross

1   Q.  Do you know whether that information was placed before the

2   grand jury?

3   A.  No.

4   Q.  All right.

5         Do you know whether any of that information was

6   utilized in obtaining an indictment with regard to the HLF?

7   A.  I've seen the indictment.  It's been a while since I've

8   seen it.  I can't say for sure.  Again, I know it was admitted

9   as evidence in their trial.

10  Q.  Okay.

11        Now, let me ask you another question.  You did not

12  expect that the verdict on the RICO count would go out -- go

13  the way that it did, did you?

14        MR. FERGUSON:  Objection.  Relevance.

15        MR. MOFFITT:  Bias.

16        THE COURT:  Bias?

17        MR. MOFFITT:  Bias.  That he's angry and part of the

18  reason he's testifying in the manner that he is, is that he's

19  angry that he didn't win.

20        MR. FERGUSON:  I'll lift the objection and let the

21  agent answer.  It's fine.

22        THE COURT:  Okay.

23        Go ahead.

24  BY THE WITNESS:

25  A.  That is absolutely not correct.

Bray - cross

204

1   BY MR. MOFFITT:

2   Q.  You had --

3   A.  I'm not angry at all.

4   Q.  Okay.

5        You had spent how many years involved in this

6   investigation?

7   A.  Five.

8   Q.  Five?

9   A.  Part of the time as case agent.  I supervised the squad

10  that eventually took it to trial.

11  Q.  Important case?

12  A.  Yeah, it was an important case, sure.

13  Q.  You wanted to win?

14  A.  Sure.

15  Q.  All right.

16       Did you plan the party for after you won?

17  A.  No.

18       MR. MOFFITT:  Let me check.

19       (Brief pause.)

20  BY MR. MOFFITT:

21  Q.  At any point in your investigation and your attempts to

22  get Dr. Ashqar to testify, did you know what was going on

23  between the Israeli authorities and any members of

24  Dr. Ashqar's family?

25  A.  No.

1           MR. MOFFITT:  I think I'm done.

2           THE COURT:  Thank you, Mr. Moffitt.

3           Any redirect?

4           MR. FERGUSON:  I just have one question, Judge.

5                     REDIRECT EXAMINATION

6    BY MR. FERGUSON:

7    Q.  Special Agent Bray, do you want me --

8           THE COURT:  Will you stand, please, Mr. Ferguson?

9           MR. FERGUSON:  I'm sorry.

10   BY MR. FERGUSON:

11   Q.  Special Agent Bray, do you want me to ask any more

12   questions?

13   A.  No, I do not.

14          MR. FERGUSON:  I have no other questions, Judge.

15          THE COURT:  You may step down.

16          THE WITNESS:  Thank you.

17          (Witness excused.)

18          THE COURT:  We are going to break for ten minutes.  I

19   will be back in ten minutes, and we will start with the

20   Presentence Investigation Report.

21          (Brief recess.)

22          MR. MOFFITT:  May we approach, your Honor?

23          THE COURT:  I am sorry?

24          MR. MOFFITT:  May we approach?

25          THE COURT:  Yes.

1          (Proceedings had at sidebar:)

2          MR. MOFFITT:  May I ask an adjournment at this

3     particular point?

4          I've got plane tickets back.  I don't know if I can

5     change them.  They were scheduled for 5:50 tonight.  We've

6     still got to get to the airport in the middle of the rush

7     hour.  Even if I were to leave now, I don't know if I could

8     get there.  I'm prepared to come back on the 13th.

9          THE COURT:  I cannot do the 13th.

10         MR. MOFFITT:  Well, I can do it --

11         MR. FERGUSON:  If the Court is prepared to proceed,

12     the government would like to proceed.

13         MR. MOFFITT:  I did not make plans to spend the

14     night.  I've also got a commitment that I made tomorrow.  I'd

15     ask some indulgence.

16         THE COURT:  When can you come back?

17         The problem is my schedule.

18         MR. MOFFITT:  Well, if you tell me what your schedule

19     is --

20         MR. SPIELFOGEL: :  The 19th was what Edna checked

21     out.

22         If you can't do it the 13th, the 19th?  How is that?

23         THE COURT:  How about the day before Thanksgiving?

24         MR. SCHAR:  The 21st.

25         MR. MOFFITT:  If I have to do it the day before

1    Thanksgiving, I will do it the day before Thanksgiving.

2            MR. SPIELFOGEL: :  We'll get it all done on that day.

3            THE COURT:  I do not want to ruin any -- if people

4    have travel plans, I --

5            MS. HAMILTON:  I won't be here, but you should go

6    ahead.

7            MR. SCHAR:  Ms. Hamilton will not be available, but

8    if that's the day --

9            MS. HAMILTON:  If that's the day --

10           MR. SPIELFOGEL: :  I'm leaving on Thanksgiving Day,

11   but that's -- we'll get it all done on the 21st.

12           MR. MOFFITT:  I mean, I have --

13           THE COURT:  We will get it done the morning of the

14   21st.

15           MR. SPIELFOGEL: :  Okay.

16           MR. MOFFITT:  That's fine.

17           MR. SPIELFOGEL: :  Great.

18           MR. MOFFITT:  That's fine.  I mean, I have he guests

19   coming, but I will be here on the 21st.

20           MR. SPIELFOGEL: :  Do you want us here at 3:00 a.m.?

21           (Laughter.)

22           THE COURT:  Do not --

23           MR. MOFFITT:  Don't --

24           THE COURT:  Do not tempt me.

25           The 19th is full, and I cannot do the 20th.

1              The 21st.

2              MR. SCHAR:  That's fine.

3              THE COURT:  Either that or the week after

4    Thanksgiving.  But I would rather --

5              MR. SCHAR:  I'd rather do --

6              THE COURT:  -- do it sooner.

7              MR. MOFFITT:  I would rather do the 21st.

8              THE COURT:  Okay.

9              MR. MOFFITT:  Okay.

10             MR. SCHAR:  There's no other day next week, Judge,

11   that would work?  The 15th or 16th?

12             THE COURT:  I cannot because of my schedule.

13             MR. SCHAR:  21st.

14             MR. SPIELFOGEL: :  10:00 o'clock?

15             MR. SCHAR:  9:00 a.m.?

16             MR. FERGUSON:  8:30?

17             THE COURT:  Theresa, will you grab my red book for

18   the 21st.

19             Can we start at 9:00?

20             MR. MOFFITT:  Yes, ma'am.

21             (Brief pause.)

22             THE COURT:  9:00 works.  Maybe we will start at 8:30.

23             MR. FERGUSON:  The Probation Officer.

24             THE COURT:  Can you continue this -- Mr. Moffitt has

25   asked for a continuance.  Can you do this the day before

1    Thanksgiving?

2            MS. RICE:  Yes.

3            THE COURT:  Okay.

4            8:30?

5            MR. MOFFITT:  Well, I would generally take the 6:00

6    o'clock plane.  I'd be here at probably 7:00 o'clock your

7    time.  Then the only thing would be making --

8            THE COURT:  Okay.  We will start at 9:00.

9            MR. MOFFITT:  Okay.

10            MR. SPIELFOGEL: :  9:00?

11            THE COURT:  9:00 o'clock on the 21st.

12            MR. SPIELFOGEL: :  Thanks, Judge.

13            MR. MOFFITT:  Thank you very much.

14            MR. SCHAR:  Thank you, Judge.

15            (Proceedings had in open court:)

16            THE COURT:  You do not plan on calling any witnesses,

17    correct?

18            MR. MOFFITT:  No, ma'am.

19            THE COURT:  You have asked for a continuance because

20    of your schedule, Mr. Moffitt.  The 21st is open, but we would

21    need to end by 12:30.

22            Do you think --

23            MR. MOFFITT:  I believe that would not be a problem.

24            THE COURT:  Okay.

25            I am going to start it at 8:30.  I know you are

1     flying in, but you can -- I am accommodating you.

2                MR. MOFFITT:  I will be here.

3                THE COURT:  Okay.

4                At your request, I will continue this matter until

5     November 21st at 8:30.

6                You should be prepared to address the Guidelines.

7                MR. MOFFITT:  Yes, ma'am.

8                THE COURT:  I have heard all the testimony either

9     side is going to have.

10               I will tell you now I have thoroughly read each of

11    your submissions:  Your 170-plus-page submission; your

12    response; and, your reply.

13               I have read every letter that you have filed.  I do

14    not want you or do not need you to re-argue what you have

15    already submitted to the Court.  I am just letting you know

16    that right now.  I have thoroughly, thoroughly gone through

17    this.

18               I know there has been new information that we have

19    obtained today -- some new, some old.  You could certainly

20    incorporate that into your oral arguments.

21               There are two particular Guidelines that I think that

22    would be relevant to; namely, the 2J1.2(b)(2) enhancement and

23    the 3A1.4 enhancement.

24               So, I will hear your arguments on the relevancy and

25    how that plays in.  I will do that on the 21st.

1          So, I will, at your request, continue this until

2   November 21st at 8:30.

3          MR. MOFFITT:  Thank you, your Honor.

4          THE COURT:  Is there anything else?

5          MR. FERGUSON:  No, Judge.

6          MR. SCHAR:  No.

7          THE COURT:  Thank you.

8          (Whereupon, an adjournment was taken at 4:15 o'clock

9      p.m., until 8:30 o'clock a.m., November 21, 2007.)

10                    *     *     *     *     *

11   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
12

13

     _____     _____, 2007
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25